## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **Christian Healthcare Centers, Inc.,** | |
| Plaintiff, | |
| v. | |
| **Dana Nessel,** in her official capacity as Attorney General of Michigan; **John E. Johnson, Jr.,** in his official capacity as Executive Director of the Michigan Department of Civil Rights; **Portia L. Roberson, Zenna Faraj Elhason, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, and David Worthams,** in their official capacities as members of the Michigan Civil Rights Commission. | Case No.    1:22-cv-00787  **Verified Complaint** |
| Defendants. | |

**Introduction**

Plaintiff Christian Healthcare Centers, Inc. ("Christian Healthcare" or "the ministry") is a faith-based, non-profit, Michigan medical organization that provides high-quality healthcare to all while offering substantially reduced prices for patients with lower incomes who cannot afford quality care elsewhere. Because Christian Healthcare operates independently from the constraints associated with traditional insurance reimbursement, its doctors are free to focus on patients' physical and spiritual wellbeing rather than just the financial bottom line.

Christian Healthcare was founded to offer a distinctly Christian alternative to traditional primary care. Instead of rushing to hand out prescriptions and get to the next appointment, Christian Healthcare doctors often spend more than 30 minutes face-to-face with each patient, far more than the norm in traditional practices. That extra time is spent discussing the spiritual aspects of medical care, praying with patients, and meeting their medical, emotional, and spiritual needs. Christian Healthcare even offers on-site biblical counselors for patients needing extra support. Everything Christian Healthcare does is infused with its faith.

Christian Healthcare serves everybody regardless of race, religion, sex, sexual orientation, or gender identity. Indeed, Christian Healthcare has served and currently serves patients who identify as transgender and provides them the same high-quality care it provides all its patients. Like many religious ministries, Christian Healthcare cannot provide treatments or affirm views that contradict its religious beliefs. For example, Christian Healthcare cannot prescribe cross-sex hormones to facilitate a gender transition or use pronouns that do not accord with a person's biological sex, as that would violate its belief in the immutability of biological sex. Christian Healthcare also maintains the integrity of its religious mission by only hiring employees who share its faith. This is standard procedure in ministry and is perfectly legal under federal law and the law of nearly every state.

But not in Michigan. Michigan's civil-rights law—reinterpreted by courts to cover sexual orientation and gender identity—forbids this common practice. Under the guise of stopping discrimination, the law discriminates against religious organizations, requiring them to forfeit their religious character and hire people who do not share their faith. That same law also forces Christian Healthcare to prescribe cross-sex hormones and refer to patients in communications and medical records according to their stated gender identity, rather than their biological sex. All of this violates Christian Healthcare's religious convictions. In effect, the law requires Christian Healthcare to check its religious faith at the clinic door—the very faith that motivates the clinic to open its doors to help those in need.

Michigan law poses an imminent threat to Christian Healthcare. It needs to hire in the near term. And it needs to immediately publicize a job opening and explain its policies to prospective and current patients, yet it can do none of this without violating Michigan law. And Christian Healthcare is constantly at risk that current and future patients who identify as transgender request a service or form of address that it cannot provide. Christian Healthcare has already been asked to use preferred pronouns and to change patient sex in medical records and refused. And Christian Healthcare currently holds policies that violate Michigan's law and subject it to immediate investigation and prosecution.

The First and Fourteenth Amendments protect Christian Healthcare's religious and expressive freedom to do so. Just as the government cannot force a synagogue to hire Hindus or an Islamic cultural center to promote alcohol use, it cannot force Christian Healthcare to compromise its religious character, hire those who do not share its faith, or speak messages that contradict that faith. Christian Healthcare brings this lawsuit to protect its right to operate as a religious ministry. Ministries like Christian Healthcare should not have to choose between helping the

hurting and following their faith. They can do both. The Constitution requires it. And Michigan is better off for it.

## Jurisdiction and Venue

1.      This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) costs and attorneys' fees under 42 U.S.C. § 1988.

4.      Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Western District of Michigan; the effects of the challenged laws are felt here; Defendants can and do perform official duties here; and Defendants reside here.

## Plaintiff

5.      Christian Healthcare is a 501(c)(3) non-profit corporation organized under Michigan law with its principal place of business in Plainfield Charter Township, Michigan. A true and correct copy of its Articles of Incorporation is attached hereto as Exhibit 1.

6.      Christian Healthcare has a main clinic in Plainfield Charter Township and a secondary clinic in Newaygo, Michigan.

7.      All of the Christian Healthcare's employees work out of these clinics.

## Defendants

8.    Dana Nessel is Attorney General of Michigan and has the authority to administer, enforce, and prosecute Michigan's criminal laws, including Michigan's public-accommodations law.[1] MCL 761.1(r), MCL 767.40.

9.    Attorney General Nessel also represents the Michigan Department of Civil Rights (Department) and Michigan Civil Rights Commission (Commission) in any lawsuit filed under Michigan's civil-rights law. MCL 37.2602(b).

10.    John E. Johnson, Jr., is the Executive Director of the Department and is responsible for executing the Commission's policies. MCL 37.2602(a).

11.    Director Johnson has authority to receive, initiate, investigate, and file complaints alleging violations of Michigan's civil-rights law and administers, enforces, and prosecutes the law.[2] *See, e.g.*, MCL 37.2602, MCL 37.2603; MDCR Rules 37.4(2), 37.12, 37.16.

12.    Portia L. Roberson, Zenna Faraj Elhasan, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, and David Worthams are members of the Commission.

13.    The Commissioners have authority to initiate and file complaints alleging violations of Michigan's civil rights law and administer, enforce, and prosecute the law. *See, e.g.*, MCL 37.2601.

14.    The Attorney General, Department, and Commission have offices in Grand Rapids.

15.    All defendants are named in their official capacities.

---

[1] This complaint refers to MCL 750.146–47 as Michigan's public-accommodations law or Michigan's law.

[2] This complaint refers to the Elliott-Larsen Civil Rights Act (MCL 37.2101 *et seq.*) and its related regulations as Michigan's civil-rights law or Michigan's law.

**Factual Background**

<u>Christian Healthcare's religious beliefs motivate and permeate everything it does, including its medical practice.</u>

16.     In 2015, a group of like-minded Christians incorporated Christian Healthcare in Michigan as a non-profit, charitable corporation organized on a directorship basis.

17.     Christian Healthcare's purpose is to be a Christian medical-service ministry that serves the community by providing direct medical services to its patients consistent with the tenets of its faith and to communicate those beliefs to its patients and the public.

18.     Christian Healthcare considers itself to be a public religious ministry and its religious beliefs shape its purpose, mission, and activities.

19.     For example, Christian Healthcare seeks to fulfill the biblical mandate to care for one another by providing exceptional medical and wellness services. John 13:35; Galatians 6:2.

20.     Christian Healthcare uses its expertise and resources to help its patients flourish physically, emotionally, and spiritually by providing excellent healthcare.

21.     Christian Healthcare also desires to use its medical practice to share the Gospel with others—the belief that everyone needs forgiveness offered through God's son, Jesus—based on its belief that the Gospel leads to human flourishing.

22.     Christian Healthcare adopted as its motto Jeremiah 17:8: "They will be like a tree planted by the water that sends out its roots by the stream. It does not fear when heat comes; its leaves are always green. It has no worries in a year of drought and never fails to bear fruit."

23.     This motto reflects Christian Healthcare's vision of a medical practice rooted in its religious beliefs, just as the thriving tree in Jeremiah is planted by and drinks from a flowing stream of water.

24.      Christian Healthcare adopted a logo based on this image of the well-watered tree, surrounded by its core beliefs and values.



25.     As depicted in this logo, Christian Healthcare's primary value is to be "Christ Centered" in everything it does.

26.     Other values grow from this primary value.

27.     One of these is that Christian Healthcare is "Prayer Driven," which means that Christian Healthcare believes in the power of prayer, its employees pray for its members and its mission before they begin each workday, and its employees often pray with patients. Philippians 4:6.

7

28.     Another value is that Christian Healthcare is "Life Affirming," which means that Christian Healthcare believes that all human life is created by God and is sacred from conception to natural death.

29.     Christian Healthcare provides life-affirming medical care that values the unborn, the aged, the infirm, and the mentally or physically challenged as children of God, "created in Christ Jesus for good works." Ephesians 2:10.

30.     Another value is "Whole Person Focus," which means that Christian Healthcare providers view wellness wholistically and seek to heal patients physically, emotionally, and spiritually rather than simply treating the presenting physical ailment. Psalm 23:3.

31.     Another is "Community Building," which means that Christian Healthcare desires to use its medical practice to develop and care for its community, particularly those with the least access to high-quality healthcare.

32.     To foster these values, Christian Healthcare believes that its medical professionals and staff are called to be good managers of the resources that God has given to them. 1 Peter 4:10.

<u>Christian Healthcare's membership practices are based on its religious beliefs and convictions.</u>

33.     Christian Healthcare seeks to provide an alternative to what it views as the dehumanizing, assembly-line nature of insurance-based primary care that emphasizes processing a high number of patients as quickly as possible rather than emphasize quality time with each patient.

34.     Unlike the traditional fee-for-service model where patients (and their insurance carriers) are charged for specific services, Christian Healthcare follows a

model in which patients receive access to a package of services in return for a monthly membership fee.[3]

35.    Specifically, in return for the monthly fee, patients are entitled to unlimited physician visits, primary-care services, normal preventative care, medical management of chronic diseases, physical exams, nutritional assessments and coaching, wound care (stiches, splints, casts), routine lab testing, certain prescription medications, x-rays, and other services specified in the membership agreement.

36.    Christian Healthcare also offers on-site, short-term biblical counseling services for a nominal fee of $20 per visit.

37.    While Christian Healthcare offers a wide variety of primary-care services, like most primary-care practices, it does not have an emergency department and does not provide emergency care.

38.    Should a member experience potentially life-threatening injuries or symptoms, such a chest pain, sudden loss of speech, or suicidal ideation, Christian Healthcare encourages the member to call 9-1-1 or to get to the nearest emergency department as quickly as possible.

39.    Membership in Christian Healthcare and thus access to Christian Healthcare's medical services are open to all, regardless of race, color, religion, sex, sexual orientation, gender identity, disability, marital status, and any other protected characteristic, in obedience to Jesus' example of caring for people of all faiths and from all walks of life. Luke 7:1–10; John 4:1–26.

40.    For example, Christian Healthcare has served and continues to serve members who identify as transgender and would welcome many more.

---

[3] Christian Healthcare uses the word "member" the same way many gyms and retail stores do, referring to anyone who has signed the membership agreement and paid the monthly fees.

41.    While Christian Healthcare is a distinctly Christian organization, there is no requirement that members be professing Christians, and Christian Healthcare has members of many different faiths and no faith at all.

42.    Membership is open to all members of the public. Christian Healthcare is not selective in determining who can become a member and performs only perfunctory scrutiny before accepting a person's membership application.

43.    Outside of extraordinary circumstances, Christian Healthcare accepts prospective members into membership as long as they understand the nature of the practice, agree to the terms of the membership agreement, and agree to pay the monthly membership fee.

44.    Other than providing ordinary customer feedback, members play no role in the governance of Christian Healthcare; rather, Christian Healthcare is governed by a self-perpetuating Board of Directors.

45.    There is no requirement that Directors be members of Christian Healthcare, and many of the Directors are not members.

46.    Christian Healthcare offers a MemberCare Assistance Program by which it discounts—and in some cases nearly eliminates—the cost of membership based on household income out of obedience to the biblical mandate to care for those in need. Proverbs 19:17.

47.    This gives access to unlimited high-quality primary care and related services for a patient who otherwise would struggle to afford top-notch healthcare.

48.    Christian Healthcare funds the MemberCare Assistance Program by soliciting charitable donations and committing a minimum of 10% of its annual gross revenue to support the program.

49.    Christian Healthcare solicits charitable donations from like-minded Christians, churches, and ministries.

50.     For example, from 2018 to 2020, Christian Healthcare received almost one million dollars in cash donations and more than one-and-a-half million dollars in noncash donations. https://bit.ly/3K8WUFH.

51.     Donors typically contribute to Christian Healthcare because they agree with its religious mission and values and want to make distinctly Christian healthcare more widely available.

52.     Christian Healthcare does not receive any government funding.

53.     Christian Healthcare encourages the public to inquire about membership and to become members by responding to telephone calls from the public, previously posting its Membership Agreement on its website (and desiring to re-publish that agreement), providing detailed information about its services on its website, blogging about its services and its religious mission, answering frequently asked questions on its website, and meeting with people interested in membership. True and correct excerpts from Christian Healthcare's blog are at attached hereto as Exhibit 2.

54.     Christian Healthcare seeks to obey the biblical command of being honest, upfront, and transparent with prospective members and with the public about the ministry's religious faith and beliefs and medical practice. Proverbs 16:11.

55.     To that end, Christian Healthcare previously published (and desires to re-publish) on its website its Membership Agreement, which includes its Religious Provider Disclosure and Philosophy of Wellness and Healthcare.

56.     A true and correct copy of the current version of the Membership Agreement, including the Religious Provider Disclosure and Philosophy of Wellness and Healthcare, is attached hereto as Exhibit 3.

57.     The Religious Provider Disclosure states that members are not required to personally affirm the statement or its values and doing so is not a condition for membership.

11

58.     But the Religious Provider Disclosure summarizes Christian Healthcare's Statement of Faith and explains that Christian Healthcare employees affirm its Statement of Faith and other religious documents.

59.     A true and correct copy of the Christian Healthcare's Statement of Faith is attached hereto as Exhibit 4.

60.     The Religious Provider Disclosure explains to prospective members that Christian Healthcare's services will comport with its Statement of Faith and other religious documents; that Christian Healthcare providers will not provide services that conflict with its religious beliefs, such as treatment designed to transition a person to the opposite biological sex; and that providers will encourage behavior consistent with that statement, such as sexual abstinence outside of marriage between one man and one woman.

61.     By signing the Membership Agreement, members expressly acknowledge the religious character of Christian Healthcare and its healthcare services (but need not affirm they agree with the Christian Healthcare's religious beliefs).

62.     In Christian Healthcare's experience, members—regardless of their religious beliefs—often join specifically because they believe in Christian Healthcare's philosophy of healthcare and wellness and desire to visit a distinctly faith-based medical practice.

63.     Likewise, in Christian Healthcare's experience, many members who share Christian Healthcare's religious beliefs join so that they can openly discuss how their faith affects their medical needs with medical providers who understand those beliefs, pray with them, and provides spiritual and medical counsel.

<u>Christian Healthcare lives out its religious faith through regular corporate prayer,
worship, and Bible study.</u>

64.     Staff at Christian Healthcare begin each workday with corporate
prayer, including personal sharing of prayer requests and prayer for the patients
who will visit the clinics that day.

65.     This practice allows the staff to prayerfully commit themselves and
their work to God, seek His guidance in all that they do, commune with Him before
the work of the day begins, live out their religious belief in the healing power of
prayer, and focus on Jesus Christ and their commitment to serve their patents in
His name. Matthew 18:20.

66.     This practice also promotes the spiritual growth and unity of the staff
by allowing them to grow into a more mature faith together.

67.     In addition to daily corporate prayer, Christian Healthcare has a
longer staff meeting each month where they engage in corporate worship, Bible
study, and an extended period of corporate prayer.

68.     Staff members also have a quarterly meeting that includes corporate
worship, Bible study, and an extended session of corporate prayer.

69.     Regular corporate worship is integral to the Christian Healthcare's
identity as a religious ministry, as it provides a way for the ministry to heed the
biblical command to worship and praise God. Psalm 95:6.

70.     Corporate Bible study is equally foundational, as it provides a way for
Christian Healthcare to obey the biblical command to meditate on the Word of God.
Psalm 1:1-3.

71.     These practices are core to the exercise of the ministry's religious faith.

72.     These practices are also an important way Christian Healthcare
conveys it religious beliefs to its employees and encourages employees to grow in
their faith.

<u>Christian Healthcare's model of providing patient care is based on its religious
beliefs and convictions.</u>

73.     When patients arrive at either of Christian Healthcare's clinics, they
are greeted by a receptionist who takes their information and invites them to sit in
a waiting room designed to have a living-room feel.

74.     Before COVID, the waiting room contained Bibles and a variety of
other faith-oriented magazines and literature designed to give patients spiritual
counsel and comfort as they wait for their medical visit to begin. These items were
removed at the beginning of the pandemic, but Christian Healthcare intends to
return them to the waiting room in the near future.

75.     The décor throughout the clinics, and particularly in exam rooms,
includes Bible verses and other Christian messages to remind patients that God is
with them and to provide spiritual nourishment.

76.     A virtual tour showing these aspects of the practice is available at
https://youtu.be/7ROrFRaOhe4.

77.     Once taken to an exam room, patients typically see a medical
assistant; a nurse; and either a nurse practitioner, physician assistant, or doctor.

78.     All of these medical professionals focus on spending unhurried, quality
time with the patient.

79.     The nurse practitioner, physician assistant, or doctor typically spends
more than 30 minutes face-to-face with each patient, and it's not uncommon for
them to spend 60 minutes or more.

80.     The purpose of spending this much time with each patient is to ensure
that the medical provider gets to know the patient and that the patient has the
time, space, and comfort level to share all of their questions and needs with the
provider.

81.     During these lengthy face-to-face sessions, Christian Healthcare providers often pray with their patients and discuss the spiritual dimensions of disease and medical care.

82.     For example, if a patient reports anxiety, depression, or insomnia, Christian Healthcare providers will explore the root cause of these feelings, which frequently involves a discussion of the patient's spiritual health, an invitation to pray together, and a recommendation to engage in spiritual disciplines like Bible study, worship, finding a faith community to join, or consulting with a pastor, in addition to any standard medical treatments for the condition.

83.     Offering prayer and skillfully discussing spiritual matters with patients is part and parcel of Christian Healthcare fulfilling its religious mission, and it is a firm requirement that every provider offer these religious services.

84.     Further, all of the medical services that Christian Healthcare provides accord with Christian Healthcare's religious beliefs.

85.     If a patient needs additional spiritual or emotional support, Christian Healthcare has an on-site short-term biblical counseling service.

86.     All biblical counseling services provided at Christian Healthcare are grounded in the Bible and what it says about the human person, relationships, ethics, and morality.

87.     Christian Healthcare also puts on educational events at its clinic locations that are open to the public.

88.     Some public educational events are geared toward adults and provide information about medical and ethical issues, such as end-of-life care. All sessions are open to the public and include content on the spiritual dimensions of the issue being discussed and how to approach the issue from a biblical worldview consistent with Christian Healthcare's religious faith.

89.     Other public education events are geared toward schoolchildren and provide information on a particular portion of human anatomy, such as the immune system or central nervous system. These events are open the public and have historically attracted 350–400 participants. All of the events include a presentation on the Gospel and Christian Healthcare's religious beliefs.

90.     Typically, the speakers at these events include Christian Healthcare's CEO, Medical Director, and other Christian Healthcare medical professionals.

91.     Christian Healthcare uses these public educational events to describe its distinctively faith-based approach to health care to the general public.

<u>Christian Healthcare's employment practices are based on its religious beliefs and convictions.</u>

92.     Christian Healthcare fulfills its religious purpose and expresses its religious beliefs through its employees who operationalize its mission and communicate its beliefs as ambassadors of the ministry and its faith.

93.     To fulfill its religious purpose, it is critical that Christian Healthcare hire employees who agree with, personally adhere to, agree to abide by, and can effectively communicate its religious beliefs.

94.     To that end, Christian Healthcare requires its employees to affirm they agree with, will personally adhere to, and agree to abide by a Statement of Faith, Philosophy of Wellness and Healthcare, Statement of Values, Affirmation on Marriage and Human Sexuality, and Code of Conduct for its employees (collectively, the "Religious Statements").

95.     True and correct copies of the Statement of Values, Affirmation on Marriage and Human Sexuality, and Code of Conduct are attached hereto as <u>Exhibits 5, 6, and 7</u> respectively.

16

96.     Employees are required to re-affirm their commitment to these values by signing the Religious Statements each year at the time of the employee's annual review.

97.     Because annual reviews are conducted on a rolling basis, in any given month, multiple employees are due to receive their review and re-affirm their commitment to the Religious Statements.

98.     Between September and December 2022, 18 employees are due to receive their review and re-affirm their commitment to the Religious Statements.

99.     Christian Healthcare's Affirmation on Marriage and Human Sexuality clarifies and affirms its religious beliefs about the issues of marriage, human sexuality, and gender identity.

100.    That document affirms Christian Healthcare's religious beliefs that marriage is the exclusive union of one man and one woman, that sexual acts outside of marriages are contrary to God's design for humanity, that biological sex is immutable as God created persons as either male or female, and that human sexuality is reserved for marriage between one man and one woman.

101.    It further clarifies that Christian Healthcare and its staff cannot participate in medical treatment designed to transition someone from one biological sex to the other nor can they use pronouns or other forms of reference inconsistent with a person's biological sex because Christian Healthcare believes that the use of a pronoun or form of reference conveys a message about the referenced person's sex.

102.    And because Christian Healthcare believes that God created humans to be either male or female, messages about a referenced person's sex ultimately reflect their belief about God's design for humanity.

103.    Christian Healthcare staff often use pronouns or other gendered forms of reference in medical records and written and oral communications. And when they do, those pronouns and forms of reference accord with the person's biological

sex. For example, for a biologically male patient, Christian Healthcare staff would record the patient's sex as male in its medical records, and would use he/him pronouns or other forms of reference consistent with his biological sex both orally and in writing.

104.    Christian Healthcare does not believe that sex is mutable, so using a pronoun or reference inconsistent with the person's biological sex is untruthful, and being untruthful violates Christian Healthcare's religious beliefs.

105.    Additionally, the Affirmation on Marriage and Human Sexuality affirms Christian Healthcare's commitment "[a]s a Christian healthcare ministry" to "welcome without judgment and treat with respect, compassion, and sensitivity all who experience same-sex attractions or gender dissonance."

106.    The Code of Conduct requires all employees to acknowledge their belief in Jesus Christ as Lord and Savior, agree to actively participate in the ministry of a Christian church, and agree to refrain from other activities, such as sexual activity outside marriage as defined as the union between one man and one woman.

107.    Christian Healthcare expects all staff members to act as ambassadors for the ministry, to be prepared to discuss the ministry's distinctives as an expressly Christian healthcare ministry, and to provide spiritual and prayer support for members and their families as needed.

108.    Accordingly, Christian Healthcare provides training to staff members on the ministry's distinctly Christian approach to healthcare, as well as the ministry's religious beliefs and convictions.

109.    Requiring employees to affirm the Religious Statements ensures that Christian Healthcare can effectively communicate the ministry's religious beliefs to its employees, patients, and the public.

110.   Likewise, all employees who provide direct patient care are expected to and do convey the ministry's religious beliefs regarding medical treatment to patients and provide medical treatment consistent with those beliefs.

111.   Requiring employees to affirm the Religious Statements ensures that staff provide medical treatment consistent with the ministry's faith, including the beliefs that prayer and spiritual ministry are necessary components of successful medical outcomes.

112.   Employees could not effectively communicate the ministry's religious beliefs or provide medical treatment consistent with those beliefs if they disagreed with, did not understand, or engaged in activities that conflicted with those beliefs.

113.   Therefore, Christian Healthcare could not carry out its religious purpose if it were prevented from ensuring its employees complied with the Religious Statements.

<u>Managers</u>

114.   Christian Healthcare employs a Chief Executive Officer (CEO) and a Director of Operations (together, Managers).

115.   The CEO leads the ministry at the pleasure of the Board of Directors.

116.   The CEO is responsible for the overall leadership and management of the ministry, and supervises, directly or indirectly, all of the ministry's employees.

117.   The CEO implements the Board's vision for Christian Healthcare as a religious ministry, develops and implements policies, procedures, and practices that carry out its religious mission, and conveys that mission to the public.

118.   The CEO reviews, edits, and approves all of Christian Healthcare's major external communications to ensure comportment with Christian Healthcare's religious beliefs and message.

119.    The CEO regularly writes blog posts for Christian Healthcare's website, meets with potential donors, interacts with the media, and leads the public events, all of which require him to speak and communicate in accordance with the ministry's religious beliefs and message.

120.    The Director of Operations reports to the CEO and manages the daily operations of the Christian Healthcare's offices.

121.    A true and correct copy of the Director of Operations' job description, which accurately reflects the primary job duties carried out by the person holding that position, is attached hereto as Exhibit 8.

122.    Christian Healthcare requires the CEO and the Director for Operations to agree with, follow, and effectively communicate the Religious Statements.

123.    The CEO and the Director of Operations have primarily religious duties in that they ensure the ministry operates consistent with its religious beliefs, develop religious doctrine and enforce and develop policies consistent with those beliefs, and communicate Christian Healthcare's religious message to members, the general public, prospective hires, employees, and potential donors and ministry partners.

124.    These duties can only be performed by a CEO and Director of Operations who share the ministry's faith.

125.    The CEO and the Director of Operations also regularly provide spiritual guidance to and offer prayer for employees who ask for it.

126.    By doing these activities and conveying these messages, the CEO and the Director of Operations perform important religious functions for the ministry.

<u>Medical Director</u>

127.    Christian Healthcare employs a Medical Director, who serves as the ministry's chief medical officer.

128.    The Medical Director is a licensed physician who performs all the functions of one of Christian Healthcare's Advanced Practice Medical Provider.

129.    The Medical Director also declines to perform the same treatments the Advance Practice Medical Providers decline. *Infra* ¶¶ 142–43.

130.    A true and correct copy of the Medical Director's job description, which accurately reflects the primary job duties carried out by the person holding that position, is attached hereto as <u>Exhibit 9</u>.

131.    All members of the clinical staff report to the Medical Director.

132.    Christian Healthcare requires the Medical Director to agree with, follow, and effectively communicate the Religious Statements.

133.    The Medical Director has a primarily religious duty which is co-extensive with his or her medical responsibilities, and these duties can only be performed by a Medical Director who shares the ministry's faith.

134.    By doing these activities and conveying these messages, the Medical Director performs important religious functions for Christian Healthcare.

<u>Advanced Practice Medical Providers</u>

135.    Christian Healthcare employs physicians, physician assistants, and nurse practitioners (collectively, Advanced Practice Medical Providers), all of whom serve as the highest-level provider a patient sees during a medical visit.

136.    True and correct copies of the job descriptions for physicians and for nurse practitioners / physician assistants, which accurately reflect the primary job duties carried out by the people holding these positions, are attached hereto as <u>Exhibits 10 and 11</u> respectively.

137.   Christian Healthcare requires Advanced Practice Medical Providers to agree with, follow, and effectively communicate its Religious Statements.

138.   The Advanced Practice Medical Providers have primarily religious duties that are co-extensive with these providers' medical responsibilities, and these duties can only be performed by Advanced Practice Medical Providers who share the ministry's faith.

139.   For example, whenever they provide medical treatment, they are expected to provide medical treatment consistent with the ministry's religious beliefs.

140.   This includes praying with patients, providing spiritual guidance consistent with the ministry's faith and conveying the ministry's religious message to patients.

141.   Advanced Medical Providers also provide medical care in accordance with the Religious Statements and Christian Healthcare's distinct religious philosophy of wellness and healthcare.

142.   For example, Advanced Medical Providers sometimes provide medically indicated testosterone injections for biological boys and men or medically indicated estrogen therapy for biological women to treat conditions such as low testosterone in men or symptoms associated with menopause in women.

143.   But Advance Medical Providers will not provide testosterone for biological females or estrogen for biological males to facilitate an attempt to transition to the opposite sex, as doing so would violate Christian Healthcare's religious beliefs and its ethical and medical judgment.

144.   Such therapy is not used to treat emergency medical conditions, is ethically and medically controversial, and has many potential side effects, including sterilization.

145.    Although Christian Healthcare will not provide cross-sex hormone therapy, it is widely available in the geographic area served by the ministry.

146.    By praying with patients, providing spiritual guidance, discussing patients' spiritual and emotional health, providing medical care in accordance with Christian Healthcare's Religious Statements, and conveying messages in accordance with these practices, Advanced Practice Medical Providers perform important religious functions for Christian Healthcare.

<u>Biblical Counselors</u>

147.    Christian Healthcare also employs on-site Biblical Counselors.

148.    The Biblical Counselors provide spiritual counsel to patients referred to them by the Advanced Practice Medical Providers.

149.    The Biblical Counselors do not provide long-term counseling or traditional professional counseling; rather, they are there to provide biblical support on a temporary basis.

150.    A true and correct copy of the Biblical Counselor's job description, which accurately reflects the primary job duties carried out by those holding that position, is attached hereto as <u>Exhibit 12</u>.

151.    Christian Healthcare requires Biblical Counselors to agree with, follow, and effectively communicate the Religious Statements.

152.    Biblical Counselors root their counseling in Christian Healthcare's religious beliefs, and a primary role of the Biblical Counselors is to help patients work through how the Bible informs their situation.

153.    Biblical Counselors offer intercessory prayer to patients because the ministry believes that all mental and physical healing ultimately comes from God.

154.    Christian Healthcare is aware that a longtime Biblical Counselor is leaving the practice at the end of August 2022, and Christian Healthcare would like

to immediately begin publicizing its open counseling position and receiving applications to potentially hire a new Biblical Counselor.

### Member Services Coordinator

155.    Christian Healthcare employs a Member Services Coordinator.

156.    A true and correct copy of the Member Services Coordinator's job description, which accurately reflects the primary job duties carried out by the person holding that position, is attached hereto as Exhibit 13.

157.    Christian Healthcare requires its Member Services Coordinator to agree with, follow, and effectively communicate the Religious Statements.

158.    The Member Services Coordinator has primarily religious duties which are co-extensive with his or her informative duties.

159.    By doing these activities and conveying these messages, the Member Services Coordinator performs important religious functions for Christian Healthcare.

### Member Services / Reception

160.    Christian Healthcare employs multiple people in a Member Services / Reception position at both of its clinic locations.

161.    A true and correct copy of the Member Services / Reception job description, which accurately reflects the primary job duties carried out by the people holding that position, is attached hereto as Exhibit 14.

162.    People in the Member Services / Reception position act as the initial "face" of the ministry to people who call on the telephone or visit in person.

163.    Being able to communicate the ministry's religious message is thus a core part of the Member Services / Reception job.

164.   Accordingly, Christian Healthcare requires people holding the Member Services / Reception job to agree with, follow, and effectively communicate its Religious Statements.

<u>Other Positions</u>

165.   In addition to the positions detailed above, Christian Healthcare employs staff in other positions: nurses, a Newaygo office manager, a custodian, and medical assistants.

166.   Most employees—including the receptionists, nurses, Newaygo office manager, and medical assistants—have regular interactions with members, members' families, and other staff.

167.   All staff members attend the daily corporate prayer meetings (unless not scheduled for that time period), as well as the monthly and quarterly staff meetings involving worship, Bible study, and more extended corporate prayer.

168.   All staff members are required to affirm and sign the Religious Statements on an annual basis and to comply with them.

169.   It is critical to Christian Healthcare's mission that everyone in the clinic be prepared to communicate the ministry's message concerning its religious beliefs and its distinctly Christian approach to healthcare so that any patient, prospective member, family member, or member of the public receives the same message when interacting with staff.

170.   It is critical to the exercise of Christian Healthcare's religious faith that the ministry be permitted to build a staff of fellow believers who will understand and live out the ministry's mission as only co-believers can effectively do.

171.    Christian Healthcare further desires to build a work environment where staff members will grow together in their faith, support each other in their faith, and work together to build a cohesive mission-focused religious ministry.

Michigan's Supreme Court redefines "sex" which threatens the ministry.

172.    Michigan's civil-rights law prohibits, among other things, discrimination "because of … religion, … sex, … or marital status" by employers, places of public accommodation, and public service providers. MCL 37.2102(1).

173.    In May 2018, the Commission reinterpreted the law's prohibition on discrimination "because of sex" to include sexual orientation and gender identity in Interpretative Statement 2018–1, *available at* https://bit.ly/3yGdHdM.

174.    In 2019, under the authority of the Interpretive Statement, the Commission began investigating two businesses that operate according to their owners' religious beliefs for alleged discrimination on the basis of sexual orientation and gender identity. Complaint, *Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20–000145–MZ (Mich. Ct. of Claims July 28, 2020).

175.    In August 2020, the businesses challenged the Interpretive Statement by filing a complaint for declaratory judgment and injunctive relief. *Id.*

176.    The businesses alleged that "sex" in Michigan's civil-rights law does not include sexual orientation or gender identity.

177.    In December 2020, a Michigan Court of Claims held that "sex" includes gender identity, but not sexual orientation. In doing so, the court invalidated the Interpretative Statement to the extent that it defined sex to include sexual orientation. *See Rouch World, LLC v. Mich. Dep't of C.R.*, No. 20–000145–MZ (Mich. Ct. of Claims Dec. 7, 2020).

178.    The Department appealed the decision directly to the Michigan Supreme Court. *Rouch World, LLC v. Dep't of C.R.*, 961 N.W.2d 153 (Mich. 2021).

179.   On July 28, 2022, the Michigan Supreme Court decided *Rouch World, LLC v. Department of Civil Rights*, 2022 WL 3007805.

180.   In *Rouch World*, the Michigan Supreme Court held that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of [Michigan civil rights law]."*Id.* at *11.

181.   This is so, according to the Court, because "[s]exual orientation is inextricably bound up with sex." *Id.* at 9 (cleaned up).

182.   In reaching this holding, the Michigan Supreme Court relied on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), in which the Supreme Court of the United States held that the "because of sex" language in Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sexual orientation and gender identity.

183.   A dissenting justice in *Rouch World* specifically noted that Michigan's civil-rights law, unlike its federal analogue, does not contain any exemptions for religious organizations. *Id.* at *43 (Viviano, J., dissenting). Thus, the dissenting justice criticized the majority for rewriting Michigan's civil-right law "without any concern for whether that interpretation violates constitutional protections of religious liberty." *Id.*

184.   While the *Rouch World* decision did not formally decide that discrimination on the basis of gender identity is proscribed by Michigan's civil-rights law, the Commission's Interpretative Statement 2018-1 and the Court of Claims holding that "sex" includes gender identity remain in place.

185.   And Attorney General Nessel has also taken the position that antidiscrimination laws that prohibit discrimination "because of sex" likewise prohibit discrimination based on sexual orientation and gender identity. *See* Br. for Ill. et al as Amici Curiae in Support of Employees 3–4, *Bostock v. Clayton County*, 2019 WL 2915040 (Nos. 17–1618, 17–1623, 18–107) (July 2019).

186.    Christian Healthcare had been aware of, and had read news reports about, how other medical providers and religious business owners were being sued and threatened with severe penalties for declining to provide healthcare or services that conflicted with their faith or for operating their medical practice or operations consistent with their faith.

187.    In recent years, Christian Healthcare has had and still has patients who identify as members of the opposite sex.

188.    Christian Healthcare has provided and continues to provide high-quality care to such patients consistent with its religious beliefs.

189.    But this caused Christian Healthcare to consider how it would address patients who identify as transgender in the future and to investigate its legal responsibilities.

190.    Christian Healthcare became aware of *Rouch World* in 2021 after the case attracted significant media attention.

191.    Christian Healthcare began following and learning about *Rouch World* before the Michigan Supreme Court decided the case.

192.    Christian Healthcare realized that if the Michigan Supreme Court re-interpreted Michigan's civil-rights law to prohibit discrimination based on sexual orientation—and if "because of sex" included "because of gender identity"—its ability to operate its medical practice and manage its employment relationships consistent with its religious beliefs about biology, human sexuality, and other topics would be threatened.

193.    Christian Healthcare also learned more information and read more news reports about other medical providers who were being sued and threatened with severe penalties.

194.    Christian Healthcare learned more about how medical providers under similar laws were affected.

195.    As Christian Healthcare learned more about Michigan's civil-rights law, it also discovered Michigan's public-accommodations law.

196.    Christian Healthcare realized that it faces a credible threat and substantial risk that it will be investigated and prosecuted under these laws for engaging in activities and speaking in accordance with its religious beliefs.

197.    Specifically, Christian Healthcare faces such a risk under the laws' regulations of employers, public accommodations, and public services.

198.    After learning about Michigan's civil-rights and public-accommodations laws, Christian Healthcare waited to bring this suit until after Michigan's Supreme Court decided *Rouch World* to avoid piecemeal litigation and to fully understand how those laws applied to it.

199.    Now, Christian Healthcare recognizes the threats Michigan's civil-rights and public-accommodations laws pose to its religious mission in two primary areas: (1) in its employment decisions and (2) in how it serves the public.

<u>Michigan's employment laws threaten Christian Healthcare's ability to manage its employment choices consistent with its religious beliefs.</u>

200.    Michigan's civil-rights law defines an employer as any person who employs one or more individuals. MCL 37.2201(a).

201.    Christian Healthcare is therefore an employer under and subject to Michigan's laws because it employs more than one individual.

202.    Michigan's civil-rights law prohibits discrimination in employment through two clauses: the Employment Clause and the Notice Clause.

203.    The Employment Clause prohibits employers from failing or refusing to hire or recruit, discharging, or otherwise discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment" because of religion, sexual orientation, or gender identity. MCL 37.2202(1)(a).

204.   The Employment Clause also prohibits employers from limiting, segregating, or classifying employees or applicants in a way that adversely affects their employment or application status "because of" religion, sex, sexual orientation, marital status, or gender identity. MCL 37.2202(1)(b).

205.   As interpreted by Michigan, the Employment Clause prohibits Christian Healthcare from:

- asking prospective employees about whether they agree with, follow, and can effectively communicate the religious beliefs contained in the Religious Statements;

- exclusively recruiting and hiring prospective employees who affirm they agree with, follow and can effectively communicate the religious beliefs contained in the Religious Statements;

- declining to recruit and hire prospective employees who are unable or refuse to do so;

- maintaining a written policy or unwritten practice of only recruiting and hiring prospective employees who affirm, follow, and can effectively communicate the religious beliefs contained in the Religious Statements, and uniformly declining to hire those who are unable or refuse to do so;

- imposing employment-related qualifications and responsibilities on any position that requires the employee to follow the Religious Statements;

- treating prospective employees who do not share the religious beliefs indicated in Christian Healthcare's Religious Statements differently from prospective employees who do share these beliefs in any way—for example, by screening the former applicant's application on that basis;

- ensuring current employees comply with the Religious Statements and requiring them to re-affirm, agree to abide by, and sign the Religious Statements on an annual basis;

- maintaining a written policy or unwritten practice of imposing discipline up to and including termination of employment on any employee who refuses to re-affirm, agreed to abide by, and/or sign the Religious Statements upon request; and

- taking adverse employment actions against any employee who violates the requirements of the Religious Statements.

206.   The Notice Clause likewise intrudes on Christian Healthcare's ability to manage its employment relationships consistent with its religious mission and beliefs.

207.   The Notice Clause prohibits employers from posting or publishing a statement related to employment "which indicates a preference, limitation, specification, or discrimination, based on religion, … sex, … marital status" or sexual orientation, or gender identity. MCL 37.2206(1).

208.   The Notice Clause also prohibits employers from making or using a written or oral inquiry or application "that elicits or attempts to elicit information" concerning a prospective employee's religion or that "expresses a preference, limitation, specification, or discriminated based on religion, … sex, … marital status" sexual orientation, or gender identity or that keeps records of that information. MCL 37.2206(2).

209.   As interpreted by Michigan, the Notice Clause prohibits Christian Healthcare from:

- asking prospective employees about whether they agree with, follow, and can effectively communicate the beliefs contained in the Religious Statements or other questions sufficient to learn that information;

- asking prospective employees whether they identify as a Christian, the name of their church, or their frequency of church attendance;

- posting employment opportunities on its website or other job-hunting sites
  which indicate a desire to recruit and hire employees who share the
  ministry's beliefs about Christianity;

- displaying or adopting a job description listing employment-related
  qualifications or responsibilities that require the employee to follow the
  Religious Statements; and

- maintaining a written policy of only recruiting and hiring prospective
  employees who affirm, follow, and can effectively communicate the
  religious beliefs contained in the Religious Statements, and uniformly
  declining to hire those who are unable or refuse to do so;

- maintaining a written policy of imposing discipline up to and including
  termination of employment on any employee who refuses to re-affirm,
  agreed to abide by, and/or sign the Religious Statements upon request;

- annually circulating its Religious Statements for existing employees to
  sign; and

- keeping employee records of their affirmation of the Religious Statements.

210.    Michigan's civil-rights law further prohibits an employer from maintaining a "pattern or practice of discrimination." MCL 37.2605(1).

211.    Christian Healthcare's written and unwritten policies of hiring only people who agree with, affirm, and follow the ministry's Religious Statements, and of requiring employees to affirm the Religious Statements on an annual basis, constitute—in Michigan's view—a "pattern and practice" of discrimination in violation of the Employment and Notice Clauses under Michigan law.

212.    By restricting Christian Healthcare's ability to manage its employment relationships consistently with its religious beliefs as described above, the Employment and Notice Clauses interfere with the ministry's ability to promote its

religious message, practice medicine consistent with its religious beliefs, and
operate consistent with its religious purpose.

213.    Although the Employment and Notice Clauses restrict Christian
Healthcare's desired activities, they make several exemptions from their provisions
for other employers.

214.    For example, they contain exemptions related to employees or
prospective employees with disabilities, certain instances in which age
discrimination is permitted, and complete exemptions when the employer and
employee are family. *See, e.g.*, MCL 37.1202, MCL 37.1206, MCL 37.2202(2).  MCL
37.2211, MCL 37.2202(3).

215.    And the Department may make individualized exemptions for
employers who make a "sufficient showing" "that religion, national origin, age,
height, weight, or sex" or sexual orientation or gender identity "is a bona fide
occupational qualification reasonably necessary to the normal operation of the
business or enterprise." MCL 37.2208.

216.    Many primary care providers in Michigan have no requirement similar
to the Religious Statements, and there are many employment opportunities in the
healthcare industry in Michigan.

217.    Overall, approximately 500,000 people are employed in the health care
industry in Michigan.

218.    There are also over 6,000 family medicine and general practice
physicians, over 19,000 total physicians, over 8,000 total nurse practitioners, and
almost 6,000 physician assistants in Michigan.

<u>Michigan's public-accommodations laws threaten Christian Healthcare's ability to
operate its medical practice consistent with its religious beliefs.</u>

219.   Michigan's civil-rights law defines public accommodations as any
business offering or providing goods, services, privileges or advantages to the public.
MCL 37.2301(a).

220.   Michigan's law specifically names "health … facilit[ies]" as a public
accommodation. MCL 37.2301(a).

221.   Michigan's law also defines public service to include "a tax exempt
private agency established to provide service to the public." MCL 37.2301(b).

222.   Michigan's civil-rights law and public-accommodations law define
public accommodation co-extensively.

223.   Christian Healthcare is a tax-exempt non-profit corporation offering
and providing goods, services, privileges, and advantages to the public.

224.   Christian Healthcare therefore appears to fit within Michigan's
definition of a place of public accommodation and a public-service provider.

225.   Michigan's civil-rights law prohibits discrimination in places of public
accommodations and by public services through two clauses: the Accommodation
Clause and the Publication Clause.[4]

226.   The Accommodation Clause prohibits public accommodations and
public-service providers from denying an individual "the full and equal enjoyment of
the goods, services, facilities, privileges, advantages, or accommodations … because
of religion, … sex, … marital status," sexual orientation, or gender identity. MCL
37.2302(a).

---

[4] Unless context indicates otherwise, the remainder of this complaint refers to the
Publication Clause in Michigan's civil-rights law and the Publication Clause in
Michigan's public-accommodations law collectively as the Publication Clause. This
complaint will do the same for the laws' Denial and Unwelcome Clauses.

227.    The Accommodation Clause prohibits "outright denial of access to" a public accommodation's goods, premises, or facilities as well as denial of "*equal* enjoyment of th[ose] goods, services, [or] facilities." *Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. App. 1992).

228.    The Accommodation Clause also prohibits public accommodations from maintaining policies that make distinctions because of a protected characteristic. *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 732 (Mich. App. 1983).

229.    The Accommodation Clause compels Christian Healthcare to refer to its (1) members, (2) prospective members, and (3) members of the public at educational events by using those persons' preferred pronouns, regardless of whether their preferences are consistent with their biological sex.

230.    The Accommodation Clause does so because Christian Healthcare refers to members, prospective members, and members of the public at educational events according to their preferred pronouns when those pronouns are consistent with the persons' biological sex.

231.    But the Accommodation Clause considers Christian Healthcare's actions to be unequal treatment because of gender identity when Christian Healthcare does not use someone's preferred pronoun when that preference is consistent with their gender identity but inconsistent with his or her biological sex.

232.    Other jurisdictions interpret laws like the Accommodation Clause to (i) require the use of preferred pronouns and (ii) to proscribe declining to use preferred pronouns as an act of gender-identity discrimination.[5]

---

[5] *See, e.g.*, N.Y. Div. of Hum. Rights, Guidance on Protections from Gender Identity Discrimination under the New York State Hum. Rts. Law 6–7 (2020), *available at* https://on.ny.gov/3A3b7k3; Wash. State Hum. Rts. Comm'n, Sexual Orientation & Gender Identity Discrimination is Prohibited under Washington State Law 2, *available at* https://bit.ly/3p5JyA8; Iowa C.R. Comm'n, Sexual Orientation & Gender Identity 2 (2016), *available at* https://bit.ly/3AMfOPm; Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity,

233. The Attorney General agrees that failing to use preferred pronouns is an act of gender-identity discrimination, as the policy for her office requires employees to use preferred pronouns and contains no provision for religious accommodations or exceptions.[6]

234. The Accommodation Clause also forces Christian Healthcare to provide medical treatment in violation of its religious beliefs.

235. For example, Christian Healthcare's Advanced Practice Medical Providers provide testosterone injections to biological men and provide estrogen therapy for biological women where medically indicated.

236. But they do not provide testosterone injections for a biological woman or estrogen therapy to a biological man as part of an attempt to transition the person to the opposite sex because doing so would be contrary to its religious beliefs regarding the immutability of biological sex.

237. The Accommodation Clause treats Christian Healthcare's refusal to provide this treatment in this way as unequal treatment because of gender identity, which Michigan's courts now define as discrimination because of sex.

---

https://bit.ly/3bo7fk8; N.J. Div. on Civ. Rights, 5 Things You Should Know about Discrimination and Harassment in Public Accommodations Based on Gender Identity or Expression, *available at* https://bit.ly/3QMwegz; Colo. C.R. Comm'n Rules & Regs., 3 CCR 708–1, R. 81.6, *available at* https://bit.ly/3An1nQq; *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099–1100 (S.D. Cal. 2017) (interpreting non-discrimination provision of Affordable Care Act to require medical provider to use preferred pronouns); *Smith v. Univ. of Rochester Med. Ctr.*, No. 17-cv-6781-CJS, 2017 WL 11428785, at *3–4 (W.D.N.Y. Dec. 28, 2017); *Doe v. City of New York*, 42 Misc. 3d 502, 504 (N.Y. Sup. Ct. 2013); 3 C.C.R. § 708–1:81.6 (sexual orientation harassment includes "[d]eliberately misusing … gender-related pronouns").
[6] Mich. Dep't of Att'y Gen., Transgender Pol'y (June 8, 2021), http://bit.ly/3Q7SWiT.

238.    Other jurisdictions interpret laws like the Accommodation Clause to require health care providers to provide gender-transition services, such as hormone therapy, if they would provide similar treatments for other purposes.[7]

---

[7] For example, the U.S. Department of Health and Human Services recently proposed a rule interpreting Section 1557 of the Affordable Care Act as making it unlawful for a health care provider to "[d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity would provide to an individual for other purposes if the denial or limitation is based on a patient's sex assigned at birth, gender identity, or gender otherwise recorded." Nondiscrimination in Health Programs and Activities, 87 Fed. Reg. 47918 (Aug. 4, 2022); *see also Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021) (enjoining interpretation of Section 1557 of the Affordable Care Act that would force certain Christian health care providers to provide gender transition services); *Scott v. St. Louis Univ. Hosp.*, No. 4:21-cv-01270-AGF, 2022 WL 1211092, at *1, 6 (E.D. Mo. Apr. 25, 2022) (Catholic hospital excluded transition procedures); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 571–72, 574, 591 (D. Md. 2021) (Catholic hospital declined transition procedure); *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 793–94 (W.D. Wash. 2021) (Catholic employer's health plan excluded transition procedures); *Kadel v. Folwell*, 446 F. Supp. 3d 1, 7, 16–17 (M.D.N.C. 2020) (state health plan excluded transition procedures); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 950 (D. Minn. 2018) (hospital excluded transition procedures); *Flack v. Wis. DHS*, 328 F. Supp. 3d 931, 934–35, 946–51 (W.D. Wis. 2018) (state health plan excluded transition procedures); *Hennessy-Waller v. Snyder*, No. cv-20-00335 (D. Ariz. filed Aug. 6, 2020); *Conforti v. St. Joseph's Healthcare Sys.*, No. 2:17-cv-00050-JLL-JAD (D.N.J. filed Jan. 5, 2017); *Robinson v. Dignity Health*, No. 16-3035, 2016 WL 7102832 (N.D. Cal. filed June 6, 2016); *Dovel v. Pub. Library of Cincinnati & Hamilton Cnty.*, No.16-955 (S.D. Ohio filed Sept. 26, 2016); *Cruz v. Zucker*, 116 F. Supp. 3d 334 (S.D.N.Y. 2015); *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D.N.D. 2021) (enjoining interpretation of ACA that would compel medical procedures); *Christian Emps. All. v. United States Equal Opportunity Comm'n*, No. 1:21-cv-195, 2022 WL 1573689, at *1 (D.N.D. May 16, 2022) (same); *Fain v. Crouch*, No. 3:20-0740, 2022 WL 3051015, at *11–12 (S.D.W. Va. Aug. 2, 2022) (holding that state law denying reimbursement for sex transition procedures violates the ACA); *Lange v. Houston Cnty., Georgia*, 2022 WL 1812306, at *14 (M.D. Ga. June 2, 2022); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 995 (W.D. Wis. 2018).

239.    Because Christian Healthcare appears to fall within the definition for a Michigan place of public accommodation and public-service provider, the Accommodation Clause also applies to Christian Healthcare's employment decisions in a manner that is co-extensive with the Employment Clause. *See Haynes v. Neshewat*, 729 N.W.2d 488, 490 (Mich. 2007) (once an entity is a public accommodation, it "prohibits unlawful discrimination against any individual, not just members of the public"); *Jamoua v. Michigan Farm Bureau*, No. 20-cv-10206, 2021 WL 5177472, at *16 (E.D. Mich. Nov. 8, 2021).

240.    Likewise, the Publication Clause prohibits Christian Healthcare from explaining on its website, its blog, or its Membership Agreement its religious beliefs, including its beliefs about biology and human sexuality.

241.    The Publication Clause also prohibits Christian Healthcare from explaining these beliefs directly to current or prospective members or members of the public at educational events.

242.    The Publication Clause prohibits these things through two sub-clauses: the Denial and Unwelcome Clauses.

243.    The Publication Clause is contained in Michigan's civil-rights and public-accommodations laws.

244.    Michigan's civil-rights law's Denial Clause prohibits public accommodations and public service providers from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" will be "refused, withheld from, or denied an individual because of religion, … sex, … marital status," sexual orientation, or gender identity. MCL 37.2302(b).

245.    Michigan's public-accommodations law's Denial Clause prohibits public accommodations from "directly or indirectly" publishing or displaying "any written

or printed communication[], notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places shall be refused, withheld from or denied to any person on account of … religion." MCL 750.147.

246.   The Michigan civil-rights law's Unwelcome Clause prohibits public accommodations and public service providers from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates … that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of … religion, … sex, … marital status," sexual orientation, or gender identity. MCL 37.2302(b).

247.   Michigan's public-accommodations law's Unwelcome Clause prohibits public accommodations from "directly or indirectly" publishing or displaying "any written or printed communication[], notice or advertisement to the effect that … any particular … religion … [or] sex … is not welcome, objectionable, or not acceptable, not desired or solicited." MCL 750.147.

248.   Michigan law nowhere defines objectionable, unwelcome, not welcome, unacceptable, not acceptable, undesirable, or not desired or solicited.

249.   These terms are vague, overbroad, and totally discretionary.

250.   These vague, overbroad, and discretionary terms used in Michigan's Unwelcome Clauses hinder Christian Healthcare's ability to explain its religious beliefs on its own website, to explain its religious beliefs to prospective members, to explain to prospective members the reasons why those beliefs are integral to Christian Healthcare's medical practice, and to explain to prospective members the types of medical services it does and does not provide according to its religious beliefs.

251.    The Unwelcome Clause also prohibits *any* faith-based organization that provides services to the public from explaining its religious beliefs to the public as that might cause someone to feel that the "patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of … religion, … sex, … marital status," sexual orientation, or gender identity (MCL 37.2302(b)) or have "the effect" of making someone feel "not welcome, objectionable, or not acceptable, not desired or solicited" because of religion (MCL 750.147).

252.    Michigan's civil-rights law further prohibits an employer from maintaining a "pattern or practice of discrimination." MCL 37.2605(1).

253.    Christian Healthcare's written and unwritten policies of only providing medical care in accordance with Christian Healthcare's religious beliefs, not prescribing cross-sex hormones to facilitate a gender transition, and not using pronouns or other forms of reference that do not comport with a person's biological sex constitute—in Michigan's view—a "pattern and practice" of discrimination in violation of the Accommodation and Publication Clauses under Michigan law.

254.    Although the Accommodation and Publication Clauses restrict Christian Healthcare's desired activities in these ways, they make several exemptions from their provisions for other public accommodations.

255.    For example, upon information and belief, other medical providers may decline to provide medical treatment for any number of reasons, including but not limited to:

- the medical provider believing that he or she does not have sufficient experience to be comfortable providing the requested treatment;

- the medical provider believing that the treatment is outside of his or her area of practice or expertise;

- the medical provider believing that the treatment is not sufficiently effective, even if other medical providers would conclude otherwise;

- the medical provider believing that the risks or side-effects associated with the treatment outweigh the likely benefits, even if other medical providers would conclude otherwise; or

- the medical provider being uncomfortable that the treatment involves the off-label usage of particular medication, even if other medical providers would not have similar discomfort.

256.    Michigan provides numerous exemptions to its public accommodations law, including exemptions related to disability, exemptions for certain types of private clubs, and exemptions for religious dining clubs. *See, e.g.*, MCL 37.1302(a), 37.1302(b), MCL 37.2303, MCL 37.2301.

257.    Michigan also makes numerous exemptions that allow medical providers to refuse to provide certain medical procedures for conscience-reasons and to inform patients about those objections. *See* MCL 333.20181, MCL 333.20182, MCL 333.20183.

258.    And Michigan makes an exemption by refusing to reimburse—and thereby effectively prohibiting—women on public assistance from receiving a hysterectomy for family planning purposes with no similar restriction on male family planning procedures. Mich. Admin. Code r. 400.7704.

259.    Michigan makes other exemptions by refusing to reimburse for the use of medical marijuana and investigational drugs, biological products, or devices. MCL 333.26427(c)(1); MCL 333.26453.

<u>Michigan aggressively enforces its laws with severe penalties.</u>

260.    The Commission and the Department are responsible for investigating, enforcing, and prosecuting alleged violations of Michigan's civil-rights law.

41

261.    The Department receives complaints alleging violations of Michigan's civil rights law from "[a]ny person claiming to be aggrieved by unlawful discrimination." MDCR Rule 37.4(1).

262.    "Person" includes individuals, associations, advocacy organizations, legal or commercial entities, and Michigan, its subdivisions, and its agencies. MDCR Rule 37.2(m).

263.    The Department may initiate complaints on its own authority. MCL 37.2602(c).

264.    The Commission, the Director, or any of their agents may initiate and file a complaint with the Department on their own authority. MDCR Rule 37.4(2).

265.    The Department and the Commission also have the authority to use "testers" to investigate suspected violations of Michigan's civil-rights law and have in fact used testing evidence to bring enforcement action under some provisions of Michigan's civil-rights law.[8]

266.    Even where a particular complainant lacks a basis for challenging, the Department and Commission may pursue cases alleging discrimination based on a policy or a "pattern or practice of discrimination." MCL 37.2605(1); *Whirlpool Corp. v. C.R. Comm'n*, 390 N.W.2d 625, 626, 628–29 (Mich. 1986) (Commission's pursuit of case against company policy disallowing employment of spouses as "pattern or practice" of marital status discrimination despite lack of any complainant with standing); *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 731 (Mich. App. 1983) ("technically moot" denial still led to finding that policy violated law).

267.    After the Department receives a complaint against a respondent (the individual or entity that allegedly discriminated against the complainant), the Department investigates the complaint. MCL 37.2602(c).

---

[8] Mich. C.R. Comm'n 2020-2021 Biannual Report, https://bit.ly/3wstBrZ.

268.    This investigatory process imposes significant burdens on the respondent.

269.    The investigation occurs in an adversarial process because the Department ultimately is responsible for prosecuting the charge on the complainant's behalf. MDCR Rule 37.12(6).

270.    If the Commission finds that a respondent has engaged in unlawful discrimination, it can award significant remedies including damages for mental distress, "humiliation, embarrassment, outrage, disappointment, and other forms of mental anguish that result [from] discrimination" based on the complaint's testimony alone. *Mich. Dep't of C.R. v. Ranir DCP Corp.*, No. 151858–EM07, at 2 (Mich. C.R. Comm'n Dec. 3, 2001). *See also* MCL 37.2605(1)–(2).

271.    The Commission has significant discretion in awarding non-economic damages, and the Commission previously awarded a complainant $150,000 for non-economic damages including mental and emotional distress. *Mich. Dep't of C.R.  v. Suburban Mobility Auth. for Regional Transp.*, No. 325610, at 3 (Mich. C.R. Comm'n May 25, 2012).

272.    The Commission has significant discretion in awarding attorney fees and costs, and the Commission previously awarded $58,000 in attorney fees and costs after finding that a housing provider violated Michigan's civil rights law. *Mich. Dep't of C.R. v. Royalwood Coop. Apartments, Inc.*, No. 268485, at 4 (Mich. C.R. Comm'n Feb. 2, 2004).

273.    In addition, the Commission's findings may be grounds for revoking the respondents' license. MCL 37.2605(3).

274.    The Department and the Commission actively receive and prosecute complaints and charges for alleged violations of Michigan's civil-rights law.

275.    The Department and the Commission actively receive and prosecute complaints and charges for alleged violations of Michigan's civil-rights law.

276.    Between fiscal years 2011 and 2021, the Department and the Commission received, investigated, and processed more than 7,000 complaints against employers and more than 2,000 complaints against public accommodations.

277.    Between fiscal years 2011 and 2021, the Department and the Commission also received, investigated, and processed more than 5,000 complaints alleging sex discrimination and more than 700 complaints alleging religious discrimination.

278.    Between May 2018 and December 2019, the Department and the Commission received, investigated, and processed 73 complaints alleging sexual orientation and gender-identity discrimination.

279.    The Department and the Commission did so even though binding authority held that Michigan's civil-rights law did not prohibit sexual orientation discrimination. *Barbour v. Dep't of Soc. Servs.*, 497 N.W.2d 216 (Mich. App. 1993).

280.    For the fiscal year ending in 2023, the Department and the Commission have a $7 million budget to investigate and prosecute complaints. Executive Budget Bill FY 2023–2024 36 (2022), *available at* https://bit.ly/3AVzJMe.

281.    Michigan's civil-rights law also permits any person alleging a violation of the law to file a civil action for injunctive relief, damages, and attorney fees and costs in an appropriate circuit court. MCL 37.2801(1)–(2).

282.    Likewise, Michigan's public-accommodations law permits any person alleging a violation of the law to file a civil action to recover "treble damages" sustained by the allegedly injured party. MCL 750.147.

283.    Attorney General Nessel also has the authority to criminally prosecute public accommodations who violate the public-accommodations law, including its Publication Clause. MCL 750.147.

284.    If a court finds that a public accommodation violated the public-accommodations law, an owner, proprietor, manager, or employee of the public

accommodation "shall for every offense be deemed guilty of a misdemeanor" and "shall be fined … or imprisoned for not less than 15 days or both." MCL 750.147.

<u>Michigan's laws impose overwhelming and ongoing burdens on Christian Healthcare's ability to operate its medical practice consistent with its beliefs.</u>

285. Michigan's laws impose significant pressures and burdens on Christian Healthcare and how it operates its medical practice, how it manages employment decisions, and how it communicates about its services.

286. For example, Christian Healthcare must recruit and hire employees who agree with, follow, and are able to effectively communicate the religious beliefs contained in the Religious Statements to fulfill its religious mission of providing medical treatment consistent with its religious beliefs, to effectively communicate those beliefs to its employees, patients, and the public, and to ensure that its doctrinal beliefs contained in the Religious Statements will be consistently applied.

287. But the Employment and Accommodation Clauses prohibit Christian Healthcare from doing these things—or adopting and following policies enabling it to do these things—because they would require Christian Healthcare to hire employees who do not share its religious faith as set forth in its Religious Statements.

288. Those Religious Statements require Christian Healthcare employees to profess belief in traditional Christianity, to abstain from same-sex relationships, to abstain from sexual relationships outside of the context of marriage between one man and one woman, to affirm the religious belief that sex is an immutable God-given biological reality, and to otherwise act and communicate consistent with the beliefs contained in the Religious Statements.

289. But the Employment and Accommodation Clauses consider these decisions to be employment discrimination because of religion, marital status, sexual orientation, and gender identity.

290.    Michigan's laws do not contain a religious exemption for religious entities like Christian Healthcare.

291.    Michigan's Employment Clause allows employers to apply to the Commission for an exemption on the basis that religion is a bona fide occupational qualification (BFOQ) reasonably necessary to the normal operation of the business or enterprise. MCL 37.2208; MDCR Rule 37.25(1).

292.    But Christian Healthcare has not applied for this exemption because the Commission may direct the Department to investigate any matter relevant to the application, including by demanding that the applicant produce records, documents, data, or other information. MDCR Rule 37.25(2).

293.    The Commission and the Department may also initiate complaints, file complaints or issue charges alleging violations of Michigan's civil-rights law on their own authority. MCL 37.2602(c); MDCR Rule 37.4.

294.    The initiation of a complaint would terminate any request Christian Healthcare made for an exemption, and Christian Healthcare would instead be subject to investigation as set forth above. MDCR Rule 37.25(2).

295.    The Commission may also revoke any BFOQ exemption once granted. MDCR Rule 37.25(3).

296.    And any entity obtaining a BFOQ exemption must notify the Commission if the classification is no longer used. MDCR 37.25(3).

297.    Because Christian Healthcare requires all employees to affirm and live in accordance with its Religious Statements, which prohibit same-sex relationships and expressing a transgender identity, it would need a BFOQ exemption from discrimination on the basis sexual orientation, gender identity, and religion for every one of its employees.

298.    Bona fide occupational qualification (BFOQ) exceptions are interpreted narrowly and in ways that would not protect Christian Healthcare's hiring and employment practices.[9]

299.    Christian Healthcare is not aware of any jurisdiction granting a BFOQ exception based on religious beliefs about sexual orientation, marital status, or gender identity.

300.    The very fact that Title VII contains a specific co-religionist exception in addition to the BFOQ exception indicates that the BFOQ exception is not sufficient to allow religious ministries like Christian Healthcare to hire people who share their faith.

301.    Based on the investigative and prosecutorial authority granted to the Attorney General, Department and Commission, Christian Healthcare faces a credible threat and substantial risk that it would be investigated and prosecuted for

---

[9] The BFOQ exception in Title VII is "extremely narrow." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). BFOQ exceptions granted on the basis of sex have been typically limited to extreme situations involving vulnerable or captive populations, clear danger to physical safety, and/or significant bodily privacy interests, none of which are relevant to the Center's practice. *See, e.g., Rawlinson*, 433 U.S. at 335 (allowing BFOQ exception for prison positions involving contact with male sex offenders); *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 756–57 (6th Cir. 2004) (allowing BFOQ exception to require female prison guards in female prison based on privacy and safety interests); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 133–34 (3d Cir. 1996) (allowing BFOQ exception based on sex based on privacy concerns of vulnerable underage psychiatric in-patients). Requests for broader BFOQ exemptions have typically been rejected. *See* EEOC Guidance CM-625 Bona Fide Occupational Qualifications (cataloging cases), available at https://bit.ly/3Cuidzy. With respect to religion-based BFOQ requests under Title VII, successful requests have generally been limited to hiring for overtly clerical positions or extreme cases involving the employee's physical safety. *See, e.g., McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 881 (9th Cir. 2011) (allowing state corrections department to require that chaplains for a particular denomination be ordained clergy in that denomination); *Kern v. Dynalectron Corp.*, 577 F. Supp. 1196, 1200 (N.D. Tex. 1983) (allowing company to require that pilot flying into Mecca be Muslim since any non-Muslim in Mecca is subject to being beheaded).

its decision to operate its ministry according to its religious beliefs if it submitted an application for a BFOQ exemption.

302.   Likewise, because of the severely intrusive nature of Michigan's investigatory process and authority and the burden of requesting an individual BFOQ exemption for each and every position, the fear of going through this process has caused Christian Healthcare to refrain from initiating it by filing an application.

303.   By forbidding Christian Healthcare from managing its employment decisions consistent with its religious beliefs, and by containing no religious exception for religious organizations, the Employment Clause interferes with the ministry's ability to select its leaders; restricts the ministry's ability to associate with employees who share its religious beliefs; interferes with the ministry's ability and autonomy to conduct its internal affairs consistent with its religious beliefs; interferes with the ministry's ability to spread its religious beliefs to its employees, its patients, and the public; and threatens the ministry's ability to operate as a faith-based medical provider.

304.   If Christian Healthcare were unable to only employ persons who affirmed, followed, and could effectively communicate its religious beliefs, its religious message would necessarily be changed, it would be unable to communicate those beliefs effectively, it would be prohibited from only associating with employees who share its religious beliefs, and its ability to provide healthcare consistent with its beliefs would be thwarted.

305.   Likewise, Christian Healthcare's ability to access donor funding— which is often predicated upon Christian Healthcare's consistent dedication to its religious mission and values—would be severely compromised.

306.    This, in turn, would require Christian Healthcare to reduce its medical practice by refraining from offering membership to individuals and families who cannot afford it without being subsidized by donations.

307.    The Employment, Accommodation, and Notice Clauses hinder Christian Healthcare's ability to operate its ministry in other ways as well.

308.    For example, Christian Healthcare desires to ask prospective employees questions sufficient for it to learn about whether they are able to affirm, follow, and effectively communicate the religious beliefs contained in the Religious Statements.

309.    Christian Healthcare previously asked such questions during interviews with prospective employees, during informal conversations with persons interested in applying, on its employment application form which it posted on its website.

310.    That application asked if applicants identified as a Christian, where applicants attended church, whether applicants had read the Statement of Faith, and whether they agreed with the statement.

311.    A true and correct copy of its employment application form is attached to the complaint as <u>Exhibit 15</u>.

312.    But the Employment and Notice Clauses forbid Christian Healthcare from asking these questions.

313.    For that reason, Christian Healthcare has been forced to temporarily remove its employment application from its website.

314.    The Employment and Notice Clauses also prohibit Christian Healthcare from employment opportunities on other job-hunting sites if those notices explain Christian Healthcare's religious mission and values and indicate its desire to hire employees who agree with and share that mission and those values.

315.    The Employment and Notice Clauses also prohibit Christian Healthcare from asking employees to annually affirm the Religious Statements to ensure each year that all employees agree with, personally adhere to, agree to abide by, and can effectively communicate the beliefs contained in the Religious Statements.

316.    The Employment, Accommodation, and Notice Clauses hinder Christian Healthcare ability to recruit and hire new employees and to retain existing employees who share its religious mission and values.

317.    But Christian Healthcare needs to be able to effectively hire and employ employees because it is an actively expanding its ministry.

318.    In April 2022, Christian Healthcare opened its Newaygo office.

319.    Christian Healthcare has been actively recruiting and hiring employees to staff that office.

320.    Christian Healthcare has hired approximately one employee per month since July 2021.

321.    Christian Healthcare is actively exploring the potential to open additional clinic locations, which would require hiring new staff.

322.    Christian Healthcare reasonably anticipates continuing to grow and recruiting and hiring for additional positions in the near future.

323.    Christian Healthcare particularly desires to immediately publicize and begin receiving applications for potential hire of a Biblical Counselor to replace a departing employee.

324.    The ministry is not publicizing the job opening solely because the Employment, Accommodation, and Notice Clauses prohibit it.

325.    But for the Employment, Accommodation, and Notice Clauses, Christian Healthcare would immediately post the job opening on its website.

326. Further, Christian Healthcare desires to place its employment application back on its website and to publicize its desire to receive applications from people interested in working with the ministry, even when there is not an open position, so that Christian Healthcare can consider particularly qualified candidates and build a database of candidates for when positions come open.

327. Again, the ministry is not publicizing its desire to receive employment applications solely because the Employment, Accommodation, and Notice Clauses prohibit it.

328. But for the Employment, Accommodation, and Notice Clauses, Christian Healthcare would immediately re-post the employment application on its website and publicize through its website its desire to receive employment applications even in the absence of a formally open position.

329. Thus, the Employment, Accommodation, and Notice Clauses are currently preventing Christian Healthcare from pursuing its religious mission by hindering its ability to effectively manage its employment decisions and recruit new employees.

330. The Accommodation and Publication Clauses likewise restrict Christian Healthcare's ability to operate consistent with its religious beliefs.

331. For example, the Accommodation Clause compel Christian Healthcare to refer to members using pronouns based on the members' own gender-identity choices and gender expression even if that pronoun does not align with the members' biological sex. *See supra* ¶¶ 238–40.

332. Staff often refer to members using pronouns when the same pronouns accord with the members' biological sex and gender identity.

333. But Christian Healthcare cannot refer to members using pronouns inconsistent with the members' biological sex because doing so would violate its religious beliefs that biological sex is an immutable, God-given biological reality.

334.    Christian Healthcare would gladly refer to a member who identifies as a sex other than the member's biological sex by using the member's first or last name instead of using pronouns or working with the member on an appropriate and respectful accommodation. Indeed, to date, it has addressed and referred to transgender patients using their preferred first or last names.

335.    But this solution runs afoul of the Accommodation Clause's prohibition on gender-identity discrimination.

336.    Attorney General Nessel insists that "[p]ronouns are important and using them properly conveys respect for those you're working with."[10]

337.    Likewise, the Accommodation Clause compels Christian Healthcare to provide medical treatment to facilitate attempts to transition to the opposite biological sex contrary to its religious beliefs. *See supra* ¶¶ 233–36.

338.    The Accommodation Clause prohibits Christian Healthcare from following and adopting pronoun policies and policies regarding medical treatment for attempts to transition to the opposite biological sex.

339.    Christian Healthcare faces a credible threat and substantial risk that it will be investigated and prosecuted under the Accommodation Clause for its religious-based policies.

340.    For example, the Attorney General has taken the position that there should not be religious-based exemptions to providing hormone therapy treatment to facilitate gender transitions. *See Mem. of Law in Supp. of Pls.' Cross-Mot. for Summ. J., in Opp'n to Defs.' Mot. to Dismiss or for Summ. J., and Reply in Supp. of Pls.' Mot. for Prelim. Inj.* 18–19, 28–29 & n.23, 19-civ-4676-PAE (S.D.N.Y. Sept. 5, 2019).

---

[10] Nick LaAFave, 13 on Your Side, *Alone at the Desk – 27: Pride Month with Dana Nessel* (June 25, 2021, 3:21 PM), https://bit.ly/3R6biAB.

341.    Likewise, the Department has investigated an electrolysis provider for allegedly discriminating based on gender identity when the provider declined to provide hair removal services to a biological male who identified as female. *Rouch World*, 2022 WL 3007805, at *5.

342.    The Department pursued the investigation even though the provider explained that because of the business's religious beliefs that "sex is an immutable gift from God." *Id.*

343.    The investigation only stopped when the customer filed a private lawsuit against the electrolysis provider. *Id.*

344.    Across the country, including in Michigan, religious medical providers are being sued for declining to perform certain procedures and practices on religious grounds.[11]

345.    Likewise, Christian Healthcare currently treats and has recently treated patients who identify as a gender other than their biological sex.

346.    Christian Healthcare has already been requested to and declined to refer to those patients using pronouns that reflect the sex they identify as but has

---

[11] *See, e.g.*, Dep't of Health & Hum. Serv., Protecting Statutory Conscience Rights in Health Care; Delegations of Authority, 84 Fed. Reg. 23170, 23175–79 (May 21, 2019) (collecting numerous instances of religious intolerance in health care, citing this case twice); Complaint, *Knight v. St. Joseph Health N. Cal.*, No. DR190259 (Cal. Super. Ct. Mar. 21, 2019) (hospital refused to allow hysterectomy as treatment for gender dysphoria); Complaint, *Mahoney v. Centura Health Corp.*, No. 19-cv-02478 (D. Colo. Aug. 30, 2019) (religious hospital disallowed employees from advocating for physician-assisted suicide); Complaint, *Dale-Jablonowski v. Univ. of Cal. Bd. Of Regents*, No. CGC-15-549626 (Cal. Super. Ct. July 7, 2017) (physician declined to participate in suicide of terminally ill cancer patient); Complaint, *Conforti v. St. Joseph's Healthcare Sys.*, Inc., 2:17-cv-00050-CCC-CLW (D. N.J. Jan. 5, 2017) (Catholic hospital refused to perform hysterectomy for gender dysphoria); *ACLU v. Trinity Health Corp.*, 178 F. Supp. 3d 614 (E.D. Mich. 2016) (network of Catholic hospitals sued for adhering to religious directives prohibiting abortion); *Chamorro v. Dignity Health*, No. CGC-15-549626 (Cal. Super. Ct. Dec. 28, 2015) (Catholic hospital refused to conduct tubal ligation sterilization procedure).

provided those patients with excellent medical treatment consistent with its religious beliefs.

347.   Christian Healthcare desires to continue to provide medical care for patients who identify as transgender and will happily provide medical care for anyone, regardless of status, so long as the treatment is consistent with its religious beliefs.

348.   Christian Healthcare has also had multiple young patients whose families inquired with Christian Healthcare about the potential that the child suffered from gender dysphoria or similar conditions, and Christian Healthcare providers have discouraged them from seeking gender-transition care.

349.   Christian Healthcare is constantly at risk of a patient or a patient's family requesting such treatment or being asked to refer to those patients using their preferred pronouns.

350.   To be transparent and honest with members, potential members, and the public before such issues arise, Christian Healthcare desires to explain and to publicize its religious beliefs to members and prospective members.

351.   Christian Healthcare has previously done so by including a Religious Provider Disclosure and its Philosophy of Wellness and Health Care statement in Membership Agreement forms that it publishes on its website.

352.   Christian Healthcare includes these documents so that it can explain its religious beliefs to prospective members and avoid giving any false impression about its medical practice.

353.   Christian Healthcare recently amended its policies to be even more explicit about including its position on pronoun usage and gender transition treatment.

354.   But the Accommodation and Publication Clauses prohibits Christian Healthcare from including these policies in its Membership Agreement (including

its Religious Provider Disclosure and Philosophy of Wellness and Healthcare) or otherwise publicizing them.

355.   Because of the Accommodation and Publication Clauses, Christian Healthcare has been forced to temporarily remove its Membership Agreement from its website.

356.   If not for the Employment, Notice, Accommodation, and Publication Clauses, Christian Healthcare would immediately re-initiate activities motivated by its religious beliefs.

357.   If not for the Employment and Notice Clauses, Christian Healthcare would immediately republish its employment application on its website.

358.   If not for the Employment and Notice Clauses, Christian Healthcare would immediately publish information about its opening for a biblical counselor position, including the employment application, on its website.

359.   If not for the Accommodation and Publication Clauses, Christian Healthcare would immediately republish its Membership Agreement on its website.

360.   Because of the severely intrusive nature of Michigan's investigatory process (including the process described in ¶¶ 258–82), the fear of going through this process has forced Christian Healthcare to refrain from reposting its employment application, posting its biblical counselor position, and reposting its Membership Agreement on its website.

361.   Likewise, Christian Healthcare has and continues to refrain from reposting the employment application, posting the biblical counselor position, or reposting its Membership Agreement on its website because it faces a credible threat and substantial risk that it will be investigated or prosecuted under Michigan's law for posting the application.

362.   Further, because the Employment and Accommodation Clauses prohibit holding policies that conflict with them—such as the employment, pronoun,

and medical-treatment policies contained in Christian Healthcare's Religious Statements—Christian Healthcare is constantly at risk of investigation and enforcement action by the Attorney General, Department, and/or Commission.

363.   Likewise, because the Notice and Publication Clauses prohibit publishing these policies internally to Christian Healthcare's employees, and because Christian Healthcare does in fact publish these policies internally and require employees to review and affirm them annually, Christian Healthcare is constantly at risk of investigation and enforcement action by the Attorney General, Department, and/or Commission.

364.   The ongoing and continual exposure to liability, investigation, and prosecution hinders the ability of Christian Healthcare to operate its organization, retain current employees, attract future employees, raise charitable donations, and make future plans for the organization.

365.   As a result, Christian Healthcare currently diverts resources, time, and efforts away from its daily operations and ministry to time and efforts spent on monitoring the changes to Michigan law mentioned above, evaluating its scope and risk of liability, and informing and preparing employees to respond to patient and public inquiries about treatments and pronoun usage now mandated under Michigan law.

366.   Michigan's law imposes a greater burden on the operation of Christian Healthcare because of its faith-based policies than it does on other healthcare facilities that do not have these same policies.

367.   For example, Michigan's law does not burden Planned Parenthood of Michigan's Irwin/Martin Health Center, which is located approximately 10 miles from Christian Healthcare's main clinic.

368.   Unlike Christian Healthcare, Planned Parenthood can post its pronoun policy without fear of prosecution or enforcement action because it agrees with the speech Michigan's law compels. https://bit.ly/3Ai7G7S; https://bit.ly/3PHZ0gI.

369.   Likewise, unlike Christian Healthcare, Planned Parenthood can post its views on prescribing cross-sex hormones to facilitate a gender transition because it does not hold the viewpoint that Michigan's law prohibits. https://bit.ly/3QSNX5w

370.   And, unlike Christian Healthcare, Planned Parenthood can freely advertise its job openings, thus making it easier to attract talented applicants, because it does not hold the employment policies that Michigan's law prohibits. https://jobs.lever.co/ppmi.

371.   Accordingly, Michigan's law places Christian Healthcare at a competitive disadvantage and places competitive burdens on it because of its religious faith, its viewpoint and desire to express its viewpoint, and its refusal to speak the government's message.

## Legal Allegations

372.   Plaintiff is subject to and must comply with Michigan's Employment, Notice, Accommodation, and Publication Clauses.

373.   These clauses violate Plaintiff's constitutional rights, and chill and deter Plaintiff from exercising its constitutional rights.

374.   As a direct and proximate result of Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered and will suffer ongoing irreparable harm, entitling Plaintiff to declaratory and injunctive relief.

375.   Plaintiff does not have an adequate monetary or legal remedy for the loss of its constitutional rights.

376.   Unless Defendants are enjoined, Plaintiff will continue to suffer irreparable harm.

<u>First Cause of Action</u>
<u>Violation of the First Amendment's Free Exercise and Establishment Clauses:</u>
<u>Religious Autonomy, Ministerial Exception, Co-Religionists, and Compelled</u>
<u>Participation</u>

377.   Plaintiff repeats and realleges all preceding allegations.

378.   The First Amendment's Free Exercise and Establishment Clauses protect Plaintiff's right to select its leaders, to decide for itself matters of faith and doctrine, to manage its internal affairs related to employment and the services it provides, to decide how to effectively communicate its religious beliefs, to operate itself as a religious ministry, to associate with and employ employees in accordance with its religious beliefs, and to be free from participating in activities and procedures that violate its religious beliefs.

379.   Plaintiff is a Christian medical service ministry that treats and serves its patients consistent with its religious beliefs and that communicates those beliefs to its employees, its patients, and the public.

380.   Plaintiff exercises its religious belief when it employs and seeks to hire leaders who share, abide by, and live out its religious beliefs.

381.   Plaintiff's CEO, Director of Operations, Medical Director, Advanced Practice Medical Providers, and Biblical Counselors (collectively, its "leaders") perform important religious functions for the ministry by providing spiritual ministry to its employees, patients, and the public and by leading Bible studies and prayers with its employees.

382.   Plaintiff's leaders' primary duties consist of discussing spiritual matters with patients, providing medical treatment consistent with Plaintiff's religious beliefs to patients, praying with patients as a necessary component of medical treatment, and incorporating Plaintiff's religious beliefs and communicating those beliefs as a necessary component of medical treatment.

383.   Plaintiff's leaders are selected based on their agreement with the Religious Statements, their ability to express the beliefs contained in that statement, their ability to incorporate the values contained in that statement with their position or medical practice, and their excellence in performing all job functions consistent with the Religious Statements.

384.   Plaintiff also exercises its religious belief when it employs and seeks to hire individuals—regardless of leadership status—who share, abide by, and live out its religious beliefs.

385.   Plaintiff must recruit, hire, and employ only those individuals who assent to and agree to personally live out its religious beliefs so that all of its employees are capable of authentically conveying its beliefs to its employees, patients, and the public.

386.   Plaintiff's employees share Plaintiff's religious beliefs with its other employees, patients, and the public.

387.   Plaintiff's Religious Statements sets forth its core religious beliefs that define its mission, guide its work, and help it select leaders and employees.

388.   Plaintiff requires all employees to affirm, live out, and effectively communicate its religious beliefs to ensure that they are committed to its mission and are capable of authentically convey its beliefs to other employees, patients, and the public.

389.   All of Plaintiff's staff are selected based on their agreement with the Religious Statements and their ability to express the beliefs contained therein.

390.   Plaintiff also exercises its religious beliefs when it operates its ministry, adopts policies consistent with its religious beliefs, honestly communicates with employees, patients, and the public about its religious beliefs, and provides medical healthcare consistent with its religious beliefs.

391.    Plaintiff's decision to refuse to provide cross-sex hormones—or any other treatment—to facilitate gender transition is guided by its religious judgments about moral, ethical, and just medical treatment and is inextricably intertwined with its religious tenets.

392.    Plaintiff's provision of medical treatment to members of the public is motivated by and infused with its religious beliefs about the most effective and loving way to care for others as it follows the biblical mandate to care for its neighbors, including members of the general public in Michigan.

393.    There is a longstanding tradition in this country of religious organizations exercising their faith and religious autonomy to hire religious leaders and employees who share their faith, and to require that leaders and employees live in accordance with the organization's religious faith and practice.

394.    Likewise, Plaintiff's practice of declining to provide care that violates its sincerely held religious, moral, ethical, and medical beliefs is consistent with a longstanding tradition in this country of medical practitioners exercising a high level of autonomy and discretion in determining what treatments the practitioner will provide.

395.    Traditionally, medical practitioners have validly declined to provide particular non-emergency treatments based on the practitioner's independent judgment and weighing of the moral, ethical, Hippocratic, and medical concerns attendant to the particular treatment.

396.    This tradition is particularly strong where the treatment at issue is morally, ethically, and/or medically controversial, and where it has the potential to cause sterility.

397.    The history of a medical practitioner's right to decline to provide particular treatments goes back to the times of the adoption of the First and Fourteenth Amendments.

398.   Plaintiff's employment practices and its practice of providing public services consistent with its religious beliefs are consistent with the practices common among religious organizations throughout the history of this country, including at the time of the adoption of the First and Fourteenth Amendments.

399.   Simply maintaining a written or unwritten policy of only hiring leaders and employees who agree to, affirm, and follow the Plaintiff's Religious Statements, and requiring employees to affirm the Religious Statement on an annual basis, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Employment, Accommodation, and Notice Clauses.

400.   Likewise, simply maintaining a written or unwritten policy of declining to provide medical treatment to facilitate gender transitions at least constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Accommodation Clause.

401.   As applied to Plaintiff, the Employment and Accommodation Clauses substantially burden Plaintiff's First Amendment right to select its own religious leaders and staff, and to govern itself according to its religious principles by requiring it to hire employees who do not conform to its religious beliefs, by failing to include a religious exemption for religious organizations, by prohibiting Plaintiff from maintaining a written policy or unwritten practice of only hiring and employing employees who share its religious beliefs, by prohibiting Plaintiff from imposing faith-based employment-related qualifications and responsibilities on any position, and by prohibiting Plaintiff from ensuring that its employees agree with and adhere to its Religious Statements.

402.   As applied to Plaintiff, the Notice Clause substantially burdens Plaintiff's First Amendment right to select its own religious leaders and staff, and to govern itself according to its religious principles by prohibiting Plaintiff from asking prospective employees questions related to Plaintiff's Religious Statements

or about prospective employee's religious beliefs, by failing to include a religious exemption for religious organizations, by prohibiting Plaintiff from posting employment opportunities indicating a desire to hire employees who affirm Plaintiff's Religious Statements, and by prohibiting displaying or adopting a job description which lists adherence to Plaintiff's Religious Statements as an employment-related qualification.

403.    Likewise, as applied to Plaintiff, the Accommodation and Publication Clauses substantially burden Plaintiff's First Amendment right by prohibiting it from operating its ministry and adopting policies consistent with its religious beliefs about biological sex, honestly communicating those policies to employees, patients, and the public, only providing medical healthcare consistent with its religious beliefs about biological sex, and by forcing its participation in ethically and medically controversial, non-emergency, off-label medical treatment prohibited by its religious beliefs.

404.    Plaintiff has refrained from engaging in certain religiously motivated conduct because of the Employment, Accommodation, Notice, and Publication Clauses.

405.    If not for the Employment, Accommodation, Notice, and Publication Clauses, Plaintiff would immediately begin to act again in ways motivated by its religious beliefs.

406.    The Employment, Accommodation, Notice, and Publication Clauses are per se unconstitutional because they infringe on Plaintiff's religious autonomy by restricting and regulating its internal management.

407.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiff's rights to select its own employees and govern itself according to its religious principles.

408.    Accordingly, as applied to Plaintiff, the Employment, Accommodation, Notice, and Publication Clauses violate the protections of the First Amendment's Free Exercise and Establishment Clauses.

<u>Second Cause of Action</u>
<u>Violation of the First Amendment's Free Exercise Clause: Lack of General Applicability, Individualized Exemptions, and Compelled Participation</u>

409.    Plaintiff repeats and realleges all preceding allegations up to and included Paragraph 376.

410.    The First Amendment's Free Exercise Clause protects Plaintiff's right to be free from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being compelled to offer and provide medical services that conflict with their religious beliefs, being targeted for its religious beliefs, and being punished for exercising its religious beliefs.

411.    Plaintiff exercises its religion under the First Amendment when it operates its ministry, adopts policies consistent with its religious beliefs, honestly communicates with employees, patients, and the public about its religious beliefs, and provides medical healthcare consistent with its religious beliefs.

412.    Simply maintaining a written or unwritten policy of only hiring employees who agree to, affirm, and follow Christian Healthcare's Religious Statements, and of requiring employees to affirm the Religious Statement on an annual basis, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Employment and Notice Clauses.

413.    As applied to Plaintiff, the Employment, Accommodation, and Notice Clauses substantially burden Plaintiff's sincerely held religious beliefs by requiring it either to refrain from adopting employee policies and practices consistent with its religious beliefs, ignore those beliefs, or close its practice, by preventing it from

maintaining and enforcing employment policies consistent with its religious views, by preventing it from selecting employees who share its religious beliefs, by stopping it from being honest with prospective employees by barring it from inquiring or informing them about its religious beliefs, and by preventing its religiously motivated speech.

414.    The Employment and Accommodation Clauses are not neutral or generally applicable because they contain a system of exceptions, including individualized exemptions that authorize Michigan to make individualized assessments of employment positions and exempt some positions from the Employment Clause that Defendants determine qualify as "bona fide occupational qualification" based on Defendants' sole discretion.

415.    Simply maintaining a written or unwritten policy of not providing treatment that violates Plaintiff's Religious Statements, not providing cross-sex hormones to facilitate and gender transition, and not using pronouns or other references that do not comport with a person's biological sex constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Accommodation and Publication Clauses.

416.    As applied to Plaintiff, the Accommodation and Publication Clauses substantially burden Plaintiff's sincerely held religious beliefs by requiring it either to refrain from operating its medical practice consistent with its religious beliefs or violate those beliefs or close its practice, by preventing it from maintaining policies consistent with its religious views, by stopping it from being honest with prospective patients and the public by barring it from informing them about its religious beliefs, by preventing its religiously motivated speech, and by forcing its participation in ethically and medically controversial, non-emergency, off-label medical treatment prohibited by its religious beliefs.

417.    The Employment, Notice, Accommodation, and Publication Clauses do not force nonreligious persons and businesses, or persons and business with favored religious views, to choose between these same options when they process employment applications, review employee performance, or provide medical treatment.

418.    The Employment, Notice, Accommodation, and Publication Clauses are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiff due to its religious beliefs.

419.    The Employment, Notice, Accommodation, and Publication Clauses are not neutral or generally applicable because Michigan's laws and other laws and regulations adopted by Michigan contain several categorical exemptions, yet Defendants refuse to grant a religious exemption to Plaintiff.

420.    The Employment, Notice, Accommodation, and Publication Clauses also violate Plaintiff's free-exercise rights under the hybrid-rights doctrine because they implicate free-exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, press, and assembly.

421.    The Employment, Notice, Accommodation, and Publication Clauses impose severe coercive pressure on Plaintiff to change or violate its religious beliefs and to stop operating its ministry according to its religious beliefs.

422.    Plaintiff has refrained from engaging in certain religious exercise because of the Employment, Notice, Accommodation, and Publication Clauses.

423.    If not for the Employment, Notice, Accommodation, and Publication Clauses, Plaintiff would immediately resume this religious exercise.

424.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise Plaintiff's religion.

425.   Accordingly, as applied to Plaintiff, the Employment, Notice, Accommodation, and Publication Clauses violate the First Amendment's protections to freely exercise religion.

426.   Accordingly, as applied to Plaintiff, the Employment Clause violates the First Amendment's protections to freely exercise religion.

Third Cause of Action
Violation of the First Amendment's Free Speech and Assembly Clauses: Freedom of
Speech, Expressive Association, Press, and Assembly

427.   Plaintiff repeats and realleges all preceding allegations up to an including Paragraph 376.

428.   The First Amendment's Free Speech, Press, and Assembly Clauses protect Plaintiff's ability to speak; to create, publish, and distribute speech; to associate with others for expressive purposes; to only associate with Plaintiff's desired messages; and to peaceably assemble to engage in otherwise lawful religious worship and speech activities with persons of its choosing.

429.   The First Amendment also protects Plaintiff's ability not to speak; to exercise control over their speech; to decline to associate with others for expressive purposes; and to decline to assemble with others.

430.   The First Amendment also protects Plaintiff's right to be free from content, viewpoint, and speaker-based discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

431.   The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

432.   Plaintiff's Religious Statements and Membership Agreement communicate with its employees, patients, and the public about its religious beliefs, and communications with patients are forms of protected speech and expression, and Plaintiff publishes its speech to the public.

433. Plaintiff also engages in expression, expressive activities, and protected assembly as an organization when its employees gather together, provide medical treatment, and communicate with the public because Plaintiff believes that these activities and this organization are a witness of its faith and thus inherently expressive.

434. Simply maintaining a written or unwritten policy of only hiring employees who agree to, affirm, and follow Christian Healthcare's Religious Statements, and requiring employees to affirm the Religious Statement on an annual basis, constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Employment and Notice Clauses.

435. Simply maintaining a written or unwritten policy of not providing treatment that violates Christian Healthcare's Religious Statements, not providing cross-sex hormones to facilitate and gender transition, and not using pronouns or other references that do not comport with a person's biological sex constitutes—in Michigan's view—a pattern or practice of discrimination in violation of the Accommodation and Publication Clauses.

436. As applied to Plaintiff, the Employment and Notice Clauses prohibit Plaintiff from engaging in its desired expressive association and assembly; compel Plaintiff to engage in expressive associations and assembly it finds objectionable; inhibit Plaintiff from forming expressive associations and assemblies it desires to form and from avoiding expressive associations and assemblies it wants to avoid, prohibit Plaintiff from adopting its desired employment policies, and regulate association and assembly based on content, viewpoint, and speaker identity.

437. As applied to Plaintiff, the Accommodation Clause compels speech Plaintiff objects to, forbids it from tailoring its ministry and from adopting certain policies consistent with its religious beliefs, and regulates speech based on content, viewpoint, and speaker identity.

438.   As applied to Plaintiff, the Employment, Notice, Accommodation, and Publication Clauses condition its ability to provide medical care on the requirement that Plaintiff abandon its religious beliefs when it provides that care and as it makes employment decisions.

439.   As applied to Plaintiff, the Employment, Notice, and Publication Clause are content, viewpoint, and speaker-based regulations that ban, chill, and burden Plaintiff's desired speech (and publication of that speech) on Plaintiff's website, directly to prospective and existing employees and patients, and the public.

440.   As applied to Plaintiff, the Publication Clause's Unwelcome Clause is vague, overbroad, and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the Unwelcome and Discrimination Clauses.

441.   The Publication Clause's Unwelcome Clause is also facially unconstitutional because it is vague, overbroad, allows unbridled discretion, and is a content-based and viewpoint-based regulation that bans, chills, and burdens speech and publication of speech.

442.   Plaintiff has not and cannot not engage in certain protected speech, expressive association, and assembly because of the Employment, Notice, and Publication Clauses.

443.   If not for the Employment, Notice, and Publication Clauses, Plaintiff would immediately begin to again engage in this protected speech, expressive association, and assembly.

444.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiff's free-speech, free-association, free-press, and free-assembly rights.

445.    Accordingly, as applied to Plaintiff, the Employment, Notice, Accommodation, and Publication Clauses violate the First Amendment's protections for free speech, free association, free press, and free assembly.

446.    Accordingly, the Publication Clause's Unwelcome Clause facially violates the First Amendment's protections for free speech and free press.

Fourth Cause of Action<br>Violation of the Fourteenth Amendment's Due Process Clause: Vagueness

447.    Plaintiff repeats and realleges all preceding allegations up to and including Paragraph 376.

448.    The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violate Michigan's law.

449.    The Publication Clause's Unwelcome Clause prohibits any public accommodation or public service from publishing a "statement, advertisement, notice, or sign" to the effect that" a person's "patronage of or presence at" the public accommodation or public service is "objectionable, unwelcome, unacceptable, or undesirable" because of the person's religion, sex, marital status, sexual orientation, or gender identity (MCL 37.2302(b)) or publishing any statement indicating that someone is "not welcome, objectionable, or not acceptable, not desired or solicited" because of religion (MCL 750.147).

450.    Michigan's law nowhere defines "objectionable, unwelcome, unacceptable, or undesirable" or "not welcome, objectionable, or not acceptable, not desired or solicited."

451.    Plaintiff, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's or public service's website or made directly to prospective clients indicate a person's "patronage of or presence" at a place of public accommodation or public service is "objectionable, unwelcome, unacceptable, or undesirable" because of religion, sex, marital status, sexual orientation, or gender identity or "objectionable, or not acceptable, not desired or solicited" because of religion therefore cannot know what is prohibited by the Unwelcome Clause.

452.    Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Unwelcome Clause in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

453.    Accordingly, facially and as applied to Plaintiffs, the Publication Clause's Unwelcome Clause violates the Fourteenth Amendment's Due Process Clause.

## Prayer for Relief

Plaintiff respectfully asks this Court to enter judgment against Defendants and provide the following relief:

1.    A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

   a.    enforcing the Employment, Notice, Accommodation, and Publication Clauses as applied to Plaintiff's constitutionally protected religious autonomy, religious exercise, establishment clause, speech, association, free press, and assembly rights; and

   b.    enforcing the Publication Clause's Unwelcome Clause facially;

2.    A declaration that the Employment, Notice, Accommodation, and Publication Clauses have violated and continue to violate Plaintiff's First

Amendment rights under the United States Constitution to religious autonomy, exercise religion, be free from the establishment of religion, engage in speech, association, press, and assembly as applied to Plaintiff's constitutionally protected activities;

3.    A declaration that the Publication Clause's Unwelcome Clause facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.    That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.    That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.    That this Court award Plaintiff's costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiff; and

8.    That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 29th day of August, 2022.

|  |  |
|---|---|
| Jonathan A. Scruggs | By: <u>s/ John J. Bursch</u> |
| Arizona Bar No. 030505 | John J. Bursch |
| Ryan J. Tucker | Michigan Bar No. P57679 |
| Arizona Bar No. 034382 | **Alliance Defending Freedom** |
| Henry W. Frampton, IV* | 440 First Street NW, Suite 600 |
| South Carolina Bar No. 75314 | Washington, DC 20001 |
| Bryan D. Neihart* | (202) 393-8690 |
| Arizona Bar No. 035937 | (202) 347-3622 Fax |
| **Alliance Defending Freedom** | jbursch@ADFlegal.org |
| 15100 N. 90th Street | |
| Scottsdale, Arizona 85260 | |
| (480) 444-0020 | |
| (480) 444-0028 Fax | |
| jscruggs@ADFlegal.org | |
| rtucker@ADFlegal.org | |
| hframpton@ADFlegal.org | |
| bneihart@ADFlegal.org | |

*Attorneys for Plaintiff*

*Pending Admission

72

## Declaration Under Penalty of Perjury

I, Mark Blocher, a citizen of the United States and a resident of the State of Michigan, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of August, 2022, at Grand Rapids, Michigan.

Mark Blocher