# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**Christian Healthcare Centers, Inc.**

                    Plaintiff,

v.

**Dana Nessel,** in her official capacity as
Attorney General of Michigan; **John E.
Johnson, Jr.,** in his official capacity as
Executive Director of the Michigan
Department of Civil Rights; **Portia L.
Roberson, Zenna Faraj Elhason, Gloria
E. Lara, Regina Gasco-Bentley,
Anupama Kosaraju, Richard
Corriveau, and David Worthams,** in
their official capacities as members of the
Michigan Civil Rights Commission.

                    Defendants.

Case No.    1:22-cv-00787

**Plaintiff's Brief in Support of
Its Preliminary Injunction
Motion**

*Oral Argument Requested*

# TABLE OF CONTENTS

Table of Authorities......................................................................................................iii

Introduction ............................................................................................................... 1

Summary of Facts ...................................................................................................... 2

Argument .................................................................................................................... 9

I.    The Accommodation and Publication Clauses violate Christian
      Healthcare's First Amendment rights ............................................................ 9

      A.    The Accommodation Clause compels Christian Healthcare to
            speak a message about gender identity to which it objects. .................... 9

      B.    The Accommodation Clause violates Christian Healthcare's
            religious autonomy by forcing it to provide medical services that
            contradict its religious beliefs ............................................................ 13

            1.    The First Amendment's text, history, and tradition protects
                  Christian Healthcare's autonomy to refuse controversial
                  medical treatment that violates its faith. ...................................... 13

            2.    The Clause violates Christian Healthcare's religious
                  autonomy by compelling it to provide medical treatment
                  contrary to its conscience .......................................................... 15

            3.    The Clause is per se unconstitutional as applied to Christian
                  Healthcare's refusal to facilitate gender transitions .................... 19

      C.    The Publication Clause restricts Christian Healthcare's religiously-
            motivated speech based on content and viewpoint .............................. 19

II.   The Employment, Accommodation, and Notice Clauses violate Christian
      Healthcare's First Amendment free-exercise, expressive-association, and
      free-speech rights ......................................................................................... 21

      A.    The Employment Clause defies Christian Healthcare's free
            exercise rights by allowing individualized exemptions. ........................ 22

      B.    Michigan's law infringes on Christian Healthcare's religious
            autonomy ......................................................................................... 23

            1.    The First Amendment's text, history, and tradition
                  protects Christian Healthcare's autonomy to manage its
                  employment policies and decisions .............................................. 24

2.      The Clauses violate the ministerial exception by interfering with Christian Healthcare's ability to adopt leadership policies and to select religious leaders ............................................. 25

3.      The Clauses violate the co-religionist exception by interfering with Christian Healthcare's faith-based employment policies and decisions. .................................................... 27

4.      The Clauses are per se unconstitutional as applied to Christian Healthcare's employment policies and decisions........ 30

C.      Michigan's law interferes with Christian Healthcare's expressive association ...................................................................................... 31

D.      The Notice Clause restricts Christian Healthcare's religiously-motivated speech on employment topics based on content and viewpoint. ................................................................................... 33

III.    Michigan's law fails strict scrutiny as applied to Christian Healthcare's expression and religious exercise........................................................... 35

A.      Michigan's law does not advance a compelling interest as applied to Christian Healthcare .............................................................. 35

B.      Michigan's law is not narrowly tailored as applied to Christian Healthcare ........................................................................................ 37

Conclusion ........................................................................................................... 38

# Table of Authorities

**Cases**

*Ashcroft v. ACLU,*
 542 U.S. 656 (2004) .......................................................................... 37

*Bays v. City of Fairborn,*
 668 F.3d 814 (6th Cir. 2012) .............................................................. 9

*Boy Scouts of America v. Dale,*
 530 U.S. 640 (2000) ............................................................ 32, 33, 36, 37

*Brown v. Entertainment Merchants Association,*
 564 U.S. 786 (2011) .......................................................................... 35

*Chrisman v. Sisters of St. Joseph of Peace,*
 506 F.2d 308 (9th Cir. 1974) .............................................................. 14

*Christian Legal Society v. Walker,*
 453 F.3d 853 (7th Cir. 2006) .............................................................. 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
 508 U.S. 520 (1993) .......................................................................... 22

*City of Boerne v. Flores,*
 521 U.S. 507 (1997) .......................................................................... 35

*Clarke v. K Mart Corporation,*
 495 N.W.2d 820 (Mich. App. 1992) .................................................... 11

*Conlon v. InterVarsity Christian Fellowship,*
 777 F.3d 829 (6th Cir. 2015) ........................................................ 25, 26

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day
 Saints v. Amos,*
 483 U.S. 327 (1987) ...................................................................... 25, 29

*Duquesne University of the Holy Spirit v. NLRB,*
 947 F.3d 824 (D.C. Cir. 2020) ............................................................ 29

*E.E.O.C. v. Townley Engineering & Manufacturing  Company,*
 859 F.2d 610 (9th Cir. 1988) .............................................................. 30

*Employment Division v. Smith,*
 494 U.S. 872 (1990) .......................................................................... 19

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) .................................................................. 22, 23, 35, 36

*Hall v. Baptist Memorial Health Care Corporation,*
    215 F.3d 618 (6th Cir. 2000) ............................................................ 29

*Hammons v. University of Maryland Medical System Corporation,*
    551 F. Supp. 3d 567 (D. Md. 2021) .................................................. 16

*Hankins v. The New York Annual Conference of United Methodist Church,*
    516 F. Supp. 2d 225 (E.D.N.Y. 2007) .............................................. 37

*Haynes v. Neshewat,*
    729 N.W.2d 488 (Mich. 2007) .......................................................... 23

*Hollins v. Methodist Healthcare, Inc.,*
    474 F.3d 223 (6th Cir. 2007) ............................................... 14, 25, 26

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ......................................................................... 37

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.,*
    565 U.S. 171 (2012) .................................................................*passim*

*Hutchinson v. Thomas,*
    789 F.2d 392 (6th Cir. 1986) ............................................................ 32

*Jamoua v. Michigan Farm Bureau,*
    2021 WL 5177472 (E.D. Mich. Nov. 8, 2021) .................................. 23

*Janus v. American Federation of State, County, & Municipal Employees.,*
    *Council 31,*
    138 S. Ct. 2448 (2018) ............................................................... 10, 12

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
    344 U.S. 94 (1952) ..................................................................... 13, 14

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ............................................................ 30

*Lamb's Chapel v. Center Moriches Union Free School District,*
    508 U.S. 384 (1993) ......................................................................... 34

*Lange v. Houston County, Georgia,*
    2022 WL 1812306 (M.D. Ga. June 2, 2022) ............................... 16, 19

*Means v. United States Conference of Catholic Bishops,*
  2015 WL 3970046 (W.D. Mich. 2015)................................................ 14, 18, 19

*Means v. United States Conference of Catholic Bishops,*
  836 F.3d 643 (6th Cir. 2016) ............................................................ 14

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ...................................... 10, 12, 13, 21, 36

*Minton v. Dignity Health,*
  39 Cal. App. 5th 1155 (Cal. Ct. App. 2019) ..................................... 16

*N.L.R.B. v. Catholic Bishop of Chicago,*
  440 U.S. 490 (1979) .......................................................................... 31

*Our Lady of Guadalupe School v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020) ............................................ 17, 24, 26, 30, 31

*Pacific Gas & Electric Company v. Public Utilities Commission of California,*
  475 U.S. 1 (1986) ............................................................................... 9

*Penn v. New York Methodist Hospital,*
  884 F.3d 416 (2d Cir. 2018) ............................................................. 14

*Pittsburgh Press Company v. Pittsburgh Commission on Human Relations,*
  413 U.S. 376 (1973) .......................................................................... 21

*Planet Aid v. City of St. Johns,*
  782 F.3d 318 (6th Cir. 2015) ............................................................ 12

*Porth v. Roman Catholic Diocese of Kalamazoo,*
  532 N.W.2d 195 (Mich. App. 1995).................................................. 30

*Prescott v. Rady Children's Hospital-San Diego,*
  265 F. Supp. 3d 1090 (S.D. Cal. 2017)............................................. 11

*Ramirez v. Collier,*
  142 S. Ct. 1264 (2022) ...................................................................... 38

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ............................................... 9. 19, 20, 33, 35

*Roberts v. Jaycees,*
  468 U.S. 609 (1984) ...................................................................... 31, 32

*Roe v. Wade,*
  410 U.S. 113 (1973) .......................................................................... 14

*Rouch World, LLC v. Department of Civil Rights*,
 2022 WL 3007805 (Mich. July 28, 2022) ...................................... 1, 4, 12, 16, 30

*Salas v. Clements*,
 247 N.W.2d 889 (Mich. 1976) .......................................................................... 22

*Seattle's Union Gospel Mission v. Woods* (*SUGM*),
 142 S. Ct. 1094 (2022) ........................................................................ 24, 25, 29

*Telescope Media Group v. Lucero* (*TMG*),
 936 F.3d 740 (8th Cir. 2019) ...................................................................... 11, 38

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
 137 S. Ct. 2012 (2017) .................................................................................... 17

*United States v. Playboy Entertainment Group, Inc.*,
 529 U.S. 803 (2000) ........................................................................................ 35

*West Virginia State Board of Education v. Barnette*,
 319 U.S. 624 (1943) ........................................................................................ 23

*Ward v. Polite*,
 667 F.3d 727 (6th Cir. 2012) .......................................................................... 23

*Watson v. Jones*,
 80 U.S. (13 Wall.) 679 (1871) .................................................................... 13, 24

*Whitman v. Mercy-Memorial Hospital*,
 339 N.W.2d 730 (Mich. App. 1983) ......................................................... 8, 11, 15

*Wooley v. Maynard*,
 430 U.S. 705 (1977) ........................................................................................ 10

## Statutes, Rules and Ordinances

42 U.S.C.A. § 2000e-1(a) ...................................................................................... 34, 38

42 U.S.C.A. § 2000e-3(b) ............................................................................................ 34

42 U.S.C.A. § 300a-7 .................................................................................... 14, 18, 38

A.C.A. § 17-80-504 (Arkansas) ................................................................................ 38

Grand Rapids City Ord. No. 2019–43, § 9.937 ........................................................ 37

MCL 37.2102 ............................................................................................................ 35

MCL 37.2102(1) ......................................................................... 10, 15, 35

MCL 37.2202(1) ...................................................................... 4, 7, 27, 28

MCL 37.2206(1)–(2) ...........................................................................*passim*

MCL 37.2208 ....................................................................................... 22, 31

MCL 37.2302 ........................................................................................... 4, 20

MCL 37.2302(a) ...................................................................................*passim*

MCL 37.2302(b) .................................................................................. 6, 20, 27

MCL 37.2404 .............................................................................................. 35

MCL 37.2503 .............................................................................................. 35

MCL 37.2605 ........................................................................ 8, 10, 11, 15, 27

MCL 333.20181 ......................................................................................... 38

MCL 333.20182 ......................................................................................... 38

MCL 333.20183 ......................................................................................... 38

MCL 750.147 ........................................................................ 4, 6, 8, 20, 27

MDCR Rule 37.6 ....................................................................................... 17

MDCR Rule 37.16 ..................................................................................... 17

MDCR Rule 37.25 ............................................................................... 22, 23

Miss. Code. Ann. § 41-107-5 (Mississippi) .................................................. 38

R.C. § 4743.10 (Ohio) ............................................................................... 38

S.C. Code Ann. § 44-139-30 (South Carolina) ............................................ 38

## **Other Authorities**

Douglas Laycock, *Religious Liberty and the Culture Wars*,
   2014 U. Ill. L. Rev. 839 ........................................................................ 17

Iowa Civil Rights Commission, *Sexual Orientation & Gender Identity*,
   https://bit.ly/3oJJvtA............................................................................ 12

John Witte Jr., *Back to the Sources? What's Clear and Not so Clear About the Original Intent of the First Amendment*, 47 BYU L. Rev. 1303 (2022)............................................................ 19

New York State Division of Human Rights, *Guidance on Protections from Gender Identity Discrimination* 3 (2020), https://on.ny.gov/3Q9HUcj...... 11, 12

Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, https://bit.ly/3bo7fk8. ................................... 12

## **Most Pertinent Statutory Provisions**

MCL 37.2102(1) ............................................................................. 10, 15, 35

*Text*: The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status as prohibited by this act, is recognized and declared to be a civil right.

MCL 37.2202(1) ............................................................................. 4, 7, 27, 28

*Text*: (1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. (b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status. (c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system.

MCL 37.2206(1)-(2)........................................................................ 4, 7, 27, 28, 33, 34

*Text:* (1) An employer, labor organization, or employment agency shall not print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign relating to employment by the employer, or relating to membership in or a classification or referral for employment by the labor organization, or relating to a classification or referral for employment by the employment agency, which indicates a preference, limitation, specification, or discrimination, based on religion, race, color, national origin, age, sex, height, weight, or marital

status. (2) Except as permitted by rules promulgated by the commission or by applicable federal law, an employer or employment agency shall not: (a) Make or use a written or oral inquiry or form of application that elicits or attempts to elicit information concerning the religion, race, color, national origin, age, sex, height, weight, or marital status of a prospective employee. (b) Make or keep a record of information described in subdivision (a) or to disclose that information. (c) Make or use a written or oral inquiry or form of application that expresses a preference, limitation, specification, or discrimination based on religion, race, color, national origin, age, sex, height, weight, or marital status of a prospective employee.

MCL 37.2302(a) ........................................................... 6, 7, 10, 15, 27, 28, 35

*Text*:  Except where permitted by law, a person shall not: (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status.

MCL 37.2302(b) ............................................................................. 6, 20, 27

*Text*:  Except where permitted by law, a person shall not: ... (b) Print, circulate, post, mail, or otherwise cause to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service will be refused, withheld from, or denied an individual because of religion, race, color, national origin, age, sex, or marital status, or that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of religion, race, color, national origin, age, sex, or marital status.

MCL 37.2605(1) ............................................................... 8, 10, 11, 15, 27

*Text*:  If the commission, after a hearing on a charge issued by the department, determines that the respondent has violated this act or the handicappers' civil rights act, Act No. 220 of the Public Acts of 1976, being sections 37.1101 to 37.1607 of the Michigan Compiled Laws, the commission shall state its findings of fact and conclusions of law and shall issue a final order requiring the respondent to cease and desist from the discriminatory practice and to take such other action as it deems necessary to secure equal enjoyment and protection of civil rights. If at a hearing on a charge, a pattern or practice of discrimination prohibited by this act or Act No. 220 of the Public Acts of 1976 appears

in the evidence, the commission may, upon its own motion or on motion of the claimant, amend the pleadings to conform to the proofs, make findings, and issue an order based on those findings. A copy of the order shall be delivered to the respondent, the claimant, the attorney general, and to other public officers and persons as the commission deems proper.

MCL 750.147 ............................................................................ 4, 6, 8, 20, 27

*Text:* Any person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place who shall directly or indirectly refuse, withhold from or deny to any person any of the accommodations, advantages, facilities and privileges thereof or directly or indirectly publish, circulate, issue, display, post or mail any written or printed communications, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places shall be refused, withheld from or denied to any person on account of race, color, religion, national origin, sex or blindness or that any particular race, color, religion, national origin, sex or blindness is not welcome, objectionable or not acceptable, not desired or solicited, shall for every such offense be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than $100.00 or imprisoned for not less than 15 days or both such fine and imprisonment in the discretion of the court; and every person being an owner, lessee, proprietor, manager, superintendent, agent or employee of any such place, and who violates any of the provisions of this section, shall be liable to the injured party, in treble damages sustained, to be recovered in a civil action: Provided, however, That any right of action under this section shall be unassignable. In the event that any person violating this section is operating by virtue of a license issued by the state, or any municipal authority, the court, in addition to the penalty prescribed above, may suspend or revoke such license.

## Introduction

Plaintiff Christian Healthcare Centers, Inc. is a non-profit faith-based medical ministry in Michigan. The ministry provides exceptional, low-cost healthcare to all, including to patients who could not otherwise afford quality services. Consistent with its religious mission, Christian Healthcare incorporates spiritual wellness into its physical care, wholistically treats men and women of all backgrounds, only provides treatments consistent with its religious beliefs, and hires employees who share its heart for missional medicine.

But after the Michigan Supreme Court's redefinition of the phrase "because of sex," in Michigan's public-accommodations and employment laws, *Rouch World, LLC v. Dep't of C.R.*, 2022 WL 3007805 (Mich. July 28, 2022), Michigan now seeks to override these religious and medical judgments and coerce Christian Healthcare and staff to violate their conscience. These laws require Christian Healthcare to promote gender-identity ideology, forcing the ministry to use feminine pronouns for men (and vice versa) and dole out treatments that facilitate so-called gender transitions—when all this violates the ministry's beliefs. These laws also require the ministry to onboard and keep staff that condemn its religious beliefs, something that would fatally undermine the ministry's mission and message.

Christian Healthcare is in the law's crosshairs. The ministry maintains policies that violate the law, has and currently treats transgender patients without facilitating transitions, and has already been asked to violate its beliefs. Because it refuses to fall in line, it risks huge fines, jailtime, and other penalties and so has already begun to chill its speech and alter its practices to reduce these risks. But it shouldn't have to do so. Christian Healthcare therefore requests a preliminary injunction to stop this ongoing threat to its First Amendment rights so that it can continue to serve the public, minister to the poor, and proclaim Gospel's healing power without the immediate threat of adverse government action.

### Summary of Facts

Christian Healthcare exists to fulfill the biblical mandate to serve others. VC ¶ 19. It does this by offering medical and wellness services to the public. VC ¶ 39. Christian Healthcare follows a membership model where member-patients receive access to a package of medical services for a monthly fee. VC ¶ 35. Membership is not selective—one need only apply and pay the monthly dues (if any). VC ¶ 43. This model allows Christian Healthcare's providers to avoid the hustle-and-bustle of other primary care offices. VC ¶ 33. In turn, the ministry's staff spends significant time with each patient, offers to pray with them, and often discusses the spiritual dimensions of sickness. VC ¶ 81. Christian Healthcare incorporates spiritual care with physical wellness consistent with its belief that spiritual disciplines (prayer, church engagement, and biblical principles) contribute to well-being. VC ¶ 82. But Christian Healthcare cannot provide any medical treatment that violates its religious beliefs about God's design for humanity. VC ¶ 141. That includes its belief that sex is an immutable trait, not a changeable subjective identity. VC ¶ 100.

Christian Healthcare's religious mission is also evident by *who* it treats—anyone. For example, Christian Healthcare wants to care for those in need. VC ¶ 46. So Christian Healthcare solicits donations and reinvests its own revenue to subsidize membership costs (sometimes down to almost zero) for low-income families. VC ¶¶ 48–49. And Christian Healthcare believes that all humans are created in God's image. VC Ex. 4. So Christian Healthcare treats patients regardless of their religion, sexual orientation, gender identity, or any other characteristic. VC ¶ 39. Christian Healthcare has treated and presently treats transgender patients and would welcome many more. VC ¶ 40.

Hiring those who agree with and live out Christian Healthcare's religious beliefs is crucial to the ministry's success. VC ¶ 93. The ministry strives to share its

faith with each patient interaction—from a prospective patient's first inquiry until an existing patient's last visit. VC ¶ 92. To effectively communicate that faith—and provide its desired faith-based medical care—Christian Healthcare requires employees to affirm the ministry's beliefs by signing its Religious Statements (a Statement of Faith, Philosophy of Wellness and Healthcare, Statement of Values, Affirmation on Marriage and Human Sexuality, and Code of Conduct). VC ¶ 94. That affirmation is required when an employee applies and annually once hired. VC ¶ 96. Eighteen employees are set to re-affirm the Religious Statements in the next few months. VC ¶ 98. As Christian Healthcare actively grows its practice—even opening a new office recently—it must continue to aggressively look for new employees to fill new positions. VC ¶¶ 317–22. The ministry has a current opening for a biblical counselor. VC ¶ 323.

Christian Healthcare wants to be in the missional medical field for the long haul. To shore up its sustainability, Christian Healthcare has adopted policies to ensure it doesn't promote views or provide procedures contrary to its faith. First, Christian Healthcare only refers to patients with sex-based pronouns or their names. VC ¶¶ 101–04, Ex. 6. Second, Christian Healthcare declines gender-transition interventions, like cross-sex hormone therapy. VC ¶ 143, Ex. 6. Third, Christian Healthcare requires employees to affirm and abide by the Religious Statements. VC ¶ 96. Fourth, Christian Healthcare only hires employees who agree with the Religious Statements and asks applicants about their faith. VC ¶¶ 307–11, Exs. 5, 8. Fifth, Christian Healthcare requires employees to reaffirm those beliefs annually. VC ¶ 96.

Christian Healthcare desires to be transparent about its religious beliefs and how those beliefs affect its practice by disclosing them publicly. VC ¶ 350. To that end, Christian Healthcare desires to (1) post its membership agreement online, which includes its pronoun and gender-transition policies, VC ¶¶ 54–56; (2) include

its Religious Provider Disclosure and Philosophy of Wellness and Health Care statement in the membership agreement it posts online to empower patients can make an informed choice before entering care, VC ¶¶ 54–56 Ex. 3; (3) post job notices explicitly stating its religious beliefs, asking applicants about their religious views and habits, and indicating its desire to employ staff who adhere to its Religious Statements, VC ¶ 326; and (4) post an online application form for its open biblical-counselor position, inviting anyone who shares the ministry's religious beliefs to apply. VC ¶ 323.

The problem? Michigan forbids all this through its civil-rights and public-accommodations laws. The former's Accommodation Clause requires Christian Healthcare to provide "equal enjoyment" and "equal utilization" of its services regardless of gender identity. MCL 37.2302(a); MCL 37.2102(1); *Rouch World*, 2022 WL 3007805, at *10–15. This clause requires Christian Healthcare to refer to patients using their gender-identity-based pronouns because it refers to other patients using their sex-based pronouns. § I.A. This clause also forces Christian Healthcare to offer cross-sex hormone therapy to patients who identity as transgender because it offers hormone treatment to biological men and women not seeking to alter their sex. § I.B.

In addition, the Publication Clause—collectively, the civil-rights law (MCL 37.2302(b)) and the public-accommodations law (MCL 750.147)—acts as a gag order. The clause makes it illegal for Christian Healthcare to "publish[]" certain "statements" about its inability to provide certain services. § I.C. This has caused Christian Healthcare to refrain from posting its pronoun and gender-transition policies online; and the ministry could be punished for explaining the religious nature of its services to prospective patients. VC ¶¶ 354–55.

There's more. The Accommodation Clause and the civil-rights law's Employment (MCL 37.2202(1)) and Notice Clauses (MCL 37.2206(1)–(2))—that ban

discrimination in employment decisions and notices—force Christian Healthcare to hire leaders and employees who oppose its religious values, retain employees who have changed their minds about those values, and prohibit it from adopting faith-based policies. § II.A–C.

The Notice Clause also prohibits Christian Healthcare from promoting its desire to hire Christian staff, asking prospective employees whether they agree with the Religious Statements, or requiring employees to sign those statements. § II.D. As a result, Christian Healthcare has removed its employment application and hasn't posted information about its open biblical-counselor position or a general invitation for people to submit applications. VC ¶¶ 357–58.

In short, Michigan's law burdens Christian Healthcare as shown in these illustrative tables:

| Law | Text Summary | Effects |
|---|---|---|
| *As applied to Christian Healthcare as a public accommodation.* | | |
| *Accommodation Clause* MCL 37.2302(a) | • Prohibits denial of "full and equal enjoyment" of services because of protected traits.<br>• Prohibits "pattern or practice of discrimination" through MCL 37.2605(1). | 1. Compels preferred pronouns.<br>2. Compels gender-transition procedures.<br>3. Prohibits policies that decline preferred pronouns or gender-transition procedures. |
| *Publication Clause* MCL 37.2302(b) | • Prohibits publication "which indicates … full and equal enjoyment" of services will be denied because of protected traits.<br>• Prohibits publication "which indicates" a person's patronage "is objectionable, unwelcome, unacceptable, or undesirable" because of protected traits. | 1. Prohibits publishing description of religious values in membership agreement.<br>2. Prohibits publishing pronoun and gender-transition policies. |
| *Publication Clause* MCL 750.147 | • Prohibits publication "to the effect that any" service will be denied "on account of" protected traits.<br>• Prohibits publication "to the effect that" any person is "not welcome, objectionable or not acceptable, not desired or solicited," "on account of" protected traits. | Same as immediately above. |

| Law | Text Summary | Effects |
|---|---|---|
| *As applied to Christian Healthcare as an employer.* | | |
| *Employment Clause* MCL 37.2202(1) | • Prohibits failing to hire or recruit or limiting, segregating, or classifying employees or applicants "because of" religion and other protected traits. <br> • Allows BFOQ exemptions through MCL 37.2208. <br> • Prohibits "pattern or practice of discrimination" through MCL 37.2605(1). | 1. Allows discretionary BFOQ exemptions. <br> 2. Requires hiring and retaining leaders and staff who hold contrary religious beliefs. <br> 3. Prohibits policy of only hiring and retaining leaders and staff who hold religious beliefs. |
| *Accommodation Clause* MCL 37.2302(a) | Same as immediately above. | Same as immediately above. |
| *Notice Clause* MCL 37.2206(1)–(2) | • Prohibits publication "which indicates" preference or specification "based on" protected traits. <br> • Prohibits "written or oral inquiry or form of application that elicits or attempts to elicit information concerning" protected traits. <br> • Prohibits "written or oral inquiry or form of application that expresses" preference or limitation "based on" protected traits. | 1. Same as #2 and #3 in above Employment Clause. <br> 2. Prohibits publishing religious values in employment applications and annual renewals. <br> 3. Prohibits asking employees about their faith. |

Christian Healthcare operates under the threat of these laws everyday—it currently addresses its transgender patients without using pronouns, has received multiple patient inquiries about treatment for gender-dysphoria, follows its policy and practice of only hiring and retaining employees who agree with the Religious

statements, and requires employees to reaffirm those beliefs. VC ¶¶ 96, 334, 348–49, 388.

Meanwhile, Michigan is already prosecuting a business for not providing hair-removal service to a man who desires to transition to a woman because of the business's religious beliefs about the unchangeable nature of sex. VC ¶ 341. Around the country, laws like Michigan's are being used to punish entities for engaging in activities Christian Healthcare is doing or wants to do. *See, e.g.*, VC ¶¶ 238 n.7, 344 n.11 (collecting law and cases involving pronoun usage and denial of gender transition treatment). And almost anyone "claiming to be aggrieved" can enforce Michigan's laws against Christian Healthcare—the Commission, the Department, "testers," and even private individuals. VC ¶¶ 260–64. In fact, Michigan law makes it illegal to merely adopt and hold policies like Christian Healthcare's. *See* MCL 37.2605 (banning "a pattern or practice of discrimination"); *Whitman v. Mercy-Mem'l Hosp.*, 339 N.W.2d 730, 732 (Mich. App. 1983) (existence of policy suffices to prove unlawful discrimination). All this puts tremendous pressure on Christian Healthcare to choose between its faith and operating its medical clinic.

The consequences build that pressure. Public accommodations and employers that violate Michigan's laws may be ordered to "cease and desist," provide the "service" at issue, reinstate or hire the employee, pay compensatory damages and attorney fees, and pay civil fines of up to $50,000. MCL 37.2605. Public accommodations that violate the public-accommodations law's Publication Clause can be fined, imprisoned, or both. MCL 750.147.

These penalties threaten Christian Healthcare's rights and chill its speech. Christian Healthcare requests a preliminary injunction.

## Argument

For preliminary-injunction requests, courts typically consider likelihood of success on the merits, irreparable harm to plaintiffs absent an injunction, whether an injunction will cause substantial third-party harm, and whether an injunction will serve the public interest. *Bays v. City of Fairborn*, 668 F.3d 814, 818–19, 825 (6th Cir. 2012). But likelihood of success is the "crucial inquiry" here because First Amendment violations satisfy the other factors. *Id.* at 819, 825 (cleaned up). Christian Healthcare deserves its requested injunction because Michigan's law violates Christian Healthcare's constitutional rights many times over.

### I.   The Accommodation and Publication Clauses violate Christian Healthcare's First Amendment rights.

The Accommodation and Publication Clauses violate Christian Healthcare's free-speech and religious-liberty rights by (A) compelling it to speak views it rejects based on content and viewpoint; (B) forcing it to participate in medical procedures that violate its conscience; and (C) restricting its speech based on content and viewpoint.

#### A.   The Accommodation Clause compels Christian Healthcare to speak a message about gender identity to which it objects.

The Accommodation Clause requires Christian Healthcare to contradict its religious beliefs about the immutability of sex by referring to patients with pronouns that reflect their self-asserted gender identity regardless of their biological sex. That compels speech based on content and viewpoint and triggers strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164–65 (2015) (applying strict scrutiny to content and viewpoint-based law); *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 19 (1986) (plurality) (same to law compelling speech).

The First Amendment ensures the government cannot force someone "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). So speakers may choose to speak—or stay silent—on any topic. *Id.* at 714. Christian Healthcare has made such a choice on pronouns.

Masculine and feminine pronouns "convey a powerful message implicating a sensitive topic of public concern"—gender identity. *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021). For Christian Healthcare, pronouns communicate a biblical worldview. Christian Healthcare believes that the biblical reference to God creating humankind as "male and female" means that sex cannot be chosen or changed—it is an immutable trait based on biology. VC ¶ 95; Ex. 6. Christian Healthcare intentionally affirms that view by referring to its patients using sex-based pronouns. VC ¶ 103; Ex. 6. And it refrains from endorsing a contrary view by declining to refer to patients using gender-identity-based pronouns. VC ¶ 104; Ex. 6.

Others use preferred pronouns, gender neutral pronouns, or fluid pronouns to communicate that a person's sex is rooted in their self-professed gender-identity. App. 28–41. In this debate, Christian Healthcare's sex-based pronoun decision "concerns a struggle over the social control of language" and reflects its "conviction that one's sex cannot be changed." *Meriwether*, 992 F.3d at 508. Ultimately, through its pronoun policy and practice, the ministry stakes its claim on the "sensitive political topic[]" of "gender identity." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

But Michigan's law makes this stance illegal. The Accommodation Clause requires public accommodations and services to provide "equal enjoyment" and "equal utilization" of their goods, services, and privileges. MCL 37.2302(a); MCL 37.2102(1). The law bans public accommodations and services from even having a policy—or pattern and practice—that makes gender-identity distinctions even if the

policy never leads to an actual denial. MCL 37.2605; *Whitman*, 339 N.W.2d at 732 (policy violated law without denial of service). And the law requires public accommodations and services to provide the *exact* same services to all regardless of gender identity. *See Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. App. 1992) (law bans denial of "full and *equal* enjoyment"). *Cf. Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 748–49, 750 n.2 (8th Cir. 2019) (adopting same interpretation of public-accommodations law).

This law threatens Christian Healthcare's pronoun policy and practice. As to policy, Christian Healthcare states that it "cannot use pronouns or other forms of reference that do not accord with a person's biological sex." Ex. 3. As to practice, Christian Healthcare refers to its patients—in interactions with them, with other employees, with outside providers, and in charting—using their preferred pronouns when those pronouns are consistent with the patient's biological sex. VC ¶ 103. But Christian Healthcare does not do so when those pronouns are based on the patient's subjective gender identity. VC ¶ 333. Christian Healthcare has even declined the requested use of pronouns contrary to their biological sex. VC ¶ 346.

According to Michigan, Christian Healthcare's policy unlawfully makes distinctions and its practice denies equal treatment (pronoun usage) based on gender identity. Michigan's interpretation tracks how other jurisdictions have interpreted laws like Michigan's—to require health-care facilities to use pronouns that match gender-identity, not biological sex. *E.g.*, *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099, 1100 (S.D. Cal. 2017) (hospital patient stated a "because of sex" discrimination claim by alleging staff referred to "transgender boy" patient with feminine pronouns); VC ¶ 238 n.7 (collecting authority).[1]

_____

[1] *See also* New York State Division of Human Rights, *Guidance on Protections from Gender Identity Discrimination* 3 (2020) (discriminatory to refuse "to use an

In turn, Michigan compels speech—by forcing Christian Healthcare to refer to biological males who identify as female with feminine pronouns and vice versa to avoid penalty. Christian Healthcare objects to this compelled speech. VC ¶¶ 101–04. Affirming a patient's gender identity with gender-identity-based pronouns burdens the ministry's ability to advocate its religious beliefs about biological sex and alters the content of its desired message. This "violates" a "cardinal constitutional command" by forcing Christian Healthcare "to mouth support for views [it] finds objectionable." *Janus*, 138 S. Ct. at 2463.

*Meriwether* opens and shuts this issue. There, a university required professors to address students' using their gender-identity-based pronouns. 992 F.3d at 498. One professor objected because of his religious "conviction that one's sex cannot be changed." *Id.* at 508. The university punished him. *Id.* at 502. The Sixth Circuit held that that violated the First Amendment. The punishment compelled him to express a view about gender identity that he opposed through pronoun usage. *Id.* at 506–07. So too here.

*Meriwether* also shows the law compels speech based on content and viewpoint. The law is content based because it applies to the substance of Christian Healthcare's speech: pronouns. The alarm doesn't sound for all forms of speech (soccer, astronomy, etc.). *Planet Aid v. City of St. Johns*, 782 F.3d 318, 327 (6th Cir. 2015) (law content based when it is not applicable to all speech irrespective of content" (cleaned up)). And the law is viewpoint-based because it disfavors Christian Healthcare's sex-based-pronouns and favors gender-identity-based

---

individual's requested name or pronouns"), https://on.ny.gov/3Q9HUcj; Iowa Civil Rights Commission, *Sexual Orientation & Gender Identity*, https://bit.ly/3oJJvtA (similar). The EEOC interprets Title VII to prohibit employers from using sex-based pronouns. *See* Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, https://bit.ly/3bo7fk8. And Michigan interprets the Accommodation Clause consistent with "federal precedent interpreting Title VII." *Rouch World, LLC*, 2022 WL 3007805, at *6.

pronouns. *Meriwether*, 992 F.3d at 506 (school policy viewpoint based when it forbade professor's "views on gender identity" that sex was unchangeable).

Michigan's law compels this speech even though Christian Healthcare happily provides medical care to patients who identify as transgender. VC ¶ 40. And Christian Healthcare continues to treat them using pronouns consistent with Christian Healthcare's religious beliefs. VC ¶ 334. But the Accommodation Clause prohibits this underlying policy and practice. So Christian Healthcare now risks prosecution each time it treats its transgender patients.

### B. The Accommodation Clause violates Christian Healthcare's religious autonomy by forcing it to provide medical services that contradict its religious beliefs.

The Accommodation Clause also violates Christian Healthcare's religious autonomy by forcing it to provide medical services—cross-sex hormone therapy—that contradict its belief that one's sex is immutable.  Christian Healthcare's religious autonomy (1) is supported by the First Amendment's text, history, and tradition and (2) applies to its decisions about whether to provide controversial, readily-accessible, sterilizing, and non-emergency medical care. This renders the Accommodation Clause (3) per se unconstitutional as applied to Christian Healthcare.

### 1. The First Amendment's text, history, and tradition protects Christian Healthcare's autonomy to refuse controversial medical treatment that violates its faith.

For over 150 years, the United States Supreme Court has interpreted the First Amendment's Free Exercise and Establishment Clauses to protect religious autonomy. This means the government cannot intrude on matters that "concern[] theological controversy" or direct religious members to follow "a standard of morals." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). This autonomy gives "religious organizations[] an independence from secular control or manipulation," to

decide their own "questions of discipline, or of faith, or of ecclesiastical rule, custom or law." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 115–16 (1952).

Religious autonomy often applies in the religious hospital context. *See Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012); *Penn v. New York Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018); *Means v. United States Conference of Catholic Bishops*, 2015 WL 3970046, *13 (W.D. Mich. 2015), *aff'd on other grounds*, 836 F.3d 643 (6th Cir. 2016). That makes sense. After all, faith-based healthcare providers (like Christian Healthcare) are typically motivated to minister to others through health care as a concrete expression of faith and mission. VC ¶¶ 18–22, Ex. 1. Granting religious autonomy in this context recognizes the "special solicitude to the rights of religious organizations," *Hosanna-Tabor*, 565 U.S. at 189, and preserves "a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs," *id.* at 199 (Alito, J., concurring).

This autonomy covers faith-based healthcare ministries' decisions over medical services that "are inextricably intertwined with … religious tenets" because those decisions are part in parcel of "ecclesiastical rule, custom, or law" questions. *Means*, 2015 WL 3970046, at *12–13. Recognizing such, legislatures rushed to pass conscience laws after the first systematic threat to that autonomy appeared—*Roe v. Wade*, 410 U.S. 113 (1973). *See* 42 U.S.C.A. § 300a-7; *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308, 312 (9th Cir. 1974). Today, all states have laws that authorize health facilities, physicians, and other medical staff to decline certain medical treatment (including abortions, sterilizations, and physician-assisted suicide) if it violates their religious beliefs. App. 110–24.

14

What's more, conscience-based exemptions are embedded in medical codes of ethics. The American Medical Association (AMA) gives physicians "considerable latitude to practice in accord with well-considered, deeply held beliefs that are central to their self-identities." App. 92. The AMA's Council on Ethical and Judicial Affairs agrees. App. 95. The Code of Ethics for Nurses establishes that nurses are "justified in refusing to participate" in "a particular decision or action [that] is morally objectionable to the nurse." App. 109. Such exemptions are particularly powerful for controversial treatments like "abortion, sterilization," "emergency contraception," and "organ retrieval." App. 97.

To summarize: the text, history, and tradition of American law and medical ethics recognize the religious-autonomy doctrine in the provision of medical care.

> ### 2.     The Clause violates Christian Healthcare's religious autonomy by compelling it to provide medical treatment contrary to its conscience.

That doctrine protects Christian Healthcare's decision to only provide medical treatment consistent with its religious belief that sex is unchangeable. The Accommodation Clause forces Christian Healthcare to do otherwise.

Recall that Michigan's law requires Christian Healthcare to offer its patients "equal enjoyment" and "equal utilization" of its services. MCL 37.2302(a); MCL 37.2102(1). Michigan counts anything less as unlawful discrimination. § I.A (explaining this point). Not only that, but the law prohibits policies, patterns, or practices of discrimination. MCL 37.2605; *Whitman*, 339 N.W.2d at 732. And Michigan prohibits discrimination because of sex or gender identity. MCL 37.2302(a); VC ¶¶ 184–85.

This renders Christian Healthcare's current hormone-therapy policy and practice illegal. Christian Healthcare provides testosterone injections for males with low testosterone if they identify as male. VC ¶ 142. And it provides estrogen

therapy for females to treat menopausal symptoms if they identify as female. *Id*. But Christian Healthcare cannot provide testosterone injections for females who identify as male or estrogen therapy for males who identify as female if these treatments were requested in conjunction with an attempt to transition a patient's gender. VC ¶ 143. This follows Christian Healthcare beliefs that God created human beings as male or female, that sex is a biologically determined, immutable trait, and that facilitating any effort to alter a patient's biological sex is sinful. VC Ex. 6.

To Michigan, Christian Healthcare denies "equal enjoyment" or "equal utilization" by offering hormone therapy to some but not all patients. VC ¶ 237. And, to Michigan, the treatment is unequal "because of" sex or gender identity because Christian Healthcare's decision to provide the treatment depends on whether the patient's gender identity aligns with his or her biological sex. VC ¶ 237. The very policy violates the law. VC ¶ 400. So, by not offering the same hormone treatment to patients who identify as a gender other than their biological sex, Christian Healthcare runs afoul of the Accommodation Clause.

Michigan is already prosecuting a business that declined to remove hair from a man who desires to identify as a woman because of the owner's religious belief about the immutability of sex. *Rouch World, LLC*, 2022 WL 3007805, at *5. *See also* App. 147–66. Some jurisdictions have interpreted laws like the Accommodation Clause to require gender-transition treatments. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 571–72, 574, 591 (D. Md. 2021) (gender-identity discrimination when Catholic hospital declined transition procedure); *Minton v. Dignity Health*, 39 Cal. App. 5th 1155, 1165-66 (Cal. Ct. App. 2019) same); VC ¶ 343 n.11. (collecting authority). Even Title VII—the statute from which Michigan takes its interpretive cue, *Rouch World, LLC*, 2022 WL 3007805, at *6—has been so interpreted. *See Lange v. Houston Cnty., Georgia*, 2022 WL 1812306, at *1, 14 (M.D.

Ga. June 2, 2022) (insurance exclusion for "sex change surgery" violates Title VII); VC ¶ 344 n.11 (collecting authority).

This conflict infringes Christian Healthcare's religious autonomy. Michigan's law "impos[es] secular morality" on gender identity "inside religious institutions," Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. Ill. L. Rev. 839, 867, and forces Christian Healthcare to "disavow its religious character" to participate in public ministry, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017). Specifically, the law requires Christian Healthcare to redirect its medical care to facilitate gender transitions contrary to its religious beliefs. This usurps one of the "internal management decisions" that is "essential to the … central mission" of Christian Healthcare—providing excellent healthcare consistent with its faith. *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). By overriding Christian Healthcare's management of its ministry on a matter of profound doctrinal importance, Michigan's law violates the religious-autonomy doctrine.

Applying Michigan's law to Christian Healthcare also requires the state to judge the ministry's religious views on God's design for humanity. For Accommodation Clause claims, Michigan must investigate the complaint, determine if "sufficient grounds" support a charge, and decide whether "unlawful discrimination" occurred. MDCR Rules 37.6, 37.16. As applied to Christian Healthcare's refusal to provide cross-sex hormone treatment, Michigan must pry into the theology behind that decision, interpret those beliefs, decide if those beliefs constitute sufficient or insufficient grounds for a charge, and ultimately decide whether those beliefs unlawfully discriminate.

The First Amendments stops this entanglement before it starts, as this Court has held. In *Means*, the plaintiff alleged that a Catholic hospital negligently failed to discuss with her the option of terminating her pregnancy. 2015 WL

17

3970046, at *2. The court dismissed the lawsuit because it implicated the "medical moral teachings" of the Catholic Church, required "a nuanced discussion about how 'direct abortion' is defined in Catholic doctrine," and involved "questions" that were "inextricably intertwined with the Catholic Church's religious tenets." *Id.* at *2, 13.

To be sure, there's a difference between "articulation of church doctrine and policy" and healthcare providers' professional obligations. *Id.* at *14. Christian Healthcare's decision about cross-sex hormone therapy is based on the former. And it is fully compatible with the latter.

Medical ethical guidelines commonly recognize conscience protections for morally controversial and contentious practices, particularly those that may cause sterilization. *See* App. 97 (listing "abortion, sterilization," "emergency contraception," and "organ retrieval" as examples). Cross-sex hormone therapy fits that description. It has not been FDA-approved for treating gender dysphoria. App. 51. And the Mayo Clinic warns about its infertility risks. App. 68–69, 78. For that reason, conscience-based objections to procedures affecting fertility are widely accepted. App. 110—24 (collecting conscience exemptions for sterilizations); 42 U.S.C.A. § 300a-7 (exempting medical professionals from "sterilization procedure[s]"). Christian Healthcare's objection follows this tradition by objecting to cross-sex hormone therapy which can cause infertility.

What's more, Christian Healthcare has in the past notified prospective patients that it cannot offer gender-transition intervention due to its religious beliefs. VC ¶ 55. It would continue to do so, but for Michigan's Publication Clause censorship. § I.C. Giving prospective patients advance notice about conscience objections is a commonly encouraged practice that preempts most future conscience dilemmas, empowers patients to make informed choices, and allows patients to seek alternative providers before establishing care. See App. 92–96, 108–09 (emphasizing nurse communication).

But Michigan's law sweeps all this aside and targets Christian Healthcare's policy and practice of declining treatment that alters a patient's sex. That decision is based on Christian Healthcare's religious views. So by targeting these things, Michigan's law intrudes on the ministry's religious autonomy. Full stop.

### 3. The Clause is per se unconstitutional as applied to Christian Healthcare's refusal to facilitate gender transitions.

That intrusion violates Christian Healthcare's religious autonomy. So *Employment Division v. Smith*, 494 U.S. 872 (1990) does not control.[2] *Hosanna-Tabor*, 565 U.S. at 190. When a law invades religious autonomy, it is unconstitutional. *Id.* at 196; *Means*, 2015 WL 3970046, at *13. That's the case here. A contrary rule would ordain courts as religious councils to "scrutinize religious doctrine" and "risk[] excessively entangling the law in" religion. *Means*, 2015 WL 3970046, at *12–13. Even if strict scrutiny applies (it doesn't), the Accommodation Clause fails. *See infra* § III.

### C. The Publication Clause restricts Christian Healthcare's religiously-motivated speech based on content and viewpoint.

Michigan's law also triggers strict scrutiny because it restricts Christian Healthcare's speech based on content and viewpoint on its face and as applied. *Reed*, 576 U.S. at 164–65. The law restricts Christian Healthcare's speech on pronouns, gender-transition interventions, and the religious nature of its services.

A law is content based on its face when it "draws distinctions based on the message a speaker conveys." *Id.* at 163. A law is content- or viewpoint- based as

---

[2] If *Smith* controls, it should be overruled as inconsistent with the First Amendment's text, history, and tradition. *See* § I.B.1–2; John Witte Jr., *Back to the Sources? What's Clear and Not so Clear About the Original Intent of the First Amendment*, 47 BYU L. Rev. 1303, 1310 (2022) ("[M]ost founders include protections for … charity" and "mission work" alongside religious liberty.). Christian Healthcare preserves this issue for appeal.

applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id*. at 164 (cleaned up). The Publication Clause fails these standards.

The Publication Clause prohibits statements that "indicate[] that the full and equal enjoyment" of public accommodations will be denied or that anyone is "unwelcome" based on their gender identity. MCL 37.2302(b); MCL 750.147. Thus, the clause is content based on its face because its restrictions "depend entirely on the communicative content of the" speech. *Reed*, 576 U.S. at 164. The law restricts some speech that touches on gender identity or other protected classes, but not all such speech and not speech on other topics. While Christian Healthcare doesn't seek to *facially* enjoin the Publication Clause, it is still facially content based.[3] That triggers strict scrutiny as applied to the ministry. *Id*.

As applied here, the Publication Clause restricts Christian Healthcare's desired speech based on content. Christian Healthcare cannot say that it only uses sex-based pronouns or refuses cross-sex-hormone therapy consistent with its faith. VC ¶¶ 350–54. But other medical providers can post and explain their pronoun or hormone therapy policies if the pronoun policy *affirmed* a patient's preferred pronoun or if the hormone therapy policy *allowed* gender-transition interventions. *See* MCL 37.2302(b) (banning statements "indicat[ing]" denial of "equal enjoyment"); MCL 750.147 (banning statements "to the effect that" an advantage will be "withheld"). Likewise, Christian Healthcare cannot describe its religiously motivated care to prospective patients. But it could explain its services to prospective patients if it omitted religion. MCL 37.2302 (prohibiting "unwelcome" statements); MCL 750.147 (same). All of this turns solely on the content of

---

[3] The Unwelcome Clause is facially invalid, but Christian Healthcare doesn't seek a preliminary relief on that basis. VC ¶ 441.

Christian Healthcare's desired speech. A sign saying "We only use biological pronouns" is forbidden; one saying "We use any requested pronouns" is allowed. Content through and through.

The law also restricts Christian Healthcare's speech as applied based on its viewpoint by banning Christian Healthcare's view that sex is unchangeable, as well as information about its religious beliefs, while allowing other medical providers' view that sex is changeable and their secular beliefs. *See Meriwether*, 992 F.3d at 509.

To be sure, laws can ban speech about *illegal* and constitutionally *unprotected* activities. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388–89 (1973) (banning employment listing proposing "illegal" commercial activity). But laws cannot ban speech about *legal* and constitutionally *protected* activities. *See Meriwether*, 992 F.3d at 506–07 (school policy could not ban constitutional views in syllabus).

Christian Healthcare's desired statements fall into the latter category. Christian Healthcare has a constitutional right to refrain from referring to patients with pronouns inconsistent with their sex, to decline to provide medical treatment that violates its conscience, and to operate consistent with its faith. *Supra* §§ I.A–B. So it can explain those views to its prospective patients and the public.

## II. The Employment, Accommodation, and Notice Clauses violate Christian Healthcare's First Amendment free-exercise, expressive-association, and free-speech rights.

The Employment, Accommodation, and Notice Clauses violate Christian Healthcare's free-exercise rights by (A) lacking general applicability through discretionary individualized exemptions, and (B) invading Christian Healthcare's religious autonomy over its selection of employees who share its religious beliefs. The Employment and Accommodation Clauses also violate Christian Healthcare's

expressive-associational freedoms by (C) forcing it to associate with messages that contradict its faith. And the Notice Clause violates Christian Healthcare's free-speech rights by (D) restricting its speech based on content and viewpoint.

### A. The Employment Clause defies Christian Healthcare's free exercise rights by allowing individualized exemptions.

The Employment Clause burdens Christian Healthcare's religious freedom but lacks general applicability here. Thus, the law must—but cannot—pass strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

A law is not generally applicable if it burdens religiously motivated conduct but gives the government discretion to exempt similar non-religious conduct. *Id.* at 543. The Employment Clause flunks this test. The law burdens Christian Healthcare's free exercise by interfering with its employment policies and decisions which thwarts its ability to operate consistent with its beliefs. *Infra* § II.B.

The law also gives the Commission discretion to authorize "individualized exemptions" for some employment-related activities through a "formal" exemption process. *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877, 1879 (2021). The Commission may exempt employers from the Employment Clause "[u]pon sufficient showing" that certain traits—including sex, sexual orientation, and gender identity—are "a bona fide occupational qualification reasonably necessary to the normal operation of the" employer.[4] MCL 37.2208. This BFOQ exception does not define "sufficient showing," leaving the Commission with absolute discretion to grant or deny an application. *Id.* The Commission can even revoke previously

---

[4] The Accommodation Clause—as applied to employers, *infra* n.5—likely incorporates the BFOQ exception to avoid the absurd result that an employer with a BFOQ exception could still be liable under the Accommodation Clause. *Salas v. Clements*, 247 N.W.2d 889, 891 (Mich. 1976). If true, the Accommodation Clause also lacks general applicability for the same reasons stated here.

granted exemptions. MDCR Rule 37.25. Such discretion lacks general applicability because "it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up).

Nor does it matter that Christian Healthcare has not applied for an exemption. The BFOQ exception's mere existence creates a "formal mechanism for granting exceptions" which renders the Employment Clause "not generally applicable, regardless whether any exceptions have been given." *Id.* at 1879. In any event, Christian Healthcare has not applied for good reason—applications lead to Michigan investigations and complaints. VC ¶¶ 292–94. Even with an exemption, the ministry must continue to "notify" the Commission of any positional changes and the Commission can revoke previously granted exemptions. MDCR Rule 37.25. These fleeting "vicissitudes" are a far cry from steadfast constitutional security. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). This system is "the antitheses of a … generally applicable policy." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012).

### B. Michigan's law infringes on Christian Healthcare's religious autonomy.

The Employment, Accommodation, and Notice Clauses violate Christian Healthcare's First Amendment religious autonomy by requiring it to employ and retain staff who do not share—and even disagree with—Christian Healthcare's religious mission.[5] The (1) First Amendment's history, text, and tradition supports

---

[5] The Accommodation Clause applies to Christian Healthcare's employment decisions because Michigan interprets the clause to "forbid[] unlawful discrimination against any individual in a place of public accommodation, not just members of the public." *Haynes v. Neshewat*, 729 N.W.2d 488, 494 (Mich. 2007). "Any individual" includes contracting physicians, *id.* at 490, 493–94, and other employees, *Jamoua v. Michigan Farm Bureau*, 2021 WL 5177472, at *16–17 (E.D. Mich. Nov. 8, 2021).

Christian Healthcare's right to religious autonomy, which applies to its (2) leadership and (3) co-religionist hiring. These Clauses violate this right, so they are (4) per se unconstitutional as applied to Christian Healthcare.

> ### 1. The First Amendment's text, history, and tradition protects Christian Healthcare's autonomy to manage its employment policies and decisions.

The religious autonomy doctrine ensures religious organizations have autonomy to organize "voluntary religious associations to assist in the expression and dissemination of any religious doctrine." *Watson*, 80 U.S. at 727–729. *Supra* § I.C.1 (providing additional doctrinal context). This selective association gives religious organizations autonomy over membership and employment decisions. *See Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060.

The early American colonists aspired to this freedom. *Hosanna-Tabor*, 565 U.S. at 182–85. The Puritans escaped to New England to "elect their own ministers," northern colonists "sought independence from the Church of England," and southern colonists frequently clashed with the English Crown's selection of religious leaders. *Id.* at 183–84. After independence, the Religion Clauses were adopted to counteract the colonists' experience of governmental meddling in "the freedom of religious groups to select their own." *Id.* at 184.

This history produced two separate but related protections: the ministerial exception and the co-religionist exception. The ministerial exception applies to religious organizations' employment decisions for positions that "play certain key roles" that "are essential to the institution's central mission." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060. The co-religionist exception applies to all employees of religious organizations. This exception ensures that religious organizations may hire only those who share their beliefs and will contribute to a shared culture of faith, conduct, and mission. *See Seattle's Union Gospel Mission v.*

Woods (*SUGM*), 142 S. Ct. 1094, 1094 (2022) (Alito, J., concurring in denial of certiorari); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 333 n.9 (1987) (amending Title VII's religious exemption from "religious activities" to "all activities of religious organizations" sought to maximize co-religionist protection).

As explained below, both exceptions apply here and protect Christian Healthcare's ability to select leaders and hire co-religionists who share its religious mission and values.

> **2.  The Clauses violate the ministerial exception by interfering with Christian Healthcare's ability to adopt leadership policies and to select religious leaders.**

The Employment, Accommodation, and Notice Clauses violate the ministerial exception by interfering with Christian Healthcare's ability to hire and retain key employees who share its religious mission.

The ministerial exception "categorically prohibits … state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015). The exception applies to religious organizations and their "ministerial employee[s]." *Hollins*, 474 F.3d at 225. Once applied, the exceptions bars the government from interfering with the religious organization's leadership choices. *Hosanna-Tabor*, 565 U.S. at 184. Consider those steps here.

*First*, Christian Healthcare is a religious organization. Christian Healthcare's articles of incorporation state its "specifically … Christian" purpose. VC Ex. 1. To fulfill that purpose, Christian Healthcare's faith animates its daily rhythms. It holds a corporate prayer each morning, provides medical treatment as an act of religious obedience, practices a philosophy of wellness that incorporates prayer and acknowledges God's authority as creator, and ministers to its patients through

prayer and spiritual advice. VC ¶¶ 64–68; Ex. 3. These distinctions "mark" Christian Healthcare as a religious organization with "clear or obvious religious characteristics." *Hollins*, 474 F.3d at 226. *See also Conlon*, 777 F.3d at 834 (examining mission and activities of nondenominational religious organization).

*Second*, the ministry's Managers, the Medical Director, the Advance Practice Medical Providers, and Biblical Counselors hold ministerial positions. There is no "rigid formula" for determining whether a position qualifies as ministerial. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2062. Ministers can include an individual "who leads a religious organization … or serves as a messenger or teacher of its faith." *Id.* at 2063. But "[w]hat matters, … is what an employee does." *Id.* 2064. Several factors are relevant; none dispositive. *Id.* at 2063–66; *Conlon*, 777 F.3d at 834–36.

Christian Healthcare's Managers, Medical Director, Advance Practice Medical Providers, and Biblical Counselors qualify as ministers. The Managers set ministry policies, approve external communications, and ensure Christian Healthcare operates consistent with its faith. VC ¶¶ 114–26. The Medical Director integrates the ministry's religious beliefs into its medical care and ensures medical staff provide care consistent with those beliefs. VC ¶¶ 127–34. The Medical Director, Advanced Practice Medical Providers, and Biblical Counselors provide medical treatment and counseling services consistent with Christian Healthcare's religious views and are expected to communicate those views to members through prayer or spiritual advice. VC ¶¶ 135–54. These roles are "vital" to Christian Healthcare's "mission" and hold "an important position of trust" because they are responsible for leading the ministry, developing and protecting its doctrine, and proselytizing through medical care and counseling. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2063, 2066. Likewise, these positions "educat[e]," inculcat[e]," "guide," and "train[]" others in the faith. *Id.* at 2054, 2063–64, 2066.

*Third*, the Employment, Accommodation, and Notice Clauses interfere with Christian Healthcare's leadership choices. Michigan's law prohibits Christian Healthcare from making or publishing any distinctions in its employment policies "because of" religion, sex, marital status, sexual orientation, or gender identity. MCL 37.2202(1); MCL 37.2206(1)–(2); MCL 37.2302(a).

This means Christian Healthcare cannot hold or act on its current policy of recruiting and hiring staff who agree with the Religious Statements because those statements express a religious preference. *See, e.g.*, MCL 37.2605 (prohibiting "pattern or practice of discrimination"). Next, Christian Healthcare cannot continue its current policy of requiring staff to reaffirm the Religious Statements each year because that affirmation also indicates a religious preference. *Id.* Finally, Christian Healthcare cannot post a job listing for its open biblical-counselor position because the application indicates a religious preference and the ministry intends to ask applications about their religious views. MCL 37.2302(b); MCL 750.147.

In these ways, Michigan's law imposes on Christian Healthcare an "unwanted minister" who does not share its "faith and mission." *Hosanna-Tabor*, 565 U.S. at 188. This necessarily "contradict[s]" Christian Healthcare's desired leadership choices, which violates its freedoms guaranteed by the ministerial exception. *Id.* at 185.

### 3. The Clauses violate the co-religionist exception by interfering with Christian Healthcare's faith-based employment policies and decisions.

The Employment, Accommodation, and Notice Clauses also violate Christian Healthcare's religious autonomy by interfering with its faith-based hiring practice for all its employees—including non-ministers.

Christian Healthcare's activities revolve around its purpose as "a Christian, nondenominational medical services organization that exists to serve the body of

Christ and community by providing direct medical services to its members."
VC ¶ 17, Ex. 1. This physical care leads to opportunities for Christian Healthcare to
minister to patient's spiritual needs by sharing the Gospel with them. VC ¶ 21.
Christian Healthcare views every aspect of its care—from speaking with prospective
patients, to having patients wait in the well-appointed lobby, to taking a patient's
heartrate, to communicating a difficult diagnosis—as an opportunity to share the
love of Jesus Christ. VC ¶¶ 75, 81, 92. So too with the ministry's interactions with
its own employees. That's why Christian Healthcare holds daily corporate prayers
where employees share their joys and burdens and lift those delights and sorrows
up in prayer. VC ¶¶ 64–66.

None of this would be possible without Christian Healthcare's employees.
Some of the employees fall under the ministerial exception. § II.B.2. But some do
not, and the ministry depends on *all* its employees—ministers and non-ministers
alike—to communicate its faith and put that faith into action. So every employee's
primary responsibility is to model and share Christian Healthcare's faith with
everyone. VC ¶¶ 107–13. Staff who reject or disagree with that faith cannot credibly
demonstrate or share it with others. So Christian Healthcare requires all employees
to follow the Religious Statements. *Id.*

But this requirement is illegal under the Employment, Accommodation, and
Notice Clauses. These laws prohibit Christian Healthcare from making any
distinctions in its recruiting, hiring, and employment policies "because of" religion,
sex, marital status, sexual orientation, or gender identity. MCL 37.2202(1); MCL
37.2206(1)-(2); MCL 37.2302(a). This means that Christian Healthcare cannot hire
only employees who agree with the Religious Statements, ensure that current
employees abide by those values, or keep policies to that effect. VC ¶¶ 204–10.
Stated positively, Christian Healthcare must delete its employment policy and hire
and retain employees who disagree with and want to change its religious beliefs.

This interferes with Christian Healthcare's religious autonomy by obligating it to alter "the way [it] carrie[s] out [its] religious mission" due to "potential liability" *Amos*, 483 U.S. at 336, and infringing on an "internal [religious] decision that affects the faith and mission of" Christian Healthcare, *Hosanna-Tabor*, 565 U.S. at 190. The co-religionist exception deflects this burden by protecting Christian Healthcare's right to decide "that certain activities are in furtherance of [its] religious mission, and that only those committed to that mission should conduct them." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). That principle is equally true of ministers as it is to any representative of a religious organization's theological views.

Building on this insight, the Sixth Circuit recognized that a religious college could decline to retain a student-services specialist after she disclosed that she was a lesbian who espoused different views of sexuality than those held by the college. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 625 (6th Cir. 2000). As the court reasoned, the college had "a constitutional right to be free from government intervention" because (1) religious groups have a "constitutionally-protected interest . . . in making religiously-motivated employment decisions," and (2) courts cannot "dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices." *Id*. at 623, 625–26. Many other courts have likewise "protected the autonomy of religious organization[s] to hire personnel who share their beliefs." *SUGM*, 142 S. Ct. at 1094 (Alito, J., concurring in denial of certiorari) (collecting cases). *E.g.*, *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 833 (D.C. Cir. 2020) (religious school could not be compelled to collectively bargain with adjunct faculty representative regardless of whether "the adjuncts are faculty members *who play a role in Duquesne's religious educational environment*").

In most cases, statutory co-religionist exemptions protect religious employers. *See* App. 125–27 (listing statutes). But Michigan's law is unusual: it has no religious

exemption. *Rouch World*, 2022 WL 3007805, at \*43 (Viviano, J., dissenting) ("It does not appear that there are any such statutory provisions [for religious organizations] applicable to the ELCRA."); *Porth v. Roman Cath. Diocese of Kalamazoo*, 532 N.W.2d 195, 202 (Mich. App. 1995) (Murphy, J.) (noting lack of exemptions for "religious schools" was a "constitutional defect" in Michigan's law).

The First Amendment's co-religionist exception fills this void. *Hall*, 215 F.3d at 625. That exception—at least co-extensive with Title VII religious-employer exemptions—covers all employees within religious organizations. *E.g. Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) ("The religious-employer exemptions in [two federal laws] are legislative applications of the church-autonomy doctrine."); *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 n.13 (9th Cir. 1988) (Even absent Title VII's religious exemptions, "the First Amendment would limit Title VII's ability to regulate the employment relationships within churches and similar organizations."). And because Christian Healthcare is a religious organization, it may limit its employees to those who share its religious objectives and values. Michigan's law dictates otherwise. That violates the First Amendment.

> **4.  The Clauses are per se unconstitutional as applied to Christian Healthcare's employment policies and decisions.**

The Employment and Notice Clauses interfere with Christian Healthcare's authority to choose its religious leaders and the other employees who help it to fulfill its ministry. The Religion Clauses categorically bar this intrusion. *Hosanna-Tabor*, 565 U.S. at 196 (eschewing balancing test).

This categorical bar makes sense. After all, history teaches that the ministerial and co-religionist exceptions were meant to give religious organizations a private sphere within which to operate. §§ I.B.1, II.B.1. Absent a categorical bar, courts "risk judicial entanglement in religious issues," by weighing the interests of

the religious organization against the state's asserted interest in enforcing employment discrimination statutes. *Our Lady of Guadalupe*, 140 S. Ct. at 2069. But few decisions are as closely linked to religious nonprofits' "independence … in matters of faith and doctrine" as their selection of leaders and their assessment of who is a coreligionist. *Id.* at 2061, 2069.

For this reason, Michigan's BFOQ exception points up the problem by authorizing Michigan to evaluate exemptions based on a "sufficient showing" that the requested exemption is a bona-fide-occupational qualification "reasonably necessary to the normal operation" of the enterprise. MCL 37.2208. In Christian Healthcare's case, this inquiry empowers Michigan to evaluate Christian Healthcare's religious mission, scrutinize each employment position, determine how best Christian Healthcare could function as a ministry, and then decide whether an exemption for each position was "necessary" to the organization's "normal operation." The "very process" of such an inquiry threatens "to impinge on rights guaranteed by the Religion Clauses." *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979) (labor board lacked jurisdiction over teachers in a church-operated school to avoid risk of violating the Religion Clauses).

The ministerial and co-religionist exceptions apply to Christian Healthcare's choices over its leadership and its employees. The Employment and Notice Clauses infringe on these decisions. So they are per se unconstitutional as applied to Christian Healthcare (and fail strict scrutiny anyway, *infra* § III).

### C.  Michigan's law interferes with Christian Healthcare's expressive association.

The Employment, Accommodation, and Notice Clauses force Christian Healthcare to associate in ways that undermine its religious messages. Implicit in Christian Healthcare's religious liberty is "a corresponding right to associate with others in pursuit of … religious … ends." *Roberts v. Jaycees*, 468 U.S. 609, 622

(1984). The Supreme Court uses a three-part test to evaluate this expressive association right. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Christian Healthcare passes this test.

*First*, Christian Healthcare "engage[s] in some form of expression." *Id.* at 648. This is a low bar, that the ministry easily clears. *Id.* at 653 (courts defer to "an association's assertions regarding the nature of its expression"). Among other things, Christian Healthcare shares the Gospel with patients, prays with them and its employees, and offers medical care as an act of religious obedience. VC ¶¶ 19, 21, 27. Christian Healthcare also expresses some of its religious views on its blog and website. VC Ex. 2. It "is unquestioned" that Christian Healthcare has the right to organize as a "religious association[] to assist in the expression and dissemination of any religious doctrine." *Hutchinson v. Thomas*, 789 F.2d 392, 394 (6th Cir. 1986) (cleaned up).

*Second*, Michigan's law "affects in a significant way" Christian Healthcare's "ability to advocate public or private viewpoints" *Dale*, 530 U.S. at 648, and interferes with its right to "not … associate." *Jaycees*, 468 U.S. at 622–23. Here too, the ministry's burden is light. *Dale*, 530 U.S. at 653 (courts defer "to an association's view of what would impair its expression").

But Michigan's law deprives Christian Healthcare of that freedom. The law forbids Christian Healthcare from keeping its faith-based employment policy. *See* MCL 37.2605 (banning "a pattern or practice of discrimination"). And the law forces Christian Healthcare to hire and retain employees who disagree with and do not follow its religious beliefs on healthcare, sexuality, and other topics. § II.B. That in turn forces Christian Healthcare to associate with those who communicate messages contrary to the ministry's messages promoted elsewhere, VC ¶¶ 204–10. What's more, the law requires Christian Healthcare to insert such employees into leadership positions within the ministry. § II.B.1. There is "no clearer example of an

intrusion" into a religious organization's associational protections than forcing it to accept insiders who do not share its faith, since that "would cause the group as it currently identifies to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006). In these ways, the law forces Christian Healthcare "to propound a point of view contrary to its beliefs" by associating with others who reject the organization's religious beliefs.  *Dale*, 530 U.S. at 654.

*Finally*, forcing Christian Healthcare to associate fails strict scrutiny. *Id.*  at 656–57; § III. So Michigan cannot alter Christian Healthcare's desired expression by forcing it to associate with persons who don't share its religious views or banning it from following such a policy.

### D.     The Notice Clause restricts Christian Healthcare's religiously-motivated speech on employment topics based on content and viewpoint.

Like the Publication Clause for public accommodations, the Notice Clause for employers triggers strict scrutiny because it restricts Christian Healthcare's speech based on content and viewpoint. *Reed*, 576 U.S. at 164–65.

The Notice Clause is content based on its face for the same reasons as the Publication Clause. *Supra* § I.C (explaining standard for facially content-based law). The Notice Clause prohibits statements that "indicate[] a preference" or "express[] a preference" based on religion, sex, marital status, gender identity, or sexual orientation or "elicit[] or attempt[] to elicit information concerning" those characteristics. MCL 37.2206(1)-(2). By banning a subclass of speech, the law is facially content based. The facially content-based nature of the Notice Clause triggers strict scrutiny as the law applies to Christian Healthcare.

As applied, the law prohibits Christian Healthcare from publishing its general employment policies, asking prospective applicants questions about their faith, asking existing employees to reaffirm the Religious Statements, posting the

announcement and application for the biblical-counselor position (which is currently open), and posting a solicitation for employment applications regardless of whether positions are open. VC ¶ 209. This is a content and viewpoint-based restriction.

The law is content based because Christian Healthcare could express a preference for University of Michigan graduates in policies, with applicants, or with current employees. *See* MCL 37.2206(1) –(2) (banning statements indicating "preference" or asking about certain topics). But it cannot express a preference based on religion. That distinction turns on content.

The restriction is also viewpoint based. While the ministry is muzzled, other employers may discuss their secular workplace policies with prospective and current employees. That's viewpoint discrimination because the ban targets faith-based employment discussions and publications, but authorizes non-religious employment discussions and publications. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393–95 (1993) (policy was viewpoint based when it banned the use of school buildings for "religious purposes" but allowed the use of those buildings for other civic purposes addressing the same topic).

As mentioned, laws can still ban illegal *and* unprotected activities. § I.C.  But Christian Healthcare's ability to follow faith-based policies and hire and retain employees who abide by and share its beliefs is constitutionally protected by its authority as a religious ministry. §§ II.B–C. So Michigan's law cannot ban Christian Healthcare's speech on those topics. This limitation ensures that other bans on discriminatory employment notices can remain on the books. Many employment laws already exempt religious organizations from publication bans. *Compare* 42 U.S.C. 2000e-1 (allowing religious corporations to hire based on religion) *with* 42 U.S.C. 2000e-3(b) (prohibiting other forms of discriminatory advertising). Christian Healthcare just seeks this common freedom.

**III.    Michigan's law fails strict scrutiny as applied to Christian Healthcare's expression and religious exercise.**

Some of Michigan's laws are per se unconstitutional because they invade Christian Healthcare's religious autonomy. §§ I.B.3, II.B.4. The law's other applications are at least subject to strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)—because they violate Christian Healthcare's free-speech, free-exercise, and expressive-association rights. Strict scrutiny requires Michigan to prove that its law (A) serves a compelling interest in (B) the most narrowly tailored way. *See, e.g.*, *Fulton*, 141 S. Ct. at 1881; *Reed*, 576 U.S. at 171. Michigan's law cannot pass that test here.

**A.    Michigan's law does not advance a compelling interest as applied to Christian Healthcare.**

A compelling interest must be "of the highest order." *Fulton*, 141 S. Ct. at 1881. Michigan must justify that interest by producing evidence of "an actual problem" in need of solving. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–24 (2000).

Michigan may claim an interest in ending discrimination. *See* MCL 37.2102. But that interest trips out of the blocks because the law is underinclusive as to that interest. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (noting underinclusivity undermines government's asserted interest). For example, Michigan's law regulates real estate and education. MCL 37.2102(1). But the law authorizes blatant discrimination in those contexts. Some sports leagues and male and female educational institutions can discriminate based on sex, sexual orientation, and gender identity. MCL 37.2302a(4); MCL 37.2404.[6] And some landlords can discriminate for any reason. MCL 37.2503. If Michigan can allow

---

[6] These law's text mention "sex" only, but *Rouch World, LLC* and Michigan interpret "sex" throughout to mean sexual orientation and gender identity. VC ¶¶ 180–85.

these exceptions, it cannot defend coercing Christian Healthcare to operate its ministry inconsistent with its religious mission.

Michigan's general antidiscrimination interest is insufficient a second way too. Strict scrutiny requires "precise analysis" beyond "broadly formulated interests" like eradicating discrimination. *Fulton*, 141 S. Ct. at 1881 (cleaned up). Michigan must prove it has a compelling interest in applying its law to *Christian Healthcare*. *Id.* With that focus, Michigan's interest in applying the Accommodation, Publication, Employment, and Notice Clauses here falls flat.

*Accommodation and Publication Clauses*. Compelling Christian Healthcare to use gender-based pronouns and restricting it from explaining its faith-based policies does not stop discrimination by public accommodations or services. Christian Healthcare serves members regardless of their status, including transgender status. VC ¶¶ 39–40. The ministry already created a win-win by serving existing transgender patients and using pronouns consistent with the ministry's beliefs. VC ¶ 334. *See Meriwether*, 992 F.3d at 510 (no interest in compelling pronoun usage). And forcing Christian Healthcare to provide controversial and unproven medical treatments—something they don't provide for anyone—does nothing to ensure healthcare access when other entities will readily provide these treatments. VC ¶ 145; App. 85–91. Christian Healthcare simply does not provide certain medical treatments for anyone, no matter who they are, when those treatments violate the ministry's religious beliefs and have the potential to sterilize patients. What's more, barring Christian Healthcare from explaining the religious nature of its medical care to prospective patients *harms* them—without that explanation, those patients lack relevant information about their healthcare options. § I.B.2.

*Employment and Notice Clauses*. Michigan also lacks a compelling interest in forcing Christian Healthcare to abandon its employment policies and hire and retain employees who disagree with its religious views. Michigan's general interest

36

"do not justify such a severe intrusion" on Christian Healthcare's ability to express its religious views. *Dale*, 530 U.S. at 659 (no compelling interest when law imposed "severe intrusion" on expression). Likewise, Michigan's interests do not overcome Christian Healthcare's free-exercise rights. *Hankins v. The New York Ann. Conf. of United Methodist Church*, 516 F. Supp. 2d 225, 237 (E.D.N.Y. 2007) (age discrimination law had no compelling interest applied to religious denomination). In any event, there's no actual employment problem here either because hundreds of thousands of other employment opportunities exist in Michigan's healthcare industry. VC ¶¶ 217–18. Finally, because Christian Healthcare's employment policies and management are constitutionally protected, Michigan has no interest in banning its speech on those topics. § II.C (making this point).

### B.   Michigan's law is not narrowly tailored as applied to Christian Healthcare.

Michigan's law also fails the "exceptionally demanding" narrow-tailoring prong. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Michigan must prove that regulating Christian Healthcare is "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). But many more tailored options exist.

As a macro-option, Michigan could limit its law to stop actual status discrimination. For example, Michigan could exempt First Amendment activity from its law, as at least one other Michigan city has done. *See* Grand Rapids City Ord. No. 2019–43, § 9.937 ("This Ordinance shall be construed and applied in a manner consistent with the First … Amendment[].") This would allow Christian Healthcare to develop reasonable pronoun accommodations while still serving everyone, make conscience-based decisions about treatment, employ leaders and staff who agree with its beliefs, and publish constitutionally permissible notices about its services and employment. Likewise, Michigan could interpret its law to

allow expression of religious beliefs. Other jurisdictions do this without an uptick in discrimination. *See, e.g.*, *TMG*, 936 F.3d at 752.

There are also several more narrowly tailored micro-options:

*Accommodation and Publication Clause*. Michigan could exempt religious medical providers from providing non-emergent, controversial, and sterilizing medical treatment. Michigan does something like this for abortion. MCL 333.20181, MCL 333.20182, MCL 333.20183. The federal government and many other states do this for sterilization. 42 U.S.C.A. § 300a-7; App. 110–24. And some states do this for conscience objections across-the-board. A.C.A. § 17-80-504 (Arkansas); R.C. § 4743.10 (Ohio); S.C. Code Ann. § 44-139-30 (South Carolina); Miss. Code. Ann. § 41-107-5 (Mississippi). Michigan is the outlier here.

*Employment and Notice Clause*. For employment, Michigan could exempt religious organizations from its employment law. The federal government already does this. 42 U.S.C.A. § 2000e-1(a). So do most states. App. 125–27.

These exemptions—already in place elsewhere—prove Michigan's law is not narrowly tailored. *Ramirez v. Collier*, 142 S. Ct. 1264, 1279 (2022) (other states' practices showed Texas "ban on audible prayer" not narrowly tailored).  This proves the law cannot pass strict scrutiny.

## Conclusion

Michigan's law irreparable harms Christian Healthcare by violating its First Amendment rights. But the law ultimately threatens the continued existence of all religious organizations who are motivated by their faith to serve the public. To stop this violation, Christian Healthcare asks this Court to grant its preliminary-injunction motion.

Respectfully submitted this 29th day of August, 2022.


Jonathan A. Scruggs
Arizona Bar No. 030505
Ryan J. Tucker
Arizona Bar No. 034382
Henry W. Frampton, IV*
South Carolina Bar No. 75314
Bryan D. Neihart*
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
rtucker@ADFlegal.org
hframpton@ADFlegal.org
bneihart@ADFlegal.org

By: s/ John J. Bursch
John J. Bursch
Michigan Bar No. P57679
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
jbursch@ADFlegal.org


*Attorneys for Plaintiff*


*Pending Admission

**Certificate of Compliance with Local Civil Rule 7.2(b)(i)**

This brief was produced on Microsoft Word® for Microsoft 365 MSO (Version 2207 Build 16.0.15427.20182) 64-bit. According to the word count generator within that program, the word count for this brief including headings, footnotes, citations and quotations, but not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, is 10,772.

By: s/ John J. Bursch

John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001

*Attorney for Plaintiff*

**Certificate of Service**

I hereby certify that on the 29th day of August, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all defendants.

By: s/ John J. Bursch

John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001

*Attorney for Plaintiff*