## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**Christian Healthcare Centers, Inc.**

Plaintiff,

v.

**Dana Nessel,** in her official capacity as Attorney General of Michigan; **John E. Johnson, Jr.,** in his official capacity as Executive Director of the Michigan Department of Civil Rights; **Portia L. Roberson, Zenna Faraj Elhason, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, and David Worthams,** in their official capacities as members of the Michigan Civil Rights Commission.

Defendants.

Case No. 1:22-cv-00787-JMB-PTG

**Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss and Reply Brief in Support of Its Preliminary Injunction Motion**

*Oral Argument Requested*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................. iii

Introduction ............................................................................................................... 1

Clarification of Standard of Review ........................................................................ 2

Argument ................................................................................................................... 3

I.     Christian Healthcare has standing to challenge Michigan's laws.................... 3

     A.    Christian Healthcare intends to and engages in constitutionally
           protected activities ...................................................................................... 5

     B.    Michigan's law arguably prohibits Christian Healthcare's desired
           activities..................................................................................................... 6

     C.    Christian Healthcare is entitled to a presumption that there is a
           credible threat of enforcement ................................................................ 12

     D.    Michigan has not rebutted the enforcement presumption created
           by its law.................................................................................................. 14

     E.    Other facts support the enforcement presumption, bolstering
           Christian Healthcare's standing.............................................................. 20

     F.    None of Michigan's counterarguments negate the credible threat
           faced by Christian Healthcare ................................................................ 22

           1.    Undefined defenses and religious exemptions don't alleviate
                 Christian Healthcare's current injuries or the threat of
                 credible enforcement ................................................................... 23

           2.    Christian Healthcare need not apply for a BFOQ because
                 that process causes independent harms and is futile ............... 30

           3.    Requiring Christian Healthcare to wait to file suit until
                 undergoing investigations and prosecutions defeats the
                 purpose of pre-enforcement suits............................................... 34

           4.    Christian Healthcare has declined to provide services that
                 violate its religious beliefs, increasing the threat of
                 enforcement.................................................................................. 37

           5.    Michigan's theory makes pre-enforcement suits impossible ..... 38

II.    Christian Healthcare's challenges to Michigan's law are ripe because the law forbids its desired activities, the factual record is developed, and the ministry suffers hardship from delayed adjudication ..................................... 40

III.   Alternatively, Christian Healthcare is entitled to limited jurisdictional discovery ............................................................................................ 43

IV.    Christian Healthcare's request for a declaratory judgment and permanent injunction should not be dismissed ................................................ 44

V.     This Court should not abstain from evaluating the Unwelcome Clause because this clause violates the First Amendment by chilling speech........... 45

VI.    Christian Healthcare meets the relevant preliminary-injunction factors ..... 47

Conclusion ................................................................................................. 49

# Table of Authorities

## Cases

*303 Creative LLC v. Elenis,*
  6 F.4th 1160 (10th Cir. 2021) ............................................................ 23, 37,47

*Ada-Cascade Watch Company v. Cascade Resource Recovery, Inc.,*
  720 F.2d 897 (6th Cir. 1983) ............................................................. 45

*Act Now to Stop War & End Racism Coalition v. District of Columbia,*
  589 F.3d 433 (D.C. Cir. 2009) ........................................................... 13

*American Booksellers Foundation for Free Expression v. Dean,*
  202 F. Supp. 2d 300 (D. Vt. 2002)....................................... 21, 36, 45

*Artway v. Attorney General of State of New Jersey,*
  81 F.3d 1235 (3d Cir. 1996) .............................................................. 22

*Assemany v. Archdiocese of Detroit,*
  434 N.W.2d 233 (Mich. App. 1988).................................................. 11

*Babbitt v. United Farm Workers National Union,*
  442 U.S. 289 (1979).................................................... 10, 12, 16, 39

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ............................................................................. 32

*Bays v. City of Fairborn,*
  668 F.3d 814 (6th Cir. 2012) ............................................................. 47

*Beech Grove Investment Company v. Civil Rights Commission,*
  157 N.W.2d 213 (Mich. 1968) ........................................................... 8

*Bongo Productions, LLC v. Lawrence,*
  548 F. Supp. 3d 666 (M.D. Tenn. 2021)..................................... 17, 19

*Bongo Productions, LLC v. Lawrence,*
  No. 3:21-CV-00490, 2022 WL 1557664 (M.D. Tenn. May 17, 2022) ......... 18, 39

*Boyd v. Harding Academy of Memphis, Inc.,*
  88 F.3d 410 (6th Cir. 1996)............................................................... 25

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) .......................................................................... 44

*Bryant v. Woodall,*
　　1 F.4th 280 (4th Cir. 2021) ............................................................ 15

*Buck v. Gordon,*
　　429 F. Supp. 3d 447 (W.D. Mich. 2019) .......................................... 22

*Buford v. Sun Oil Corp.,*
　　319 U.S. 315 (1943) ....................................................................... 45

*Chelsey Nelson Photography LLC v. Louisville/Jefferson County Metro Government,*
　　556 F. Supp. 3d 657 (W.D. Ky. 2021) .............................................. 43

*Chelsey Nelson Photography, LLC v. Louisville/Jefferson County Metro
　　Government,*
　　No. 3:19-CV-851-BJB, 2022 WL 3972873
　　(W.D. Ky. Aug. 30, 2022) ...................................... 4, 24, 37, 45, 47

*Chrysler Corp. v. Fedders Corp.,*
　　643 F.2d 1229 (6th Cir. 1981) ........................................................ 43

*Clarke v. K Mart Corporation,*
　　495 N.W.2d 820 (Mich. App. 1992) ................................................ 28

*Corning Glass Works v. Lady Cornella Inc.,*
　　305 F. Supp. 1229 (E.D. Mich. 1969) .............................................. 47

*Devlin v. Kalm,*
　　493 F. App'x 678 (6th Cir. 2012) .................................................... 46

*Doe v. Bolton,*
　　410 U.S. 179 (1973) ....................................................................... 12

*Doe v. City of New York,*
　　976 N.Y.S.2d 360 (Sup. Ct. 2013) .................................................... 9

*Doster v. Kendall,*
　　54 F.4th 398 (6th Cir. 2022) ...................................................*passim*

*Dothard v. Rawlinson,*
　　433 U.S. 321 (1977) ....................................................................... 33

*Dream Defenders v. DeSantis,*
　　553 F. Supp. 3d 1052 (N.D. Fla. 2021) ........................................... 15

*E.E.O.C. v. Kamehameha Schools/Bishop Estate,*
　　990 F.2d 458 (9th Cir. 1993) .......................................................... 33

*Elane Photography, LLC v. Willock,*
    309 P.3d 53 (N.M. 2013) ........................................................ 8

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................. 42

*Emilee Carpenter, LLC v. James,*
    575 F. Supp. 3d 353 (W.D.N.Y. 2021) ................................ 15

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ............................................... 13

*Federal Election Commission v. Cruz,*
    142 S. Ct. 1638 (2022) .................................................. 32, 38

*Federal Election Commission v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007) ............................................................. 41

*Felmeister v. Office of Attorney Ethics,*
    856 F.2d 529 (3d Cir. 1988) ............................................... 46

*Fischer v. Thomas,*
    52 F.4th 303 (6th Cir. 2022) ......................................... 16, 20

*Franciscan Alliance, Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ................................... 18, 22, 38

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ........................................................ 32

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
    23 F.3d 1071 (6th Cir. 1994) ............................................... 16

*Glenn v. Holder,*
    690 F.3d 417 (6th Cir. 2012) ............................................... 36

*Good v. Iowa Department of Human Services,*
    924 N.W.2d 853 (Iowa 2019) ................................................ 9

*Green Party of Tennessee v. Hargett,*
    791 F.3d 684 (6th Cir. 2015) ....................................... 10, 16, 22, 39

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) .................................................. 7

*Heffron v. International Society for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981) ............................................................. 39

*Hill v. Snyder*
    878 F.3d 193 (6th Cir. 2017) ........................................................................ 41

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................................ 15

*Houston v. Hill,*
    482 U.S. 451 (1987) .................................................................................... 46

*Iowa League of Cities v. E.P.A.,*
    711 F.3d 844 (8th Cir. 2013) ...................................................................... 38

*Johnson v. Rodrigues (Orozco),*
    226 F.3d 1103 (10th Cir. 2000) .................................................................. 46

*Jones v. Jegley,*
    947 F.3d 1100 (8th Cir. 2020) .................................................................... 13

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ......................................................... 6, 7, 15, 48

*Kiser v. Reitz,*
    765 F.3d 601 (6th Cir. 2014) .................................................................. 4, 21

*Knick v. Township of Scott,*
    139 S. Ct. 2162 (2019) ............................................................................... 36

*Laird v. Tatum,*
    408 U.S. 1 (1972) ....................................................................................... 36

*Lange v. Houston County, Georgia,*
    No. 5:19-cv-392 (MTT), 2022 WL 1812306 (M.D Ga. June 2, 2022) ................ 9

*Lopes v. Jetsetdc, LLC,*
    4 F. Supp. 3d 238 (D.D.C. 2014) ............................................................... 43

*LSO, Ltd. v. Stroh,*
    205 F.3d 114106 (9th Cir. 2000) ............................................................... 10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 3, 12

*Major v. Village of Newberry,*
    892 N.W.2d 402 (Mich. App. 2016) ........................................................... 11

*Mangual v. Rotger-Sabat,*
    317 F.3d 45 (1st Cir. 2003) ........................................................................ 13

*Marsh v. Department of Civil Service,*
    370 N.W.2d 613 (Mich. 1985) ......................................................... 20

*McLeod v. Providence Christian School,*
    408 N.W.2d 146 (Mich. App. 1987)............................................ 11, 33

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ................................................................... 35, 38

*Memphis Biofuels, LLC v. Chickasaw Nation Industries, Inc.,*
    585 F.3d 917 (6th Cir. 2009) ........................................................... 3

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ...................................................................... 41

*Miller v. City of Wickliffe,*
    852 F.3d 497 (6th Cir. 2017) ......................................................... 36

*Minton v. Dignity Health,*
    39 Cal. App. 5th 1155 (2019) .......................................................... 9

*Moon v. Michigan Reproductive & IVF Center, P.C.,*
    810 N.W.2d 919 (Mich. App. 2011).............................................. 8, 9

*Morrison v. Board of Education of Boyd County,*
    521 F.3d 602 (6th Cir. 2008) ......................................................... 36

*National Federation of Independent Business v. Sebelius,*
    567 U.S. 519 (2012) ...................................................................... 18

*National Organization for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) .......................................................... 19

*Neufeld v. City of Baltimore,*
    964 F.2d 347 (4th Cir. 1992) ......................................................... 46

*New Jersey Bankers Association v. Attorney General, New Jersey,*
    49 F.4th 849 (3d Cir. 2022) ............................................................. 7

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ...................................................................... 46

*New York State Club Association, Inc. v. City of New York,*
    487 U.S. 1 (1988) .......................................................................... 35

*North Carolina Right to Life, Inc. v. Bartlett,*
    168 F.3d 705 (4th Cir. 1999) ......................................................... 13

*Ohio National Life Insurance Company v. United States,*
    922 F.2d 320 (6th Cir. 1990) ........................................................... 2, 3

*Online Merchants Guild v. Cameron,*
    995 F.3d 540 (6th Cir. 2021) ...................................................... 15, 22

*Peoples Rights Organization, Inc. v. City of Columbus,*
    152 F.3d 522 (6th Cir. 1998) ...................................................... 18, 39

*Picard v. Magliano,*
    42 F.4th 89 (2d Cir. 2022) ................................................................. 7

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) ......................................................................... 18

*Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati,*
    822 F.2d 1390 (6th Cir. 1987) ......................................................... 12

*Platt v. Board of Commissioners on Grievances & Discipline of Ohio Supreme Court,*
    769 F.3d 447 (6th Cir. 2014) ............................................... 13, 20, 40

*Porth v. Roman Catholic Diocese of Kalamazoo,*
    532 N.W.2d 195 (Mich. App. 1995) ........................................... 11, 25

*Religious Sisters of Mercy v. Becerra,*
    No. 21-1890, 2022 WL 17544669 (8th Cir. Dec. 9, 2022) ........... 18, 22

*Rothamel v. Fluvanna County,*
    810 F. Supp. 2d 771 (W.D. Va. 2011) ............................................. 45

*Rouch World, LLC v. Department of Civil Rights,*
    No. 162482, 2022 WL 3007805 (Mich. July 28, 2022) .............. 25, 33

*Saginaw Housing Commission v. Bannum, Inc.,*
    576 F.3d 620 (6th Cir .2009) .......................................................... 45

*Saieg v. City of Dearborn,*
    641 F.3d 727 (6th Cir. 2011) .......................................................... 45

*Sizova v. National Institute of Standards & Technology,*
    282 F.3d 1320 (10th Cir. 2002) ...................................................... 43

*Squire v. Coughlan,*
    469 F.3d 551 (6th Cir. 2006) .......................................................... 35

*Steffel v. Thompson,*
    415 U.S. 452 (1974) .................................................................. 33, 35

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ............................................................ 3, 5, 21, 24

*Telescope Media Group v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) ....................................................... 24, 37

*Terrace v. Thompson,*
  263 U.S. 197 (1923) ...................................................................... 39

*Turtle Island Foods, SPC v. Thompson,*
  992 F.3d 694 (8th Cir. 2021) ............................................................. 7

*Tweed-New Haven Airport Authority v. Tong,*
  930 F.3d 65 (2d Cir. 2019) .............................................................. 15

*United States v. Stevens,*
  559 U.S. 460 (2010) ...................................................................... 40

*United States v. Supreme Court of New Mexico,*
  839 F.3d 888 (10th Cir. 2016) .......................................................... 13

*Universal Life Church Monastery Storehouse v. Nabors,*
  35 F.4th 1021 (6th Cir. 2022) ...................................................... 15, 21

*Vermont Right to Life Committee, Inc. v. Sorrell,*
  221 F.3d 376 (2d Cir. 2000) ......................................................... 7, 17

*Virginia v. America Booksellers Association, Inc.,*
  484 U.S. 383 (1988) ...................................................................... 12

*Weishuhn v. Lansing Catholic Diocese,*
  787 N.W.2d 513 (Mich. App. 2010) .................................................... 11

*Whitman v. Mercy-Memorial Hospital,*
  339 N.W.2d 730 (Mich. App. 1983) ................................................ 29, 38

*Whole Woman's Health v. Jackson,*
  141 S. Ct. 2494 (2021) ................................................................... 13

*Whole Woman's Health v. Jackson,*
  142 S. Ct. 522 (2021) ........................................... 12, 13, 18, 23, 39

*William Powell Company v. National Indemnity Company,*
  18 F.4th 856 (6th Cir. 2021) ........................................................... 45

*Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*,
  473 U.S. 172 (1985) .......................................................................... 36

*Winter v. Wolnitzek*,
  834 F.3d 681 (6th Cir. 2016) ............................................................ 40

**Rules and Statutes**

MCL 24.232 ........................................................................................ 17

MCL 37.2102 ...................................................................................... 23

MCL 37.2202 .............................................................................. 11, 28

MCL 37.2206 ...................................................................... 11, 12, 21

MCL 37.2302 ...............................................................................*passim*

MCL 37.2602 .............................................................. 24, 27, 30

MCL 37.2605 ...................................................................... 11, 21, 38

MCL 37.2705 .............................................................................. 16, 17

MCL 750.147 ................................................................................*passim*

MDCR Rule 37.2 .............................................................................. 20

MDCR Rule 37.4 .................................................................. 20, 30, 38

MDCR Rule 37.7 .............................................................................. 24

MDCR Rule 37.23 .......................................................................... 17

**Other Authorities**

Brief for Massachusetts et al. as Amici Curiae in Support of Respondents,
  *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022),
  2022 WL 3691314 .................................................................. 8, 15, 26

Brief for Massachusetts et al. as Amici Curiae in Support of Defendants,
  *Emilee Carpenter v. James*, No. 22-75 (2d Cir. May 16, 2022) ....................... 15

Complaint, *New York v. U.S. Department of Health & Human Services*, Case
  No. 1:19-cv-04676 (S.D.N.Y. May 21, 2019) ..................................... 27

Complaint, *Sacred Heart of Jesus Parish v. Nessel*, Case No. 1:22-cv-1214
    (W.D. Mich. Dec. 22, 2022) ................................................................ 11

Complaint, *St. Joseph Parish St. Johns v. Nessel*, Case No. 1:22-cv-01154
    (W.D. Mich. Dec. 5, 2022) ................................................................. 11

Ed White, *Dem AG candidate: Adoption law discriminates against gays*,
    Associated Press (Sept. 27, 2018), https://bit.ly/3URynbS ............................ 26

Helen M. Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too
    Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319 (2021)......... 31

Press Release ("October 2021 Press Release"), *AG Nessel, Department of Civil
    Rights File to Protect Citizens from Sexual Orientation Discrimination
    Before Michigan Supreme Court* (Oct. 25, 2021),
    https://perma.cc/FE8Y-DVTV ...................................................... 14, 15

Michigan Department of Civil Rights, *Complaint Request*,
    https://bit.ly/3iTsPjK ........................................................................ 20

Michigan Opinion Attorney General,
    2018 Mich. OAG No. 7305, 2018 WL 3577672 (2018) ..................................... 14

Michigan Opinion Attorney General,
    2021 Michigan OAG No. 7313, 2021 WL 2890728 (2021) ................................ 5

*Protecting Statutory Conscience Rights in Health Care; Delegations of
    Authority*, 84 Fed. Reg. 23,170 (May 21, 2019)................................................ 27

Religious Liberty Law Section of the State Bar of Michigan, *Reasons for
    Opposition* 1 (Mar. 2020), https://bit.ly/3UWdT1B........................................... 25

State Attorneys General, *Comment Letter on Proposed Rule
    Nondiscrimination in Health Programs and Activities* (Oct. 3, 2022),
    https://bit.ly/3W4oZTA ...................................................................... 27

## Introduction

Christian Healthcare Centers is a faith-based medical ministry that provides exceptional healthcare to its community no matter who seeks this care. To achieve its religious mission, the ministry wants to provide medical care consistent with its beliefs, explain those services to the public, and hire employees who share its beliefs. But like similar laws across the country, Michigan's recently re-interpreted law makes it illegal for Christian Healthcare to speak and operate this way under threat of six-figure fines, jailtime, injunctions, and other penalties. That violates the ministry's constitutional rights. So the ministry filed this suit before speaking, before Michigan began prosecution, and while the ministry chills its speech and operates in fear of prosecution. *Pre-enforcement litigation exists to remedy this very dilemma.*

Much of the case is undisputed. Michigan never denies the merits of Christian Healthcare's claims. Michigan never denies that its law applies to the ministry as a public accommodation, public-service provider, and employer. Michigan concedes its authority to enforce the law. Michigan admits it is prosecuting organizations who share the ministry's beliefs on marriage and sexuality. And Michigan never disavows enforcing the law against the ministry now or in the future for engaging in its desired activities.

Instead, Michigan wants to have it both ways—on the one hand, appear noncommittal and retain its ability to prosecute the ministry in the future, and on the other, avoid accountability now before this Court. To thread this needle, Michigan denies standing on the theory that it is not *currently* prosecuting the ministry, the ministry can raise *post-prosecution* defenses, and the ministry *might* receive a bona fide occupational qualification (BFOQ) exemption for its employment activities—even though applying for that exemption would harm the ministry, would be futile, and Michigan has *never* given that exemption to anyone.

Not ever. But all this just gets the pre-enforcement standing requirements wrong. If Michigan's position defeats standing here, then officials could defeat any pre-enforcement effort to protect any constitutional or statutory right, from speech to equal protection to environmental rights.

In reality, Christian Healthcare need only show that Michigan's law arguably covers its activities and there is a credible threat of enforcement. *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 158 (2014). Not definite and certain. Arguable and credible. Christian Healthcare easily clears that low bar because Michigan actively enforces its law, its law arguably covers the ministry's activities, and Michigan never disavows. In fact, based on past statements and actions of Michigan officials as well as similar prosecutions happening all across the country, the ministry faces an unequivocable threat, not just a credible one. The ministry therefore has reasonably refrained from certain activities, fears prosecution for others, and needs immediate relief for both. Michigan's motion to dismiss should be denied, and the ministry's requested preliminary injunction should be granted.

## Clarification of Standard of Review

Michigan moves to dismiss this case under Rule 12(b)(1) and defends against the requested preliminary injunction for largely the same reasons.

Rule 12(b)(1) motions come in "two varieties"—facial and factual attacks. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A facial attack considers only the complaint and accepts its allegations as true. *Id.* A factual attack considers evidence from both parties. *Id.*

Michigan brings a factual attack by relying on facts outside the complaint— like its BFOQ approval process. *See* Defs.' Br. in Supp. of Mot. to Dismiss (Defs.' MTD), PageID.558 (noting Rule 12(b)(1) standard for "factual" challenges "rather

than … facial" ones). But Michigan never disputes any allegation in Christian Healthcare's complaint, so those must be taken as true. *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc.*, 585 F.3d 917, 919 (6th Cir. 2009) (reviewing undisputed facts as a matter of law). For jurisdiction, Christian Healthcare relies on its verified complaint, exhibits to the verified complaint, evidence attached to its preliminary-injunction motion, and evidence referenced herein and attached to this brief. This Court has "wide discretion" to consider this evidence to resolve the jurisdictional question. *Ohio Nat'l Life Ins. Co.,* 922 F.2d at 325 (collecting cases). That evidence overwhelmingly supports jurisdiction.

## Argument

Christian Healthcare has standing, and its claims are ripe. Michigan's law currently injures Christian Healthcare, and the ministry faces a credible threat of enforcement. Although jurisdiction is clear on this record, if there were any doubt, Christian Healthcare is entitled to jurisdictional discovery. For similar reasons, Christian Healthcare can pursue a declaratory judgment and permanent injunction against Michigan. Likewise, there's no reason to abstain from Christian Healthcare's facial challenge to the Unwelcome Clause, which raises a federal constitutional—not a state-law—issue. Finally, Christian Healthcare deserves a preliminary injunction because it's likely to win on the merits, suffers irreparable harm, and an injunction here serves the public interest.

## I.    Christian Healthcare has standing to challenge Michigan's laws.

Christian Healthcare has standing to bring this suit, which requires a showing of injury-in-fact, causation, and redressability. *SBA List*, 573 U.S. at 157 n.5; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Of these requirements, Michigan primarily contests injury-in-fact. Defs.' MTD, PageID.559–579. Michigan raises causation too, but this just recycles its injury-in-fact arguments. Defs.' MTD,

PageID.576–579; Defs.' Br. in Opp'n to Pl.'s Mot. for Prelim. Inj. (Defs.' MPI Resp.), PageID.520–525.[1] So these are addressed together below.

The Accommodation, Publication, Employment, and Notice Clauses all injure Christian Healthcare.[2] To establish injury-in-fact in a pre-enforcement case, Christian Healthcare need only show a "substantial risk" of Michigan's law harming it. *SBA List*, 573 U.S. at 158 (internal quotation marks omitted). Christian Healthcare has done so because it meets the Supreme Court's three-part test for pre-enforcement standing: the ministry intends "to engage in a course of conduct arguably affected with a constitutional interest," its activities are arguably "proscribed by" Michigan's law, and it faces a "credible threat of prosecution." *Id.* at 159.

Christian Healthcare meets this test because (A) Michigan never disputes the ministry's desired activities are constitutionally protected; (B) Michigan never disputes that its law arguably prohibits these activities; (C) courts presume a credible threat of enforcement in these circumstances; (D) Michigan fails to rebut this presumption; (E) many other factors support Christian Healthcare's standing; and (F) Michigan's counter arguments fail legally and factually. So this Court should deny Michigan's motion to dismiss.

---

[1] Christian Healthcare's claims are also caused by and redressable against these defendants because they have the authority to enforce the law. Verified Compl. (Compl.) ¶¶ 8–13, PageID.5; *Kiser v. Reitz*, 765 F.3d 601, 610 (6th Cir. 2014) (injury was caused by and redressable against named defendants because they had enforcement authority); *Chelsey Nelson Photography, LLC v. Louisville/Jefferson Cnty. Metro Gov't*, Case No. 3:19-cv-851-BJB, 2022 WL 3972873, at *9 (W.D. Ky. Aug. 30, 2022) (same). Michigan never disputes this civil enforcement authority besides quibbling with *Commission* members' *criminal* enforcement authority, Defs.' MTD, PageID.576–578; Defs.' MPI Resp., PageID.520–522.

[2] The Publication Clause refers to MCL 750.147 and MCL 37.2302(b) collectively unless context indicates otherwise.

## A.   Christian Healthcare intends to and engages in constitutionally protected activities.

Christian Healthcare intends to and currently engages in activities affected with constitutional interests, satisfying the first *SBA List* factor. 573 U.S. at 159. Christian Healthcare refers to patients using pronouns consistent with its religious beliefs about the immutability of sex, declines medical services—like prescribing cross-sex hormones—that violate its religious autonomy, and hires employees who agree with and live out the ministry's religious calling. Compl. ¶¶ 96, 101–04, 143, 307–11, PageID.17–18, 22, 49.[3] To ensure consistency with its religious mission, Christian Healthcare follows policies to these ends. *See* Compl. Exs. 4–15, PageID.122–153.

Christian Healthcare has also refrained from other constitutionally protected activities because of Michigan's law. For example, the ministry desires to explain its religiously motivated healthcare policies to the public and make hiring decisions consistent with its religious mission. Compl. ¶¶ 55–56, 307–30, 350–61, PageID.11, 49–51, 54–55. To avoid prosecution, though, the ministry is refraining from (1) posting its medical care policies; (2) including its Religious Provider Disclosure and Philosophy of Wellness and Health Care statement in the membership agreement it posts online; (3) indicating its desire to employ staff who adhere to its religious beliefs; and (4) posting a job notice for a vacant biblical-counselor position. *Id.*

The First Amendment's free speech, expressive association, and religion clauses protect these practices, policies, and postings. *See generally* Pl.'s MPI.

---

[3] The ministry declines to perform certain medical procedures that harm patients, such as declining cross-sex hormones to facilitate gender transitions because they cause sterilization. Pl.'s Br. in Supp. of Its Prelim. Inj. Mot. (Pl.'s MPI), PageID.433. Elsewhere, Michigan agrees these procedures "may well result in that person's sterilization" and that "[n]o state interest supports such an unnecessary burden." Mich. Op. Att'y Gen., 2021 Mich. OAG No. 7313, at *2, 2021 WL 2890728 (2021).

Michigan correctly identifies the ministry's desired and ongoing activities and never disputes that they are constitutionally protected. Defs.' MPI Resp., PageID.499. So, at a minimum, the First Amendment *arguably* protects Christian Healthcare's activities, satisfying the first *SBA List* factor.

### B. Michigan's law arguably prohibits Christian Healthcare's desired activities.

Michigan's law also arguably prohibits Christian Healthcare's religiously motivated actions and speech. In fact, Michigan never disputes this second *SBA List* factor.

For example, Michigan doesn't deny that Christian Healthcare is a public accommodation, public service provider, and employer under the law. Compl. ¶¶ 200–01, 219–24, PageID.29, 34. Nor does Michigan deny that its law arguably forbids Christian Healthcare's desired activities.

Instead, Michigan argues that the ministry can simply violate the law and then *might* be able to raise an undefined "religious exemption" defense or some other type of affirmative defense to show its pronoun and cross-sex hormone policies do not violate the Accommodation and Publication Clauses; then Michigan suggests that a heretofore unrecognized BFOQ exemption *might* protect Christian Healthcare's employment decisions. Defs.' MTD, PageID.562–563, 574, 583; Defs.' MPI Resp., PageID.511, 526. These vague and strained interpretations are unlikely. *See infra* § I.F.1 (detailing these problems). But more fundamentally, Michigan gets the standing standard wrong.

For standing, Christian Healthcare need not prove that its feared interpretation—that no exemption or defense protects it—has already been applied or inevitably will be applied; Christian Healthcare just needs to show that its interpretation is arguable. *SBA List*, 573 U.S. at 162. For that, "at least a *plausible* interpretation of the statute" suffices. *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th

Cir. 2022); *accord Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (adopting a "reasonable enough" standard); *N.J. Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 855 (3d Cir. 2022) ("Arguably proscribed is not a stringent test.").

In other words, *possible* exemptions and defenses don't refute the low bar to establish injury-in-fact when a law arguably covers a plaintiff. For example, in *Doster v. Kendall*, the Air Force required service members to receive COVID-19 vaccinations or face punishment. 54 F.4th 398, 405 (6th Cir. 2022). Thousands of members requested religious exemptions from the mandate, and later filed suit alleging the mandate violated the Religious Freedom Restoration Act. *Id.* The court held the members had standing to sue because "their refusal to take a vaccine would 'arguably' violate the mandate even though—in theory, at least—some could still get an exemption at the time that they sued." *Id.* at 416.

Other courts agree and have found pre-enforcement standing even when the government proffered alternative interpretations or proposed possible exemptions. *E.g.*, *Yellen*, 54 F.4th at 337 & n.6 (standing even though "it was not yet clear, based on statute alone" how states would comply with regulation and a letter "created significant uncertainty about when tax cuts were permissible"); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (standing even though "there may be other, perhaps even better" interpretations of statute when plaintiff's interpretation was "reasonable enough that [they] may legitimately fear … enforcement of the statute").[4]

---

[4] Courts apply this "arguable" standard to avoid deciding merits issues, like statutory interpretation questions, in their standing analysis. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 700 (8th Cir. 2021) (applying "the First Amendment's lenient standing requirement" because "the standing analysis and the substantive analysis are not coextensive"); *accord Hedges v. Obama*, 724 F.3d 170, 199 (2d Cir. 2013).

With this proper standard in mind, Christian Healthcare can easily prove that each challenged provision *arguably* bars its desired activities.

*Accommodation Clause.* The Accommodation Clause compels Christian Healthcare to refer to patients by their self-asserted gender, forces the ministry to prescribe cross-sex hormones to facilitate attempted gender transitions, and prohibits the ministry from following policies on pronouns and medical procedures that align with its religious beliefs on those topics. Compl. ¶ 253, PageID.40; Pl.'s MPI, PageID.424–434.

Prior Michigan cases also confirm the threat here. These cases have consistently held that *any differentiation* in a service suffices for an Accommodation Clause violation. *See infra* § I.F.1 (collecting cases and discussing the "full and equal access" requirement); *Beech Grove Inv. Co. v. C.R. Comm'n*, 157 N.W.2d 213, 228 (Mich. 1968) (civil-rights law in Michigan provides that "a member of the public is entitled to the same treatment and consideration as anyone else—no better, but no worse").[5] Michigan recently touted this interpretation of public-accommodations laws in a brief it joined at the United States Supreme Court. Br. for Massachusetts et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022), 2022 WL 3691314, *18 ("Public accommodations laws exist to prevent not only outright exclusion, but also separate and unequal treatment.").

Likewise, a Michigan state court has already held that a physician arguably discriminated based on marital status when he declined to provide a service to a

---

[5] Other state courts interpret their similar laws the same way. *See Elane Photography, LLC v. Willock*, 309 P.3d 53, 62 (N.M. 2013) ("[I]f a restaurant offers a full menu to male customers, it may not refuse to serve entrees to women, even if it will serve them appetizers.... Elane Photography's willingness to offer some services to [a woman entering a same-sex marriage] does not cure its refusal to provide other services that it offered to the general public.").

single woman that he would have provided to a married woman. *Moon v. Michigan Reprod. & IVF Ctr., P.C.*, 810 N.W.2d 919, 921 (Mich. App. 2011). And Michigan took this view in *Rouch World* by arguing that the Accommodation Clause adopts a "but-for causation" standard, meaning "that liability cannot be avoided just by citing some other factor [i.e., a desire to follow one's conscience] that contributed to the challenged decision." Pl.'s App. to Opp'n to Defs.' Mot. to Dismiss & Reply Br. in Supp. of Its Prelim. Inj. Mot. (Supp. App.) 190.

What's more, courts around the country have interpreted laws like Michigan's (with similar language) to require entities to use gender-identity-based pronouns. Compl. ¶ 238, PageID.37 (collecting cases); *Doe v. City of New York*, 976 N.Y.S.2d 360, 361–62 (Sup. Ct. 2013) (plaintiff who identified as transgender stated claim for public-accommodations discrimination where city agency used "male pronouns"). So too have courts interpreted laws like Michigan's to require gender-transition treatments. Compl. ¶ 344, PageID.53 (collecting cases). For example, California courts interpret the California public-accommodation law to require Catholic hospitals to provide these medical treatments, and Michigan's law has nearly identical language. *Minton v. Dignity Health*, 39 Cal. App. 5th 1155, 1165–66 (2019); *cf. Good v. Iowa Dep't of Hum. Servs.*, 924 N.W.2d 853, 856, 862 (Iowa 2019) (state rules administering Medicaid, which would not pay for gender-transition procedures, violated Iowa's public-accommodations law). Likewise, courts interpreting Title VII also impose these treatments on private employers, and Michigan has repeatedly said it looks to Title VII to define the meaning of gender-identity discrimination. *Lange v. Houston Cnty.*, Civil Action No. 5:19-cv-392 (MTT), 2022 WL 1812306, at *1, *14 (M.D. Ga. June 2, 2022).

Michigan never disavows these court interpretations of its law, other court's interpretations of similar laws, or its own prior actions. Christian Healthcare need not stick its head in the sand and ignore all these context clues pointing to the

threat posed by the Accommodation Clause. Rather, these factors combine to show that the Accommodation Clause arguably prohibits Christian Healthcare's pronoun and cross-sex hormone policy and practice. And that is true even though Michigan has not yet enforced its Accommodation Clause in the precise way Christian Healthcare fears. *Compare* Defs.' MTD, PageID.565–567, 573 (faulting lack of prior enforcement against Christian Healthcare's desired activities), *with Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (standing even though law "has not yet been applied" to activities that plaintiff wanted to engage in); *and Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (standing though "defendants have not enforced or threatened to enforce this statute against plaintiffs or any other political party").[6]

*Publication Clause.* The Publication Clause also restricts the ministry's speech on pronouns, gender-transition interventions, and the religious nature of its services. Compl. ¶¶ 55–56, 240–41, 350–61, PageID.11, 38, 54–55. Michigan never disavows this interpretation, which comes from the statute's text. MCL 37.2302(b); MCL 750.147. So the Publication Clause arguably prevents Christian Healthcare from publishing a description of its religious values in its membership agreement, its pronoun policy, or its gender-transition policy. Michigan can easily say otherwise. It hasn't.

*Employment, Accommodation, and Notice Clause.* The Employment, Accommodation, and Notice Clauses arguably prohibit Christian Healthcare from hiring and retaining employees who agree with its religious beliefs and following policies to that effect. Compl. ¶ 205, PageID.30–31; Pl.'s MPI, PageID.436–443; *see also id.* at PageID.438n.5 (explaining why Employment and Accommodation

---

[6] Other circuits agree here too. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("However, enforcement history alone is not dispositive. Courts have found standing where no one had ever been prosecuted under the challenged provision.").

Clauses operate similarly). That's evident from the law's plain language which prohibits recruiting employees "because of" religion, MCL 37.2202(1), declining to hire employees "because of" religion, sex, marital status, or other protected characteristics, *id.*, and using or following a pattern or practice of such recruiting and hiring, MCL 37.2206(2), MCL 37.2605(1).

Others read Michigan's law as Christian Healthcare does. In fact, two church-operated schools recently filed suit to challenge Michigan's law because it interprets the law the same way as Christian Healthcare. Complaint, *Sacred Heart of Jesus Parish v. Nessel*, Case No. 1:22-cv-1214 (W.D. Mich. Dec. 22, 2022), PageID.1–74; Complaint, *St. Joseph Parish St. Johns v. Nessel*, Case No. 1:22-cv-01154 (W.D. Mich. Dec. 5, 2022), PageID.1–44.

Michigan courts agree too. These courts say employers violate the Employment Clause when they consider protected classifications in their employment decisions. *See Major v. Vill. of Newberry*, 892 N.W.2d 402, 414–16 (Mich. App. 2016). The same is true of religious employers. Indeed, for decades, Michigan's religious employers have faced suits for adopting employment practices that ensure employees agree with and abide by their religious tenets. *See McLeod v. Providence Christian Sch.*, 408 N.W.2d 146, 150 (Mich. App. 1987); *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 234 (Mich. App. 1988); *Porth v. Roman Cath. Diocese of Kalamazoo*, 532 N.W.2d 195, 197–98 (Mich. App. 1995); *Weishuhn v. Lansing Cath. Diocese*, 787 N.W.2d 513, 518 (Mich. App. 2010). Though some raised successful defenses, the fact that the Employment Clause applied to them in the first place shows that the clause arguably applies to Christian Healthcare.

*Notice Clause*. The Notice Clause also arguably prohibits Christian Healthcare from publishing its religious values in employment applications and annual renewals and asking prospective employees about their faith. Compl. ¶ 209,

PageID.31–32; Pl.'s MPI, PageID.436–443. The statue makes that clear. MCL 37.2206(1). Michigan never disputes this.

### C. Christian Healthcare is entitled to a presumption that there is a credible threat of enforcement.

Christian Healthcare can prove a credible enforcement threat because the ministry is an object of Michigan's law, the law arguably proscribes the ministry's desired activities, and Michigan actively enforces the law.

In these circumstances, the Supreme Court and the Sixth Circuit presume a credible threat of enforcement. *Whole Woman's Health v. Jackson,* 142 S. Ct. 522, 537 (2021) (standing where "provisions of state law" authorized enforcements against plaintiffs); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (seeing "no reason to assume" a "newly enacted law will not be enforced"); *Babbitt*, 442 U.S. at 302 (finding credible threat because the plaintiffs' intended conduct was covered by the face of the challenged provision); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (standing because law "directly operate[d]" against abortion providers even though they had never "been prosecuted, or threatened with prosecution"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) (standing where "statutory language of the Ordinance" applied to plaintiff). In other words, when a plaintiff is "an object of the action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

Indeed, in the Supreme Court's most recent pre-enforcement case, abortion providers challenged a law fearing that licensing officials *might* enforce this law against them—even though the law had not gone into effect and licensing officials had never enforced the law in that way against anyone, and state officials explicitly disavowed this application. *Whole Woman's Health v. Jackson,* 142 S. Ct. at 530,

537; *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (noting Texas disclaimed "executive employees … authority to enforce the Texas law either directly or indirectly."). But the Court still found standing because it "appears" officials could enforce that law against plaintiffs' desired activities and because plaintiffs alleged "a direct effect on their day-to-day operations." *Whole Woman's Health,* 142 S. Ct. at 537. Simply put, courts assume officials will enforce state laws that *arguably* cover plaintiffs' desired activities—not definitely, but arguably. That alone is enough to establish a credible threat.

The Sixth Circuit and other circuits agree with this low bar; they do not even "closely scrutinize the plaintiff's complaint for standing" but rely on the assumption that officials will enforce non-moribund laws, especially in the First Amendment context. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014).[7]

This presumption applies here. As explained, Christian Healthcare is an object of Michigan's law, the law arguably prohibits the ministry from engaging in religiously motivated speech, medical practice, and employment decisions, and

---

[7] *See also Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (defining pre-enforcement standing standard as a "extremely low"); *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019) (when party is "an object of" statute, there is "ordinarily little question" that statute causes injury); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (acknowledging "presumption"); *Ezell v. City of Chicago*, 651 F.3d 684, 695–96 (7th Cir. 2011) ("The very existence of a statute implies a threat to prosecute" (cleaned up)); *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020) ("fear of prosecution for illegal activity is objectively reasonable" when there is no evidence of refusal to enforce a statute); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016) (credible threat when "provision on its face proscribes" the conduct in which a plaintiff wishes to engage, and the state "has not disavowed any intention of invoking the … provision" against the plaintiff"); *Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (standing based on "conventional background expectation that the government will enforce the law").

Michigan actively enforces its law. *See supra* § I.A–B; *infra* § I.D. That establishes standing under Supreme Court precedent.

### D.   Michigan has not rebutted the enforcement presumption created by its law.

In some situations, the government can rebut the presumption that it will enforce its laws, such as when a law is moribund or when officials disavow enforcement in a binding way. Michigan has done neither here.

*First*, Michigan has not shown that its law is moribund. Far from it. Michigan actively enforces its law. Over the last ten years, Michigan has investigated almost 10,000 complaints against public accommodations and employers. Compl. ¶ 276, PageID.44. Michigan also puts its money where its mouth is—to the tune of $7 million for complaint investigations and prosecutions. Compl. ¶ 280, PageID.44.

Michigan has been especially adamant about applying its law to sexual-orientation and gender-identity discrimination. In May 2018, the Commission adopted an Interpretive Statement redefining "sex" to include sexual orientation and gender identity. Compl. ¶¶ 172–74, PageID.26. It did so against the advice of its own counsel who told the Commission that it had no "authority to make such an interpretation," Supp. App. 230, and contrary to the formal opinion of then-Attorney General Schuette who concluded the interpretation was "invalid," Mich. Op. Att'y Gen., 2018 Mich. OAG No. 7305, at *10, 2018 WL 3577672 (2018).

Then, between May 2018 and December 2019, Michigan investigated 73 complaints alleging sexual-orientation and gender-identity discrimination even though binding state court precedent held that the law did not prohibit sexual orientation discrimination. Compl. ¶¶ 278–79, PageID.44. Michigan later hurried to the Michigan Supreme Court to redefine "sex" in *Rouch World* by "fil[ing] a bypass application … seeking a prompt review of" the lower court's decision defining "sex"

14

to exclude sexual orientation. Press Release, *AG Nessel, Department of Civil Rights File to Protect Citizens from Sexual Orientation Discrimination Before Michigan Supreme Court* (Oct. 25, 2021), https://perma.cc/FE8Y-DVTV. Michigan has also consistently joined amicus briefs claiming a compelling interest in enforcing similar laws with no exceptions. See Br. for Massachusetts et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022), 2022 WL 3691314; Br. of Amici Curiae Massachusetts et al. in Supp. of Defs., *Emilee Carpenter v. James*, No. 22-75 (2d Cir. May 16, 2022).[8]

And Michigan is currently prosecuting two entities who declined to provide a requested service because the request violated their "sincerely held religious beliefs" about the immutability of sex and marriage. Compl. ¶ 174, PageID.26; MPI App., PageID.342, 365. That history is more than enough. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) (standing with "several" past prosecutions); *Online Merchs. Guild*, 995 F.3d at 550–51 (standing with two past prosecutions).

This zealous enforcement reasonably caused Christian Healthcare to chill its speech. To avoid prosecution, Christian Healthcare is not posting its membership agreement online (including certain documents explaining its religious values in its online membership agreement), posting job notices, or publicly indicating its desire to employ staff who adhere to its Religious Statements. Compl. ¶¶ 55–56, 307–30,

---

[8] Courts commonly consider a state's public positions—like amicus briefs and press releases—to support likelihood of enforcing. *See Online Merchs. Guild v. Cameron*, 995 F.3d 540, 551 (6th Cir. 2021) (noting Attorney General's "significant posturing … in public comments" supported standing); *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 368 (W.D.N.Y. 2021) (standing supported by defendants' public positions); *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1077 (N.D. Fla. 2021) (standing supported by statements in press releases). That also explains the significance of Attorney General Nessel adopting a pronoun policy, advocating preferred pronoun use, and filing an amicus brief in *Bostock*. *Contra* Defs.' MTD, PageID.563. Those activities further illustrate Michigan thinks these things are important and that makes the threat of prosecution more credible.

350–61, PageID.11, 49–51, 54–55. "It is well-settled that a chilling effect on one's constitutional rights constitutes a present injury in fact." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994).

But after investigating almost 10,000 complaints in ten years and hastening to redefine "sex" in state law, Michigan now flinches at the consequences of its actions. Michigan's main strategy is to downplay its aggressive enforcement by hinting that Christian Healthcare could raise an affirmative defense in an administrative hearing and suggesting that Christian Healthcare *may* be entitled to a BFOQ exemption. Putting aside the improbability of these events (addressed *infra* § I.F), this lying-in-wait approach is insufficient to overcome the enforcement presumption. Again, the ministry need only show that its law arguably applies, not definitely.

*Second*, Michigan has not sufficiently disavowed the application of its law in a binding way. To do this, Michigan must "*explicitly* disavow[]" enforcing its law against Christian Healthcare "in the future." *Hargett*, 791 F.3d at 696 (emphasis added); *see Fischer v. Thomas*, 52 F.4th 303, 309 (6th Cir. 2022) (requiring judicial commission to "definitively disavow" enforcement). This is a high hurdle, requiring the government to take real action like stipulating to a law's unconstitutionality, "submitting an affidavit forswearing prosecuting," *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022), or passing a new binding rule preventing enforcement, *Yellen*, 54 F. 4th at 339. Interim rules don't even count as disavows because they can always be revised. *Id.* at 339 n.9. Nor do statements that the law "may never be applied" suffice when there is no "disavow[al]." *Babbitt*, 442 U.S. at 302. Michigan does not come close to this standard.[9]

---

[9] Even explicit disavowals cannot overcome a law's plain text. "Unofficial and non-binding statements such as these do not and cannot override the plain text of the [statutes] when it comes to establishing a credible threat of enforcement." *Bryant v. Woodall*, 1 F.4th 280, 289 (4th Cir. 2021) (cleaned up). And for good reason. Non-

At best, Michigan says MCL 37.2705(1) could affect how it "choose[s] to address religious rights." Defs.' MTD, PageID.564. The next line, though, gives the game away: Michigan acknowledges that neither the Commission nor the Attorney General has "otherwise opined on that issue." *Id.* Michigan also admits that it has "no formal policy … regarding how any religious exemption will apply to public accommodations" despite investigating, prosecuting, and advocating for sexual orientation and gender-identity discrimination in a variety of contexts for the past several years. Defs.' MTD, PageID.583. That's nowhere near the requisite definiteness for a disavowal. *See Bongo Prods., LLC v. Lawrence*, 548 F. Supp. 3d 666, 678 (M.D. Tenn. 2021) ("The defendants, however, seek to have it both ways— to pretend that no one knows how the Act will be enforced, despite the fact that, of course, they know, because they will be among the ones doing the enforcing, and they are simply keeping their plans to themselves.").[10]

In fact, Michigan's "argument conflicts with century-old law"—and with Sixth Circuit precedent issued just last month. *Doster*, 54 F.4th at 417 ("The Supreme Court has long held that parties may raise pre-enforcement challenges to a legal mandate *before engaging in the act that will trigger it*." (emphasis added)). Pre-enforcement suits exist to protect against uncertainty. Otherwise, plaintiffs

binding, non-definitive disavowals do not "prevent[] the State from changing its mind." *Vt. Right to Life Comm.*, 221 F.3d at 383–84 (standing despite officials disclaiming enforcement when law arguably applied to plaintiffs). For these reasons, Michigan's suggestion of an Interpretative Statement, Defs.' MTD, PageID.564, 566, 580, does no good because, even if passed, those don't have the force of law, MCL 24.232(5), and can be rescinded on a whim, MDCR 37.23.

[10] Other circuits agree. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013) ("It is disingenuous for Defendants to insinuate that New York might not enforce § 14–100.1 against NOM, when the statute quite clearly applies to NOM's activities, at least as NOM alleges them to be, and when Defendants' counsel, at oral argument, stated that the New York Board of Elections currently regulates approximately 11,000 'political committees.'").

who want to exercise a constitutional right proscribed by law would "face a clear Hobson's choice"—risk prosecution by exercising their right or avoid prosecution by depriving themselves of the right. *Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 529 (6th Cir. 1998); *accord Bongo Prods., LLC v. Lawrence*, No. 3:21-CV-00490, 2022 WL 1557664, at *12 (M.D. Tenn. May 17, 2022)  ("A world in which a private person has to choose between complying with a controversial law or putting his business at risk, only then to be able to sue, is not a world in which the First Amendment is being adequately protected, and the caselaw recognizes as much.").

But leaving plaintiffs "at the mercy of officials' enforcement discretion" acts "as a trap that the state can spring at any time." *Bongo Prods.*, 2022 WL 1557664, at *13 (officials' vague, non-binding statements did not defeat standing to challenge law requiring businesses to post statements whether they opened their bathrooms to either "biological sex"). And "a trap is a trap, even before it goes off." *Id.* After all, by saying that it "'has not to date evaluated' whether" to include a religious exemption in its law, Michigan is conceding that its law "may" apply (and currently does apply) to the ministry. *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022) (pre-enforcement suit brought by religious healthcare providers challenging requirement that they perform and ensure abortions and gender-transitions in violation of their conscience); *accord Religious Sisters of Mercy v. Becerra*, No. 21-1890, 2022 WL 17544669, at *14 (8th Cir. Dec. 9, 2022) (same).

Michigan's we're-not-sure-how-the-law-applies approach runs headlong into a long line of cases finding standing *before a law even goes into effect*. *Whole Woman's Health*, 142 S. Ct. at 536–37 (finding standing prior to "effective date" of law); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 539–40 (2012) (resolving case involving penalties that may have accrued in 2014); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 530–31 (1925) (reaching merits of challenge to statute more than a year before its "effective" date). If ever a wait-and-

see approach had any appeal, it would be in these cases. Even so, the Supreme
Court decided them because the laws (at least arguably) applied to the plaintiffs.

Tellingly, Michigan never disavows future enforcement—and never commits
to exempting Christian Healthcare—despite overwhelming details about Christian
Healthcare's desired activities and operation. *See Bongo Prods.*, 548 F. Supp. 3d at
678 ("Conspicuously, although the defendants attempt to foster a sense of mystery
regarding how, whether, and when the Act will be enforced, they do not actually
take the position that Tennessee businesses can safely ignore the portions of the
building code they disagree with.")

As to the Accommodation and Publication Clauses, Christian Healthcare
described its current practice for its patients who identify as transgender and for
parents who seek advice about children suffering from gender dysphoria and similar
conditions, explained its policies on pronoun usage and cross-sex hormones, and
provided the specific information it desires to post. *E.g.*, Compl. ¶¶ 103–04, 142–44,
332–34, 345–55, PageID.17–18, 22, 51–52, 54–55; Compl. Exs. 3, 6, PageID.116,
126. As to the Employment, Accommodation, and Notice Clauses, Christian
Healthcare described its current employment practices and policies, provided
detailed job descriptions for each employee, explained how adhering to the
ministry's religious requirements is fundamental to those positions, and detailed
the questions the ministry wants to ask prospective employees. Compl. ¶¶ 92–171,
PageID.16–26; Compl. Exs. 4–15, PageID.121–153.

That's more than enough information for Michigan to determine whether to
explicitly disavow enforcement. Not once does it say it needs additional information.
This refusal to disavowal coupled with Michigan's active enforcement shows
Christian Healthcare faces a credible threat of harm.

### E.   Other facts support the enforcement presumption, bolstering Christian Healthcare's standing.

Although unnecessary to prove standing, many other factors bolster

Christian Healthcare's standing to bring this suit.

*First*, courts apply standing requirements most leniently in the speech

context and Christian Healthcare has alleged a reasonable chill. *Fisher*, 52 F.4th at

307 (describing chill as "most important factor" among other factors). It is doing so

by refraining from posting its membership agreement with its pronoun and cross-

sex hormone policies, posting job notices, publicly indicating its desire to employ

staff who adhere to its Religious Statements, and filling a vacant biblical counselor

position. Compl. ¶¶ 55–56, 307–30, 350–61, PageID.11, 49–51, 54–55

*Second*, Michigan's law is easy to enforce: "any person—not just a prosecutor

or state agency may initiate enforcement of" this law. *Platt*, 769 F.3d at 452

(invoking this factor based on *SBA List*); MDCR Rule 37.4(1). Michigan law defines

"person" broadly to include individuals, associations, and advocacy organizations.

MDCR Rule 37.2(m). Michigan posts its complaint form online, making it

convenient and easy for persons to file complaints. *See* Mich. Dep't of C.R.,

*Complaint Request*, https://bit.ly/3iTsPjK (last visited Dec. 14, 2022); *Platt*, 769

F.3d at 452 (online complaint form bolstered standing). Complainants may

"proceed simultaneously" before the Commission and any state circuit court, giving

the forums "concurrent" jurisdiction and effectively offering complainants two bites

at the apple. *Marsh v. Dep't of Civ. Serv.*, 370 N.W.2d 613, 616 (Mich. 1985); Defs,'

MTD, PageID.566n.5.

What's more, the Department, the Commission, and the Director may

initiate complaints on their own motion. MCL 37.2602(c); MDCR Rule 37.4(2). The

Department and the Commission have initiated complaints with "testers." Compl.

¶ 265, PageID.42. And a person need not be denied a service or job position to file a

complaint—they can do so based on a policy or seeing an objectionable posting. *See id.* at ¶ 266, PageID.42 (collecting authority); MCL 37.2302(b); MCL 750.147; MCL 37.2206(1)–(2). This wide-ranging "universe of potential complainants" increases Christian Healthcare's prosecution risk. *SBA List*, 573 U.S. at 164.

*Third*, violating Michigan's law comes with devastating consequences. For Christian Healthcare, those penalties could include performing medical procedures or using pronouns that violate its religious beliefs, hiring and retaining employees who disagree with the ministry's religious mission, paying damages, civil fines, and attorney fees, and risking the loss of medical licenses. MCL 37.2605(1)–(3). The fines and fees can be severe too—Michigan has awarded $150,000 for non-economic damages and $58,000 in attorney fees. Compl. ¶¶ 270–72, PageID.43. Christian Healthcare employees even risk jailtime if the ministry posted its pronoun policy, gender-transition policy, or Religious Provider Disclosure and Philosophy of Wellness and Health Care statement. MCL 750.147. The mere threat of license revocation supports Christian Healthcare's standing. *Kiser*, 765 F.3d at 605, 609 (possibility of revocation of "license to practice dentistry" supported standing). That Christian Healthcare faces additional penalties cements its standing.

*Fourth*, the Michigan law has very recently been re-interpreted to cover sexual-orientation and gender-identity discrimination. This recent change explains in part why Michigan has not yet enforced its law against Christian Healthcare or other religious healthcare ministries. *Contra* Defs.' MTD, PageID.562 (suggesting "recent decision" reduced threat). Lack of opportunity does not mean lack of willingness. The recency of this change bolsters the presumption that the law will in fact be enforced and is not moribund. *See Am. Booksellers Ass'n*, 484 U.S. at 393 (standing to challenge "newly enacted law"); *Universal Life Church Monastery Storehouse*, 35 F.4th at 1035 (6th Cir. 2022) ("By making the proscription so much clearer in 2019, the legislature may have emboldened prosecutors in a way that

they were not before the amendment."); *Bryant*, 1 F.4th at 287 (standing to challenge moribund law that was recently amended because these "recent revisions" suggest a "renewed interest" in enforcement).

*Fifth*, there is an ongoing national debate about the right of religious medical organizations to use pronouns consistent with patient's biological sex and to decline certain medical procedures related to gender identity. Courts and officials are enforcing similar laws across the country while courts have already found standing by similar religious entities to challenge similar policies. *Franciscan All.*, 47 F.4th at 376; *Religious Sisters of Mercy*, 2022 WL 17544669, at *14; Compl. ¶ 238 & n.7, PageID.37. "While this conversation rages around us, this court cannot say that the threat of prosecution to [medical providers] who violate the law is not credible." *Bryant*, 1 F.4th at 288 (standing based in part because of national "debate over legal status of abortion"); *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1248 (3d Cir. 1996) (standing bolstered by "high profile" nature of law challenged).

Christian Healthcare could challenge Michigan's law if none of the above factors were met. *Online Merchs. Guild*, 995 F.3d at 550 (each factor need not "be established"); *Hargett*, 791 F.3d at 695 (standing based only on no disavowal). But the ministry easily meets all five of these factors.

### F.   None of Michigan's counterarguments negate the credible threat faced by Christian Healthcare.

There is overwhelming support for Christian Healthcare's standing. Even so, Michigan offers a few off-ramps to challenge the ministry's standing: (1) vague and heretofore unrecognized religious exemptions and defenses; (2) a never-before-applied BFOQ; (3) lack of a pending prosecution; and (4) an (incorrect) claim that the ministry has received no requests. But those quickly dead-end. None of Michigan's arguments or cited cases come close to blocking Christian Healthcare's

standing. And if Michigan's off-ramps were followed, (5) they'd lead to a destination without any pre-enforcement suits at all.

### 1. Undefined defenses and religious exemptions don't alleviate Christian Healthcare's current injuries or the threat of credible enforcement.

Michigan first denies Christian Healthcare's standing to challenge the Accommodations and Publication Clauses because the State has not yet decided how the *Rouch World* decision "would interface with religious rights." Defs.' MTD, PageID.562; *see also id*. at PageID.564–566, 581, 583. Michigan also suggests that Christian Healthcare may be able to raise a religious-exemption or other defense to avoid liability. *See id*. at PageID.574. But these arguments about post-violation possibilities do not negate current realities. Michigan's law harms the ministry now because the law arguably covers the ministry's activities. Nor does Michigan even justify the existence of any post-violation defenses.

Start with the possibility that Michigan might interpret its law (contrary to text and practice) to create some type of religious exemption or that courts might accept some affirmative defense. This possibility is true for every pre-enforcement case and would defeat standing in every such case. As the Supreme Court and the Sixth Circuit recently noted, the possibility of successful defenses does not negate an injury-in-fact now. *Whole Woman's Health*, 142 S. Ct. at 530, 537 (providers had standing to bring pre-enforcement challenge despite fact that law "provide[d] a defense" to liability); *Doster*, 54 F.4th at 417 (plaintiffs had standing in pre-enforcement challenge to vaccine mandate and case was ripe even though plaintiffs could "invoke RFRA as a defense" once "termination proceedings" began). Other courts agree and regularly allow plaintiffs to challenge anti-discrimination laws like Michigan's before enforcement—even if these plaintiffs could raise affirmative defenses after the fact. *E.g.*, *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1171–75

(10th Cir. 2021); *Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 749–50 (8th Cir. 2019); *Chelsey Nelson Photography*, 2022 WL 3972873, at *5–9. Pre-enforcement standing law allows Christian Healthcare to challenge Michigan's law *before violating the law and before being investigated or prosecuted*, rather than playing defense at the risk of fines, jailtime, and other penalties.

Just take one example of current harms. Merely going through a burdensome investigative process harms Christian Healthcare and justifies standing, whether any actual penalties are eventually applied or not. *SBA List*, 573 U.S. at 164 (standing for similar administrative system). In another pre-enforcement action, a court in this circuit held that "even without a ruling against [the plaintiff], the investigative process itself—demanding written responses, document production, witness testimony, and the like—is onerous." *Chelsey Nelson Photography*, 2022 WL 3972873, at *6. That process "contributed to the chilling effect and harm of an enforcement threat." *Id.* Michigan's investigation imposes similar burdens by subjecting Christian Healthcare to intrusive interrogatories, document production, witness testimony, and administrative hearings. MCL 37.2602(d); MDCR Rule 37.7(2); MPI App., PageID.351–359, 378–385. Christian Healthcare need not endure litigating as a respondent for years—potentially being on the hook for staggering sanctions—with the threat of massive penalties looming overhead.

The fundamental flaw in Michigan's argument is that Michigan incorrectly assumes that plaintiffs must prove inevitability—that a law inevitably applies to them, and that they will inevitably be prosecuted, inevitably lose every possible defense, and inevitably be punished in the end. But that changes the correct standard from arguable and credible to inevitable and inescapable. *Supra* § I.B–C.

Moving beyond this legal flaw with Michigan's post-violation defense, Michigan cannot justify that any religious exemption or viable defense even exists.

Vague, Hail Mary defenses do not defeat standing. Indeed, Michigan never identifies how Christian Healthcare can possibly show a viable defense when the ministry flatly refuses to use pronouns in certain situations or provide certain medical procedures. Michigan seems to think that merely providing the opportunity to raise any defenses after the fact—no matter how vague or futile—defeats pre-enforcement standing. That is not the law.

Begin with the undefined religious defense. State court judges and members of the local bar have consistently recognized that Michigan's law lacks a religious exemption. *Rouch World, LLC v. Dep't of C.R.*, No. 162482, 2022 WL 3007805, at *43 (Mich. July 28, 2022) (Viviano, J., dissenting) (noting lack of religious exemptions for religious organizations); *Porth*, 532 N.W.2d at 202 (Murphy, J.) (same as to religious schools); Religious Liberty Law Section of the State Bar of Michigan, *Reasons for Opposition* 1 (Mar. 2020), https://bit.ly/3UWdT1B (law has no "religious exemption … for religious … public accommodations").

What's more, the Sixth Circuit has interpreted Title VII's religious exemption to *not* cover alleged sex, sexual-orientation, and gender-identity discrimination. *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) ("Title VII … applies … to a religious institution charged with sex discrimination."). That's relevant because Michigan interprets its public-accommodation law consistent with Title VII. *Rouch World*, 2022 WL 3007805, at *6 (collecting decades-old cases). Michigan would therefore need to depart from its longstanding effort to harmonize its law with Title VII to recognize a religious-exemption defense allowing Christian Healthcare to use pronouns and perform procedures consistent with its religious beliefs as a public accommodation.

Based on Michigan's past litigation, it's incredibly unlikely that Michigan would ever consider this departure. For example, Michigan began litigating *Rouch World* in August 2020. *See* MPI App., PageID.386 (Rouch World's civil complaint

against Michigan). Even though Michigan has litigated that case for two years, it still "has yet to determine … how Michigan's civil rights laws interface with constitutional rights involving religion." Defs.' MTD, PageID.580–581. That's due to a lack of will, not opportunity.

The *Rouch World* plaintiffs claimed the First Amendment protected them from providing the services because they conflicted with their faith. Supp. App. 196–98. But Michigan made clear that no exemption would be forthcoming. In Michigan's view, the First Amendment did not protect the plaintiffs because Michigan's law is "a neutral and generally applicable public accommodations law" that Michigan had a "compelling interest" to enforce. *Id.* at 204.

This unwillingness to grant a religious exemption echoes other comments Michigan has made in similar contexts. For example, Michigan has said that exempting a website designer who objects to celebrating a view of marriage that conflicts with her faith "would dramatically undermine the States' interests in eradicating discrimination and harm individuals and society at large." Br. for Massachusetts et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022), 2022 WL 3691314, *5. Then-candidate Nessel appallingly described the "purpose" of religious exemptions for faith-based adoption agencies as "to discriminate against people" based on "discriminatory animus." Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press (Sept. 27, 2018), https://bit.ly/3URynbS. She said she wouldn't even defend that kind of exemption. *Id.*

We already know what Attorney General Nessel thinks about exemptions for religious ministries. Once in office, Attorney General Nessel changed state policy from defending religious exemptions for faith-based adoption providers to attacking them and trying to terminate them as state providers. *Buck v. Gordon*, 429 F. Supp. 3d 447, 467 (W.D. Mich. 2019). The pivot was so direct and immediate that a

federal court in this district found the shift supported "a strong inference" that she "targeted" a faith-based provider "based on its religious belief." *Id.*

Attorney General Nessel has also joined litigation to peel back religious liberty protections in the healthcare industry by challenging the *Protecting Statutory Conscience Rights in Health Care; Delegations of Authority*, 84 Fed. Reg. 23,170 (May 21, 2019) executive order. Among other things, she claimed the rule was arbitrary and capricious and violated the Establishment Clause. Complaint ¶ 7, *New York v. U.S. Dep't of Health & Human Servs.*, Case No. 1:19-cv-04676 (S.D.N.Y. May 21, 2019). And concerned about access to gender transition procedures, Attorney General Nessel recently signed a comment on a proposed rule that asserted that the proposed religious exemption to the nondiscrimination rule "will only compound negative health outcomes." State Attorneys General, *Comment Letter on Proposed Rule Nondiscrimination in Health Programs and Activities* at 25 (Oct. 3, 2022), https://bit.ly/3W4oZTA.

Attorney General Nessel isn't quiet about her opinions about religious beliefs (like Christian Healthcare's) that sex is immutable and marriage is reserved for one man and one woman. In tweets, she's said that these honorable and long-held religious views "discriminate" and are based on a "dislike" of "LGBT people more than" caring about adhering to "religion." Supp. App. 207. And Attorney General Nessel said that those who decline to provide "medical treatment" that conflicts with their conscience regarding the immutability of sex "are not religious heroes, they are bigots." *Id.* at 210.

With such strong language and disregard for prior religious exemptions, it's comical to ask Christian Healthcare to hold out hope that Michigan will suddenly about-face. Especially since the Attorney General prosecutes violations of the Publication Clause and represents the Department and Commission in lawsuits filed under Michigan's law. MCL 37.2602(b); MCL 750.147.

Even putting all that aside, additional history shows there is still no reason to think Michigan would recognize an affirmative defense of a religious exemption. In 2017—five years before *Rouch World*—Michigan held public hearings on redefining "sex." Supp. App. 215–53. During those hearings, the Commission discussed religious exemptions, but later rejected them. One option before the Commission was to redefine "sex" and then include "an additional provision indicating that the Commission's interpretation of the [law's] prohibitions may not be applied in a manner that infringes upon the constitutionally protected practice of religion." *Id.* at 224. But the final Interpretive Statement omitted this exemption. MPI App., PageID.338–340. Michigan would have this Court believe that it will now provide an undefined, non-textual exemption that has already been rejected and that contradicts all the State's prior behavior. That is a bet Christian Ministries should not be forced to make.

Beyond its "religious exemption" defense, Michigan also claims Christian Healthcare could show that it provided an "alternative that constituted 'full and equal' access" to avoid liability under the Accommodation Clause. Defs.' MTD, PageID.574. But Michigan never commits to accepting any defense, never identifies or explains what defense would exist, and has given every reason to think no defense exists. In the end, this suggestion ignores Michigan's law and how it's currently being applied.

The Accommodation Clause's "equal enjoyment" and "equal utilization" requirements regulate Christian Healthcare's use of pronouns and cross-sex hormones. Pl.'s MPI, PageID.425–426 (explaining this point); MCL 37.2302(a); MCL 37.2102(1). Neither clause contains an option to provide "alternative services." In *Clarke v. K Mart Corp.*, a state court held that a plaintiff stated a claim under the Accommodations Clause even though she had now shown "an outright denial of access" to the requested services. 495 N.W.2d 820, 822 (Mich.

App. 1992). Likewise, in *Whitman v. Mercy-Memorial Hospital*, an unwed father stated a claim under the Accommodations Clause based on the hospital's policy of only allowing "immediate family" in the delivery room during childbirth even though he had in fact been "present in the delivery room." 339 N.W.2d 730, 732 (Mich. App. 1983).

And in *Rouch World*, the organizations alleged in their complaint that they declined the requested services because it would have violated a "core tenant of [their] religion." MPI App., PageID.388. That didn't matter to Michigan. Michigan interpreted the Accommodation Clauses' "full and equal" access requirement to apply a "traditional but-for causation standard." Supp. App. 190. To Michigan, that standard means that a faith-motivated organization cannot avoid sexual-orientation or gender-identity discrimination liability "by citing some other factor that contributed to the challenged decision." *Id.* Put differently, the *Rouch World* business owners' religious beliefs were irrelevant to their decision to decline to host a same-sex wedding ceremony or assist in a gender transition. In both cases, sexual orientation and gender identity was "'one but-for cause' of" the decline. *Id.*

So the Accommodation Clause (at least arguably) compels Christian Healthcare to provide the exact same services regardless of gender identity. Christian Healthcare refers to patients using their preferred pronouns when those pronouns are consistent with the patient's biological sex and prescribes certain hormones to men who identify as men and women who identify as women. Compl. ¶¶ 142–43, 331–34, PageID.22, 52; Pl.'s MPI, PageID.425–426, 430–431. Under Michigan's law, Christian Healthcare must therefore refer to patients using their preferred pronouns and prescribe the same hormones regardless of the patient's biological sex. Anything less arguably violates the law. Compl. ¶¶ 230, 253, 415, PageID.35, 40, 64. For these same reasons, the Accommodation Clause also bans the ministry's pronoun and hormone policies, and Publication Clause prohibits the

ministry from publicizing these policies. *See, e.g.*, Pl.'s MPI, PageID.425 (making this point).

Ultimately, Michigan never disclaims that Christian Healthcare's desired activities violate the Accommodation and Publication Clauses. Nor does Michigan offer some way Christian Healthcare could show "full and equal" access to its services based on pronoun usage and cross-sex hormones. Instead, Michigan tells Christian Healthcare to hang its hat on defenses that are likely futile and contrary to how it has interpreted its law in the past. That requires too much.

### 2. Christian Healthcare need not apply for a BFOQ because that process causes independent harms and is futile.

Michigan next argues that Christian Healthcare lacks standing because it could apply for a BFOQ exemption. *E.g.*, Defs.' MTD, PageID.563–566, 575. But that misses a few key points.

*First*, this BFOQ process does not apply to Christian Healthcare as a public accommodation or public service provider. So Michigan's argument has no bearing on the ministry's challenge to the Accommodation and Publication Clauses in that context.

*Second*, even for the employment provisions, Christian Healthcare cannot reasonably use the BFOQ process because it exposes the ministry to liability. Michigan can initiate complaints against BFOQ applicants. MCL 37.2602(c); MDCR Rule 37.4. So Christian Healthcare has avoided the BFOQ process because it reasonably fears being investigated if it began that process. Compl. ¶¶ 291–303, PageID.46–48. The ministry should not be forced to use a process where it notifies enforcement officials that it violates the law.

*Third*, going through the BFOQ application process would harm Christian Healthcare. *See Doster*, 54 F.4th at 416 (standing when parties want benefit and "government has forced them to proceed through an unlawful process to obtain

it."). Christian Healthcare has alleged that the Employment Clause interferes with its religious autonomy and ability to hire leaders and staff who agree with the ministry's religious mission. Compl. ¶¶ 203–05, 303, 401, PageID.29–31, 48, 61. This interference is especially prominent in the BFOQ process. Compl. ¶ 302, PageID.48; Mark Blocher's Decl. in Supp. of Pl.'s App. to Opp'n to Defs.' Mot. to Dismiss & Reply Br. in Supp. of Its Prelim. Inj. Mot. (Blocher Decl.) ¶¶ 8–39.

That 13-step process is incredibly intrusive. Supp. App. 211–12. Christian Healthcare would need to hire an attorney to draft the requisite "legal brief in support of the BFOQ" with an "in depth analysis" of the cases, gather all "supporting materials," correspond with Michigan about why the BFOQ is "necessary to the normal operation of the" ministry, and expose itself to potential liability if Michigan decided to investigate Christian Healthcare about the request. Blocher Decl. ¶¶ 8–39; Compl. ¶¶ 291–303, PageID.46–48. The ministry would have to make this request for each of its current employees—managers, medical director, advanced practice medical providers, biblical counselors, member services coordinator, receptionist, nurses, office managers, custodians, and medical assistants. Blocher Decl. ¶¶ 8–39; Compl. ¶¶ 114–71, PageID.19–26. That's because every employee contributes to the ministry's religious mission, and so adhering to and abiding by Christian Healthcare's religious beliefs is a BFOQ for each position. Compl. ¶¶ 92–113, PageID.16–26.[11]

Christian Healthcare would have to do the same for all new employees anytime it wanted to fill an open position. That just amplifies Christian

---

[11] Social influence theory supports Christian Healthcare's practical desire to employ those who agree with and will abide by its religious values. That theory says that "employees play a crucial role in preserving and transmitting—or undermining— institutional ideas and norms, including within religious institutions." Helen M. Alvaré, *Church Autonomy After Our Lady of Guadalupe School: Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol'y 319, 354 (2021).

Healthcare's injury—the ministry is actively recruiting and hiring new employees. Compl. ¶¶ 319–22, PageID.50. As Christian Healthcare waited for Michigan's decision on these new BFOQ applications, it would have to refrain from posting about the job position to avoid liability. Compl. ¶¶ 324–29, PageID.50–51. In the meantime, those positions would remain unfilled and hamper the ministry's ability to provide much-needed medical care to its community. In this respect, the process acts like a prior restraint on the ministry's speech and free exercise. *Cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (finding "system of prior administrative restraints" violated the First Amendment).

These intrusions further violate Christian Healthcare's religious freedom by authorizing Michigan to scrutinize the ministry's beliefs and make individualized determinations about their legitimacy as applied to its positions. *See, e.g.*, Compl. ¶ 414, PageID.64; Blocher Decl., ¶ 23. For that injury, it is irrelevant whether Christian Healthcare has requested an exemption. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021) (system of individualized exemptions violated First Amendment "regardless whether any exceptions have been given"). Christian Healthcare "need not proceed through this allegedly invalid process to challenge" the Employment, Accommodation, and Notice Clauses "in court." *Doster*, 54 F.4th at 416. Christian Healthcare has a constitutional right to select its employees according to the ministerial exception, the co-religionist doctrine, and expressive-association principles. Pl.'s MPI, PageID.436–448. So Christian Healthcare need not ask Michigan to provide what the Constitution already demands. *See FEC v. Cruz*, 142 S. Ct. 1638, 1648 (2022) ("Demanding that the Committee comply with the Government's 'alternative' would therefore require it to forgo the exercise of a First Amendment right we must assume it has …. And this would require the Committee to subject itself to the very framework it says

unconstitutionally burdens its speech. Such a principle finds no support in our standing jurisprudence.").

Michigan also incorrectly suggests that Christian Healthcare must go through the BFOQ process before filing this suit as a matter of state law. Defs.' MPI Resp., PageID.520 (citing *McLeod v. Providence Christian Sch.*, 408 N.W.2d 146 (Mich. App. 1987)). But *McLeod* is not binding as to federal standing requirements. Michigan misreads this case anyway. *McLeod* did not say a person must go through the BFOQ process before challenging the constitutionality of a provision; in fact, the court addressed the merits of the defendant's free-exercise defense in that case. Michigan's reading of *McLeod* conflicts with *Fulton*, *Cruz*, *Doster*, and other binding cases. *See Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974) (There is no "exhaustion of state judicial or administrative remedies" for federal constitutional claims.). Moreover, the *McLeod* court never considered the BFOQ process's burdens or entanglement concerns. 408 N.W.2d at 151; *id.* at 152 (only analyzing entanglement as to "money damages"). And *McLeod*'s suggestion that religious entities can simply avail themselves of "the statute's available safeguards" misses the mark.

*Fourth*, going through the harmful BFOQ process would be futile. That's because Michigan interprets its law consistent with Title VII. *Rouch World*, 2022 WL 3007805, at \*6. And Title VII's BFOQ exemption is "extremely narrow," especially regarding sex (and sexual orientation and gender identity), *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977); Compl. ¶¶ 298–99, PageID.47, as Michigan apparently concedes, *see* Defs.' MTD, PageID.564. For example, one court denied that adherence to the Protestant faith was a BFOQ for teaching French at a school that was created to be taught by "persons of the Protestant religion." *E.E.O.C. v. Kamehameha Sch./Bishop Est.*, 990 F.2d 458, 459, 465–67 (9th Cir. 1993). And Michigan does not cite a single case in any jurisdiction in America that has applied

33

a BFOQ exception to employment activities that Christian Ministries wants to engage in. Nor can Christian Ministries find such a case. So it defies belief that Michigan would give Christian Healthcare a BFOQ for each of its positions, including its secretarial and other staff. Blocher Decl., ¶¶ 25–32.

Reality confirms what caselaw suggests. According to Michigan, the State has never granted an entity a BFOQ exemption in its history. Not once. Supp. App. 213. Christian Healthcare need not hope that it will be the first to walk on water rather than drown under Michigan's administrative process. Nor should the ministry be asked to wait while it refrains from recruiting and hiring new employees to fulfill its religious purpose.

And despite all this, Michigan could alleviate any doubt and affirmatively grant Christian Healthcare BFOQ exemptions for every position based on the facts of this case. Compl. ¶¶ 92–113, PageID.16–26; Compl. Exs. 8–14, PageID.129–149. But Michigan has expressly refused to do so. And Michigan has refused to pinpoint any new facts it would need to make that decision. Once again, that leaves Christian Healthcare in limbo because Michigan never disputes that the ministry is an employer subject to the Employment, Accommodation, and Notice Clauses. By refusing to specifically disavow future enforcement, Michigan confirms the credible threat here. So Christian Healthcare has standing to challenge these clauses.

### 3. Requiring Christian Healthcare to wait to file suit until undergoing investigations and prosecutions defeats the purpose of pre-enforcement suits.

Michigan also claims that Christian Healthcare lacks standing because the ministry has not yet been warned, investigated, or prosecuted under the law. Defs.' MTD, PageID.562, 569–570, 573–574, 576–577, 579. Michigan also says Christian Healthcare could always file suit after "specific action is taken against it." *Id.* at PageID.566. But this contradicts innumerable precedents.

Christian Healthcare need not "first expose" itself to "actual … prosecution" to challenge Michigan's law. *Steffel*, 415 U.S. at 459; *accord MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]e do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."). Requiring *actual* investigation before allowing pre-enforcement suits would defeat their entire purpose—to avoid placing plaintiffs "between the Scylla of intentionally flouting state law and the Charybdis of forgoing" constitutionally protected activities. *Steffel*, 415 U.S. at 462.[12]

That's why courts find standing for plaintiffs who are the object of a law even before the law has been enforced against them or anyone else. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9–11 (1988) (standing "before any enforcement proceedings were initiated"); *supra* § I.B (citing cases where standing was found despite no prior enforcement). Christian Healthcare's standing is even stronger here because Michigan regularly enforces its law, including against those with religious beliefs like Christian Healthcare's. Compl. ¶¶ 276–78, 341–43, PageID.44, 53. And even though Michigan claims Attorney General Nessel has not yet prosecuted a public accommodation under MCL 750.147, she has the authority to do so and has not disavowed. Defs.' MTD, PageID.507. That supports standing.

Michigan's theory is especially inappropriate here because Christian Healthcare is chilling its speech to avoid investigation and prosecution. *E.g.*, Compl. ¶¶ 55–56, 307–30, 350–61, PageID.11, 49–51, 54–55. Christian Healthcare should not be dinged on standing for reducing its exposure. Pre-enforcement suits

---

[12] The same principles defeat Michigan's argument that Christian Healthcare must wait until "a complaint" is filed or "an investigation is initiated" before requesting injunctive relief. Defs.' MPI Resp., PageID.503. By then it may be too late to seek federal relief. *See Squire v. Coughlan*, 469 F.3d 551, 556 (6th Cir. 2006) (explaining state-level investigations trigger federal court abstention).

are meant to ameliorate the harm of "self-censorship." *Am. Booksellers Ass'n*, 484 U.S. at 393. It would be incongruous if self-censorship prevented courthouse access.

And unlike the cases Michigan relies on, Christian Healthcare's chill is reasonable because Michigan's law undoubtedly applies to the ministry as a public accommodation, public service provider, and employer. *See supra* § I.A–B. By contrast, the plaintiffs in Michigan's cited cases lacked standing because they were not arguably subject to the law. *See* Defs.' MTD, PageID.570–71, 573, 578.

The plaintiffs in *Laird v. Tatum*, 408 U.S. 1 (1972), had a general grievance against "the mere existence" of a data-gathering activity but were not "presently or prospectively subject to" surveillance. The student in *Morrison v. Board of Education of Boyd County*, 521 F.3d 602 (6th Cir. 2008), challenged a policy that was subsequently changed and did not cover the student's religiously motivated speech to begin with. And the pastors in *Glenn v. Holder*, 690 F.3d 417 (6th Cir. 2012), filed suit against a law that did "not prohibit Plaintiffs' proposed course of speech."

Michigan's final case is *Miller v. City of Wickliffe*, 852 F.3d 497 (6th Cir. 2017). That case is different because the plaintiffs there never claimed that the permitting process itself violated a constitutional right. But here, forcing Christian Healthcare to chill its speech and go through the BFOQ process are distinct constitutional harms. *See supra* § I.F.2. *Miller* also relied on a now-overturned "finality requirement." 852 F.3d at 504 (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), *overruled by Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2169–70 (2019)).

In sum, the plaintiffs in Michigan's cited cases lacked a credible threat because the law didn't even arguably apply to them. That makes sense. But when a law applies to a plaintiff—like Michigan's to Christian Healthcare—that person need not await formal action before filing suit. *Doster*, 54 F.4th at 416 (service

members subject to vaccine mandate had standing to challenge requirement though they "had yet to receive an initial denial").

### 4. Christian Healthcare has declined to provide services that violate its religious beliefs, increasing the threat of enforcement.

Michigan also denies Christian Healthcare's standing on the assumption it hasn't received a request for gender-transition services or pronoun usage. Defs.' MTD, PageID.564; Defs.' MPI Resp., PageID. 509. But that's wrong as a matter of fact and irrelevant as a matter of law.

As a matter of fact, Christian Healthcare currently treats several patients who identify as transgender and hopes to treat many more. Compl. ¶ 40, PageID.9. The ministry was asked, but declined, to refer to those patients using gender-identity based pronouns. Compl. ¶ 346, PageID.53–54. For those patients, the ministry and the patient have developed mutual agreeable accommodations. Compl. ¶ 334, PageID.52. But those accommodations—as well as Christian Healthcare's pronoun policy—violate Michigan's "equal access" requirement. *See supra* § I.A, F.1. Christian Healthcare also discourages parents from pursuing gender-transition procedures for their children. Compl. ¶¶ 346–49, PageID.53–54. Christian Healthcare would also violate the Publication and Notice Clauses by posting its pronoun, medical procedure, and employment policies—regardless of whether anyone requested those services or was denied a position. *E.g.*, Compl. ¶¶ 55–56, 307–30, 350–61, PageID.11, 49–51, 54–55. These undisputed facts show a credible risk of prosecution, even if a complaint has not yet been filed.

As a matter of law, Christian Healthcare's standing to challenge the Accommodation Clause doesn't depend on receiving requests. *E.g.*, *303 Creative LLC*, 6 F.4th at 1171–75; *TMG*, 936 F.3d at 749–50; *Chelsey Nelson Photography*, 2022 WL 3972873, at *5–9. Michigan's law prohibits Christian Healthcare from

37

merely having its current pronoun and cross-sex hormone policy. Under Michigan law, those policies at least arguably constitute a "pattern or practice of discrimination." MCL 37.2605(1). Anyone—including Michigan—can initiate a complaint against Christian Healthcare after viewing that policy. Compl. ¶¶ 260–66, PageID.41–42. No specific denials needed. *See Whitman*, 339 N.W.2d at 732 (father could challenge hospital delivery room policy even though he had been "present in the delivery room").

Michigan's Publication Clause also arguably prohibits Christian Healthcare from publicly explaining its pronoun and cross-sex hormone policies and posting its membership agreement. Compl. ¶¶ 54–56, PageID.11. Anyone can file a complaint after viewing these statements if they claimed to be "aggrieved." MDCR Rule 37.4(1); MCL 37.2302(b); MCL 750.147. And because the Publication Clause "cannot operate independently" of the Accommodation Clause, the ministry has standing to challenge both. *See Cruz*, 142 S. Ct. at 1649 (standing to challenge regulation conferred standing to challenge enabling statute); *Franciscan All.*, 47 F.4th at 378 (same). Put differently, the Publication Clause prohibits statements about denials of service and the Accommodations Clause defines what counts as a denial. So the clauses are intertwined and Christian Healthcare's standing to challenge one necessarily gives it standing to challenge both.

### 5.  Michigan's theory makes pre-enforcement suits impossible.

In the end, Michigan places too many barriers to pre-enforcement challenges. Christian Healthcare need not "bet the farm," *MedImmune*, 549 U.S. at 134, or "play an expensive game of Russian roulette," *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 868 (8th Cir. 2013), so that it can operate and speak according to its religious views.

38

Under Michigan's theory, any person who desires to engage in constitutionally protected activities arguably forbidden by a regulation must wait until charged and investigated, go through an expensive and harmful process to wait for a potential exemption that has never been given, may never appear, and will likely be futile—all before exercising their rights. All the while, that person is put to an impossible choice: exercise the right while violating the law or comply with the law while foregoing that freedom. *See Peoples Rts. Org., Inc.*, 152 F.3d at 529. Pre-enforcement actions exist to avoid this dilemma.

Courts have entertained pre-enforcement actions in a wide variety of circumstances. Parties have used them to challenge: a regulation that compelled restaurants to post a bathroom sign about gender identity when the prosecutor said refusal to post the sign would be "unlikely" to result in "a criminal case," *Bongo Prods.*, 2022 WL 1557664, at *10; abortion laws, leafletting restrictions affecting religious minorities, and labor laws before any of them had been enforced against anyone, *Whole Woman's Health*, 142 S. Ct. at 529, 536–37; *Babbitt*, 442 U.S. at 302; *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 644 (1981) (challenging fair ordinance day before fair opened); and restrictions on political speech with no history of enforcement, *Hargett*, 791 F.3d at 696. Countless other examples exist over the last century. *See Terrace v. Thompson*, 263 U.S. 197, 216 (1923) ("They are not obliged to take the risk of prosecution, fines and imprisonment and loss of property in order to secure an adjudication of their rights.").

But Michigan's theory makes all these suits impossible. Governments could insulate any law affecting constitutional interests from pre-enforcement challenges with Michigan's approach. That wrongly places the burden of risking enforcement on the constitutional actor. Any burden, though, must be placed on the government to specifically disavow. *See supra* § I.D. That's because "the First Amendment

protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

## II.   Christian Healthcare's challenges to Michigan's law are ripe because the law forbids its desired activities, the factual record is developed, and the ministry suffers hardship from delayed adjudication.

Christian Healthcare's claims are also ripe because Michigan's law injures the ministry. In pre-enforcement First Amendment cases like this one, the line between "standing and ripeness … has evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). So standing and ripeness boil down to the same question: does Michigan's law injure Christian Healthcare? *Platt*, 769 F.3d at 451 (pre-enforcement cases are ripe when there is an injury-in-fact). It does. *Supra* § I.

The law prohibits Christian Healthcare from adopting, following, and publicizing policies about its beliefs on biological sex, including pronoun usage and cross-sex hormones. Compl. ¶¶ 210–11, 228, 253, 266, 338, 353–54, 362, 400, 415, PageID.32, 35, 40, 42, 52, 54–56, 61, 64. The law also prohibits Christian Healthcare from adopting, following, and publicizing policies ensuring that the ministry hires and retains employees who will abide by its religious beliefs. Compl. ¶¶ 287, 314, 363, 399, PageID.45, 49, 56, 61. But Christian Healthcare faces a credible threat that it will be prosecuted if it posts some of the statements it wants to post. Compl. ¶¶ 339, 360–63, PageID.52, 55–56. So it has refrained from doing so. That's an injury. And contrary to Michigan's suggestion, that injury is ongoing, and the risk of prosecution is substantial. *Compare* Defs.' MTD, PageID.561–563, *with supra* § I.

What's more, Christian Healthcare has provided the exact statements it wants to post, described its policies on pronouns, cross-sex hormones, and employment, and detailed each of its employment positions and why those positions must be filled with someone who shares the ministry's religious beliefs. *E.g.*, Compl.

¶¶ 92–171 332–34, 345–55, PageID.16–26, 51–52, 54–55; Compl. Exs. 3–15, PageID.116–153. Courts have adjudicated cases on much sparser records than this. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 n.7 (2010) (deciding pre-enforcement case based on firm's status and its "general claims about the nature of its advertisements"); *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 458 (2007) (deciding pre-enforcement case based on exemplar transcripts of desired advertisement).

And though Michigan never mentions it, Christian Healthcare's facial challenge to the Unwelcome Clause is also ripe because it involves a purely legal dispute. *See, e.g.*, *Hill v. Snyder*, 878 F.3d 193, 213–14 (6th Cir. 2017) (collecting cases and holding "pre-enforcement facial constitutional challenges" were ripe for review because they presented "purely legal" issues).

So the claims are fit. Fitness is a "relatively modest" requirement anyway. *Doster*, 54 F.4th at 417. But Michigan claims this Court lacks the necessary facts because (1) Christian Healthcare *may* be granted a BFOQ; (2) there *may* be a religious exemption; and (3) the ministry's members *may* never seek cross-sex hormones or complain about pronouns. Defs.' MTD, PageID.563–564. For the same reasons that Christian Healthcare has standing despite these suggestions, its claims are ripe.

To recap: Michigan never says it needs more facts to determine whether Christian Healthcare's employees qualify for the BFOQ or whether Christian Healthcare would be entitled to a religious exemption affirmative defense or any other affirmative defense. The BFOQ process independently harms Christian Healthcare. *See supra* § I.F.2. And Michigan has never in its history allowed a BFOQ exemption. Supp. App. 213. Michigan has also never interpreted its law to allow for a religious exemption despite having more than five years to think about religious exemptions in the context of redefining "sex" from its 2017 public hearings

until *Rouch World* in 2022. *Supra* § I.F.1. Michigan claimed that any religious defenses raised by the *Rouch World* plaintiffs would fail because of Michigan's compelling interest in enforcing its law. Supp. App. 203–04. And under Michigan's interpretation, the ministry is currently violating the law with its policies and practices towards its current members. *Supra* § I.F.4. Again, Michigan never identifies what specific facts it or this Court lacks to determine whether the law applies or whether it violates the ministry's constitutional rights.

Against this overwhelming evidence of likely enforcement, Christian Healthcare's claims are ripe without first subjecting itself to Michigan's faulty process. *See Doster*, 54 F.4th at 418 (service members didn't need to "finish[] the process" for exemptions before challenging underlying mandate).

Delaying review of these ripe claims would harm Christian Healthcare. The ministry is already refraining from constitutionally protected activities to avoid prosecution. *E.g.*, Compl. ¶¶ 55–56, 307–30, 350–61, PageID.11, 49–51, 54–55. That causes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (Even brief "loss of First Amendment freedoms … unquestionably constitutes irreparable harm."). And while Michigan says it has not "definitely interpreted" its law to prohibit Christian Healthcare's desired activities, neither has it formally disavowed enforcement. Defs.' MTD, PageID.565. Meanwhile, Michigan is prosecuting two entities who share Christian Healthcare's religious beliefs, is actively enforcing its law, previously declined to include a religious exemption in the 2018 Interpretive Statement, and has never authorized a BFOQ exemption. Without a binding disavowal, that activism creates an enforcement presumption that is actionable.

### III.   Alternatively, Christian Healthcare is entitled to limited jurisdictional discovery.

If there is any question about Christian Healthcare's standing or the ripeness of its claims, this Court should order limited discovery on these issues because Michigan raises a factual attack on jurisdiction, as previously explained.

Jurisdictional discovery is appropriate where there is a "reasonable basis to expect that further discovery" would reveal evidence supporting jurisdiction. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981). Refusal to grant such discovery is an abuse of discretion when it prejudices the litigant. *See Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1322 (10th Cir. 2002) (collecting cases from three circuits); *see also Lopes v. Jetsetdc, LLC*, 4 F. Supp. 3d 238, 242 (D.D.C. 2014) (same and collecting more cases).

Here, jurisdiction is clear on the record. But if the Court disagrees, then Christian Healthcare respectfully requests discovery on the following topics to rebut Michigan's jurisdictional arguments: (1) the number of times Michigan has granted a religious exemption under the Accommodation, Publication, Employment, or Notice Clauses; (2) documents related to those exemptions, including any final orders, file records, statements, and case files; (3) information on the number of times Michigan has used testers to elicit violations of the law; (4) final orders, file records, and non-privileged case file documents related to complaints alleging discrimination based on sex, religion, marital status, sexual orientation, and gender identity; (5) the number of times Michigan has received, approved, and denied BFOQ requests; and (6) documents related to those requests, including any final orders, file records, and case files. *See Chelsey Nelson Photography LLC v. Louisville/Jefferson Cnty. Metro Gov't*, 556 F. Supp. 3d 657, 663–66 (W.D. Ky. 2021) (holding similar documents were relevant to pre-

enforcement standing). Christian Healthcare would be prejudiced by a dismissal without this discovery.

## IV.    Christian Healthcare's request for a declaratory judgment and permanent injunction should not be dismissed.

Christian Healthcare will request a declaratory judgment and a permanent injunction preventing Michigan from enforcing the law against Christian Healthcare in violation of its First and Fourteenth Amendment rights. *See* Compl., Prayer for Relief ¶¶ 1–4, PageID.70–71. But for now, the ministry only seeks a preliminary injunction to protect its constitutional interests as it pursues these other remedies. Even so, Michigan argues this Court should decline to eventually issue declaratory and injunctive relief. Defs.' MPI Resp., PageID.525–528; Defs.' MTD, PageID.581–584. Not so. That relief should remain on the table.

Most of Michigan's arguments are repetitive—Christian Healthcare lacks standing. Those arguments have already been addressed.

Of the new arguments, Michigan first claims that declaratory relief would not "clarify the legal relations in issue." Defs.' MPI Resp., PageID.583 (brackets omitted). But of course it would. Michigan concedes its own confusion about its law—religious exemptions are "still under consideration" and Michigan "has yet to issue a formal policy." *Id.* That's clear as mud. A declaration would clarify that the Employment, Notice, Accommodation, and Publication Clauses cannot violate Christian Healthcare's constitutional rights as applied to its constitutionally protected activities. Compl., Prayer for Relief ¶ 2, PageID.70–71.

Michigan also claims that a permanent injunction would be unnecessary because a declaration puts state officials on sufficient notice. Def.'s MTD, PageID.584. But courts routinely issue permanent injunctions in pre-enforcement cases to protect constitutional interests. *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 789 (2011) (affirming permanent injunction in video-game free speech case);

*Chelsey Nelson Photography*, 2022 WL 3972873, at \*31 (permanently enjoining public accommodation law regulating speech in pre-enforcement suit); *Rothamel v. Fluvanna Cnty.*, 810 F. Supp. 2d 771, 776 (W.D. Va. 2011) (similar); *Am. Booksellers Found. for Free Expression v. Dean*, 202 F. Supp. 2d 300, 302, 321 (D. Vt. 2002) (similar). A permanent injunction is apt here because Michigan's law violates Christian Healthcare's constitutional rights, causes irreparable harm, and no adequate remedy at law exists. *See Saieg v. City of Dearborn*, 641 F.3d 727, 733 (6th Cir. 2011) (listing these factors). If Christian Healthcare eventually proves it deserves a permanent injunction, this Court should issue it.

## V.  This Court should not abstain from evaluating the Unwelcome Clause because this clause violates the First Amendment by chilling speech.

Abstaining from Christian Healthcare's facial challenge to the Unwelcome Clause is inappropriate. Courts have a "virtually unflagging" obligation to "exercise" "properly conferred" jurisdiction. *William Powell Co. v. Nat'l Indem. Co.*, 18 F.4th 856, 864 (6th Cir. 2021). This Court has jurisdiction. So the challenge to the Unwelcome Clause should move forward.

Michigan relies on "an extraordinary and narrow exception" to this general duty, *Saginaw Housing Comm'n v. Bannum, Inc.*, 576 F.3d 620, 625 (6th Cir.2009) (cleaned up): abstention under *Buford v. Sun Oil Corp.*, 319 U.S. 315 (1943), Defs.' MTD, PageID.579–581. Michigan claims the second of two factors justifies abstention: "the existence of a state-created forum with specialized competence in the particular area." Defs.' MTD, PageID.580 (citing *Ada-Cascade Watch Co. v. Cascade Res. Recovery, Inc.*, 720 F.2d 897, 903 (6th Cir. 1983)).[13]

---

[13] Michigan misses the first *Burford* abstention factor too—"the presence of a complex state regulatory scheme." Defs.' MTD, PageID.580. Michigan's run-of-the-mill administrative process does not remotely compare to the intricacies of the Texas oil-and-gas regime, which was the "complex state regulatory system" in

But Christian Healthcare brings its facial challenge to the Unwelcome Clause under the First and Fourteenth Amendments. That claim requires this Court to determine whether the Unwelcome Clause violates the federal constitution—a determination well within "the district court['s] … area of expertise." *Johnson v. Rodrigues (Orozco)*, 226 F.3d 1103, 1112 (10th Cir. 2000); a*ccord Devlin v. Kalm*, 493 F. App'x 678, 683 (6th Cir. 2012). Courts must be "particularly reluctant to abstain in cases involving facial challenges based on the First Amendment," *Houston v. Hill*, 482 U.S. 451, 467 (1987), regardless of Michigan's self-proclaimed "competence and experience in the area of civil rights." Defs.' MTD, PageID.580.

Michigan next expresses concern that if "this Court declares portions of the ELCRA to be facially vague, they would be void ab initio and unenforceable prospectively." *Id.* at PageID.581. That's true of all facial challenges. "Of course, the threat that the federal courts might decide the entire state system unconstitutional is not a valid justification for *Burford* abstention." *Neufeld v. City of Baltimore*, 964 F.2d 347, 351 (4th Cir. 1992). Otherwise, facial challenges to state laws could rarely proceed. *Cf. Felmeister v. Off. of Att'y Ethics*, 856 F.2d 529, 534 (3d Cir. 1988) (expressing "serious doubts as to whether *Burford* abstention ever would be appropriate where substantial first amendment issues are raised"). Michigan never offers any new, legitimate readings of the Unwelcome Clause. Nor is the vague clause in need of the State's clarification because "[a] federal court may not properly ask a state court if it would care in effect to rewrite a statute." *Hill*, 482 U.S. at 471.

---

*Burford. New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361–62 (1989).

Michigan retreads old ground by arguing it hasn't determined how to interpret its statute after *Rouch World*. Defs.' MTD, PageID.581. But the terms "objectionable, unwelcome, unacceptable, or undesirable" are not susceptible to a limiting construction. *See* MCL 37.2302(b); MCL 750.147. That's why the Unwelcome Clause is vague, overbroad, and gives unbridled enforcement discretion. Michigan claims that the vagueness standard is "high." Defs.' MTD, PageID.581. But Christian Healthcare has sufficiently alleged vagueness. Compl. ¶¶ 246–51, 448–53, PageID.39–40, 69–70. And Michigan never disputes that the ministry alleged the Unwelcome Clause is also overbroad and gives unbridled discretion to enforcement officials. It did so allege. *Id.* Courts regularly address such claims in this context. *303 Creative LLC*, 6 F.4th at 1189–90; *Chelsey Nelson Photography*, 2022 WL 3972873, at *26–28. So this claim should proceed, and abstention is not warranted.

## VI.   Christian Healthcare meets the relevant preliminary-injunction factors.

The parties agree on the relevant preliminary-injunction factors. *Compare* Pl.'s MPI, PageID.424, *with* Defs.' MPI Resp., PageID.500–501. In fact, much of Christian Healthcare's preliminary-injunction motion is undisputed. There's no dispute that likelihood of success is the focal point in First Amendment cases. Pl.'s MPI, PageID.424. Michigan never disputes any of Christian Healthcare's facts, which can therefore "be taken as true." *Corning Glass Works v. Lady Cornella Inc.*, 305 F. Supp. 1229, 1231 (E.D. Mich. 1969) (accepting facts not disputed at preliminary injunction stage). Michigan never contests the merits of Christian Healthcare's claims. And because Christian Healthcare is likely to win on the merits, it deserves an injunction. *See Bays v. City of Fairborn*, 668 F.3d 814, 818–19, 825 (6th Cir. 2012).

Yet again, Michigan puts nearly all of its eggs in the same standing and ripeness basket. Defs.' MPI Resp., PageID.504. But Christian Healthcare has standing, and its claims are ripe.

Next, Michigan says Christian Healthcare's injuries are not irreparable because there's no "immediate threat" of injury. Defs.' MPI Resp., PageID.501. But there is—objective chill. Christian Healthcare is reasonably chilling its speech because it faces a credible threat of enforcement. This threat exists without "open civil rights complaints or investigations," "prosecutions[,] or enforcement actions." Defs.' MPI Resp., PageID.502–503. Christian Healthcare also faces ongoing compliance costs that affect its day-to-day operations and necessitate immediate relief. *Yellen*, 54 F.4th at 342–43 (ongoing compliance costs were separate injury in need of remedy). Michigan's law makes it more difficult for the ministry to hire new employees, retain existing ones, and fill a currently open biblical counselor position. *E.g.*, Compl. ¶¶ 313–16, PageID.49–50. As previously explained, Michigan's law makes it illegal for Christian Healthcare to (1) use pronouns and provide medical procedures consistent with its religious beliefs; (2) hold policies to that effect; (3) explain those policies and its religious beliefs to the public; (4) hire and retain employees who abide by the ministry's religious values; and (5) publish job notices reflecting its faith-based hiring policies. All this harms the ministry, violates the Constitution, and chills the ministry's speech. So Christian Healthcare's injuries are real, irreparable, and ongoing.

Moreover, these are constitutional injuries, which cannot be remedied later. The only way to remedy them now, is to enjoin Michigan now. *See Doster*, 54 F.4th at 428 (holding injunction was appropriate because "coerced violation of religious beliefs" was an intangible injury in need of immediate relief).

Turning to the final factors, Michigan claims that issuing a preliminary injunction would harm third parties and the public interest. Defs.' MPI Resp.,

PageID.257–228. Essentially, Michigan wants to continue enforcing its law. No problem—Michigan can continue to pursue its anti-discrimination interests. The injunction simply prevents Michigan from forcing Christian Healthcare to violate its conscience or undermine its religious ministry. In other words, the injunction requires Michigan to act constitutionally. No one suffers harm when the government abides by the constitution. *Doster*, 54 F.4th at 428 ("The government usually cannot rely on the harm from stopping its likely unconstitutional conduct.").

In sum, Christian Healthcare satisfies the factors for an injunction, and the question is not a close one. This Court should enjoin Michigan as the ministry requested, so that the ministry's claims can move forward while it continues to serve the people of Michigan consistent with its religious beliefs.

## Conclusion

Christian Healthcare faces a credible threat that Michigan law will be enforced against it if it continues to speak, act, and operate consistent with its beliefs. Michigan never disputes that its law currently applies to the ministry or that its officials have enforcement authority. Nor does Michigan affirmatively disavow enforcing its law against the ministry's proposed activities. This leaves the ministry hoping and praying that Michigan will act contrary to its law and past practice. But Christian Healthcare need not violate the law to find out for sure. It has standing now to ensure it can protect its constitutional rights.

Beyond that, Christian Healthcare has also plausibly alleged a need for a declaratory judgment, permanent injunction, and a facial injunction against the Unwelcome Clause. Those challenges should move forward. In the meantime, Michigan doesn't dispute the merits of Christian Healthcare's preliminary-injunction motion. So this Court should deny Michigan's motion to dismiss and grant Christian Healthcare's preliminary-injunction motion.

Respectfully submitted this 22nd day of December, 2022.


Jonathan A. Scruggs
Arizona Bar No. 030505
Ryan J. Tucker
Arizona Bar No. 034382
Henry W. Frampton, IV
South Carolina Bar No. 75314
Bryan D. Neihart
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
rtucker@ADFlegal.org
hframpton@ADFlegal.org
bneihart@ADFlegal.org

By: s/ John J. Bursch
   John J. Bursch
   Michigan Bar No. P57679
   **Alliance Defending Freedom**
   440 First Street NW, Suite 600
   Washington, DC 20001
   (202) 393-8690
   (202) 347-3622 Fax
   jbursch@ADFlegal.org


*Attorneys for Plaintiff*

**Certificate of Compliance with Local Civil Rule 7.2(b)(i)**

This brief was produced on Microsoft Word® for Microsoft 365 MSO (Version 2207 Build 16.0.15427.20182) 64-bit. According to the word count generator within that program, the word count for this brief including headings, footnotes, citations and quotations, but not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, is 14,989 which complies with this Court's Order. Order, PageID.485.

By: <u>s/ John J. Bursch</u>

John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001

*Attorney for Plaintiff*

**Certificate of Service**

I hereby certify that on the 22nd day of December, 2022, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record who are registered users of the ECF system.

By: s/ John J. Bursch

John J. Bursch
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001

*Attorney for Plaintiff*