UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN HEALTHCARE CENTERS,
INC.,

      Plaintiff,                                 Case No. 1:22-cv-787

v.                                         HON. JANE M. BECKERING

DANA NESSEL, et al.,

      Defendants.

_____/

**OPINION AND ORDER**

Pursuant to 42 U.S.C. § 1983, Plaintiff Christian Healthcare Centers, Inc. ("Plaintiff" or "Christian Healthcare") filed this pre-enforcement civil rights action for declaratory and injunctive relief against Defendants Dana Nessel, Michigan's Attorney General; John E. Johnson, the Executive Director of Michigan's Department of Civil Rights ("the Department" or MDCR); and individual members of Michigan's Civil Rights Commission ("the Commission") (collectively, "Defendants").  Plaintiff alleges that the enforcement of certain provisions in Michigan's civil rights and public-accommodations laws will infringe on its religious mission and thereby violate the First and Fourteenth Amendments to the United States Constitution.  Pending before the Court is Plaintiff's Motion for Preliminary Injunction (ECF No. 5).  Defendants oppose the motion and filed a Motion to Dismiss (ECF No. 19), arguing, in pertinent part, that no case or controversy exists for federal jurisdiction.  For the following reasons, the Court grants the motion to dismiss and closes this case.

# I.  BACKGROUND

## A.  Statutory Framework

Plaintiff's pre-enforcement challenge concerns Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2101 *et seq.*, and Michigan's Equal Accommodations Act, MICH. COMP. LAWS § 750.146.  A brief description of both laws will help place this case (and this Court's decision) in context.

## 1.    Michigan's ELCRA

First, the ELCRA provides, in pertinent part, that "*[e]xcept where permitted by law*, a person shall not [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."  MICH. COMP. LAWS § 37.2302(a) (emphasis added).  The construction provision of the ELCRA also expressly provides that the Act "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act." MICH. COMP. LAWS § 37.2705(1).

Michigan's Department of Civil Rights is charged with receiving, initiating, investigating, conciliating, adjusting, disposing of, issuing charges, and holding hearings on complaints alleging a violation of the ELCRA.  MICH. COMP. LAWS § 37.2602(c).  The Commission was established by the Michigan Constitution of 1963 to carry out the guarantees against discrimination articulated in Article 1, § 2.  *See* MICH. CONST. 1963, Art. 1, § 2, Art. 5, § 29.  Any person claiming to be aggrieved by unlawful discrimination may file a complaint with the Department to be heard before the Commission, MICH. COMP. LAWS § 37.1605, or the aggrieved individual may bring a civil action in circuit court, MICH. COMP. LAWS § 37.1606.  *See also* MDCR Rule 37.2(m) (broadly

defining "person" to include not only individuals but also corporations, associations, or "any other legal or commercial entity").

In May 2018, the Commission adopted Interpretive Statement 2018-1, in which it concluded that "sexual orientation" and "gender identity" fall within the meaning of "sex" as used in the ELCRA (Pl. App'x, ECF No. 5-8 at PageID.338–340). The Commission explained in its statement that

> the U.S. 6th Circuit Court of Appeals . . . ruled in the case of *EEOC v R.G. & G.R. Harris Funeral Homes, Inc.* that the same language "discrimination because of . . . sex" when used in federal civil rights law protected a transgender Michigan woman who was gender stereotyped and discriminated against for not behaving like a male[.]

(*id.* at PageID.338). Accordingly, the Commission found that "continuing to interpret the protections afforded by the phrase 'discrimination because of . . . sex' more restrictively by continuing to exclude individuals for reasons of their gender identity or sexual orientation would itself be discriminatory" (*id.*). *See generally* MICH. COMP. LAWS § 24.207(h) ("[A]n interpretive statement … in itself does not have the force and effect of law but is merely explanatory.").

Subsequently, three private individuals filed complaints with the Department based on Interpretive Statement 2018-1. First, Natalie Johnson and Megan Oswalt filed a complaint alleging that Rouch World, LLC, an event center operator, discriminated against them "on the basis of sex" in violation of the ELCRA by denying their April 2019 request to host their same-sex wedding at its facility. The owners of Rouch World asserted that hosting the ceremony would violate their religious beliefs. Second, Marissa Wolfe, a transgender woman, filed a complaint with the Department, alleging that Uprooted Electrolysis, LLC, a hair removal business, had discriminated against her "on the basis of sex" in violation of the ELCRA in denying her services. The owner of Uprooted Electrolysis perceived the requested services to be centrally connected to Wolfe's

transgender identity and asserted that providing the services would violate her religious beliefs. The MDCR investigations were stayed when Rouch World and Uprooted Electrolysis jointly sued the MDCR and its then director in the Michigan Court of Claims, seeking (1) a declaratory judgment that sexual orientation and gender identity were not encompassed by the ELCRA's prohibition of sex discrimination in places of public accommodation and (2) an injunction prohibiting the continued investigation of the complaints filed against plaintiffs and the MDCR's adherence to Interpretive Statement 2018-1.  *See generally Rouch World, LLC v. Dep't of C.R.*, No. 162482, 2022 WL 3007805, at *5, ___ N.W.2d ____ (Mich. July 28, 2022) (setting forth factual background).

The Michigan Court of Claims held that discrimination "because of sex" under the ELCRA includes discrimination because of an individual's "gender identity," and granted relief in favor of the Department with regard to Uprooted Electrolysis' claim.  *Id.*  However, on the basis of stare decisis, the court denied summary disposition as to the sexual orientation claim.  *Id.*  Regarding Rouch World's and Uprooted Electrolysis' First Amendment free exercise of religion claim, the Court of Claims concluded that the issue had not "been sufficiently briefed to resolve at this juncture." *Id.* at *7.  The plaintiffs did not seek to appeal the gender identity ruling.

The Department appealed the decision directly to the Michigan Supreme Court.  In July 2022, the Michigan Supreme Court held that "the denial of 'the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service' on the basis of sexual orientation constitutes discrimination 'because of ... sex' and, therefore, constitutes a violation of the ELCRA under MICH. COMP. LAWS § 37.2302(a)." *Id.* at *15.  The Michigan Supreme Court did not decide whether gender identity was encompassed by the ELCRA—the basis of the complaint against Uprooted Electrolysis—

4

because the issue was not appealed.  *Id.* at *6.  Additionally, the Michigan Supreme Court expressly noted that "[w]hether enforcement under the ELCRA for sexual-orientation and gender-identity discrimination would violate [the] plaintiffs' federal and state constitutional religious liberty protections has not yet been adjudicated below and, accordingly, is also not currently before this Court."  *Id.* at *6, n.5.

Last, as Plaintiff acknowledges (Verified Compl. ¶ 215), the ELCRA provides the Department with authority to make individualized exemptions for employers who make a "sufficient showing" that religion is a bona fide occupational qualification (BFOQ) "reasonably necessary to the normal operation of the business."  MICH. COMP. LAWS § 37.2208.  Additionally, "[a]n employer may have a bona fide occupational qualification on the basis of religion … without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business."  *Id.*  According to the Department's Director of Enforcement, the BFOQ application is based on position, not necessarily specific individuals, so duplicative requests with every hire are not required (Trevino Aff. [ECF No. 23-1] ¶ 6).  BFOQ exemptions are valid for five years and may be extended (*id.* ¶ 7).  The Department has considered and granted BFOQs since 1976, albeit infrequently (*id.* ¶¶ 5, 8).  Plaintiff concedes that it has not sought a BFOQ exemption (Verified Compl. ¶ 292).

2.      **Michigan's Equal Accommodations Act**

Michigan's Equal Accommodations Act, MICH. COMP. LAWS § 750.146, which is part of the Penal Code, provides that "[a]ll persons within the jurisdiction of this state shall be entitled to full and equal accommodations, advantages, facilities and privileges of inns, hotels, motels, government housing, restaurants, eating houses, barber shops, billiard parlors, stores, public

conveyances on land and water, theatres, motion picture houses, public educational institutions, in elevators, on escalators, in all methods of air transportation and all other places of public accommodation, amusement, and recreation, subject only to the conditions and limitations established by law and applicable alike to all citizens and to all citizens alike, with uniform prices."

Although the Attorney General is authorized to criminally prosecute public accommodations violations, MICH. COMP. LAWS § 750.147, Defendants represent that neither Attorney General Nessel nor her predecessors have filed an action to criminally enforce the Act (ECF No. 20 at PageID.562).

### B.      Factual Background

Plaintiff is a non-profit corporation with clinics in Plainfield Charter Township and Newaygo, Michigan (Verified Compl. ¶ 16).  Its stated purpose is to be a "Christian medical-service ministry that serves the community by providing direct medical services to its patients consistent with the tenets of its faith and to communicate those beliefs to its patients and the public" (*id.* ¶ 17).   Plaintiff alleges that it is critical to the exercise of its religious faith that the ministry be permitted to build a staff of fellow believers who will "understand and live out the ministry's mission as only co-believers can effectively do" (*id.* ¶ 170).  Plaintiff further alleges that it desires to "build a work environment where staff members will grow together in their faith, support each other in their faith, and work together to build a cohesive mission-focused religious ministry" (*id.* ¶ 171).

Plaintiff alleges that it has "been aware of, and had read news reports about, how other medical providers and religious business owners were being sued and threatened with severe penalties for declining to provide healthcare or services that conflicted with their faith or for operating their medical practice or operations consistent with their faith" (*id.* ¶ 186).  Plaintiff

alleges that over the years, it has had and still has patients who identify as members of the opposite sex (*id.* ¶ 187).  Plaintiff alleges that it has provided and continues to provide "high quality care to such patients consistent with its religious beliefs," but Plaintiff has considered "how it would address patients who identify as transgender in the future and to investigate its legal responsibilities" (*id.* ¶¶ 188–189).  According to Plaintiff, it "realized that if the Michigan Supreme Court reinterpreted Michigan's civil-rights law to prohibit discrimination based on sexual orientation—and if 'because of sex' included 'because of gender identity'—its ability to operate its medical practice and manage its employment relationships consistent with its religious beliefs about biology, human sexuality, and other topics would be threatened" (*id.* ¶ 192).

Plaintiff does not identify any pending complaint, investigation, or prosecution against it. Rather, Plaintiff alleges that it faces "a credible threat and substantial risk that it will be investigated and prosecuted under these laws for engaging in activities and speaking in accordance with its religious beliefs" (*id.* ¶ 196).   Specifically, Plaintiff alleges that it faces such a risk under the laws' regulations of employers, public accommodations, and public services (*id.* ¶ 197). According to Plaintiff, the threats Michigan's civil rights and public-accommodations laws pose to its religious mission are in two primary areas: (1) its employment decisions and (2) "how it serves the public" (*id.* ¶ 199).  Plaintiff emphasizes that while the *Rouch World* decision did not "formally decide that discrimination on the basis of gender identity is proscribed by Michigan's civil rights law, the Commission's Interpretative Statement 2018-1 and the Court of Claims holding that 'sex' includes gender identity remain in place" (*id.* ¶ 184).  Plaintiff also emphasizes that Attorney General Nessel has taken the position that antidiscrimination laws that prohibit discrimination "because of sex" likewise prohibit discrimination based on sexual orientation and gender identity (*id.* ¶ 185).

7

### C.  Procedural Posture

On August 29, 2022, Plaintiff initiated this action with the filing of a Verified Complaint,

alleging the following four claims:

  I.  Violation of the First Amendment's Free Exercise and Establishment Clauses: Religious
      Autonomy, Ministerial Exception, Co-Religionists, and Compelled Participation

  II.  Violation of the First Amendment's Free Exercise Clause: Lack of General Applicability,
      Individualized Exemptions, and Compelled Participation

  III.  Violation of the First Amendment's Free Speech and Assembly Clauses: Freedom of
      Speech, Expressive Association, Press, and Assembly

  IV.  Violation of the Fourteenth Amendment's Due Process Clause: Vagueness

(ECF No. 1).  For each count, Plaintiff seeks injunctive and declaratory relief as to the disputed

ELCRA and Equal Accommodations Act provisions, in addition to costs, fees, and attorney fees

(*id.* at PageID.70–71).

Plaintiff accompanied its Verified Complaint with a Motion for a Preliminary Injunction

(ECF No. 5), seeking to "stop the named Defendants from violating the First Amendment of the

United States Constitution" (*id.* at PageID.170).  Specifically, Plaintiff seeks to enjoin Defendants

from

> • Enforcing Michigan's Accommodation Clauses (MCL 37.2302(a)) to prevent
> Christian Healthcare from adopting and following a policy, pattern, or practice of
> referring to patients or members of the public using only those pronouns consistent
> with its religious belief that sex is immutable, such as Christian Healthcare's policy
> and practice of declining to use gender-identity-based pronouns in medical charts
> and when referring to patients and the general public;
>
> • Enforcing Michigan's Accommodation Clauses (MCL 37.2302(a)) to prevent
> Christian Healthcare from adopting and following a policy, pattern, or practice of
> only offering and providing medical services consistent with its religious belief that
> sex is immutable, such as Christian Healthcare policy and practice of declining to
> offer and provide hormone treatments used to facilitate a patient's attempt to
> transition to the opposite sex;
>
> • Enforcing Michigan's Publication Clause (MCL 37.2302(b) and MCL 750.147)
> to prevent Christian Healthcare from explaining the religious nature of its medical

8

care, its views about the immutability of sex, and how that view affects its services
on their website—such as by posting Verified Complaint Exhibit 3 on its website
or by making materially similar statements on their website or directly to
prospective patients;

• Enforcing Michigan's Employment (MCL 37.2202(1)), Accommodation (MCL
37.2302(a)), or Notice (MCL 37.2206(1)–(2)) Clauses to prevent Christian
Healthcare from adopting or following a policy, pattern, or practice of only offering
positions for, only hiring, and only retaining employees who actually adhere to and
agree to abide by the beliefs contained in Christian Healthcare's Religious
Statements (Verified Compl. Exs. 3–7);

• Enforcing Michigan's Employment (MCL 37.2202(1)), Accommodation (MCL
37.2302(a)), or Notice (MCL 37.2206(1)–(2)) Clauses to prevent Christian
Healthcare from adopting or following a policy, pattern, or practice of only offering
positions for, only hiring, and only retaining employees who actually adhere to and
agree to abide by the beliefs contained in Christian Healthcare's Religious
Statements (Verified Compl. Exs. 3–7) for the following positions that qualify for
the ministerial exception: Managers, the Medical Director, the Advance Practice
Medical Providers, and Biblical Counselors as described in paragraphs 114–54 of
the Verified Complaint;

• Enforcing Michigan's Notice Clause (MCL 37.2206(1)-(2)) to prevent Christian
Healthcare from posting its desired employment application (Verified Compl. Ex.
15), biblical counselor position (Verified Compl. Ex. 12), and general solicitation
for applications (App. 22) or materially similar statements on its website,

• Enforcing Michigan's Notice Clause (MCL 37.2206(1)–(2)) to prevent Christian
Healthcare from asking prospective employees questions sufficient to learn their
views about Christian Healthcare's Religious Statements (Verified Compl. Exs. 3–
7), such as asking them whether they have read and agree with the statements,
asking them about their religious background and current religious practices, and
materially similar questions; and

• Enforcing Michigan's Employment (MCL 37.2202(1)), Accommodation (MCL
37.2302(a)), or Notice (MCL 37.2206(1)–(2)) Clauses to prevent Christian
Healthcare from asking existing employees to annually affirm the Religious
Statements (Verified Compl. Exs. 3–7).

(Pl. Proposed Order, ECF No. 5-1 at PageID.177–179).

On November 18, 2022, Defendants filed a Response in opposition to the Motion for

Preliminary Injunction (ECF No. 18) and a Motion to Dismiss (ECF No. 19).   On December 22,

2022, Plaintiff filed a combined response in opposition to the Motion to Dismiss and reply in

support of its Motion for Preliminary Injunction (ECF No. 22).  On January 13, 2023, Defendants

filed a Reply to Plaintiff's response (ECF No. 23).  On February 10, 2023, Plaintiff filed a Notice

of additional "materials"[1] (ECF No. 26), to which Defendants filed a response (ECF No. 27).

Having considered the parties' submissions, the Court concludes that oral argument is not

necessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standards

**1.      Dismissal Standard**

Defendants' motion to dismiss is filed pursuant to Federal Rule of Civil Procedure 12(b)(1)

(lack of subject-matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be

granted).  Whether a party has standing is an issue of the court's subject-matter jurisdiction under

Rule 12(b)(1), *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 506–

07 (6th Cir. 2019), and "[t]he party invoking federal jurisdiction bears the burden of establishing

the [standing] elements," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Where a defendant challenges the factual existence of subject-matter jurisdiction, "no

presumptive truthfulness applies to the factual allegations," and "the court is free to weigh the

evidence and satisfy itself as to the existence of its power to hear the case."  *United States v.

Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  *See also Thomas v. City of Memphis, Tenn.*, 996 F.3d

318, 323 (6th Cir. 2021) (citing *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th

Cir. 1990) ("a trial court has wide discretion to allow affidavits, documents, and even a limited

evidentiary hearing to resolve disputed jurisdictional facts.")).  A plaintiff is not entitled to

---

[1] Plaintiff cited to a multi-state amicus brief joined by the Attorney General and provided a press release by the Attorney General and proposed Department rules with the corresponding Impact Statement.

discovery if it cannot, at a minimum, offer a factual basis for its allegations and demonstrate a reasonable expectation that discovery would reveal evidence that supports the claimed jurisdiction. *C.H. By & Through Shields v. United States*, 818 F. App'x 481, 484 (6th Cir. 2020); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981).

Rule 12(b)(6) authorizes a court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). Specifically, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). The court views the complaint in the light most favorable to the plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of the plaintiff. *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**2.      Standard for Injunctive Relief**

Plaintiff's motion for a preliminary injunction is filed pursuant to Federal Rule of Civil Procedure 65. "Preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (examining a preliminary injunction that preserved the state-law status quo)). "[T]hat is why the plaintiff bears the burden to justify relief, even in First Amendment cases." *Id.* (citing *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)). Further, a plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). *See also Town of Chester, N.Y. v. Laroe Estates, Inc.*, —— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) ("a

plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (citation omitted); *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) ("To establish a likelihood of success in a lawsuit, a plaintiff must, of course, have standing to bring it.") (citing *Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021)).

### B.     Discussion

### 1.     Subject-Matter Jurisdiction

In both their motion to dismiss and their response in opposition to Plaintiff's motion for a preliminary injunction, Defendants argue that Plaintiff's lack of standing prevents this Court from exercising jurisdiction over the subject matter of Plaintiff's claims.  Subject-matter jurisdiction is the threshold question.  Without subject-matter jurisdiction, this Court lacks power to either consider the merits of Plaintiff's claims, *see Bell v. Hood*, 327 U.S. 678, 682 (1946) (explaining that motion to dismiss for failure to state a claim may be decided only after establishing subject-matter jurisdiction because determination of the validity of the claim is, in itself, an exercise of jurisdiction); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) ("[W]e are bound to consider the 12(b)(1) motion first, since the Rule 12(b)(6) challenge becomes moot if this court lacks subject-matter jurisdiction."), or, indeed, issue any order, *see U.S. Fid. & Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1087 (6th Cir. 1992) (explaining that where a district court lacks subject-matter jurisdiction, its orders are "void").  If the plaintiff lacks standing, then the court "need not reach the other issues: ripeness, statutory preclusion, and failure to state a claim upon which relief can be granted."  *State by & through Tenn. Gen. Assembly*, 931 F.3d at 507.  *See also Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021) ("To succeed on the merits, a party must first reach the merits, and to do so it must establish standing.").

Consequently, the Court turns first to analyzing Defendants' Rule 12(b)(1) standing argument, and the Court finds the argument dispositive.[2]

## 2.    Standing

Defendants argue that Plaintiff cannot establish standing where Plaintiff has offered only speculation about a future injury and cannot demonstrate an injury-in-fact that is fairly traceable to any action of Defendants (ECF No. 20 at PageID.572–579).  Defendants argue that because Michigan's anti-discrimination laws provide that they will be interpreted in accordance with other applicable laws, Plaintiff's allegation of a credible threat is wholly dependent upon speculation as to how the statutory language will be applied, or if it will ever be applied against them, and "frankly presumes without any evidence that the Defendants will not appropriately consider any religious exemption laws" (ECF No. 23 at PageID.753).  Without denying that they have interpreted (and the Court of Claims and Supreme Court agreed) the ELCRA's "because of sex" provision to include protection for gender identity and sexual orientation, Defendants emphasize that "the issue is whether, in the application of this provision, Defendants have refused to consider religious exemption laws—which they have not" (*id.* at PageID.759–760).

In response, Plaintiff argues that this Court should "presume" a credible threat of enforcement exists where (1) its ministry is an object of Michigan's laws; (2) the laws arguably prohibit it from engaging in religiously motivated speech, medical practice, and employment

---

[2] While the Court has not separately addressed ripeness, the analysis would likely lead to the same result.  Ripeness "shares a foundation in Article III's case-and-controversy requirement," *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 (6th Cir. 2017); *see also Doster v. Kendall*, 54 F.4th 398, 415 (6th Cir. 2022), and often "boil[s] down to the same question[,]" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007).  As the Sixth Circuit has held, "a claim does not become ripe at the first whiff of governmental insensitivity or whenever a government official takes an adverse legal position against someone, even if one potential response is to curtail protected activities."  *Ky. Press Ass'n, Inc. v. Ky.*, 454 F.3d 505, 540 (6th Cir. 2006).

decisions; and (3) Michigan actively enforces the law (ECF No. 22 at PageID.613–622). Moreover, Plaintiff argues that Defendants have not "rebutted" the "enforcement presumption"[3] by disavowing the law in some binding way or committing to exempting Plaintiff from the reach of the laws (*id.* at PageID.622–628, 633–642).  Plaintiff points out that the universe of potential complainants increases its prosecution risk and that violating Michigan's laws comes with consequences that would be devastating to its mission (*id.* at PageID.628–630).  According to Plaintiff, Defendants' argument for dismissal would change the test for standing for a pre-enforcement suit from "arguable and credible to inevitable and inescapable" and defeat the purpose of pre-enforcement suits (*id.* at PageID.632, 642–644, 647).

Defendants' argument has merit.

Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]"  42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States Constitution.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1160 (6th Cir. 2021).

The United States Supreme Court has "repeatedly reiterated" that "[a]llegations of *possible* future" constitutional violations are not a sufficient basis for federal jurisdiction.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013) (emphasis in original) (citation omitted)

---

[3] The Court notes that the phrase "enforcement presumption" appears to be one of Plaintiff's own making.  Plaintiff does not reference, and this Court did not locate, the phrase within caselaw issued by the Supreme Court or the Sixth Circuit.  For its part, Plaintiff refers to an out-of-circuit case where a presumption is merely "acknowledged."  *See* Pl. Resp., ECF No. 22 at PageID.621, n.7 (citing *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).

(rejecting Article III standing when plaintiffs relied on a "highly speculative fear" that the government would decide to target their communications in the future).  Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts "extends only to 'Cases' and 'Controversies.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016), as revised (May 24, 2016) (quoting U.S. CONST. Art. III, § 2).  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Id.* at 338.  The doctrine "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.*  "The standing doctrine delineates the boundary between justiciable cases and controversies and those disputes that are not appropriately resolved through judicial process."  *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014).

The "irreducible constitutional minimum of standing" requires the plaintiff to show it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338).  For purposes of standing, an injury means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).  Each of the standing elements "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  When a case is at the pleading stage, the plaintiff must plausibly allege facts demonstrating each element of standing.  *Spokeo*, 578 U.S. at 338; *Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 171 (6th Cir. 2022).

While allegations of "*possible* future injury" are not sufficient to establish standing, *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (quoting *Clapper*, 568 U.S. at 409), a recurring issue is "determining when the threatened enforcement of a law creates

15

an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  The Supreme

Court has held that "[w]hen an individual is subject to such a threat, an actual arrest, prosecution,

or other enforcement action is not a prerequisite to challenging the law." *Id.* at 158–59 (citing,

e.g., *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened

action by government is concerned, we do not require a plaintiff to expose himself to liability

before bringing suit to challenge the basis for the threat.")).  Instead, the Supreme Court has

permitted "pre-enforcement review under circumstances that render the threatened enforcement

sufficiently imminent." *Id.*  "The government's future enforcement of the law counts as an

'impending' injury if a court can answer 'yes' to two questions:  Does a plaintiff seek to engage

in conduct that the law 'arguably' prohibits?  And has the plaintiff shown a 'credible threat' that

the government will enforce it against the plaintiff?" *Doster v. Kendall*, 54 F.4th 398, 416 (6th

Cir. 2022) (internal citations omitted).

The  Court  therefore  turns  to  examining  whether  Plaintiff  has  plausibly  alleged  facts

demonstrating, for purposes of standing, that (1) its intended conduct is proscribed by either the

ELCRA or the Equal Accommodations Act, and (2) there exists a credible threat of prosecution

under either state law.

### a.      Is Plaintiff's Intended Conduct Arguably Proscribed by Either Statute?

Both  of  Michigan's  anti-discrimination  laws  provide  that  they  will  be  interpreted  in

accordance with other applicable laws.  The ELCRA prohibits discrimination by a place of public

accommodation "[e]xcept where permitted by law," MICH. COMP. LAWS § 37.2302, and expressly

provides for BFOQs for religious exemptions related to employment where "reasonably necessary

to  the  normal  operation  of  the  business  or  enterprise," MICH. COMP. LAWS § 37.2208.   The

construction provision of the ELCRA also specifically provides that it "shall not be construed as

16

preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth in this act."  MICH. COMP. LAWS § 37.2705(1).  Similarly, the Equal Accommodations Act provides that the nondiscrimination provision for public accommodations is subject to "the conditions and limitations established by law[.]"  MICH. COMP. LAWS § 750.146.

The Michigan statutes do not "arguably" provide that religious freedoms will not be considered.  Defendants have identified caselaw indicating that over the years, the ELCRA has been construed in conjunction with constitutional and statutory religious exemptions.  For example, in *Porth v. Roman Catholic Diocese*, 532 N.W.2d 195, 200 (Mich. Ct. App. 1995), the Michigan Court of Appeals held that the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*, barred the application of the ELCRA to a policy of the church-operated school to employ only Catholics as teachers.  Similarly, in *Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 238 (Mich. Ct. App. 1988), the Michigan Court of Appeals held that the Free Exercise Clause of the First Amendment barred the application of the ELCRA to the diocese's decision about which organist to employ.  In *Weishuhn v. Catholic Diocese*, 756 N.W.2d 483, 488–89, 500 (Mich. Ct. App. 2008), the Michigan Court of Appeals remanded a math teacher's challenge under the ELCRA to his alleged retaliatory termination for the trial court to consider application of the "ministerial exception," an exception that the panel indicated has its "roots in the First Amendment's guarantees of religious freedom."

Last, in *McLeod v. Providence Christian School*, 408 N.W.2d 141, 151 (Mich. Ct. App. 1987), the parochial school sought to have provisions of the ELCRA struck down as unconstitutional under the First Amendment's Free Exercise Clause as applied to the school, which had a policy of not employing on a full-time basis women with preschool age children.  The Michigan Court of Appeals accepted the defendant's claim that the ELCRA's prohibition against

employment discrimination on the basis of sex has an effect on this belief.  The appellate court was "not persuaded, however, that the provisions of the act constitute an undue burden on defendant's religious beliefs." *Id.*  The panel reasoned that "[s]tatutes or regulations which unduly interfere with an individual's religious belief generally present the individual with a 'hard choice,'" but the ELCRA "does not, by its own terms, put defendant to such a 'hard choice.'" *Id.*  The panel pointed out that although the "defendant contend[ed] that its religious belief constitutes a bona fide occupational qualification, defendant has not applied to the commission for such an exemption." *Id.*  The panel concluded that the defendant "seeks to have the statute declared unconstitutional as it applies to defendant without having first availed itself of the statute's available safeguards." *Id.* at 344–45.

In short, neither the ELCRA nor the Equal Accommodations Act facially fails to recognize religious freedoms like those asserted by Plaintiff herein.  As exemplified by the caselaw, neither statute "arguably" provides that religious freedoms will not be considered.  Indeed, the ELCRA expressly provides a form of redress for Plaintiff's concerns about its hiring practices that Plaintiff has not utilized.  That either of these acts "might" be applied against Plaintiff in the future is "the exact sort of hypothetical and speculative dispute that Article III proscribes from federal-court dockets." *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 507 (6th Cir. 2017) (holding that the business owners lacked standing under Article III to bring a pre-enforcement challenge to an ordinance).  "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 293 (6th Cir. 1997) (citation omitted).

**b.      Does a Credible Threat of Prosecution Exist?**

Even assuming arguendo that Plaintiff's proposed conduct is proscribed by Michigan law, Plaintiff must still show "a credible threat of prosecution" in order to establish a requisite injury-in-fact.  The Sixth Circuit has stated that "[t]o identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech."  *Fischer*, 52 F.4th at 307 (citing *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).  Here, Plaintiff has alleged how it has curtailed some activities in order to avoid investigation or prosecution.  *See* Verified Compl. ¶¶ 313, 324–29, & 354–62 (describing, for example, Plaintiff's decisions to not post its job notices or membership agreement).

However, "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (citation omitted).  The "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit.  *Whole Woman's Health v. Jackson*, ___ U.S. ___, 142 S. Ct. 522, 538 (2021) (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971) (a chilling effect "has never been considered a sufficient basis, in and of itself, for prohibiting state action")).  *See also Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 173 (6th Cir. 2022) ("Article III's case-or-controversy requirement provides a critical separation-of-powers check on the judiciary that we may not disregard simply because we think a legal question—'First Amendment or otherwise'—is important.").  Instead, the Court requires "proof of a more concrete injury and compliance with traditional rules of equitable practice."  *Whole Woman's Health, supra.  See also Plunderbund Media, L.L.C v. DeWine*, 753 F. App'x 362, 366–67 (6th Cir. 2018) (holding that where "some other indication of imminent

19

enforcement" is lacking, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes.") (citation omitted).

In *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016), the Sixth Circuit held that when plaintiffs rely on allegations of subjective chill, they must also "point to some combination of the following factors" to show the potential of enforcement: "(1) a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," and/or (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Id.* at 869 (internal citations omitted).  The Sixth Circuit noted that it had "also taken into consideration a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."  *Id.*

The Sixth Circuit has applied the *McKay* factors in three recent cases.  First, in *Online Merchants*, 995 F.3d at 550–52, the Sixth Circuit applied the *McKay* factors and determined that the plaintiff had standing to bring its pre-enforcement action where (1) there was at least "some" evidence of past enforcement actions, (2) the defendant sent the plaintiff a subpoena and civil investigatory demand (CID), (3) the statute contains a citizen-enforcement provision, and (4) the defendant had not disavowed enforcement but "vigorously litigated enforcement" of the subpoena and CID in state court.  Second, in *Fischer*, 52 F.4th at 307–09, the Sixth Circuit applied the *McKay* factors and likewise determined that the plaintiffs had standing to bring their pre-enforcement action where (1) the defendant previously investigated one of the two plaintiffs, (2) the defendant sent the plaintiffs warning letters, (3) the provision at issue contained a citizen-enforcement provision, and (4) the defendant had refused to disavow enforcement of the challenged provision.

20

Third, in *Doster v. Kendall*, 54 F.4th 398 (6th Cir. 2022), the Sixth Circuit applied the *McKay* factors and determined that the plaintiffs-service members had standing to bring their pre-enforcement action to challenge the Air Force's future enforcement of a mandate to take a COVID-19 vaccine.  The Sixth Circuit determined that the Air Force had a "history of enforcing" the mandate against "others" who refused to comply and had "administratively separated 236 active-duty Airmen" near the time of this suit.  *Id.* at 416.  Additionally, the secretary of the Air Force had issued a memorandum "warning" service members of the sanctions for not complying, indicating that those who refused to get vaccinated after the Air Force had denied an exemption "will be subject to initiation of administrative discharge."  *Id.*  Last, each of the plaintiffs in *Doster* had filed a written request for a religious exemption.  While some of the plaintiffs' requests were still outstanding, the Air Force had approved just 25 of the over 7,500 then-existing requests, and its approvals were limited to individuals who agreed to leave the Air Force within a year.  *Id.*

The Court turns to examining whether Plaintiff has likewise identified a combination of relevant factors in this case that would support the conclusion that its challenge to these laws is borne of a live controversy, and not an attempt to obtain an advisory opinion.

### (1)  History of Enforcement

The first factor weighs against Plaintiff.  Plaintiff cites to no Michigan cases interpreting the ELCRA or Equal Accommodations Act as requiring all healthcare providers to provide "gender-transition services" if they would provide similar treatments for other purposes.  *See* Verified Compl. ¶ 238, n.7 (citing out-of-state caselaw interpreting other laws).  Plaintiff cites no Michigan cases interpreting Michigan law as prohibiting a religious employer who meets the BFOQ criteria from asking prospective employees about whether they can follow and effectively communicate certain beliefs; seeking, recruiting, and hiring employees who agree with certain

21

religious beliefs; or posting employment opportunities that indicate a desire to hire employees who share certain beliefs.  *See id.* ¶¶ 205 & 209.  Defendants represent, and Plaintiff does not dispute, that neither Attorney General Nessel nor her predecessors have filed an action to criminally enforce the Equal Accommodations Act (ECF No. 20 at PageID.562).

### (2)  Enforcement Warning Letters

Not surprisingly then, the second factor also weighs against Plaintiff.  Plaintiff has not identified anything akin to a warning letter regarding the conduct outlined in its Verified Complaint.  Plaintiff has not provided evidence of any comments by the Commissioners or MDCR staff named as Defendants to establish that they have provided any credible threat of enforcement. And Plaintiff's attempts to rely upon amicus briefs Attorney General Nessel has joined or her efforts on behalf of the LGBTQ+ community do not demonstrate a "clear threat of prosecution" against Plaintiff.  As indicated, Defendants do not deny that, consistent with current legal precedent, they have interpreted the ELCRA's "because of sex" provision to include protection for gender identity and sexual orientation, but the issue in this case is whether, in applying this provision, Defendants have refused to consider constitutional and statutory religious exemptions such that Plaintiff faces a credible threat of prosecution.

### (3)  Statutory Attributes

The third factor also weighs against Plaintiff.  Plaintiff emphasizes that private individuals are statutorily empowered to bring a discrimination suit against it under the ELCRA, but this statutory attribute is not compelling where the ELCRA also provides that such a suit may not be premised on discrimination that is "permitted by law."  MICH. COMP. LAWS § 37.2302(a).  As previously described, both of Michigan's anti-discrimination laws expressly provide that they will be interpreted in accordance with other applicable laws.  Hence, unlike the service members in

*Doster* who faced a looming "Hobson's choice" between compliance with the Air Force vaccine mandate and adherence to their religious beliefs, Plaintiff has not demonstrated that application of these statutes presents a hard choice.   Indeed, the Michigan Court of Appeals in *McLeod* determined that the opposite was true.   Instead, religious freedoms must be weighed against governmental interests based on the particular facts of each case.   *See, e.g., Porth, supra*; *Assemany, supra*; *Weishuhn, supra*; *McLeod, supra*.

On balance, the three *McKay* factors do not demonstrate a credible threat of enforcement exists in this case.   To the extent the fourth "disavowing" question from *McKay* is relevant, the Court agrees with Defendants that "[i]t would be impossible for Michigan to disavow application of a Michigan statute as broad as the ELCRA and Equal Accommodations Act as to any religious entity where the religious freedom inquiry would be so fact-dependent" (ECF No. 23 at PageID.758–759).   *See, e.g., Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022) (determining that the fact that the police department had not "disavowed enforcement" of its Facebook Rule "does nothing to show that [the plaintiff] plans to engage in speech that might arguably fall within the rule").

c.   **Summary**

In summary, neither the ELCRA nor the Equal Accommodations Act facially fails to recognize religious freedoms like those asserted by Plaintiff herein.   Even assuming arguendo that either of these acts "might" be applied against Plaintiff in the future, Plaintiff has failed to supply some indication of imminent enforcement, and mere allegations of a "subjective chill" are alone insufficient to establish an injury-in-fact for standing purposes.   Because Plaintiff has not

demonstrated Article III standing sufficient to invoke federal-court jurisdiction, any decision from

this Court regarding how the statutes might apply to Plaintiff would be advisory.[4]

While Plaintiff accurately describes the issues herein as topics of ongoing national debate

(ECF No. 22 at PageID.630), "[m]atters of great public interest are precisely the kinds of issues

that demand the federal courts to be most vigilant in this area—vigilant that the powers they

exercise are powers the Constitution gives them and vigilant that they exercise those powers in

disputes with the 'clear concreteness provided when a question emerges precisely framed and

necessary for decision from a clash of adversary argument.'" *Fialka-Feldman v. Oakland Univ.*

*Bd. of Trustees*, 639 F.3d 711, 715 (6th Cir. 2011) (citation omitted). When a court lacks subject-

matter jurisdiction, "the only function remaining to the court is that of announcing the fact and

dismissing the cause." *State by & through Tenn. Gen. Assembly*, 931 F.3d at 519 (quoting *Ex*

*parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)). *See also Davis*, 51 F.4th at

176 (indicating that dismissal for lack of subject-matter jurisdiction is without prejudice); FED. R.

CIV. P. 58 (providing for entry of judgment).

### III.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 19) is

GRANTED. This action, including Plaintiff's Motion for Preliminary Injunction (ECF No. 5), is

DISMISSED.

Dated:  March 29, 2023                                 /s/ Jane M. Beckering
                                                                JANE M. BECKERING
                                                                United States District Judge

---

[4] Even if this Court were empowered to reach the merits of Plaintiff's motion for a preliminary injunction, Plaintiff would have failed to make the requisite showing for injunctive relief, for the same reasons stated herein. *See generally D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (irreparable injury must be both certain and immediate, not speculative or theoretical).

24