# No. 21
## STATE OF MICHIGAN
# Journal of the Senate
### 102nd Legislature
### REGULAR SESSION OF 2023

Senate Chamber, Lansing, Wednesday, March 1, 2023.

10:00 a.m.

The Senate was called to order by the President, Lieutenant Governor Garlin D. Gilchrist II.

The roll was called by the Secretary of the Senate, who announced that a quorum was present.

| | | |
|---|---|---|
| Albert—present | Hauck—present | Moss—present |
| Anthony—present | Hertel—present | Nesbitt—present |
| Bayer—present | Hoitenga—present | Outman—present |
| Bellino—present | Huizenga—present | Polehanki—present |
| Brinks—present | Irwin—present | Runestad—present |
| Bumstead—present | Johnson—present | Santana—present |
| Camilleri—present | Klinefelt—present | Shink—present |
| Cavanagh—present | Lauwers—present | Singh—present |
| Chang—present | Lindsey—present | Theis—present |
| Cherry—present | McBroom—present | Victory—present |
| Daley—present | McCann—present | Webber—present |
| Damoose—present | McDonald Rivet—present | Wojno—present |
| Geiss—present | McMorrow—present | |

Senators Camilleri, Geiss, Cavanagh, Klinefelt, Bayer, McMorrow, Cherry, Polehanki and Chang introduced **Senate Bill No. 125, entitled**

A bill to amend 1951 PA 51, entitled "An act to provide for the classification of all public roads, streets, and highways in this state, and for the revision of that classification and for additions to and deletions from each classification; to set up and establish the Michigan transportation fund; to provide for the deposits in the Michigan transportation fund of specific taxes on motor vehicles and motor vehicle fuels; to provide for the allocation of funds from the Michigan transportation fund and the use and administration of the fund for transportation purposes; to promote safe and efficient travel for motor vehicle drivers, bicyclists, pedestrians, and other legal users of roads, streets, and highways; to set up and establish the truck safety fund; to provide for the allocation of funds from the truck safety fund and administration of the fund for truck safety purposes; to set up and establish the Michigan truck safety commission; to establish certain standards for road contracts for certain businesses; to provide for the continuing review of transportation needs within the state; to authorize the state transportation commission, counties, cities, and villages to borrow money, issue bonds, and make pledges of funds for transportation purposes; to authorize counties to advance funds for the payment of deficiencies necessary for the payment of bonds issued under this act; to provide for the limitations, payment, retirement, and security of the bonds and pledges; to provide for appropriations and tax levies by counties and townships for county roads; to authorize contributions by townships for county roads; to provide for the establishment and administration of the state trunk line fund, local bridge fund, comprehensive transportation fund, and certain other funds; to provide for the deposits in the state trunk line fund, critical bridge fund, comprehensive transportation fund, and certain other funds of money raised by specific taxes and fees; to provide for definitions of public transportation functions and criteria; to define the purposes for which Michigan transportation funds may be allocated; to provide for Michigan transportation fund grants; to provide for review and approval of transportation programs; to provide for submission of annual legislative requests and reports; to provide for the establishment and functions of certain advisory entities; to provide for conditions for grants; to provide for the issuance of bonds and notes for transportation purposes; to provide for the powers and duties of certain state and local agencies and officials; to provide for the making of loans for transportation purposes by the state transportation department and for the receipt and repayment by local units and agencies of those loans from certain specified sources; to investigate and study the tolling of roads, streets, highways, or bridges; and to repeal acts and parts of acts," (MCL 247.651 to 247.675) by adding section 11i.

The bill was read a first and second time by title and referred to the Committee on Transportation and Infrastructure.

### Recess

Senator Singh moved that the Senate recess subject to the call of the Chair.
The motion prevailed, the time being 10:12 a.m.

10:32 a.m.

The Senate was called to order by the President, Lieutenant Governor Gilchrist.

By unanimous consent the Senate returned to the order of
### Third Reading of Bills

The following bill was read a third time:
**Senate Bill No. 4, entitled**

A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

The question being on the passage of the bill,
Senator Runestad offered the following amendments:
1. Amend page 2, line 4, after "religion," by inserting "**religious orientation, religious identity or expression,**".

2. Amend page 2, line 15, after "religion," by inserting "**religious orientation, religious identity or expression,**".

3. Amend page 4, following line 22, by inserting:

"(**k**) **"Religious orientation" means having an orientation for a faith or religious perspective or having a history of such an orientation or being identified with such an orientation.**

(**l**) **"Religious identity or expression" means having or being perceived as having a religious-related self-identity or expression whether or not associated with an individual's membership at a church, mosque, synagogue, or other place of worship.**" and relettering the remaining subdivision.

4. Amend page 5, line 2, after "religion," by inserting "**religious orientation, religious identity or expression,**".

5. Amend page 5, line 9, after "religion," by inserting "**religious orientation, religious identity or expression,**".

6. Amend page 6, line 2, after "religion," by inserting "**religious orientation, religious identity or expression,**".

7. Amend page 6, line 6, after "religion," by inserting "**religious orientation, religious identity or expression,**".

8. Amend page 6, line 13, after "religion," by inserting "**religious orientation, religious identity or expression,**".

9. Amend page 6, line 23, after "religion," by inserting "**religious orientation, religious identity or expression,**".

10. Amend page 6, line 29, after "religion," by inserting "**religious orientation, religious identity or expression,**".

11. Amend page 7, line 6, after "religion," by inserting "**religious orientation, religious identity or expression,**".

12. Amend page 7, line 19, after "religion," by inserting "**religious orientation, religious identity or expression,**".

13. Amend page 7, line 27, after "religion," by inserting "**religious orientation, religious identity or expression,**".

14. Amend page 8, line 5, after "religion," by inserting "**religious orientation, religious identity or expression,**".

15. Amend page 8, line 10, after "religion," by inserting "**religious orientation, religious identity or expression,**".

16. Amend page 8, line 14, after "religion," by inserting "**religious orientation, religious identity or expression,**".

17. Amend page 8, line 24, after "religion," by inserting "**religious orientation, religious identity or expression,**".

18. Amend page 9, line 29, after "religion," by inserting "**religious orientation, religious identity or expression,**".

19. Amend page 10, line 7, after "religion," by inserting "**religious orientation, religious identity or expression,**".

20. Amend page 10, line 11, after "religion," by inserting "**religious orientation, religious identity or expression,**".

21. Amend page 10, line 22, after "religion," by inserting "**religious orientation, religious identity or expression,**".

22. Amend page 11, line 13, after "religion," by inserting "**religious orientation, religious identity or expression,**".

23. Amend page 11, line 19, after "religion," by inserting "**religious orientation, religious identity or expression,**".

24. Amend page 11, line 23, after "religion," by inserting "**religious orientation, religious identity or expression,**".

25. Amend page 12, line 2, by inserting "**religious orientation, religious identity or expression,**".

26. Amend page 12, line 7, after "religion," by inserting "**religious orientation, religious identity or expression,**".

27. Amend page 13, line 6, after "religion," by inserting "**religious orientation, religious identity or expression,**".

28. Amend page 14, line 17, after "religion," by inserting "**religious orientation, religious identity or expression,**".

29. Amend page 14, line 27, after "religion," by inserting "**religious orientation, religious identity or expression,**".

30. Amend page 15, line 6, after "religion," by inserting "**religious orientation, religious identity or expression,**".

31. Amend page 15, line 12, after "religion," by inserting "**religious orientation, religious identity or expression,**".

32. Amend page 15, line 27, after "religion," by inserting "**religious orientation, religious identity or expression,**".

33. Amend page 16, line 12, after "religion," by inserting "**religious orientation, religious identity or expression,**".

The question being on the adoption of the amendments,

Senator Lauwers requested the yeas and nays.

The yeas and nays were ordered, 1/5 of the members present voting therefor.

The amendments were not adopted, a majority of the members serving not voting therefor, as follows:

**Roll Call No. 29**                    **Yeas—17**

| | | | |
|---|---|---|---|
| Albert | Hauck | Lindsey | Runestad |
| Bellino | Huizenga | McBroom | Theis |
| Bumstead | Johnson | Nesbitt | Victory |
| Daley | Lauwers | Outman | Webber |
| Damoose | | | |

**Nays—21**

| | | | |
|---|---|---|---|
| Anthony | Cherry | Klinefelt | Polehanki |
| Bayer | Geiss | McCann | Santana |
| Brinks | Hertel | McDonald Rivet | Shink |
| Camilleri | Hoitenga | McMorrow | Singh |
| Cavanagh | Irwin | Moss | Wojno |
| Chang | | | |

**Excused—0**

**Not Voting—0**

In The Chair: President

### Protest

Senator Moss, under his constitutional right of protest (Art. 4, Sec. 18), protested against adoption of the amendments offered by Senator Runestad to Senate Bill No. 4 and moved that the statement he made during the discussion of the amendments be printed as his reasons for voting "no."

The motion prevailed.

Senator Moss' statement is as follows:

I want to thank the Senator from White Lake for offering this amendment so I can give this detailed "no" vote explanation now and not have to utilize any time discussion this issue in my upcoming remarks in favor of the bill. This amendment is ill-informed of religious text, ill-informed of how the Elliott-Larsen Act works—specifically in this state—and ill-informed of how government works generally in this country.

First, I want to say I wholly reject that this bill promotes, quote, as was mentioned, hostility to people of faith or that it pits religious people against LGBTQ people. I am a gay person with sincerely-held religious beliefs. There is no conflict between my sexual orientation and my religion. I'm saddened that there is in

your religion, but you have that right in this country to practice that. All of us with sincerely-held religious beliefs have long been protected within our respective religious institutions and Elliott-Larsen does not disrupt that.

Religion itself is a protected class in Elliott-Larsen but the act cannot compel clergy at a church or mosque to marry a Jewish couple. Marital status is a protected class in Elliott-Larsen but the act cannot compel a Catholic priest to marry someone who has been previously divorced. Adding sexual orientation and gender identity to the act will not compel a church to marry an LGBTQ couple and in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, the Supreme Court gave religious institutions wide latitude in hiring and firing employees who perform religious duties—a church can fire a minister who teachers outside the religious text. But adherents of a religion are required to follow neutral, generally-applicable laws. The Supreme Court recognized this principle 150 years ago. To allow otherwise would, quote, make the professed doctrines of a religious belief superior to the law of the land and in effect, permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.

The Court also noted that decisions after the Masterpiece Cake Shop case that future decisions must be made with tolerance and, quote, without subjecting gay persons to indignities when they seek goods and services in an open market. This amendment, however, allows anyone to deny any good or service available in an open market to any person, to fire them or evict them, as long as their religious orientation or identity is the reason. Last year, you might recall, I spent a week reading an excerpt of 350 recently compiled claims of religious discrimination against LGBTQ people in Michigan. Some of them so egregious, I hope everyone in this room thinks that Senate Bill No. 4 should stop them, including the gay guy who was kicked out of a coney because the owner didn't want f*****s in his restaurant. This amendment gives that restaurant owner the religious freedom to do it all over again if he's living out his faith as the previous speaker mentioned. Maybe the amendment sponsor wants that, but if you go down that route with this amendment, you're going to find a lot more issues than just with LGBTQ people.

Sex is a protected class in Elliott-Larsen, but the book of Numbers says women cannot be counted in a census; it says their husbands and fathers can overturn any vow or oath they take. Are you prepared to provide that religious exemption in this amendment to exclude women from full utilization of services in the state of Michigan? Weight is a protected class in Elliott-Larsen, but Leviticus kosher laws are clear about certain kinds of fats and animals that cannot be consumed. Imagine if I went after pork eaters the way you go after gay people. It's a choice; it's a lifestyle. Some of you look like pork-eaters. This amendment provides me with the religious exemption to hire and fire and evict based on how I perceive your weight. You can take any protected class in this act and find a religious text not just from the Old Testament for someone to use even out of context to discriminate against others.

Clearly some of you still want to use one verse in Leviticus to discriminate against LGBTQ people. But if you were truly sincere, a true sincere adherent to Leviticus, and you let it define how you treat other people, let it instead be the verse that Rabbi Akiva, the ancient Jewish scholar and chief of the sages said was the greatest principle of the Torah—וְאָהַבְתָּ לְרֵעֲךָ כָּמוֹךָ—love thy neighbor as thyself, that it is forbidden to do others what you would not want done to yourself. Treat others how you would want to be treated. I studied the Torah in Hebrew school; you're not going to challenge me on the Old Testament. Just the fact that some of you can forget that simple principle, that's what some might call sacrilegious. I urge a "no" vote.


Senator Johnson offered the following amendment:

1. Amend page 3, following line 3, by inserting:

    "**Sec. 102a. This act does not apply to any claim of discrimination subject to the ministerial exception described in *Our Lady of Guadalupe Sch. v Morrissey-Berru*, 140 S Ct 2049 (2020), and *Hosanna-Tabor Evangelical Lutheran Church & Sch v EEOC*, 565 U.S. 171 (2012).**".

The question being on the adoption of the amendment,

Senator Lauwers requested the yeas and nays.

The yeas and nays were ordered, 1/5 of the members present voting therefor.

The amendment was not adopted, a majority of the members serving not voting therefor, as follows:


**Roll Call No. 30**                    **Yeas—18**


| | | | |
|---|---|---|---|
| Albert | Hauck | Lindsey | Runestad |
| Bellino | Hoitenga | McBroom | Theis |
| Bumstead | Huizenga | Nesbitt | Victory |
| Daley | Johnson | Outman | Webber |
| Damoose | Lauwers | | |

**App. 258**

### Nays—20

| | | | |
|---|---|---|---|
| Anthony | Chang | Klinefelt | Polehanki |
| Bayer | Cherry | McCann | Santana |
| Brinks | Geiss | McDonald Rivet | Shink |
| Camilleri | Hertel | McMorrow | Singh |
| Cavanagh | Irwin | Moss | Wojno |

### Excused—0

### Not Voting—0

In The Chair: President

Senator Runestad offered the following amendment:

1.  Amend page 3, following line 3, by inserting:

"**(4) This act must not be construed to diminish or abrogate a religious liberty or conscience protection otherwise available to an individual or organization under the Constitution of the United States, federal law, or the state constitution of 1963 or other law of this state.**

**(5) Consistent with the First Amendment to the Constitution of the United States and the state constitution of 1963, nonprofit religious organizations, including churches, mosques, synagogues, temples, nondenominational ministries, interdenominational and ecumenical organizations, mission organizations, faith-based social agencies, religious educational institutions, and nonprofit entities, whose principal purpose is the study, practice, or advancement of religion, and any employee of such an organization, are not required by this act to provide services, accommodations, advantages, facilities, goods, or privileges for the solemnization or celebration of a marriage. Any refusal under this subsection to provide such services, accommodations, advantages, facilities, goods, or privileges does not create any civil claim or cause of action.**".

The question being on the adoption of the amendment,

Senator Lauwers requested the yeas and nays.

The yeas and nays were ordered, 1/5 of the members present voting therefor.

The amendment was not adopted, a majority of the members serving not voting therefor, as follows:

**Roll Call No. 31**                    **Yeas—18**

| | | | |
|---|---|---|---|
| Albert | Hauck | Lindsey | Runestad |
| Bellino | Hoitenga | McBroom | Theis |
| Bumstead | Huizenga | Nesbitt | Victory |
| Daley | Johnson | Outman | Webber |
| Damoose | Lauwers | | |

### Nays—20

| | | | |
|---|---|---|---|
| Anthony | Chang | Klinefelt | Polehanki |
| Bayer | Cherry | McCann | Santana |
| Brinks | Geiss | McDonald Rivet | Shink |
| Camilleri | Hertel | McMorrow | Singh |
| Cavanagh | Irwin | Moss | Wojno |

### Excused—0

**App. 259**

**Not Voting—0**

In The Chair: President

**Protests**

Senators Moss, Geiss, Polehanki, McMorrow, Klinefelt, Irwin, Cherry, Bayer, Shink, Chang, McCann, Cavanagh, Camilleri, Hertel, Brinks, Santana, McDonald Rivet, Singh, Anthony and Wojno, under their constitutional right of protest (Art. 4, Sec. 18), protested against the adoption of the amendment offered by Senator Runestad to Senate Bill No. 4.

Senator Moss moved that the statement he made during the discussion of the amendment be printed as his reasons for voting "no."

The motion prevailed.

Senator Moss' statement, in which Senators Geiss, Polehanki, McMorrow, Klinefelt, Irwin, Cherry, Bayer, Shink, Chang, McCann, Cavanagh, Camilleri, Hertel, Brinks, Santana, McDonald Rivet, Singh, Anthony and Wojno concurred, is as follows:

If the Senator keeps opening the door, I'm going to keep walking through it—and this is my "no" vote explanation. As mentioned, this amendment deals with, among other items, protections to marriage. As previously stated, this amendment is unnecessary because government cannot intervene with religious ceremony, including marriage, but I do want to thank the Senator for bringing up this amendment on marriage because it allows me to talk briefly about the absolutely shameful way this state in the past has allowed religion to discriminate against LGBTQ people outside the walls of a religious institution. In 2004, Michigan approved the harshest marriage ban in the country—not even civil unions were allowed. During this period of time, however, rabbis and other clergy recognized, sanctioned, and even would perform same-sex marriages according to their sincerely-held religious beliefs. But your religion wouldn't allow them so therefore yours prevailed to discriminate against religious people like me. Gay people couldn't even get married in a secular ceremony inside a city hall performed by a clerk because your religion wouldn't allow it. So when you use religion only to discriminate against LGBTQ people but never to uplift LGBTQ people, I have no interest in putting this language in the Civil Rights Act. The current interpretation of law is sufficient. I request a "no" vote.

The President pro tempore, Senator Moss, assumed the Chair.

The question being on the passage of the bill,
The bill was passed, a majority of the members serving voting therefor, as follows:

**Roll Call No. 32**                    **Yeas—23**

| | | | |
|---|---|---|---|
| Anthony | Chang | Klinefelt | Santana |
| Bayer | Cherry | McCann | Shink |
| Bellino | Geiss | McDonald Rivet | Singh |
| Brinks | Hertel | McMorrow | Webber |
| Camilleri | Irwin | Moss | Wojno |
| Cavanagh | Johnson | Polehanki | |

**Nays—15**

| | | | |
|---|---|---|---|
| Albert | Hauck | Lindsey | Runestad |
| Bumstead | Hoitenga | McBroom | Theis |
| Daley | Huizenga | Nesbitt | Victory |
| Damoose | Lauwers | Outman | |

**Excused—0**

**Not Voting—0**

In The Chair: Moss

The Senate agreed to the title of the bill.

**Protests**

Senators Albert, Daley and McBroom, under their constitutional right of protest (Art. 4, Sec. 18), protested against the passage of Senate Bill No. 4.

Senators Albert and McBroom moved that the statements they made during the discussion of the bill be printed as their reasons for voting "no."

The motion prevailed.

Senator Albert's statement, in which Senator Daley concurred, is as follows:

We should all strive to treat everyone with kindness, dignity, and respect; including those different from ourselves. That is certainly the kind of world I want my kids to grow up in. One that is tolerant to everyone. At the same time, peoples' individual religious beliefs should always be protected, including when they are different from our own or popular culture. Sometimes these two priorities conflict, that is why we must tread cautiously on changes to the Elliot-Larsen Act. In this day and age of cancel culture even talking about this issue can lead to some to cast dispersions. I want to be clear, I only have love in my heart to those who are same-sex attracted or struggling with their gender identity.

The unavoidable divide here is that implementing this bill before us would inherently infringe on the free exercise of religion. It could create a situation where religious organizations, nonprofits, or even individuals might be taken to court or potentially held liable for simply exercising their religious beliefs. It could create situations where religious organizations would be forced to hire job applicants who might have individual beliefs contrary to their organizations faith. Would a Catholic school be required to hire teachers who display or promote views starkly different from the church? What are the practical implications for bathroom or locker room facilities at our schools, or other public venues? How would an individual business owner with deeply-held religious beliefs be required to respond when hiring or asked to provide services that violate their conscience? I cannot support changes to a law that would create a super right to any group, when a proposed change in itself would discriminate against another's religious beliefs. At that point we are simply trading one form of discrimination for another and that accomplishes nothing.

The change proposed to Elliot-Larsen today goes too far because it seeks to protect one group of people at the expense of others. This is an attempt by state government to force a particular belief system upon everyone, whether or not it discriminates against another's individual own beliefs. If you look at what laws are being passed in other western countries, it's easy to see what could happen here next in the United States. This proposal would be part of a dangerous slippery slope. Would religious beliefs about men and women and gender differences eventually be classified and treated as illegal hate speech? Would anyone who dares question whatever is considered mainstream be punished with the full force of state law? As a state we can and must do better.

Senator McBroom's statement is as follows:

The issue before us today is often simplified to being a conflict between civil rights and prejudice; liberty versus oppression; old ignorance versus new enlightenment; love versus hate. While I could diminish these arguments by simple rhetorical dismissal and strawman quips, they deserve a fairer consideration. Too often, and for far too long, the issues that force the debate have been carelessly and callously ignored by those in power because they saw little need for thoughtful and logical debate. They didn't see the need in order to win the day. While they weren't always clear about why they had been taught a particular belief nor why society long held these certain mores, they knew they could easily win the day for those beliefs and mores by simply casting aspersions and by name-calling. This intellectual laziness is, to some degree, responsible for our present circumstance.

Competing for that responsibility is the teachers of those foundations; primarily, the church. Churches have lapsed into the same lazy practices by practicing castigation and strident condemnation, oftentimes with vigor and hatred that impressed their flocks but failed to demonstrate compassion and love, the love and compassion of our founder, Jesus, that He showed to lost sinners. Certainly, their zeal did nothing to win over lost souls that were questioning a world, it didn't do anything to win over a world that was watching to see if Christians truly separated themselves out as purveyors of love and mercy. For those centuries'-long fumblings I can only express my sorrow and desire for forgiveness as Christians on earth are not perfect as Christ was, but are struggling to become like Him in every way, including able to share the truth, no matter how hard or unpopular, in love.

Truth is what must be brought to the fore in this debate. Not the post-modern idea of truth which is each person's truth. This is a faulty ideal of our time and contends different truth claims can be simultaneously correct and abided with no ultimate conflict. The idea is, You live your truth; I'll live mine. But as simple as that sounds, it is ultimately nonsense and cannot be long sustained. It is the prime foundation of today's thinking and is often labelled as self-actualization. The problem with self-actualization is other people. My expression of my heart's desires runs smack-dab into the expression and exercise of someone else's.

The ultimate conflict of such a situation is readily apparent and has demonstrated itself across the world in our modern times and throughout history, whether that conflict be with a dictator demanding acquiescence to his every whim and dictate, selfish or benevolent, in the minor or in the extreme; or to the menial disputing over who has the right-of-way at an intersection, the denial of absolute truth creates conflicts that lead to confusion, frustration, accidents, tyranny, and death.

Ethics and morality have been confused in this post-modern world. Morality, long seen as the sum of a culture's determinations of right and wrong behavior as demonstrated by laws and codes, written and unwritten, was always somewhat flexible. These moral practices may be as simple as the determination of crude and licentious behavior and function to hamper certain behaviors seen to be corruptive to society. Morals were naturally pushed and pulled as people tested their limits—the cut of clothes, the cut of hair, what words are offensive, what pictures are offensive, the style of dance, the displays of affection, treatment of children, the elderly, the poor, the prisoners, the disabled, and the elderly.

Ethics are the immutable codes of what is right and wrong. They are the source of morals. Whether articulated directly from God or some other source, they were considered transcendental and unchanging. Do not murder. Do not steal. Honor your father and mother. Do not commit adultery. Do not lie. These commands, not exclusively found in Judeo-Christian heritage and history, have underpinned ethics from pre-history. According to the scriptures, it is because they are exemplar of God's nature and man is made in His image, therefore; his immutable character is stamped on our hearts. And we see, throughout history, that societies that live by these values, anchored in a transcendental source, have come closer to obtaining liberty and happiness for their citizens.

Government has long served as the institutional enforcer of ethics. In our country, this law-making process is subject to the inputs of the people themselves, in a grand experiment of self-government. This can lead to confusion that ethics are simply values and truth of half the people plus one. But our nation's founders knew this wasn't true. They specifically contended that the Constitution and style of government were for a moral people, and that the source for morality was the scriptures and the God of the scriptures. This is part of why the early shortcomings and failures of our nation and its founders are presently under such unrelenting attack so as to undermine and make illegitimate all their efforts and beliefs. This deconstruction is a critical factor in what's presently before us.

It's readily apparent that the choices a government makes regarding its ethical underpinnings has a dramatic impact on the direction of the nation and its morals. When this nation chose to move beyond reluctantly tolerating slavery, Jefferson at that time saying it was as if we had a wolf by the ears, to moving to the promoting of slavery as Calhoun came before the Congress and declared slavery to be a moral good, it forced citizens to recognize the untenable nature of their stated ethics versus the statutorily adopted ones. There was no longer a mushy middle ground for those who did not want to confront the obvious dissonance between their stated ethics and the applied ethics of their nation.

The obvious truth is that simply declaring something to be right doesn't make it right. Further, in declaring something to be ethical, in stark contrast to the realities of the transcendent values promoted, the overall morals and practices of a nation descend into far more vigorous and, sometimes, heinous manifestations. Whether one explores the evolution of American slavery, particularly after Calhoun's pronouncement, or Hitler's exponential growth of persecution and destruction of the Jews, or our nation's present descent into the ever-more-perverse glorification of the slaughter of the unborn, once the government ceases to hinder acts or views, if their immediate growth thereafter does not stun and cause repudiation, soon the government will condone and even protect those views and actions even as they delve into what was previously unthinkable and undesired.

That brings me to the specifics of this current bill. Why am I, and others, drawing a hard line on the issue? Certainly, our present time would like to argue that these issues are simply bringing enlightenment and freedom where there has been ignorance and oppression. And the advocates are able to demonstrate that affected individuals have been treated with unkindness and hatred. However, it doesn't alter the truth that the law represents a direct support of behaviors that have long been held to be immoral, unethical, and deleterious to society.

While many in society today who should be teaching us have lost their connectivity to scripture and seek to show scriptures saying what is culturally popular, the scriptures are clear that such behaviors and actions are not in the image of God and are not of the natural order of the world. The scriptures tell us that truth is revealed to us in two ways: nature and the word of God. I will seek to emphasize the former because believers ought to recognize the illogic of expecting non-believers to respect the word of God. However, for those who know that the scriptures are the word of God, I beg you take particular note as how you hear nature and scripture are in accord.

Male and female are the only two forms of human life. They are the natural order of things and are the very essence of humanity. This structure has been recognized time immemorial. Further, by practice and law, all forms of human government have long recognized the inherent value to individuals, children, parents, families, and society to promote stable families made up of parents and their children. To pretend that other viewpoints were even entertained with any seriousness by science, education, religion, or state until very recently is laughable. One need only check an encyclopedia or dictionary that's more than five years old or look at the nature of laws and the very text of elementary biology textbooks to know the very definitions of man and woman. Likewise, look to the teachings of secular psychologists like Dr. Spock, who led multiple generations of parents and schools to assert that certain behaviors of a child did not portend their sexuality was anything other than what their chromosomes and phenotypical characteristics denoted.

The legislation before us seeks to continue our nation's trajectory toward untying ourselves from these long-established ethics and morals. When many began this effort years and years ago, the pledge was to simply be allowed to live free from moral condemnation and ignominy. For many whose ethics and morals were stridently opposed, although the reasons were poorly thought out or understood, allowing such seemed of very little consequence. It was in a city far away; it wasn't nearby. It wouldn't affect their own work place, their own church, their own business or home. And the penalties prescribed by law at that time added to the impetus, especially when there were friends or relatives involved. Nobody wanted to tolerate prison or exclusion for people making a private choice. That hardly seemed American. So, these issues marched on to the next barriers—forcing entry into societies' art forms and mediums, then pursuing marital privileges, then marriage itself. Now we face the next barrier: forced acceptance into the domains of church, public institutions, and private places of business.

There is a certain irony that is worthy of note here. Each of these steps were always couched in terms that there was no other agenda to go further, despite the misgivings and predictions of others. However, it's clear here as it was with the sexual revolution as a whole: it was always about reaching a society where all ethics and morality surrounding sexuality of the human race be reduced to nothing at all. That humans, being nothing but highly evolved animals, be permitted to behave with less inhibition than animals, seeking pleasure without bounds or compunction and with utter freedom from any consequence or cost.

Indeed, this is appropriately referred to as cultural Marxism because Marx was explicit in his support of removing the foundations of family and religion. He was also explicit in the power of the state to declare and determine what was right or what was wrong and that the source of all of man's evils is the oppression upon him. Maslow and others took this perspective by declaring the source of evil is culture itself and its institutions. So, despite all the insistence to the contrary, the agenda itself is clearly evident: tear down all institutions, culture, mores, and ethics that would keep us from maximizing and pursuing our hearts' desires. "Let us break their chains and throw off their shackles," as the psalmist said.

The final piece is the collective demonization of those who stand in opposition to the approved politics of our popular culture. Ultimate political hegemony is the end, not a sharing of power or a convincing by persuasion. Trueman wrote, "Society now intuitively associates sexual freedom with political freedom because the notion that, in a very deep sense, we are defined by our sexual desires is something that has penetrated all levels of our culture." This explains why everywhere around us we hear persons and institutions that defended free speech and parental rights now claim that certain speech is too dangerous or too offensive to be permitted and parental instruction must be superseded. Free speech is no longer seen as a personal expression of disagreement with another one's views but as a condemnation of that person themselves. Lutzer wrote, "This is how we got from 'I disagree with you' to 'I disagree with you and therefore you are evil.' The left says, 'My ideas can't be discussed independently from who I am; therefore, if you disagree with me, it is an attack against my personal identity. If you don't affirm my lifestyle, you are an oppressor who is causing me "psychological harm."'"

People and citizens are understandably compelled to consider this issue. Not only due to the poor understanding and teaching I have already referenced, but because of the heritage of civil rights hypocrisy which this nation has struggled with for over 200 years. So, it's reasonable that people would be open to hearing that their viewpoints and morals are also wrong today regarding this issue as they know their predecessors were on race, on handicap rights, on equality for women. However, the nation's failings on equality of race and women's rights are not comparable to the issue before us. There is no natural argument for racial superiority. There is no manifestation in culture to show one race superior to another in the matters of virtue, depravity, talent, art, love, or culture. Likewise, there is no natural argument or manifestation to show women should not be treated with—granted—equal opportunity. Further, the word itself speaks that such divisions in society are not right or justified.

Even in this instance, I am not arguing that the persons this bill seeks to protect are incapable or unable to be equal contributors to our world. On the contrary, I eschew any and all of those who have attempted to keep them from their rights as human beings or from being treated with compassion. Christ calls on us to treat our neighbor as we would like to be treated, to love our neighbor as ourself. However, people's accomplishments and rights are not contingent upon their sexual preferences or identity. People need to be judged on the content of their character and the accomplishments of their work.

What have been the out workings of this progression and modifying of long-standing ethics? Has it been the harmless, libertarian promise that we've been repeatedly given? It's blindingly obvious that it hasn't been. It has come with tremendous consequence and confusion. Even amongst those who advocated for some of the changes, they're now blowing the whistle on what's happening now, calling out the storybook hours where drag queens are reading to children or the drag shows where people take their little kids to. People in the community are calling that out and saying that should not be happening, that's wrong. Children are being mutilated and maimed for life. Children are invited to be sexual and experience sexualized activities. Parents are told their minor children's sexuality trumps their parental rights. Drugs are being administered to children and adults to cause changes not intended or properly researched when the drugs were approved. Athletics have been impossible to properly regulate or to compete in. Bathrooms no longer provide the sure privacy people rightfully expect. The vulnerable, particularly women and children, have been grievously harmed in numerous venues around the country. Marriage has become nothing special and families are no longer primarily bound to parentage as the ideal. Language itself has become unmoored from actual meanings of words and people choose circular reasoning to define what used to be well defined. Parents and child advocates are excoriated for speaking out against books and activists who promote morals and ethics contrary to their own. Property owners and employers are culturally cancelled for speaking their views.

Contrary to creating a freer society with more free speech and greater equality, the movement responsible for this bill in front of us is hampering freedom and free speech. Not only is free speech hindered by the cultural reactions of simply canceling and doxing those espousing viewpoints out of favor with the prevailing media and culture but more critically, the demand to utilize language contrary to all definitions and rationality is endangering people's employment. Words themselves are hijacked to have no meaning while having multiple meanings as, on one hand, we are assured that there is no difference between the sexes while, on the other hand, individuals are encouraged to identify as one sex or the other depending on their own, personal interpretation of what is the nature and essence of the sexes. In this way, equality is being stolen as women and men find their specific opportunities confounded by members of the sex laying claim to them. It is stolen by pretending that men and women are not different from each other at all in any way while also insisting that all distinctions are such that one can and must choose to be of a particular identity.

Whoah. You might be saying at this point, Senator, if you're so right, why is society moving so fast away from you? Aren't you on the wrong side of history? Didn't one popular president contend that the long arc of history moves towards justice? You're an old fossil. Get with the times. Such is the mystery of how mass confusion and popular culture can carry many away from truth and capture them by hollow and deceit, deceitful philosophies. But the one little boy who called out that the emperor was naked was right, despite being alone and young. Alexander Solzhenitsyn told the real story how, upon Stalin entering the hall, to thunderous applause, it went on and on and on, first three minutes, then five minutes, then ten minutes, more than ten minutes. Thunderous applause. No one would sit down. Finally one man stopped clapping and sat down and immediately the rest of the body stopped. The next day, that man was sent to the gulag and told, Never be the first one to stop clapping.

At this point, many certainly would ask, How can simply providing employment and housing protections for this minority class cause all these problems? Additionally, Enough of the philosophy and the discussion of transcendent truths, I want to know why this is problematic in the practical implementation. Ultimately, my point is about the foundations of thought and understanding that led to this legislation and its alterations to ethics and morals it creates. While many of those arguments have been made repeatedly here and in other discussions and for multiple years, they certainly bear momentary repeating. This legislation will create

impossible-to-resolve conflicts for churches, individuals, employers, and employees. A church whose janitor, for instance, who is both an attendee as well as a homosexual. The pastor and the others know about this, but they're OK with it. He understands that his employment means not representing his convictions in contradiction to the teachings of the church. However upon passage of this bill, the church would struggle if he suddenly decided to suddenly start coming to work dressed as a woman and using the ladies' restroom. Can we stop clapping yet?

More dubious is the possibility that employment needs to be terminated for other reasons but this employee contends the true reason is their sexual choices. Many of you who have been in office understand the necessity of at-will employment. This legislation puts at-will at risk of being unusable. Can we say the emperor has no clothes?

Finally, let us consider the situation of a prisoner in a prison where a new female officer is hired and the officer performs the searches of female prisoners until one day, it is revealed the officer is actually a man. Can the state dismiss this person? Can the female prisoner sue the state?

These are just a sample of very simple hypothetical scenarios where the incompatibility of what's proposed is demonstrated. There are further infringements upon rental owners with strong religious convictions, private schools, foster parents, and adoption.

Ultimately, as the decrease in sexual mores has revolutionized our culture and nation, there are costs to bear and we are paying them in spades. Teenage violence, substance abuse, suicide, and suicide ideation are all persistent and climbing. While advocates claim it's the oppression itself that causes this, that's simply non sequitur when considering that the openness and acceptance of such behaviors has never been higher than now is across media, schools, school officials, churches, teenage peers, and popular culture.

I am not blaming such behaviors for these outcomes. I am blaming the underlying lies about life and its meaning that underpin the movement. Many teens are smart enough to recognize the vanity and pointlessness that necessarily accompanies claims that, It's all about you, and, If it feels good, just do it. If we are just evolved animals we'll only live for the meaning we ourselves create. As Dr. William Provine taught, without God there is no free will, no ultimate meaning, and no source for ethics. It leaves a vacuum for the government to fill by edicts that change with the whims of power. That leaves people looking to themselves for meaning and ethics—a sure recipe for narcissism and conflict when one person's meaning collides with another. Psychiatrist Keith Ablow says of young people today, "They're doing anything to distract themselves from the fact that they feel empty inside and unworthy. Watch for an epidemic of depression and suicidality, not to mention homicidality, as the real self-loathing and hatred of others that lies beneath all this narcissism rises to the surface."

The choice before us today is not the simple one promoted by the supporters. It is not a simple civil rights matter regarding employment and housing security or a population of citizens that has suffered harsh castigation and discrimination. And the conflict is not as simple as just protecting the free exercise of religion and speech. We are instead looking at making our government advance its approval of an agenda that's contrary to the best interests of society, particularly to the foundations of family—parental rights and childhood innocence. We do so despite the evidence surrounding us from nature and the scriptures, and even our own common sense.

The costs of this legislation to the body politic is to continue to wall off a segment of society as too offensive, too obscene, and too dangerous to be granted standing in the public discourse. The dismissal of those who contend such moves as unwise, immoral, or dangerous by the collective demonization of them as bigots, Nazis, or other pejoratives is equally as dangerous to the discussion as was the very essence of fascism. It was unwise for churches and others to fail to understand these issues and explain their positions and rather just shut down and shout down arguments with dismissiveness and name calling in the past. Now the pendulum has swung to the other extreme. But I don't know that it will swing back this time. "If the foundations are destroyed, what can the righteous do?"

The evidence from history is that those who remain stalwart and uncompromising in their beliefs will suffer the consequences in their rights as citizens and parents, their jobs, tax benefits, their reputations, and, likely, in other ways. Already we see employment contingent upon agreeing to conform one's speech or to use specific language even if it becomes nonsensical; we see parents having their concerns dismissed, and parents who've lost their rights. Businesses and reputations are ruined by continual demonization; social media punishes and removes people for saying their opinions. We have already begun the creation of a political underclass, purely built on political and religious viewpoint.

We aren't in bad company. Shadrach, Meshach, and Abednego showed us the way a long time ago. When the king set up an image of gold of himself and demanded that everyone bow and worship whenever music played, they refused to do so, despite the positions of power and comfort that they had and risked losing. I will not bow, I will not dance, I will not worship this false idol. God can save me if He wants but, regardless, I will worship Him alone.

Senators Runestad, Theis, Johnson, Irwin, McMorrow, Shink, Chang, Klinefelt and Moss asked and were granted unanimous consent to make statements and moved that the statements be printed in the Journal.

The motion prevailed.

Senator Runestad's first statement is as follows:

I rise today to support my amendment to Senate Bill No. 4. This amendment only seeks to add religious orientation, religious identity, and religious expression as additional protected classes. As we know, the Elliott-Larsen Civil Rights Act protects discrimination based on a number of current classifications, including religion and sex. Senate Bill No. 4 adds the classification of sexual orientation, gender identity, and gender expression to this list. My proposed amendment simply seeks to protect individuals by prohibiting discrimination against religious people based upon the same thing—religious orientation, religious identity, and religious expression.

We can all agree that discrimination has no place in our communities. Likewise, we should all be able to agree that the state should never be able to discriminate against religious conscience. My fear and the fear of many Michiganders with sincerely-held religious beliefs is that if we pass Senate Bill No. 4 without clear protections for those practicing their faith, Senate Bill No. 4's new categories may be used as a sword rather than a shield. Unfortunately, there have been cases just like that in other parts of the country. A group of pastors in Houston who were subpoenaed to turn over their sermons, diaries, e-mails, checkbooks, and other communications for inspection by the local government officials. Two Idaho pastors who were threatened with prosecution, jail, and fines for refusing to carry out a ceremony violating their religious beliefs. A New York farmer sued for refusing to host an event that conflicted with his religious conscience. The bottom line is as currently written, Senate Bill No. 4 does not go far enough. We should do more to protect all citizens from invidious discrimination.

I offer this amendment to, one, build a bridge to real inclusiveness in Michigan; two, to stop any hostility toward people of faith; and three, to bring Michigan in line with other states and their clearly-stated protections for religious observation. The Michigan Catholic Conference reports that across the country, whenever these states enacted bills like Senate Bill No. 4, those laws also included clear protection for religious people as well. That is all I'm asking for today.

Some in this chamber have said that such an amendment is not needed as these things are already protected. To them I say, Thank you. Thank you for confirming that my proposed amendment is, in fact, lawful and important. You should, therefore, have no problem merely stating it by clearly agreeing to this language in this bill. This is a chance to work together, to honor both sides, to protect individual rights and religious conscience all at the same time. We can come together to an agreement with this one simple addition that will provide clarity, comfort, and peace to many in the faith-based community. We should be able to get this done together to protect all citizens of Michigan from discrimination.

Thank you for the support of this amendment.


Senator Theis' statement is as follows:

I agree with my colleague, people deserve to be protected and respected. I rise today to speak in favor of this amendment. The Elliot-Larsen Civil Rights Act has done much over the decades to help provide individuals and groups in our state equal treatment and protection under the law. While the current law does mention religion, this amendment would more clearly define it to include religious orientation, identity, and expression. This means protecting the actual living out of one's faith, rather than just a religious group, denomination, or church. Practically speaking, no one in Michigan should be discriminated against or punished for adhering to their deeply held religious beliefs. If a business owner turns away a prospective patron because serving them would violate their religious beliefs, then the business owner's decision should be respected as an expression of their religious identity. Religious orientation, identity, and expression are at the core of our nation and central to its continuance, and Michigan must act to protect the individual right to live out one's faith without fear of governmental reprisal. We should not be forced to do things against our will that violate our religious faith. I know that the sponsor of this bill wants to protect people. I know that about him. I know he is a man of strong faith. I respect that and I'm asking that we can respect all religious faiths. Thank you. I urge a "yes" vote.


Senator Johnson's statement is as follows:

I rise to ask my colleagues to support this amendment to Senate Bill No. 4. This is a narrowly crafted amendment which would simply codify the ministerial exception that was recognized in a unanimous decision by the United States Supreme Court. The amendment does not change anything but it does codify this precedent.

The First Amendment to the U.S. Constitution provides that there will be "no law respecting an establishment of religion, or prohibiting the free exercise thereof." This amendment would ensure that the Elliott-Larsen Civil Rights Act protects this important right for religious institutions in our state.

I ask my colleagues to support this important amendment.

Senator Runestad's second statement is as follows:

I rise to speak to my amendment to Senate Bill No. 4. The United States Congress recently passed the Respect for Marriage Act. While I thought it should have gone even further, we should at a minimum adopt the religious protection language included in the act in our own legislation. This religious protection legislation was not passed by a Republican-controlled Congress or a Republican-controlled Senate or even a Republican President. No, these religious protections were passed and included by President Biden and an overwhelmingly Democratic Congress. I have seen many here on the floor, many of my colleagues, celebrating the signing of this federal act with the religious protection included so if it's good enough for our national Democratic leaders, should it not be good enough for us now? If they included in their act, should not the same exact language be included in this legislation?

In order to better protect religious freedom and conscience, I propose that we amend the Elliott-Larsen Act to include the very same language that Congress passed. The Respect for Marriage Act reads, in general, nothing in this act, or any amendment made by this act, shall be construed to diminish or abrogate a religious liberty or conscience protection otherwise available to an individual or organization under the Constitution of the United States, the Michigan Constitution, federal law, or state law. B, that goods services consistent with the First Amendment to the United States Constitution and Michigan Constitution, nonprofit religious organizations including churches, mosques, synagogues, temples, nondenominational ministries, nondenominational and ecumenical organizations, faith-based organizations, mission organizations, faith-based social agencies, religious educational institutions, and nonprofit entities whose principal practice is the study, practice, and advancement of religion. Two, that any employee of any organization shall not be required to provide services, accommodation, advantages, facilities, goods, or privileges for the solemnization of the celebration of marriage. Any refusal under this subsection to provide such services, accommodation, advantages, facilities, goods, or privileges shall not create a civil claim or cause of action.

If these minimal protections were good enough, satisfactory, for the Democrats in Congress and our President, then is there any reason why my Democratic colleagues here in the state of Michigan could possibly oppose this language? At least what we can do is mirror the federal Respect for Marriage Act and provide some minimal protection for people of faith. I ask for your support.

Senator Irwin's statement is as follows:

Well, I didn't want to miss this opportunity to stand up and offer my vocal support for this historic advancement for freedom here in Michigan, inching closer to the promise of freedom and America's founding documents. It's a proud moment here in the Michigan Senate today.

This bill is an embodiment of our best ideals as Americans and as human beings. So I am happy that the Michigan Senate is poised to add another chapter to the story of the fight for liberty and freedom and respect for all people, expanding the circle of inclusion and pushing bigotry out of the open market for employment, housing, and public accommodation, and pushing that bigotry into the private spaces that I would note are still protected by this Elliot-Larsen Civil Rights Act.

Now, we've had this fight before and we heard a little bit about that from the Senator from the 38th District, America struggling to reconcile the freedom of some to discriminate against the freedom of all to live free in this society. Reconciling the question, Should your religious views trump all laws and give you a license to discriminate? I say, No. I don't want your latest interpretation of your favorite text and your changing interpretations of your favorite text to decide what freedoms people have in this country. That's not how it is supposed to work here in America. It's been too long that we've allowed bigotry and discrimination to rule.

So, once again, America has crossed this bridge before, and there are going to be people who try again and again to drag us back across this bridge, but I am proud to be standing here in favor of our best American ideals, in favor of the progress that leaves bigotry and discrimination behind. I am really gratified to be standing here today after a long road because I have seen friends, I've seen colleagues, I've seen constituents, I've seen loved ones face discrimination in this state, be denied housing, be fired from jobs, be turned away from public businesses because of their sexual orientation or their gender identity. I am really proud to be standing here today in advancement of the interest of those people who have been left behind, in advancement of our best American ideals, and in advancement of the Michigan Senate as an institution that's going to stand up for all people.

**App. 267**

Senator McMorrow's statement is as follows:

I will never forget the day that the United States Supreme Court decided on marriage equality. I remember taking pictures of sidewalk chalk. I remember taking pictures of the celebrations that occurred around me. And this was something that didn't impact my life in any way. It didn't make my life any better; it didn't make my life any worse. But I recognized in that moment that finally my friends and my neighbors had the same rights that I've had. I'm a straight Catholic woman married to a straight Jewish man. Because of who we are, I cannot be fired from my job; my husband cannot be fired from his job. We cannot be denied a mortgage; we cannot be denied housing. The reality is that most of us in this room today enjoy those same protections, but some of us in this room today do not. Some of us in this room can be fired from their jobs simply because of who they are. Some of the people in this room can be denied an apartment or a house not because of sexual desires or actions but simply because of who they are. And we have an historic opportunity today to right a wrong that should have been righted decades ago.

Every single one of us in this room has to recognize that granting those around us more rights and more protections does nothing to strip away our own rights and protections. This is an incredibly proud day for the state of Michigan, a state that is signaling to the rest of the country that no matter who you are, you are welcome here. You will be protected here, you can find a job, a career, doing what you love in a place and a community that you can call home. I'm incredibly proud and grateful to this Legislature and my colleague for working on this for so many years and I am proud to stand in support of this today.

Senator Shink's statement is as follows:

I rise today to speak in support of voting for the Elliott-Larsen Civil Rights Act expansion. Some of the comments of my colleagues across the aisle about why their religious beliefs justify discrimination against Michiganders in their daily lives illustrates exactly why this legislation is necessary. Everyone is entitled to their religious beliefs; however no one's religious beliefs no matter how sincerely they hold them or how righteous and god-blessed they think they are an excuse for the oppression of others as the Senator from the 7th District has argued here today so succinctly.

I appreciate that my colleagues across the aisle have shown us who they are and that without a "yes" vote on the Elliott-Larsen Civil Rights Act today, millions of Michiganders will continue to experience discrimination in their daily lives. For all the people who I know who struggle with this discrimination, who have struggled with this discrimination, who have had to pretend that they are somebody else that they weren't in their private life—which is nobody's business but their own—so that they could keep their job, so that they would be sold their house, so that they could access medical care just like the rest of us, I am so amazingly proud to be here today to take this vote.

Senator Chang's statement is as follows:

This morning it seems we've been on the receiving end of lectures about ethics and morals from those who appear to be poised to take a "no" vote that I believe years in the future—and today—will be seen as clearly immoral and unethical. It is unethical to deny someone housing because of their sexual orientation or gender identity. It is unethical to deny someone a job because of who they are. It is immoral to deny someone their right to identify how they choose and how they truly are inside of themselves. It also seems that some of our colleagues are trying to make this into a complicated issue, however the reality is that this bill is very simple. It is about equal protection under the law. It is about basic human dignity and respect. It is about giving people the opportunity to be their true, authentic selves.

Lastly, after all of the comments we've heard from detractors, I think it is so critical that we take a moment to uplift the years and decades of organizing and advocacy on the part of LGBTQ people and their allies. You have gone through so much to get to this point. Today's victory, once we pass Senate Bill No. 4, is your victory. I applaud you and I continue to be inspired by your movement for change. I am proud to support Senate Bill No. 4 and I urge my colleagues vote with their heart and to do the right thing today.

Senator Klinefelt's statement is as follows:

I've had to sit here and listen to individuals indicate that who my son is and how he was born violates the conscience of others. It is not my son's fault that his mere existence interferes with others moral order of things. But it is precisely because individuals in this room and elsewhere have that feeling about my son that he needs to be protected against you. Thank you, Senator Moss.

Senator Moss' statement is as follows:

In 1977, Democratic Representative Daisy Elliott and Republican Representative Mel Larsen passed the civil rights act here in Michigan that states: The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities

**App. 268**

without discrimination because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status is recognized and declared to be a civil right. And from the beginning, starting during the first hearing process of this bill in 1973—fifty years ago—there has been a dogged yet unsuccessful effort to add sexual orientation and gender identity and expression among those protected classes. Unsuccessful until now.

Today I'm running through the tape, but this baton has been passed from generations to generations of LGBTQ activists. From those in Ann Arbor and East Lansing who adopted the first local ordinances protecting individuals in our community in 1972, to organizers of the first Pride march that same year in Detroit. Icons from our community who propelled this movement that got us here, many of whom are no longer with us after fearlessly dedicating their lives to equality. Jeff Montgomery, Ruth Ellis, Jim Toy, Henry Messer. Jim Dressel, a former Republican state representative from Ottawa County who first introduced this bill in 1983—40 years ago. He died in 1992, still hoping that this day would come.

In these last decades, real Michiganders suffered from real acts of discrimination. Denied housing and evicted, denied jobs and fired, denied services and put out of places for no other reason than their sexual orientation or gender identity. They were kicked out of Michigan's economy as workers and consumers. This left them figuratively and sometimes literally beaten, battered, and bruised for having the audacity to live their lives as they were. Had it not been for their courage to come forward, to bring much-needed attention to these wrongs, we could not have progressed to this moment. This bill is dedicated to them.

I also want to uplift another class of LGBTQ people who have long suffered due their exclusion in the civil rights act: those who have long suffered in silence. Those who have avoided at all costs sharing aspects of their personal life with their work colleagues, never talking about partners or interests or hobbies for fear of how it could impact their economic security. Always painfully mindful of how they act, how they walk, how they talk, how they present themselves, and who they affiliate with. Just this last week I heard from a former friend of an 80 year old woman, who cut out everyone from her life when she moved into a senior living facility. She said, I'm no longer a lesbian, I'm just a bridge player. She didn't want to lose a secure place to live in her remaining years so she could not be both a lesbian and a bridge player. Still today those who don't sit on the same side of the restaurant booth with a loved one or hold hands with them while walking down the street because it opens them up to discrimination with no remedy for justice. This bill liberates them. Our community deserves to thrive.

Eighteen years ago when I was 18 years old, I didn't know who I was or what I was going to be. That year, Michigan voted for one of the harshest marriage bans in the country that I previously mentioned. I thought I had no future. Not just no future here in Michigan, I thought I had no future. What kind of life could I possibly live? Just by existing, my life was unlawful. I've come a long way to get here. Our community has come a long way to get here. I know many of you have come a long way and opened up your hearts and minds in the last years since this long journey began. It's time to write the final chapter. You all have an opportunity now to be a part of it and when this vote came up on the board, you will tell generations of the people yet to even come that they have a future too.

The President, Lieutenant Governor Gilchrist, resumed the Chair.

### Announcements of Printing and Enrollment

The Secretary announced that the following bills were printed and filed on Tuesday, February 28, and are available on the Michigan Legislature website:

**House Bill Nos.**    4137  4138  4139  4140  4141  4142  4143  4144  4145  4146  4147  4148  4149
                       4150  4151  4152  4153  4154

### Committee Reports

The Committee on Housing and Human Services reported
**Senate Bill No. 35, entitled**
A bill to amend 1939 PA 280, entitled "The social welfare act," by amending section 10d (MCL 400.10d), as added by 2012 PA 79.

With the recommendation that the bill pass.

The committee further recommends that the bill be given immediate effect.

Jeff Irwin
Chairperson

To Report Out:
  Yeas: Senators Irwin, Santana, Cavanagh, Bayer, Shink, Chang, Cherry, Geiss, Lindsey and Damoose
  Nays: None
  The bill was referred to the Committee of the Whole.


### COMMITTEE ATTENDANCE REPORT

  The Committee on Housing and Human Services submitted the following:
  Meeting held on Tuesday, February 28, 2023, at 12:00 noon, Room 403, 4th Floor, Capitol Building
  Present: Senators Irwin (C), Santana, Cavanagh, Bayer, Shink, Chang, Cherry, Geiss, Lindsey, Hoitenga and Damoose


### COMMITTEE ATTENDANCE REPORT

  The Committee on Local Government submitted the following:
  Meeting held on Tuesday, February 28, 2023, at 1:30 p.m., Room 1200, Binsfeld Office Building
  Present: Senators Klinefelt (C), Wojno, Moss, Bayer, Shink, Hoitenga and Daley


### COMMITTEE ATTENDANCE REPORT

  The Committee on Natural Resources and Agriculture submitted the following:
  Meeting held on Tuesday, February 28, 2023, at 3:00 p.m., Room 1300, Binsfeld Office Building
  Present: Senators Shink (C), Cherry, Singh, Polehanki, Daley, Victory and Hoitenga


### COMMITTEE ATTENDANCE REPORT

  The Committee on Transportation and Infrastructure submitted the following:
  Meeting held on Tuesday, February 28, 2023, at 3:30 p.m., Room 403, 4th Floor, Capitol Building
  Present: Senators Geiss (C), Klinefelt, Wojno, Hertel, Camilleri, Chang, McCann, McBroom, Victory, Bumstead and Bellino


### Scheduled Meetings


**Appropriations –**

  **Subcommittees –**

  **DHHS –** Thursday, March 2, 4:00 p.m., Room 403, 4th Floor, Capitol Building (517) 373-2768

  **EGLE –** Thursday, March 2, 3:00 p.m., Room 403, 4th Floor, Capitol Building (517) 373-2768

  **Military, Veterans, State Police –** Tuesday, March 7, 9:00 a.m., Harry T. Gast Appropriations Room, 3rd Floor, Capitol Building (517) 373-2768

  **Transportation –** Thursday, March 2, 3:00 p.m., Harry T. Gast Appropriations Room, 3rd Floor, Capitol Building (517) 373-2768

**Civil Rights, Judiciary, and Public Safety –** Thursday, March 2, 12:00 noon, Room 1100, Binsfeld Office Building (517) 373-5312

**Economic and Community Development –** Thursday, March 2, 11:15 a.m., Room 1200, Binsfeld Office Building (517) 373-1721

**App. 270**

**Energy and Environment –** Thursday, March 2, 1:30 p.m., Room 403, 4th Floor, Capitol Building (517) 373-5323

**Labor –** Thursday, March 2, 8:30 a.m., Room 1300, Binsfeld Office Building (517) 373-5314

**Regulatory Affairs –** Thursday, March 2, 8:30 a.m., Room 1100, Binsfeld Office Building (517) 373-1721

  Senator Singh moved that the Senate adjourn.
  The motion prevailed, the time being 11:47 a.m.

  The President, Lieutenant Governor Gilchrist, declared the Senate adjourned until Thursday, March 2, 2023, at 10:00 a.m.

DANIEL OBERLIN
Secretary of the Senate

← **Thread**

 **Senator Jeremy Moss** ✔
@JeremyAllenMoss

⋯

Some MI GOP senators want to allow #LGBTQ discrimination in the name of religion.

Their amendment to our civil rights bill would permit a person to deny anyone goods or services, to fire or evict them, as long as religion is the reason.

@MISenDems reject that.



White Lake for introducing this amendment so I can give this

▶ 9,081 views                    0:06 / 5:49   cc  🔇  ⤢

From **MI Senate Dems** ✔

2:32 PM · Mar 1, 2023 · **51.6K** Views

**75** Retweets   **13** Quotes   **294** Likes

**App. 272**

 **Luke Londo** @llondo · Mar 1

One of the last things I said to @JeremyAllenMoss in the lead up to today is just... how lucky we are, in the #LGBTQ community, to have this man leading us on this pursuit for equality.

He's the best person at the right time to represent us and the generations who came before.

 **Senator Jeremy Moss** ✔ @JeremyAllenMoss · Mar 1

Some MI GOP senators want to allow #LGBTQ discrimination in the name of religion.

Their amendment to our civil rights bill would permit a person to deny anyone goods or services, to fire or evict them, as long as religion is the reason.

@MISenDems reject that.

Show this thread



Sen. Jeremy Moss
Amend 1976 Public Act 453
Elliott-Larsen Civil Rights Act

▶ 9,081 views                                    0:00 / 5:49   cc   🔊   ⤢

💬 1          🔁 5          ♡ 54          📊 4,316          ⬆

**App. 273**



# HOUSE OF REPRESENTATIVES

### COMMITTEE ON JUDICIARY
REP. KELLY A BREEN
CHAIR

# COMMITTEE MEETING MINUTES

Wednesday, March 8, 2023          10:30 AM          Room 521, House Office Building

The House Committee on Judiciary was called to order by Chair Breen.

The Chair requested attendance be called:
    Present: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou, Fink, Wendzel, Wozniak, Outman, Johnsen.
    Absent: None.
    Excused: None.

Representative Tsernoglou moved to adopt the meeting minutes from March 1, 2023. There being no objection, the motion prevailed by unanimous consent.

Representative Dievendorf moved to adopt the meeting minutes from March 1, 2023. There being no objection, the motion prevailed by unanimous consent.

The Chair laid HB 4003 and SB 4 before the committee:

HB 4003    (Rep. Hoskins)          A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

| SB 4 | (Sen. Moss) | A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216. |
|---|---|---|

Representative Hoskins and Senator Moss testified in support of HB 4003 and SB 4. Questions and discussion followed.

Jay Kaplan representing the ACLU of Michigan testified in support of HB 4003 and SB 4. Questions and discussion followed.

Tom Hickson representing the Michigan Catholic Conference testified in opposition to HB 4003 and SB 4.

Wendy Block representing the MI - Chamber testified in support of SB 4.

Erin Knott representing the Equality Michigan testified in support of SB 4.

The following people submitted a card in support of HB 4003 and SB 4, but due to the time constraints were unable to speak:
    Benjamin D. Orjada, representing the Young Democrats of Michigan.

The following people submitted a card in opposition to HB 4003 and SB 4, but due to the time constraints were unable to speak:
    Austin Kreutz, representing the Bonltoeffen Forum.
    Dawud Walid, representing the CAIR - MI.
    Eileen McNeil, representing the Citizens for Traditional Values.
    Julie Doll, representing the themselves.

The following people submitted a card in support of HB 4003, but due to the time constraints were unable to speak:
    Akin Nzere Kwabena, representing the LGBT Detroit.

The following people submitted a card in opposition to HB 4003, but due to the time constraints were unable to speak:
    Katherine Bussard, representing the themselves.

The following people submitted a card in support of SB 4, but due to the time constraints were unable to speak:
    Dell Darnell, representing the themselves.

App. 275

The following people submitted a card in opposition to SB 4, but due to the time constraints were unable to speak:

Bree Moeggberg, representing the her business and herself.

The following people submitted a card in support of HB 4003 and SB 4, but did not wish to speak:

Oakland County Executive David Coulter.
Beth Berglin, Initiatives & Public Policy Officer, representing the Kalamazoo Community Foundation.
Andy Johnston, representing the Grand Rapids Chamber.
Rachel Richards, representing the Michigan League for Public Policy.
Bill Flory, representing the Michigan Association for Justice.
Jennifer Smith, representing the Michigan Association of School Boards.
Yousef Rabhi, representing the Michigan Nurses Association.
Judy Karandjeff, representing the League of Women Voters.
Frank Foster, representing the Michigan Medicine.
Winston Feeheley, representing the DTE.
Brad Williams, representing the Detroit Regional chamber.
Jeff Stoutenburg, representing the Dow.
Kyle McCree, representing the Consumers Energy.
Brian Westrin, representing the Michigan Realtors.
Mary Pollock, representing the The American Association of University Women of Michigan.

The following people submitted a card in opposition to HB 4003 and SB 4, but did not wish to speak:

Stephanie Kreuz, representing the Heritage Action for America.

The following people submitted a card in support of HB 4003, but did not wish to speak:

John McNamera, representing the Michigan Restaurant and Lodging Association.
Sarah Woolsey, representing the themselves.
Joshua Ferguson, representing the themselves.
Jimmy Greene, representing the ABC Michigan.

The following people submitted a card in opposition to HB 4003, but did not wish to speak:

Cole Thompson, representing the themselves.

The following people submitted a card in support of SB 4, but did not wish to speak:

David Worthams, representing the Michigan Manufacturing Association.

The following people submitted a card in opposition to SB 4, but did not wish to speak:

Elizabeth Whitt, representing the Conway Township Clerk.

Representative Johnsen offered the following amendment to HB 4003:
1. Amend page 9, line 24, after "302." by inserting "**(1)**".
2. Amend page 10, following line 13, by inserting:
"**(2) This section does not compel an individual to violate the individual's sincerely held religious beliefs.**".

Representative Johnsen moved to adopt the amendment to HB 4003. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Wendzel offered the following amendment to HB 4003:
1. Amend page 5, following line 28, by inserting:
"**(4) This section does not apply to an employer that is a religious corporation, association, society, or other organization, including an employer that is a religious school, college, university, educational institution, or other institution of learning, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on of its activities.**".

Representative Wendzel moved to adopt the amendment to HB 4003. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Outman offered the following amendment to HB 4003:
1. Amend page 11, line 9, after "402." by inserting "**(1)**".
2. Amend page 12, following line 9, by inserting:
"**(2) This section does not apply to an educational institution operated by a religious corporation, association, society, or other organization, or an educational institution that is a religious school, college, university, or other institution of learning, with respect to the services, activities, or programs provided by the educational institution.**".

Representative Outman moved to adopt the amendment to HB 4003. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Fink offered the following amendment to HB 4003:
1. Amend page 16, following line 22, by inserting:
"Enacting section 2. This amendatory act does not take effect unless House Bill No. 4075 of the 102nd Legislature is enacted into law.".

Representative Fink moved to adopt the amendment to HB 4003. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
  Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
  Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
  Pass: None.

Representative Arbit moved to report out HB 4003 with recommendation. The motion prevailed 8-3-2:

FAVORABLE ROLL CALL
  Yeas: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
  Nays: Reps. Fink, Outman, Johnsen.
  Pass: Reps. Wendzel, Wozniak.

Representative Wozniak offered the following amendment to HB 4003:
1. Amend page 8, following line 16, by inserting:
"Sec. 208. A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, or sex, **sexual orientation, or gender identity or expression** is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate section of this article. An employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight **age, height, weight, marital status, sex, sexual orientation, or gender identity or expression** without obtaining prior exemption from the commission, provided that an employer who **that** does not obtain an exemption shall have **has** the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.".

Representative Wozniak moved to adopt the amendment to HB 4003. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
  Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
  Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
  Pass: None.

Representative Johnsen offered the following amendment to SB 4:
1. Amend page 9, line 24, after "302." by inserting "**(1)**".
2. Amend page 10, following line 13, by inserting:
"**(2) This section does not compel an individual to violate the individual's sincerely held religious beliefs.**".

Representative Johnsen moved to adopt the amendment to SB 4. The motion did not prevail

5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Wendzel offered the following amendment to SB 4:
1. Amend page 5, following line 28, by inserting:
"**(4) This section does not apply to an employer that is a religious corporation, association, society, or other organization, including an employer that is a religious school, college, university, educational institution, or other institution of learning, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on of its activities.**".

Representative Wendzel moved to adopt the amendment to SB 4. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Outman offered the following amendment to SB 4:
1. Amend page 11, line 9, after "402." by inserting "**(1)**".
2. Amend page 12, following line 9, by inserting:
"**(2) This section does not apply to an educational institution operated by a religious corporation, association, society, or other organization, or an educational institution that is a religious school, college, university, or other institution of learning, with respect to the services, activities, or programs provided by the educational institution.**".

Representative Outman moved to adopt the amendment to SB 4. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou.
    Pass: None.

Representative Fink offered the following amendment to SB 4:
1. Amend page 16, following line 22, by inserting:
"Enacting section 2. This amendatory act does not take effect unless House Bill No. 4075 of the 102nd Legislature is enacted into law.".

Representative Fink moved to adopt the amendment to SB 4. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
>    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
>    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins,
>    Tsernoglou.
>    Pass: None.

Representative Wozniak offered the following amendment to SB 4:

1. Amend page 8, following line 16, by inserting:

"Sec. 208. A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, ~~or sex~~**, sexual orientation, or gender identity or expression** is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate section of this article. An employer may have a bona fide occupational qualification on the basis of religion, national origin, ~~sex, age, or marital status, height and weight~~ **age, height, weight, marital status, sex, sexual orientation, or gender identity or expression** without obtaining prior exemption from the commission, provided that an employer ~~who~~ **that** does not obtain an exemption ~~shall have~~ **has** the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.".

Representative Wozniak moved to adopt the amendment to SB 4. The motion did not prevail 5-8-0:

UNFAVORABLE ROLL CALL
>    Yeas: Reps. Fink, Wendzel, Wozniak, Outman, Johnsen.
>    Nays: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins,
>    Tsernoglou.
>    Pass: None.

Representative Dievendorf moved to report out SB 4 with recommendation. The motion prevailed 8-3-2:

FAVORABLE ROLL CALL
>    Yeas: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins,
>    Tsernoglou.
>    Nays: Reps. Fink, Outman, Johnsen.
>    Pass: Reps. Wendzel, Wozniak.

There being no further business before the committee, Chair Breen adjourned the meeting at 11:56 AM.

_____
Representative Kelly Breen, Chair

Melissa Sweet
Committee Clerk
msweet@house.mi.gov

Date Adopted: March 15, 2023

## No. 22
## STATE OF MICHIGAN

## JOURNAL
### OF THE

# House of Representatives

### 102nd Legislature
### REGULAR SESSION OF 2023

House Chamber, Lansing, Wednesday, March 8, 2023.

1:30 p.m.

The House was called to order by the Speaker.

The roll was called by the Clerk of the House of Representatives, who announced that a quorum was present.

| | | | |
|---|---|---|---|
| Aiyash—present | Dievendorf—present | Markkanen—present | Schriver—present |
| Alexander—present | Edwards—present | Martin—present | Schuette—present |
| Andrews—present | Farhat—present | Martus—present | Scott—present |
| Aragona—present | Filler—present | McFall—present | Shannon—present |
| Arbit—present | Fink—present | McKinney—present | Skaggs—present |
| Beeler—present | Fitzgerald—present | Meerman—present | Slagh—present |
| BeGole—present | Fox—present | Mentzer—present | Smit—present |
| Beson—present | Friske—present | Miller—present | Snyder—present |
| Bezotte—present | Glanville—present | Morgan—present | St. Germaine—present |
| Bierlein—present | Grant—present | Morse—present | Steckloff—present |
| Bollin—present | Green, P.—present | Mueller—present | Steele—present |
| Borton—present | Greene, J.—present | Neeley—present | Stone—present |
| Brabec—present | Haadsma—present | Neyer—present | Tate—present |
| Breen—present | Hall—present | O'Neal—present | Thompson—present |
| Brixie—present | Harris—present | Outman—present | Tisdel—present |
| Bruck—excused | Hill—present | Paiz—present | Tsernoglou—present |
| Byrnes—present | Hoadley—present | Paquette—present | VanderWall—present |
| Carra—present | Hood—present | Pohutsky—present | VanWoerkom—present |
| Carter, B.—present | Hope—present | Posthumus—present | Wegela—present |
| Carter, T.—present | Hoskins—present | Prestin—present | Weiss—present |
| Cavitt—present | Johnsen—present | Price—present | Wendzel—present |
| Churches—present | Koleszar—present | Puri—present | Whitsett—present |
| Coffia—present | Kuhn—present | Rheingans—present | Wilson—present |
| Coleman—present | Kunse—present | Rigas—present | Witwer—present |
| Conlin—present | Liberati—present | Rogers—present | Wozniak—present |
| DeBoer—present | Lightner—present | Roth—present | Young—present |
| DeBoyer—present | MacDonell—present | Schmaltz—present | Zorn—present |
| DeSana—present | Maddock—present | | |

e/d/s = entered during session

Rep. Jennifer Conlin, from the 48th District, offered the following invocation:

"As we all gather here today in friendship and community, taking a moment out of our busy lives,... to learn, share and reflect on the insights, experiences and wisdom of others, we are reminded of how blessed we all are. In the current world around us there are many who suffer and face grave challenges. We stand in solidarity with them in compassion and by practicing loving kindness to ourselves and all those around us.

Let us pray the following in the name of all that is good.

May we all be well, happy and peaceful, May no harm come to us,

May we all also have patience, courage, understanding, and determination to meet and overcome inevitable difficulties, problems, and failures in life.

May our parents, our teachers and mentors, our friends and may all living beings across the world...be well, happy and peaceful. May no harm come to them,

May they also have patience, courage, understanding, and determination to meet and overcome inevitable difficulties, problems, and failures in life."

_____

The Speaker called the Speaker Pro Tempore to the Chair.

_____

Rep. Posthumus moved that Rep. Bruck be excused from today's session.

The motion prevailed.

### Reports of Standing Committees

The Committee on Judiciary, by Rep. Breen, Chair, reported

**Senate Bill No. 4, entitled**

A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

Without amendment and with the recommendation that the bill pass.

The bill was referred to the order of Second Reading of Bills.

Favorable Roll Call

To Report Out:

Yeas: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins and Tsernoglou

Nays: Reps. Fink, Outman and Johnsen

The Committee on Judiciary, by Rep. Breen, Chair, reported

**House Bill No. 4003, entitled**

A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

**App. 283**

Without amendment and with the recommendation that the bill pass.
The bill was referred to the order of Second Reading of Bills.


Favorable Roll Call

To Report Out:
  Yeas: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins and Tsernoglou
  Nays: Reps. Fink, Outman and Johnsen


COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Breen, Chair, of the Committee on Judiciary, was received
and read:
  Meeting held on: Wednesday, March 8, 2023 at 10:30 a.m.
  Present: Reps. Breen, Edwards, Tyrone Carter, Hope, Arbit, Dievendorf, Hoskins, Tsernoglou, Fink,
Wendzel, Wozniak, Outman and Johnsen


The Committee on Labor, by Rep. Haadsma, Chair, reported
**House Bill No. 4004, entitled**
  A bill to amend 1947 PA 336, entitled "An act to prohibit strikes by certain public employees; to provide
review from disciplinary action with respect thereto; to provide for the mediation of grievances and the
holding of elections; to declare and protect the rights and privileges of public employees; to require certain
provisions in collective bargaining agreements; to prescribe means of enforcement and penalties for the
violation of the provisions of this act; and to make appropriations," by amending sections 9, 10, and 15 (MCL
423.209, 423.210, and 423.215), as amended by 2014 PA 414.
  Without amendment and with the recommendation that the bill pass.
  The bill was referred to the order of Second Reading of Bills.


Favorable Roll Call

To Report Out:
  Yeas: Reps. Haadsma, Mentzer, Koleszar, O'Neal, Andrews, Churches and Wegela
  Nays: Reps. Wozniak and Kunse


The Committee on Labor, by Rep. Haadsma, Chair, reported
**House Bill No. 4005, entitled**
  A bill to amend 1939 PA 176, entitled "An act to create a commission relative to labor disputes, and to
prescribe its powers and duties; to provide for the mediation and arbitration of labor disputes, and the holding
of elections thereon; to regulate the conduct of parties to labor disputes and to require the parties to follow
certain procedures; to regulate and limit the right to strike and picket; to protect the rights and privileges of
employees, including the right to organize and engage in lawful concerted activities; to protect the rights and
privileges of employers; to make certain acts unlawful; to make appropriations; and to prescribe means of
enforcement and penalties for violations of this act," by amending sections 1, 2, 8, 14, 17, and 22 (MCL
423.1, 423.2, 423.8, 423.14, 423.17, and 423.22), as amended by 2012 PA 348.
  Without amendment and with the recommendation that the bill pass.
  The bill was referred to the order of Second Reading of Bills.


Favorable Roll Call

To Report Out:
  Yeas: Reps. Haadsma, Mentzer, Koleszar, O'Neal, Andrews, Churches and Wegela
  Nays: Rep. Kunse

**App. 284**

The Committee on Labor, by Rep. Haadsma, Chair, reported
**House Bill No. 4007, entitled**
A bill to require prevailing wages and fringe benefits on state projects; to establish the requirements and responsibilities of contracting agents and bidders; and to prescribe penalties.
Without amendment and with the recommendation that the bill pass.
The bill was referred to the order of Second Reading of Bills.

Favorable Roll Call

To Report Out:
  Yeas: Reps. Haadsma, Mentzer, Koleszar, O'Neal, Andrews, Churches and Wegela
  Nays: Reps. Wozniak, Mueller and Kunse

COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Haadsma, Chair, of the Committee on Labor, was received and read:
  Meeting held on: Wednesday, March 8, 2023
  Present: Reps. Haadsma, Mentzer, Koleszar, O'Neal, Andrews, Churches, Wegela, Wozniak, Mueller and Kunse

COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Witwer, Chair, of the Committee on Appropriations, was received and read:
  Meeting held on: Wednesday, March 8, 2023
  Present: Reps. Witwer, Brixie, Hood, Brabec, Morse, Puri, Steckloff, Weiss, Martus, McKinney, Morgan, Price, Skaggs, Snyder, Wilson, Lightner, Bollin, Green, Slagh, Beson, Borton, Fink, Cavitt, DeBoer, Kuhn, Schuette and Steele
  Absent: Reps. O'Neal and Mentzer
  Excused: Reps. O'Neal and Mentzer

COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Scott, Chair, of the Committee on Energy, Communications, and Technology, was received and read:
  Meeting held on: Wednesday, March 8, 2023
  Present: Reps. Scott, Coleman, Whitsett, Neeley, Byrnes, Hill, MacDonell, McFall, Wendzel, Outman, Aragona, BeGole, Greene, Prestin and Schmaltz
  Absent: Reps. Andrews and Churches
  Excused: Reps. Andrews and Churches

COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Glanville, Chair, of the Committee on Higher Education, was received and read:
  Meeting held on: Wednesday, March 8, 2023
  Present: Reps. Glanville, Rheingans, Koleszar, Scott, Byrnes, Coffia, Hill, MacDonell, Paiz, VanderWall, Paquette, Zorn, Bruck and DeSana

COMMITTEE ATTENDANCE REPORT

The following report, submitted by Rep. Neeley, Chair, of the Committee on Tax Policy, was received and read:
  Meeting held on: Wednesday, March 8, 2023

Present: Reps. Neeley, Farhat, Brixie, Brenda Carter, Whitsett, Grant, Price, VanWoerkom, Outman, Tisdel and Hoadley
Absent: Rep. Markkanen
Excused: Rep. Markkanen

**Second Reading of Bills**

**Senate Bill No. 4, entitled**
A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.
The bill was read a second time.

Rep. Paquette moved to amend the bill as follows:
1. Amend page 4, line 26, after "**orientation.**" by inserting "**Sexual orientation does not include having a sexual orientation for, or having a history of a sexual orientation for, minors, or being identified with such a sexual orientation.**".
The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Paquette moved to amend the bill as follows:
1. Amend page 2, line 6, after "status," by striking out "or".
2. Amend page 2, line 6, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".
3. Amend page 2, line 17, after "status," by striking out "or".
4. Amend page 2, line 17, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".
5. Amend page 5, line 3, after "weight," by striking out "or".
6. Amend page 5, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
7. Amend page 5, line 10, after "weight," by striking out "or".
8. Amend page 5, line 11, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
9. Amend page 6, line 4, after "weight," by striking out "or".
10. Amend page 6, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
11. Amend page 6, line 7, after "weight," by striking out "or".
12. Amend page 6, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
13. Amend page 6, line 14, after "weight," by striking out "or".
14. Amend page 6, line 15, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
15. Amend page 6, line 25, after "weight," by striking out "or".
16. Amend page 6, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
17. Amend page 7, line 2, after "weight," by striking out "or".
18. Amend page 7, line 2, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
19. Amend page 7, line 8, after "weight," by striking out "or".
20. Amend page 7, line 8, after "status," by inserting "**or vaccination status for COVID-19,**".
21. Amend page 7, line 20, after "weight," by striking out "or".
22. Amend page 7, line 21, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
23. Amend page 7, line 29, by striking out "or".
24. Amend page 7, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".
25. Amend page 8, line 7, after "weight," by striking out "or".

26. Amend page 8, line 7, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

27. Amend page 8, line 12, after "weight," by striking out "or".

28. Amend page 8, line 12, after "status," by inserting "**or vaccination status for COVID-19,**".

29. Amend page 8, line 15, after "**expression,**" by striking out "or".

30. Amend page 8, line 16, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

31. Amend page 8, line 26, after "weight," by striking out "or".

32. Amend page 8, line 26, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

33. Amend page 10, line 1, after "**expression,**" by striking out "or".

34. Amend page 10, line 1, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

35. Amend page 10, line 9, after "**expression,**" by striking out "or".

36. Amend page 10, line 9, after "status," by inserting "**or vaccination status for COVID-19,**".

37. Amend page 10, line 13, after "**expression,**" by striking out "or".

38. Amend page 10, line 13, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

39. Amend page 10, line 22, after "status," by striking out "or".

40. Amend page 10, line 22, after "origin" by inserting a comma and "**or vaccination status for COVID-19**".

41. Amend page 11, line 14, after "**orientation,**" by striking out "**or**".

42. Amend page 11, line 15, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

43. Amend page 11, line 20, after "**orientation,**" by striking out "**or**".

44. Amend page 11, line 20, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

45. Amend page 11, line 25, after "**expression,**" by striking out "or".

46. Amend page 11, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

47. Amend page 12, line 2, after "**orientation,**" by striking out "**or**".

48. Amend page 12, line 3, after "**expression,**" by inserting "**or vaccination status for COVID-19,**".

49. Amend page 12, line 8, after "**orientation,**" by striking out "**or**".

50. Amend page 12, line 9, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

51. Amend page 13, line 7, after "status," by striking out "or".

52. Amend page 13, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

53. Amend page 14, line 18, after "status," by striking out "or".

54. Amend page 14, line 19, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

55. Amend page 14, line 28, after "status," by striking out "or".

56. Amend page 14, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

57. Amend page 15, line 8, after "status," by striking out "or".

58. Amend page 15, line 8, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

59. Amend page 15, line 13, after "status," by striking out "or".

60. Amend page 15, line 14, after "status," by inserting "**or vaccination status for COVID-19,**".

61. Amend page 15, line 29, by striking out "or".

62. Amend page 15, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

63. Amend page 16, line 14, after "status," by striking out "or".

64. Amend page 16, line 14, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Paquette moved to amend the bill as follows:

1. Amend page 2, line 4, after "sex," by striking out the balance of the line through "**expression,**" on line 5 and inserting "**gender,**".

2. Amend page 2, line 16, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

3. Amend page 3, line 18, after "includes" by striking out "**an individual**" and inserting "**a woman**".

4. Amend page 3, line 19, after "**(f)**" by striking out the balance of the line through "**birth.**" on line 22 and inserting "**"Gender" means an individual's state of being male or female.**".

5. Amend page 4, line 23, by striking out all of subdivision **(k)**.

6. Amend page 5, line 2, after "sex," by striking out the balance of the line through "**expression,**" on line 3 and inserting "**gender,**".

7. Amend page 5, line 9, after "sex," by striking out the balance of the line through "**expression,**" on line 10 and inserting "**gender,**".

8. Amend page 6, line 3, after "sex," by striking out the balance of the line through "**expression,**" on line 4 and inserting "**gender,**".

9. Amend page 6, line 6, after "sex," by striking out the balance of the line through "**expression,**" on line 7 and inserting "**gender,**".

10. Amend page 6, line 13, after "sex," by striking out the balance of the line through "**expression,**" on line 14 and inserting "**gender,**".

11. Amend page 6, line 24, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

12. Amend page 7, line 1, after "sex," by striking out the balance of the line through "**expression,**" on line 2 and inserting "**gender,**".

13. Amend page 7, line 7, after "sex," by striking out the balance of the line through "**expression,**" on line 8 and inserting "**gender,**".

14. Amend page 7, line 19, after "sex," by striking out the balance of the line through "**expression,**" on line 20 and inserting "**gender,**".

15. Amend page 7, line 28, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

16. Amend page 8, line 6, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

17. Amend page 8, line 11, after "sex," by striking out the balance of the line through "**expression,**" on line 12 and inserting "**gender,**".

18. Amend page 8, line 15, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

19. Amend page 8, line 25, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

20. Amend page 9, line 29, after "sex," by striking out the balance of the page through "**expression,**" on line 1 of page 10 and inserting "**gender,**".

21. Amend page 10, line 8, after "sex," by striking out the balance of the line through "**expression,**" on line 9 and inserting "**gender,**".

22. Amend page 10, line 12, after "sex," by striking out the balance of the line through "**expression,**" on line 13 and inserting "**gender,**".

23. Amend page 10, line 21, after "**sex,**" by striking out the balance of the line through "**expression,**" on line 22 and inserting "gender,".

24. Amend page 11, line 14, after "sex**,**" by striking out the balance of the line through "**expression**" on line 15 and inserting "**or gender**".

25. Amend page 11, line 20, after "sex**,**" by striking out "**sexual orientation, or gender identity or expression**" and inserting "**or gender**".

26. Amend page 11, line 24, after "sex," by striking out the balance of the line through "**expression,**" on line 25 and inserting "**gender,**".

27. Amend page 12, line 2, after "sex**,**" by striking out the balance of the line through "**expression**" on line 3 and inserting "**or gender**".

28. Amend page 12, line 8, after "sex**,**" by striking out the balance of the line through "**expression**" on line 9 and inserting "**or gender**".

29. Amend page 13, line 6, after "sex," by striking out the balance of the line through "**expression,**" on line 7 and inserting "**gender,**".

30. Amend page 14, line 17, after "sex," by striking out the balance of the line through "**expression,**" on line 18 and inserting "**gender,**".

31. Amend page 14, line 27, after "sex," by striking out the balance of the line through "**expression,**" on line 28 and inserting "**gender,**".

32. Amend page 15, line 7, after "sex," by striking out the balance of the line through "**expression,**" on line 8 and inserting "**gender,**".

33. Amend page 15, line 12, after "sex," by striking out the balance of the line through "**expression,**" on line 13 and inserting "**gender,**".

34. Amend page 15, line 28, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

35. Amend page 16, line 13, after "sex," by striking out the balance of the line through "**expression,**" on line 14 and inserting "**gender,**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. VanWoerkom moved to amend the bill as follows:

1. Amend page 9, line 24, after "302." by inserting "(**1**)".

2. Amend page 10, following line 13, by inserting:

"(**2**) **This section does not compel an individual to violate the individual's sincerely held religious beliefs.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Schmaltz moved to amend the bill as follows:

1. Amend page 5, following line 28, by inserting:

"(**4**) **This section does not apply to an employer that is a religious corporation, association, society, or other organization, including an employer that is a religious school, college, university, educational institution, or other institution of learning, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on of its activities.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. DeBoer moved to amend the bill as follows:

1. Amend page 11, line 9, after "402." by inserting "(**1**)".

2. Amend page 12, following line 9, by inserting:

"(**2**) **This section does not apply to an educational institution operated by a religious corporation, association, society, or other organization, or an educational institution that is a religious school, college, university, or other institution of learning, with respect to the services, activities, or programs provided by the educational institution.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Steele moved to amend the bill as follows:

1. Amend page 16, following line 22, by inserting:

"Enacting section 2. This amendatory act does not take effect unless House Bill No. 4075 of the 102nd Legislature is enacted into law.".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Fink moved to amend the bill as follows:

1. Amend page 8, following line 16, by inserting:

"Sec. 208. A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, ~~or~~ sex**, sexual orientation, or gender identity or expression** is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate section of this article. An employer may have a bona fide occupational qualification on the basis of religion, national origin, ~~sex, age, or marital status, height and weight~~ **age, height, weight, marital status, sex, sexual orientation, or gender identity or expression** without obtaining prior exemption from the commission, provided that an employer ~~who~~ **that** does not obtain an exemption ~~shall have~~ **has** the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Jaime Greene moved to amend the bill as follows:

1. Amend page 12, following line 9, by inserting:

"**Sec. 405. This article does not require an educational institution to permit an individual who was a biological male at birth to participate in a sports or athletic club, team, or activity that is offered by the educational institution for individuals who are biological females at birth.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Kuhn moved to amend the bill as follows:

1. Amend page 11, following line 8, by inserting:

"**Sec. 302b. This article does not require a provider of any place of public accommodation or public service to permit an individual who was a biological male at birth to participate in a sports or athletic club, team, or activity that is offered by the provider of the place of public accommodation or public service for individuals who are biological females at birth.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Schuette moved to amend the bill as follows:

1. Amend page 8, following line 27, by inserting:

"**Sec. 212. The provisions of this article related to sexual orientation, gender identity, or gender expression do not apply to a religious corporation, association, society, or other organization, including a faith-based nonprofit organization, when that entity is acting according to its sincerely held religious beliefs.**".

2. Amend page 11, following line 8, by inserting:

"Sec. 303. **(1)** This article shall **does** not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation or is licensed by the **this** state under Act No. 8 of the Public Acts of the Extra Session of 1933, being sections 436.1 through 436.58 of the Michigan Compiled Laws. **the Michigan liquor control code of 1998, 1998 PA 58, MCL 436.1101 to 436.2303.** This section shall **subsection does** not apply to a private club that is otherwise defined as a place of public accommodation in this article.

**(2) The provisions of this article related to sexual orientation, gender identity, or gender expression do not apply to a religious corporation, association, society, or other organization, including a faith-based nonprofit organization, when that entity is acting according to its sincerely held religious beliefs.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Tisdel moved to amend the bill as follows:

1. Amend page 3, line 21, after "**individual's**" by striking out "**assigned**" and inserting "**observed and recorded**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Slagh moved to amend the bill as follows:

1. Amend page 2, line 6, after "status," by striking out "or".

2. Amend page 2, line 6, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

3. Amend page 2, line 17, after "status," by striking out "or".

4. Amend page 2, line 17, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

5. Amend page 5, line 3, after "weight," by striking out "or".

6. Amend page 5, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

7. Amend page 5, line 10, after "weight," by striking out "or".

8. Amend page 5, line 11, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

9. Amend page 6, line 4, after "weight," by striking out "or".

10. Amend page 6, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

11. Amend page 6, line 7, after "weight," by striking out "or".

12. Amend page 6, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

13. Amend page 6, line 14, after "weight," by striking out "or".

14. Amend page 6, line 15, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

15. Amend page 6, line 25, after "weight," by striking out "or".

**App. 290**

16. Amend page 6, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

17. Amend page 7, line 2, after "weight," by striking out "or".

18. Amend page 7, line 2, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

19. Amend page 7, line 8, after "weight," by striking out "or".

20. Amend page 7, line 8, after "status," by inserting "**or vaccination status for COVID-19,**".

21. Amend page 7, line 20, after "weight," by striking out "or".

22. Amend page 7, line 21, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

23. Amend page 7, line 29, by striking out "or ".

24. Amend page 7, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

25. Amend page 8, line 7, after "weight," by striking out "or".

26. Amend page 8, line 7, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

27. Amend page 8, line 12, after "weight," by striking out "or".

28. Amend page 8, line 12, after "status," by inserting "**or vaccination status for COVID-19,**".

29. Amend page 8, line 15, after "**expression,**" by striking out "or".

30. Amend page 8, line 16, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

31. Amend page 8, line 26, after "weight," by striking out "or".

32. Amend page 8, line 26, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

33. Amend page 10, line 1, after "**expression,**" by striking out "or".

34. Amend page 10, line 1, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

35. Amend page 10, line 9, after "**expression,**" by striking out "or".

36. Amend page 10, line 9, after "status," by inserting "**or vaccination status for COVID-19,**".

37. Amend page 10, line 13, after "**expression,**" by striking out "or".

38. Amend page 10, line 13, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

39. Amend page 10, line 22, after "status," by striking out "or".

40. Amend page 10, line 22, after "origin" by inserting a comma and "**or vaccination status for COVID-19**".

41. Amend page 11, line 14, after "**orientation,**" by striking out "**or**".

42. Amend page 11, line 15, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

43. Amend page 11, line 20, after "**orientation,**" by striking out "**or**".

44. Amend page 11, line 20, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

45. Amend page 11, line 25, after "**expression,**" by striking out "or".

46. Amend page 11, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

47. Amend page 12, line 2, after "**orientation,**" by striking out "**or**".

48. Amend page 12, line 3, after "**expression,**" by inserting "**or vaccination status for COVID-19,**".

49. Amend page 12, line 8, after "**orientation,**" by striking out "**or**".

50. Amend page 12, line 9, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

51. Amend page 13, line 7, after "status," by striking out "or".

52. Amend page 13, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

53. Amend page 14, line 18, after "status," by striking out "or".

54. Amend page 14, line 19, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

55. Amend page 14, line 28, after "status," by striking out "or".

56. Amend page 14, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

57. Amend page 15, line 8, after "status," by striking out "or".

58. Amend page 15, line 8, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

**App. 291**

59. Amend page 15, line 13, after "status," by striking out "or".

60. Amend page 15, line 14, after "status," by inserting "**or vaccination status for COVID-19,**".

61. Amend page 15, line 29, by striking out "or ".

62. Amend page 15, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

63. Amend page 16, line 14, after "status," by striking out "or".

64. Amend page 16, line 14, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.


Rep. Posthumus moved to amend the bill as follows:

1. Amend page 2, line 5, after "**orientation,**" by striking out "**gender identity or expression,**".

2. Amend page 2, line 16, after "**orientation,**" by striking out "**gender identity or expression,**".

3. Amend page 3, line 19, by striking out all of subdivision (**f**) and relettering the remaining subdivisions.

4. Amend page 5, line 3, after "**orientation,**" by striking out "**gender identity or expression,**".

5. Amend page 5, line 10, after "**orientation,**" by striking out "**gender identity or expression,**".

6. Amend page 6, line 3, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 4.

7. Amend page 6, line 7, after "**orientation,**" by striking out "**gender identity or expression,**".

8. Amend page 6, line 14, after "**orientation,**" by striking out "**gender identity or expression,**".

9. Amend page 6, line 24, after "**orientation,**" by striking out "**gender identity or expression,**".

10. Amend page 7, line 1, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 2.

11. Amend page 7, line 7, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 8.

12. Amend page 7, line 20, after "**orientation,**" by striking out "**gender identity or expression,**".

13. Amend page 7, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

14. Amend page 8, line 6, after "**orientation,**" by striking out "**gender identity or expression,**".

15. Amend page 8, line 11, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 12.

16. Amend page 8, line 15, after "**orientation,**" by striking out "**gender identity or expression,**".

17. Amend page 8, line 25, after "**orientation,**" by striking out "**gender identity or expression,**".

18. Amend page 10, line 1, after "**orientation,**" by striking out "**gender identity or expression,**".

19. Amend page 10, line 8, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 9.

20. Amend page 10, line 12, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 13.

21. Amend page 10, line 21, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 22.

22. Amend page 11, line 14, after "sex**,**" by inserting "**or**".

23. Amend page 11, line 14, after "**orientation**" by inserting a period and striking out the comma and the balance of the line through "**expression**." on line 15.

24. Amend page 11, line 20, after "sex**,**" by inserting "**or**".

25. Amend page 11, line 20, after "**orientation**" by inserting a period and striking out the comma and "**or gender identity or expression**.".

26. Amend page 11, line 24, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 25.

27. Amend page 12, line 2, after "sex**,**" by inserting "**or**".

28. Amend page 12, line 2, after "**orientation**" by striking out the comma and the balance of the line through "**expression,**" on line 3.

29. Amend page 12, line 8, after "sex**,**" by inserting "**or**".

30. Amend page 12, line 8, after "**orientation**" by inserting a period and striking out the comma and the balance of the subdivision.

31. Amend page 13, line 7, after "**orientation,**" by striking out "**gender identity or expression,**".

32. Amend page 14, line 18, after "**orientation,**" by striking out "**gender identity or expression,**".

33. Amend page 14, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

34. Amend page 15, line 7, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 8.

35. Amend page 15, line 13, after "**orientation,**" by striking out "**gender identity or expression,**".

36. Amend page 15, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

37. Amend page 16, line 13, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 14.

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Fox moved to amend the bill as follows:

1. Amend page 11, line 9, after "402." by striking out "An" and inserting "**Subject to section 3 of the student restroom privacy act, an**".

2. Amend page 16, following line 22, by inserting:

"Enacting section 2. This amendatory act does not take effect unless House Bill No. 4195 of the 102nd Legislature is enacted into law.".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Aiyash moved that the bill be placed on the order of Third Reading of Bills.

The motion prevailed.

**House Bill No. 4003, entitled**

A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

The bill was read a second time.

Rep. Paquette moved to amend the bill as follows:

1. Amend page 4, line 26, after "**orientation.**" by inserting "**Sexual orientation does not include having a sexual orientation for, or having a history of a sexual orientation for, minors, or being identified with such a sexual orientation.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Paquette moved to amend the bill as follows:

1. Amend page 2, line 6, after "status," by striking out "or".

2. Amend page 2, line 6, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

3. Amend page 2, line 17, after "status," by striking out "or".

4. Amend page 2, line 17, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

5. Amend page 5, line 3, after "weight," by striking out "or".

6. Amend page 5, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

7. Amend page 5, line 10, after "weight," by striking out "or".

8. Amend page 5, line 11, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

9. Amend page 6, line 4, after "weight," by striking out "or".

10. Amend page 6, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

11. Amend page 6, line 7, after "weight," by striking out "or".

12. Amend page 6, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

13. Amend page 6, line 14, after "weight," by striking out "or".

14. Amend page 6, line 15, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

15. Amend page 6, line 25, after "weight," by striking out "or".

16. Amend page 6, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

17. Amend page 7, line 2, after "weight," by striking out "or".

18. Amend page 7, line 2, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

19. Amend page 7, line 8, after "weight," by striking out "or".

20. Amend page 7, line 8, after "status," by inserting "**or vaccination status for COVID-19,**".

21. Amend page 7, line 20, after "weight," by striking out "or".

22. Amend page 7, line 21, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

23. Amend page 7, line 29, by striking out "or".

24. Amend page 7, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

25. Amend page 8, line 7, after "weight," by striking out "or".

26. Amend page 8, line 7, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

27. Amend page 8, line 12, after "weight," by striking out "or".

28. Amend page 8, line 12, after "status," by inserting "**or vaccination status for COVID-19,**".

29. Amend page 8, line 15, after "**expression,**" by striking out "or".

30. Amend page 8, line 16, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

31. Amend page 8, line 26, after "weight," by striking out "or".

32. Amend page 8, line 26, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

33. Amend page 10, line 1, after "**expression,**" by striking out "or".

34. Amend page 10, line 1, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

35. Amend page 10, line 9, after "**expression,**" by striking out "or".

36. Amend page 10, line 9, after "status," by inserting "**or vaccination status for COVID-19,**".

37. Amend page 10, line 13, after "**expression,**" by striking out "or".

38. Amend page 10, line 13, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

39. Amend page 10, line 22, after "status," by striking out "or".

40. Amend page 10, line 22, after "origin" by inserting a comma and "**or vaccination status for COVID-19**".

41. Amend page 11, line 14, after "**orientation,**" by striking out "**or**".

42. Amend page 11, line 15, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

43. Amend page 11, line 20, after "**orientation,**" by striking out "**or**".

44. Amend page 11, line 20, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

45. Amend page 11, line 25, after "**expression,**" by striking out "or".

46. Amend page 11, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

47. Amend page 12, line 2, after "**orientation,**" by striking out "**or**".

48. Amend page 12, line 3, after "**expression,**" by inserting "**or vaccination status for COVID-19,**".

49. Amend page 12, line 8, after "**orientation,**" by striking out "**or**".

50. Amend page 12, line 9, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

51. Amend page 13, line 7, after "status," by striking out "or".

52. Amend page 13, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

53. Amend page 14, line 18, after "status," by striking out "or".

54. Amend page 14, line 19, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

55. Amend page 14, line 28, after "status," by striking out "or".

56. Amend page 14, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

57. Amend page 15, line 8, after "status," by striking out "or".

58. Amend page 15, line 8, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

59. Amend page 15, line 13, after "status," by striking out "or".

60. Amend page 15, line 14, after "status," by inserting "**or vaccination status for COVID-19,**".

61. Amend page 15, line 29, by striking out "or".

62. Amend page 15, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

63. Amend page 16, line 14, after "status," by striking out "or".

64. Amend page 16, line 14, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Paquette moved to amend the bill as follows:

1. Amend page 2, line 4, after "sex," by striking out the balance of the line through "**expression,**" on line 5 and inserting "**gender,**".

2. Amend page 2, line 16, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

3. Amend page 3, line 18, after "includes" by striking out "**an individual**" and inserting "**a woman**".

4. Amend page 3, line 19, after "(**f**)" by striking out the balance of the line through "**birth.**" on line 22 and inserting "**"Gender" means an individual's state of being male or female.**".

5. Amend page 4, line 23, by striking out all of subdivision (**k**).

6. Amend page 5, line 2, after "sex," by striking out the balance of the line through "**expression,**" on line 3 and inserting "**gender,**".

7. Amend page 5, line 9, after "sex," by striking out the balance of the line through "**expression,**" on line 10 and inserting "**gender,**".

8. Amend page 6, line 3, after "sex," by striking out the balance of the line through "**expression,**" on line 4 and inserting "**gender,**".

9. Amend page 6, line 6, after "sex," by striking out the balance of the line through "**expression,**" on line 7 and inserting "**gender,**".

10. Amend page 6, line 13, after "sex," by striking out the balance of the line through "**expression,**" on line 14 and inserting "**gender,**".

11. Amend page 6, line 24, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

12. Amend page 7, line 1, after "sex," by striking out the balance of the line through "**expression,**" on line 2 and inserting "**gender,**".

13. Amend page 7, line 7, after "sex," by striking out the balance of the line through "**expression,**" on line 8 and inserting "**gender,**".

14. Amend page 7, line 19, after "sex," by striking out the balance of the line through "**expression,**" on line 20 and inserting "**gender,**".

15. Amend page 7, line 28, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

16. Amend page 8, line 6, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

17. Amend page 8, line 11, after "sex," by striking out the balance of the line through "**expression,**" on line 12 and inserting "**gender,**".

18. Amend page 8, line 15, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

19. Amend page 8, line 25, after "sex," by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

20. Amend page 9, line 29, after "sex," by striking out the balance of the page through "**expression,**" on line 1 of page 10 and inserting "**gender,**".

21. Amend page 10, line 8, after "sex," by striking out the balance of the line through "**expression,**" on line 9 and inserting "**gender,**".

22. Amend page 10, line 12, after "sex," by striking out the balance of the line through "**expression,**" on line 13 and inserting "**gender,**".

23. Amend page 10, line 21, after "**sex,**" by striking out the balance of the line through "**expression,**" on line 22 and inserting "**gender,**".

24. Amend page 11, line 14, after "sex**,**" by striking out the balance of the line through "**expression**" on line 15 and inserting "**or gender**".

25. Amend page 11, line 20, after "sex**,**" by striking out "**sexual orientation, or gender identity or expression**" and inserting "**or gender**".

26. Amend page 11, line 24, after "sex," by striking out the balance of the line through "**expression,**" on line 25 and inserting "**gender,**".

27. Amend page 12, line 2, after "sex**,**" by striking out the balance of the line through "**expression,**" on line 3 and inserting "**or gender**".

28. Amend page 12, line 8, after "sex**,**" by striking out the balance of the line through "**expression**" on line 9 and inserting "**or gender**".

29. Amend page 13, line 6, after "sex," by striking out the balance of the line through "**expression,**" on line 7 and inserting "**gender,**".

30. Amend page 14, line 17, after "sex," by striking out the balance of the line through "**expression,**" on line 18 and inserting "**gender,**".

31. Amend page 14, line 27, after "sex," by striking out the balance of the line through "**expression,**" on line 28 and inserting "**gender,**".

32. Amend page 15, line 7, after "sex," by striking out the balance of the line through "**expression,**" on line 8 and inserting "**gender,**".

33. Amend page 15, line 12, after "sex," by striking out the balance of the line through "**expression,**" on line 13 and inserting "**gender,**".

34. Amend page 15, line 28, by striking out "**sexual orientation, gender identity or expression,**" and inserting "**gender,**".

35. Amend page 16, line 13, after "sex," by striking out the balance of the line through "**expression,**" on line 14 and inserting "**gender,**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. VanWoerkom moved to amend the bill as follows:

1. Amend page 9, line 24, after "302." by inserting "(**1**)".

2. Amend page 10, following line 13, by inserting:

"(**2**) **This section does not compel an individual to violate the individual's sincerely held religious beliefs.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Schmaltz moved to amend the bill as follows:

1. Amend page 5, following line 28, by inserting:

"(**4**) **This section does not apply to an employer that is a religious corporation, association, society, or other organization, including an employer that is a religious school, college, university, educational institution, or other institution of learning, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on of its activities.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. DeBoer moved to amend the bill as follows:

1. Amend page 11, line 9, after "402." by inserting "(**1**)".

2. Amend page 12, following line 9, by inserting:

"(**2**) **This section does not apply to an educational institution operated by a religious corporation, association, society, or other organization, or an educational institution that is a religious school, college, university, or other institution of learning, with respect to the services, activities, or programs provided by the educational institution.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Steele moved to amend the bill as follows:

1. Amend page 16, following line 22, by inserting:

"Enacting section 2. This amendatory act does not take effect unless House Bill No.4075 of the 102nd Legislature is enacted into law.".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Fink moved to amend the bill as follows:

1. Amend page 8, following line 16, by inserting:

"Sec. 208. A person subject to this article may apply to the commission for an exemption on the basis that religion, national origin, age, height, weight, ~~or~~ sex**, sexual orientation, or gender identity or expression** is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. Upon sufficient showing, the commission may grant an exemption to the appropriate

section of this article. An employer may have a bona fide occupational qualification on the basis of religion, national origin, ~~sex, age, or marital status, height and weight~~ **age, height, weight, marital status, sex, sexual orientation, or gender identity or expression** without obtaining prior exemption from the commission, provided that an employer ~~who~~ **that** does not obtain an exemption ~~shall have~~ **has** the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Jaime Greene moved to amend the bill as follows:
1. Amend page 12, following line 9, by inserting:
"**Sec. 405. This article does not require an educational institution to permit an individual who was a biological male at birth to participate in a sports or athletic club, team, or activity that is offered by the educational institution for individuals who are biological females at birth.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Kuhn moved to amend the bill as follows:
1. Amend page 11, following line 8, by inserting:
"**Sec. 302b. This article does not require a provider of any place of public accommodation or public service to permit an individual who was a biological male at birth to participate in a sports or athletic club, team, or activity that is offered by the provider of the place of public accommodation or public service for individuals who are biological females at birth.**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Schuette moved to amend the bill as follows:
1. Amend page 8, following line 27, by inserting:
"**Sec. 212. The provisions of this article related to sexual orientation, gender identity, or gender expression do not apply to a religious corporation, association, society, or other organization, including a faith-based nonprofit organization, when that entity is acting according to its sincerely held religious beliefs.**".
2. Amend page 11, following line 8, by inserting:
"Sec. 303. **(1)** This article ~~shall~~ **does** not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommodation or is licensed by ~~the~~ **this** state under ~~Act No. 8 of the Public Acts of the Extra Session of 1933, being sections 436.1 through 436.58 of the Michigan Compiled Laws.~~ **the Michigan liquor control code of 1998, 1998 PA 58, MCL 436.1101 to 436.2303.** This ~~section shall~~ **subsection does** not apply to a private club that is otherwise defined as a place of public accommodation in this article.
**(2) The provisions of this article related to sexual orientation, gender identity, or gender expression do not apply to a religious corporation, association, society, or other organization, including a faith-based nonprofit organization, when that entity is acting according to its sincerely held religious beliefs.**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Tisdel moved to amend the bill as follows:
1. Amend page 3, line 21, after "**individual's**" by striking out "**assigned**" and inserting "**observed and recorded**".

The motion did not prevail and the amendment was not adopted, a majority of the members serving not voting therefor.

Rep. Slagh moved to amend the bill as follows:
1. Amend page 2, line 6, after the first "status," by striking out "or".
2. Amend page 2, line 6, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".
3. Amend page 2, line 17, after the first "status," by striking out "or".
4. Amend page 2, line 17, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

5. Amend page 5, line 3, after "weight," by striking out "or".

6. Amend page 5, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

7. Amend page 5, line 10, after "weight," by striking out "or".

8. Amend page 5, line 11, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

9. Amend page 6, line 4, after "weight," by striking out "or".

10. Amend page 6, line 4, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

11. Amend page 6, line 7, after "weight," by striking out "or".

12. Amend page 6, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

13. Amend page 6, line 14, after "weight," by striking out "or".

14. Amend page 6, line 15, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

15. Amend page 6, line 25, after "weight," by striking out "or".

16. Amend page 6, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

17. Amend page 7, line 2, after "weight," by striking out "or".

18. Amend page 7, line 2, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

19. Amend page 7, line 8, after "weight," by striking out "or".

20. Amend page 7, line 8, after "status," by inserting "**or vaccination status for COVID-19,**".

21. Amend page 7, line 20, after "weight," by striking out "or".

22. Amend page 7, line 21, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

23. Amend page 7, line 29, by striking out "or ".

24. Amend page 7, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

25. Amend page 8, line 7, after "weight," by striking out "or".

26. Amend page 8, line 7, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

27. Amend page 8, line 12, after "weight," by striking out "or".

28. Amend page 8, line 12, after "status," by inserting "**or vaccination status for COVID-19,**".

29. Amend page 8, line 15, after "**expression,**" by striking out "or".

30. Amend page 8, line 16, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

31. Amend page 8, line 26, after "weight," by striking out "or".

32. Amend page 8, line 26, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

33. Amend page 10, line 1, after "**expression,**" by striking out "or".

34. Amend page 10, line 1, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

35. Amend page 10, line 9, after "**expression,**" by striking out "or".

36. Amend page 10, line 9, after "status," by inserting "**or vaccination status for COVID-19,**".

37. Amend page 10, line 13, after "**expression,**" by striking out "or".

38. Amend page 10, line 13, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

39. Amend page 10, line 22, after "status," by striking out "or".

40. Amend page 10, line 22, after "origin" by inserting a comma and "**or vaccination status for COVID-19**".

41. Amend page 11, line 14, after "**orientation,**" by striking out "**or**".

42. Amend page 11, line 15, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

43. Amend page 11, line 20, after "**orientation,**" by striking out "**or**".

44. Amend page 11, line 20, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

45. Amend page 11, line 25, after "**expression,**" by striking out "or".

46. Amend page 11, line 25, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

47. Amend page 12, line 2, after "**orientation,**" by striking out "**or**".

48. Amend page 12, line 3, after "**expression,**" by inserting "**or vaccination status for COVID-19**".

49. Amend page 12, line 8, after "**orientation,**" by striking out "**or**".

50. Amend page 12, line 9, after "**expression**" by inserting a comma and "**or vaccination status for COVID-19**".

51. Amend page 13, line 7, after "status," by striking out "or".

52. Amend page 13, line 8, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

53. Amend page 14, line 18, after "status," by striking out "or".

54. Amend page 14, line 19, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

55. Amend page 14, line 28, after "status," by striking out "or".

56. Amend page 14, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

57. Amend page 15, line 8, after the first "status," by striking out "or".

58. Amend page 15, line 8, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

59. Amend page 15, line 13, after "status," by striking out "or".

60. Amend page 15, line 14, after "status," by inserting "**or vaccination status for COVID-19,**".

61. Amend page 15, line 29, by striking out "or ".

62. Amend page 15, line 29, after "status" by inserting a comma and "**or vaccination status for COVID-19**".

63. Amend page 16, line 14, after the first "status," by striking out "or".

64. Amend page 16, line 14, after the second "status" by inserting a comma and "**or vaccination status for COVID-19**".

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.


Rep. Posthumus moved to amend the bill as follows:

1. Amend page 2, line 5, after "**orientation,**" by striking out "**gender identity or expression,**".

2. Amend page 2, line 16, after "**orientation,**" by striking out "**gender identity or expression,**".

3. Amend page 3, line 19, by striking out all of subdivision (**f**) and relettering the remaining subdivisions.

4. Amend page 5, line 3, after "**orientation,**" by striking out "**gender identity or expression,**".

5. Amend page 5, line 10, after "**orientation,**" by striking out "**gender identity or expression,**".

6. Amend page 6, line 3, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 4.

7. Amend page 6, line 7, after "**orientation,**" by striking out "**gender identity or expression,**".

8. Amend page 6, line 14, after "**orientation,**" by striking out "**gender identity or expression,**".

9. Amend page 6, line 24, after "**orientation,**" by striking out "**gender identity or expression,**".

10. Amend page 7, line 1, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 2.

11. Amend page 7, line 7, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 8.

12. Amend page 7, line 20, after "**orientation,**" by striking out "**gender identity or expression,**".

13. Amend page 7, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

14. Amend page 8, line 6, after "**orientation,**" by striking out "**gender identity or expression,**".

15. Amend page 8, line 11, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 12.

16. Amend page 8, line 15, after "**orientation,**" by striking out "**gender identity or expression,**".

17. Amend page 8, line 25, after "**orientation,**" by striking out "**gender identity or expression,**".

18. Amend page 10, line 1, after "**orientation,**" by striking out "**gender identity or expression,**".

19. Amend page 10, line 8, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 9.

20. Amend page 10, line 12, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 13.

21. Amend page 10, line 21, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 22.

22. Amend page 11, line 14, after "sex**,**" by inserting "**or**".

23. Amend page 11, line 14, after "**orientation**" by inserting a period and striking out the comma and the balance of the line through "**expression**." on line 15.

24. Amend page 11, line 20, after "sex**,**" by inserting "**or**".

25. Amend page 11, line 20, after "**orientation**" by inserting a period and striking out the comma and "**or gender identity or expression**.".

26. Amend page 11, line 24, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 25.

27. Amend page 12, line 2, after "sex**,**" by inserting "**or**".

28. Amend page 12, line 2, after "**orientation**" by striking out the comma and the balance of the line through "**expression,**" on line 3.

29. Amend page 12, line 8, after "sex**,**" by inserting "**or**".

30. Amend page 12, line 8, after "**orientation**" by inserting a period and striking out the comma and the balance of the subdivision.

31. Amend page 13, line 7, after "**orientation,**" by striking out "**gender identity or expression,**".

32. Amend page 14, line 18, after "**orientation,**" by striking out "**gender identity or expression,**".

33. Amend page 14, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

34. Amend page 15, line 7, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 8.

35. Amend page 15, line 13, after "**orientation,**" by striking out "**gender identity or expression,**".

36. Amend page 15, line 28, after "**orientation,**" by striking out "**gender identity or expression,**".

37. Amend page 16, line 13, after "**orientation,**" by striking out the balance of the line through "**expression,**" on line 14.

The motion did not prevail and the amendments were not adopted, a majority of the members serving not voting therefor.

Rep. Hoskins moved that the bill be placed on the order of Third Reading of Bills.

The motion prevailed.

By unanimous consent the House returned to the order of
**Third Reading of Bills**

Rep. Aiyash moved that **Senate Bill No. 4** be placed on its immediate passage.

The motion prevailed, a majority of the members serving voting therefor.

**Senate Bill No. 4, entitled**

A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

Was read a third time and passed, a majority of the members serving voting therefor, by yeas and nays, as follows:

**Roll Call No. 18**                    **Yeas—64**

| | | | |
|---|---|---|---|
| Aiyash | Edwards | McKinney | Scott |
| Andrews | Farhat | Mentzer | Shannon |
| Arbit | Filler | Miller | Skaggs |
| Beson | Fitzgerald | Morgan | Snyder |
| Bierlein | Glanville | Morse | Steckloff |
| Brabec | Grant | Mueller | Stone |
| Breen | Haadsma | Neeley | Tate |
| Brixie | Hill | O'Neal | Tisdel |
| Byrnes | Hood | Paiz | Tsernoglou |
| Carter, B. | Hope | Pohutsky | Wegela |
| Carter, T. | Hoskins | Price | Weiss |
| Churches | Koleszar | Puri | Wendzel |
| Coffia | Liberati | Rheingans | Whitsett |
| Coleman | MacDonell | Rogers | Wilson |
| Conlin | Martus | Schmaltz | Witwer |
| Dievendorf | McFall | Schuette | Young |

**Nays—45**

| | | | |
|---|---|---|---|
| Alexander | Fink | Lightner | Roth |
| Aragona | Fox | Maddock | Schriver |
| Beeler | Friske | Markkanen | Slagh |
| BeGole | Green, P. | Martin | Smit |
| Bezotte | Greene, J. | Meerman | St. Germaine |
| Bollin | Hall | Neyer | Steele |
| Borton | Harris | Outman | Thompson |
| Carra | Hoadley | Paquette | VanderWall |
| Cavitt | Johnsen | Posthumus | VanWoerkom |
| DeBoer | Kuhn | Prestin | Wozniak |
| DeBoyer | Kunse | Rigas | Zorn |
| DeSana | | | |

In The Chair: Pohutsky

Pursuant to Joint Rule 20, the full title of the act shall be inserted to read as follows:

"An act to define civil rights; to prohibit discriminatory practices, policies, and customs in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, familial status, or marital status; to preserve the confidentiality of records regarding arrest, detention, or other disposition in which a conviction does not result; to prescribe the powers and duties of the civil rights commission and the department of civil rights; to provide remedies and penalties; to provide for fees; and to repeal certain acts and parts of acts,"

The House agreed to the full title.

Rep. Aiyash moved that the bill be given immediate effect.

The motion prevailed, 2/3 of the members serving voting therefor.

———

Rep. VanWoerkom, having reserved the right to explain his protest against the passage of the bill, made the following statement:

"Mr. Speaker and members of the House:

I oppose SB4 because the lack of a religious exemption. This bill will not stop the lawsuits that continue to go through our judicial system, but it will tip the scales against our religious institutions. I supported an amendment to create a religious exemption. These exemptions are common in other states' statutes. This issue could have been resolved today in a bipartisan manner, but now will continue to be an issue that will need further debate and heartache."

Rep. Bollin, having reserved the right to explain her protest against the passage of the bill, made the following statement:

"Mr. Speaker and members of the House:

I am opposed to the expansion of the Elliot-Larsons Civil Rights Act because there are no protections or consideration for religious liberties or exemption. Courts have rendered that these expansions are already protected under the existing law. "

Rep. Lightner, having reserved the right to explain her protest against the passage of the bill, made the following statement:

"Mr. Speaker and members of the House:

The passage of this bill is something that is duplicative. There has been a court case that already identified sexual orientation and gender identity under the protected category of sex."

**App. 301**

Rep. Aiyash moved that **House Bill No. 4003** be placed on its immediate passage.
The motion prevailed, a majority of the members serving voting therefor.

**House Bill No. 4003, entitled**
A bill to amend 1976 PA 453, entitled "Elliott-Larsen civil rights act," by amending the title and sections 102, 103, 202, 203, 204, 205, 206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506 (MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206, 37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501, 37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by 1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by 1992 PA 124, sections 103 and 301 as amended by 1999 PA 202, section 202 as amended by 2009 PA 190, section 302a as added by 1992 PA 70, and section 402 as amended by 1993 PA 216.

Was read a third time and passed, a majority of the members serving voting therefor, by yeas and nays, as follows:

**Roll Call No. 19**                    **Yeas—64**

| | | | |
|---|---|---|---|
| Aiyash | Edwards | McKinney | Scott |
| Andrews | Farhat | Mentzer | Shannon |
| Arbit | Filler | Miller | Skaggs |
| Beson | Fitzgerald | Morgan | Snyder |
| Bierlein | Glanville | Morse | Steckloff |
| Brabec | Grant | Mueller | Stone |
| Breen | Haadsma | Neeley | Tate |
| Brixie | Hill | O'Neal | Tisdel |
| Byrnes | Hood | Paiz | Tsernoglou |
| Carter, B. | Hope | Pohutsky | Wegela |
| Carter, T. | Hoskins | Price | Weiss |
| Churches | Koleszar | Puri | Wendzel |
| Coffia | Liberati | Rheingans | Whitsett |
| Coleman | MacDonell | Rogers | Wilson |
| Conlin | Martus | Schmaltz | Witwer |
| Dievendorf | McFall | Schuette | Young |

**Nays—45**

| | | | |
|---|---|---|---|
| Alexander | Fink | Lightner | Roth |
| Aragona | Fox | Maddock | Schriver |
| Beeler | Friske | Markkanen | Slagh |
| BeGole | Green, P. | Martin | Smit |
| Bezotte | Greene, J. | Meerman | St. Germaine |
| Bollin | Hall | Neyer | Steele |
| Borton | Harris | Outman | Thompson |
| Carra | Hoadley | Paquette | VanderWall |
| Cavitt | Johnsen | Posthumus | VanWoerkom |
| DeBoer | Kuhn | Prestin | Wozniak |
| DeBoyer | Kunse | Rigas | Zorn |
| DeSana | | | |

In The Chair: Pohutsky

The House agreed to the title of the bill.
Rep. Aiyash moved that the bill be given immediate effect.
The motion prevailed, 2/3 of the members serving voting therefor.
Reps. Andrews, Byrnes, Brenda Carter, Coleman, Dievendorf, Edwards, Hood and McKinney were named co-sponsors of the bill.

Rep. Bollin, having reserved the right to explain her protest against the passage of the bill, made the following statement:

"Mr. Speaker and members of the House:

I am opposed to the expansion of the Elliot-Larsons Civil Rights Act because there are no protections or consideration for religious liberties or exemption. Courts have rendered that these expansions are already protected under the existing law."

Rep. Lightner, having reserved the right to explain her protest against the passage of the bill, made the following statement:

"Mr. Speaker and members of the House:

The passage of this bill is something that is duplicative. There has been a court case that already identified sexual orientation and gender identity under the protected category of sex."

———

Rep. Aiyash moved that House Committees be given leave to meet during the balance of today's session. The motion prevailed.

## Notices

I hereby give notice that on the next legislative session day I will move to discharge the Committee on Government Operations from further consideration of **House Bill No. 4075**.

Rep. Hall

## Messages from the Governor

Date: March 8, 2023
Time: 10:30 a.m.

To the Speaker of the House of Representatives:

Sir—I have this day approved and signed

**Enrolled House Bill No. 4016 (Public Act No. 5, I.E.), being**

An act to make, supplement, and adjust appropriations for various state departments and agencies and capital outlay purposes for the fiscal years ending September 30, 2022 and September 30, 2023; to provide for certain conditions on appropriations; to provide for the expenditure of the appropriations; and to repeal acts and parts of acts.

(Filed with the Secretary of State on March 8, 2023, at 11:26 a.m.)

## Introduction of Bills

Rep. Wendzel introduced

**House Bill No. 4207, entitled**

A bill to amend 1905 PA 282, entitled "An act to provide for the assessment of the property, by whomsoever owned, operated or conducted, of railroad companies, union station and depot companies, telegraph companies, telephone companies, sleeping car companies, express companies, car loaning companies, stock car companies, refrigerator car companies, and fast freight companies, and all other companies owning, leasing, running or operating any freight, stock, refrigerator, or any other cars, not being exclusively the property of any railroad company paying taxes upon its rolling stock under the provisions of this act, over or upon the line or lines of any railroad or railroads in this state, and for the levy of taxes thereon by a state board of assessors, and for the collection of such taxes, and to repeal all acts or parts of acts contravening any of the provisions of this act," (MCL 207.1 to 207.21) by adding section 5c.

The bill was read a first time by its title and referred to the Committee on Tax Policy.

SB-0004, As Passed House, March 8, 2023

# SENATE BILL NO. 4

January 12, 2023, Introduced by Senators MOSS, IRWIN, GEISS, WOJNO, POLEHANKI, CHERRY, MCDONALD RIVET, HERTEL, MCMORROW, CAVANAGH, CHANG, BAYER, MCCANN, SANTANA, KLINEFELT, CAMILLERI, SINGH, SHINK, BRINKS and ANTHONY and referred to the Committee on Civil Rights, Judiciary, and Public Safety.

        A bill to amend 1976 PA 453, entitled

"Elliott-Larsen civil rights act,"

by amending the title and sections 102, 103, 202, 203, 204, 205,

206, 207, 209, 301, 302, 302a, 402, 501, 502, 504, 505, and 506

(MCL 37.2102, 37.2103, 37.2202, 37.2203, 37.2204, 37.2205, 37.2206,

37.2207, 37.2209, 37.2301, 37.2302, 37.2302a, 37.2402, 37.2501,

37.2502, 37.2504, 37.2505, and 37.2506), the title as amended by

1992 PA 258, sections 102, 502, 504, 505, and 506 as amended by

1992 PA 124, sections 103 and 301 as amended by 1999 PA 202,

JHM

App. 304

section 202 as amended by 2009 PA 190, section 302a as added by
1992 PA 70, and section 402 as amended by 1993 PA 216.

**THE PEOPLE OF THE STATE OF MICHIGAN ENACT:**

1    TITLE

2    An act to define civil rights; to prohibit discriminatory

3  practices, policies, and customs in the exercise of those rights

4  based upon religion, race, color, national origin, age, sex, **sexual**

5  **orientation**, **gender identity or expression**, height, weight,

6  familial status, or marital status; to preserve the confidentiality

7  of records regarding arrest, detention, or other disposition in

8  which a conviction does not result; to prescribe the powers and

9  duties of the civil rights commission and the department of civil

10  rights; to provide remedies and penalties; to provide for fees; and

11  to repeal certain acts and parts of acts.

12  Sec. 102. (1) The opportunity to obtain employment, housing

13  and other real estate, and the full and equal utilization of public

14  accommodations, public service, and educational facilities without

15  discrimination because of religion, race, color, national origin,

16  age, sex, **sexual orientation**, **gender identity or expression**,

17  height, weight, familial status, or marital status as prohibited by

18  this act, is recognized and declared to be a civil right.

19  (2) This section ~~shall~~ **does** not ~~be construed to~~ prevent an

20  individual from bringing or continuing an action arising out of sex

21  discrimination before July 18, 1980 ~~which action is~~ **for a claim**

22  based on conduct similar to or identical to harassment.

23  (3) This section ~~shall~~ **does** not ~~be construed to~~ prevent an

24  individual from bringing or continuing an action arising out of

25  discrimination based on familial status before ~~the effective date~~

26  ~~of the amendatory act that added this subsection which action is~~

1   **June 29, 1992 for a claim** based on conduct similar to or identical

2   to discrimination because of the age of ~~persons~~ **anyone** residing

3   with the individual bringing or continuing the action.

4       Sec. 103. As used in this act:

5       (a) "Age" means chronological age except as otherwise provided

6   by law.

7       (b) "Commission" means the civil rights commission established

8   by section 29 of article V of the state constitution of 1963.

9       (c) "Commissioner" means a member of the commission.

10      (d) "Department" means the department of civil rights or its

11  employees.

12      (e) "Familial status" means 1 or more individuals under the

13  age of 18 residing with a parent or other person having custody or

14  in the process of securing legal custody of the individual or

15  individuals or residing with the designee of the parent or other

16  person having or securing custody, with the written permission of

17  the parent or other person. For purposes of this definition,

18  "parent" includes ~~a person~~ **an individual** who is pregnant.

19      **(f) "Gender identity or expression" means having or being**

20  **perceived as having a gender-related self-identity or expression**

21  **whether or not associated with an individual's assigned sex at**

22  **birth.**

23      **(g)** ~~(f)~~ "National origin" includes the national origin of an

24  ancestor.

25      **(h)** ~~(g)~~ "Person" means an individual, agent, association,

26  corporation, joint apprenticeship committee, joint stock company,

27  labor organization, legal representative, mutual company,

28  partnership, receiver, trust, trustee in bankruptcy, unincorporated

29  organization, ~~the~~ **this** state or a political subdivision of ~~the~~ **this**

4

1 state or an agency of ~~the~~ **this** state, or any other legal or
2 commercial entity.

3     **(i)** ~~(h)~~ "Political subdivision" means a county, city, village,
4 township, school district, or special district or authority of ~~the~~
5 **this** state.

6     **(j)** ~~(i)~~ Discrimination because of sex includes sexual
7 harassment. Sexual harassment means unwelcome sexual advances,
8 requests for sexual favors, and other verbal or physical conduct or
9 communication of a sexual nature under the following conditions:

10     (*i*) Submission to the conduct or communication is made a term
11 or condition either explicitly or implicitly to obtain employment,
12 public accommodations or public services, education, or housing.

13     (*ii*) Submission to or rejection of the conduct or communication
14 by an individual is used as a factor in decisions affecting the
15 individual's employment, public accommodations or public services,
16 education, or housing.

17     (*iii*) The conduct or communication has the purpose or effect of
18 substantially interfering with an individual's employment, public
19 accommodations or public services, education, or housing, or
20 creating an intimidating, hostile, or offensive employment, public
21 accommodations, public services, educational, or housing
22 environment.

23     **(k) "Sexual orientation" means having an orientation for**
24 **heterosexuality, homosexuality, or bisexuality or having a history**
25 **of such an orientation or being identified with such an**
26 **orientation.**

27     Sec. 202. (1) An employer shall not do any of the following:
28     (a) Fail or refuse to hire or recruit, discharge, or otherwise
29 discriminate against an individual with respect to employment,

1  compensation, or a term, condition, or privilege of employment,
2  because of religion, race, color, national origin, age, sex, **sexual**
3  **orientation, gender identity or expression**, height, weight, or
4  marital status.
5      (b) Limit, segregate, or classify an employee or applicant for
6  employment in a way that deprives or tends to deprive the employee
7  or applicant of an employment opportunity ~~,~~ or otherwise adversely
8  affects the status of ~~an~~ **the** employee or applicant because of
9  religion, race, color, national origin, age, sex, **sexual**
10 **orientation, gender identity or expression**, height, weight, or
11 marital status.
12     (c) Segregate, classify, or otherwise discriminate against ~~a~~
13 ~~person~~ **an individual** on the basis of sex with respect to a term,
14 condition, or privilege of employment, including, but not limited
15 to, a benefit plan or system.
16     (d) Treat an individual affected by pregnancy, childbirth, or
17 a related medical condition differently for any employment-related
18 purpose from another individual who is not so affected but similar
19 in ability or inability to work, without regard to the source of
20 any condition affecting the other individual's ability or inability
21 to work. For purposes of this subdivision, a medical condition
22 related to pregnancy or childbirth does not include nontherapeutic
23 abortion not intended to save the life of the mother.
24     (2) This section does not prohibit the establishment or
25 implementation of a bona fide retirement policy or system that is
26 not a subterfuge to evade the purposes of this section.
27     (3) This section does not apply to the employment of an
28 individual by ~~his or her~~ **the individual's** parent, spouse, or child.
29     Sec. 203. An employment agency shall not fail or refuse to

1 procure, refer, recruit, or place for employment, or otherwise
2 discriminate against, an individual because of religion, race,
3 color, national origin, age, sex, **sexual orientation, gender**
4 **identity or expression**, height, weight, or marital status; or
5 classify or refer for employment an individual on the basis of
6 religion, race, color, national origin, age, sex, **sexual**
7 **orientation, gender identity or expression**, height, weight, or
8 marital status.

9 　　　Sec. 204. A labor organization shall not **do any of the**
10 **following:**

11 　　　(a) Exclude or expel from membership, or otherwise
12 discriminate against, a member or applicant for membership because
13 of religion, race, color, national origin, age, sex, **sexual**
14 **orientation, gender identity or expression**, height, weight, or
15 marital status.

16 　　　(b) Limit, segregate, or classify membership or applicants for
17 membership, or classify or fail or refuse to refer for employment
18 an individual in a way ~~which~~ **that** would deprive or tend to deprive
19 that individual of an employment opportunity, or ~~which~~ **that** would
20 limit an employment opportunity, or ~~which~~ **that** would adversely
21 affect wages, hours, or employment conditions, or otherwise
22 adversely affect the status of an employee or an applicant for
23 employment, because of religion, race, color, national origin, age,
24 sex, **sexual orientation, gender identity or expression**, height,
25 weight, or marital status.

26 　　　(c) Cause or attempt to cause an employer to violate this
27 article.

28 　　　(d) Fail to fairly and adequately represent a member in a
29 grievance process because of religion, race, color, national

1  origin, age, sex, **sexual orientation, gender identity or**
2  **expression**, height, weight, or marital status.

3     Sec. 205. An employer, labor organization, or joint labor-
4  management committee controlling an apprenticeship, on the job, or
5  other training or retraining program, shall not discriminate
6  against an individual because of religion, race, color, national
7  origin, age, sex, **sexual orientation, gender identity or**
8  **expression**, height, weight, or marital status, in admission to, or
9  employment or continuation in, a program established to provide
10  apprenticeship on the job, or other training or retraining.

11     Sec. 206. (1) An employer, labor organization, or employment
12  agency shall not print, circulate, post, mail, or otherwise cause
13  to be published a statement, advertisement, notice, or sign
14  relating to employment by the employer, or relating to membership
15  in or a classification or referral for employment by the labor
16  organization, or relating to a classification or referral for
17  employment by the employment agency, ~~which~~ **that** indicates a
18  preference, limitation, specification, or discrimination, based on
19  religion, race, color, national origin, age, sex, **sexual**
20  **orientation, gender identity or expression**, height, weight, or
21  marital status.

22     (2) Except as permitted by rules promulgated by the commission
23  or by applicable federal law, an employer or employment agency
24  shall not **do any of the following:**

25     (a) Make or use a written or oral inquiry or form of
26  application that elicits or attempts to elicit information
27  concerning the religion, race, color, national origin, age, sex,
28  **sexual orientation, gender identity or expression**, height, weight,
29  or marital status of a prospective employee.

8

1    (b) Make or keep a record of information described in
2    subdivision (a) or ~~to~~ disclose that information.
3    (c) Make or use a written or oral inquiry or form of
4    application that expresses a preference, limitation, specification,
5    or discrimination based on religion, race, color, national origin,
6    age, sex, **sexual orientation**, **gender identity or expression**,
7    height, weight, or marital status of a prospective employee.
8    Sec. 207. An individual seeking employment shall not publish
9    or cause to be published a notice or advertisement that specifies
10   or indicates the individual's religion, race, color, national
11   origin, age, sex, **sexual orientation**, **gender identity or**
12   **expression**, height, weight, or marital status, or expresses a
13   preference, specification, limitation, or discrimination as to the
14   religion, race, color, national origin, age, height, weight, sex,
15   **sexual orientation**, **gender identity or expression**, or marital
16   status of a prospective employer.
17   Sec. 209. A contract to which ~~the~~ **this** state, a political
18   subdivision, or an agency ~~thereof~~ **of this state or of a political**
19   **subdivision** is a party ~~shall~~ **must** contain a covenant by the
20   contractor and ~~his~~ **the contractor's** subcontractors not to
21   discriminate against an employee or applicant for employment with
22   respect to hire, tenure, terms, conditions, or privileges of
23   employment, or a matter directly or indirectly related to
24   employment, because of race, color, religion, national origin, age,
25   sex, **sexual orientation**, **gender identity or expression**, height,
26   weight, or marital status. Breach of this covenant may be regarded
27   as a material breach of the contract.
28   Sec. 301. As used in this article:
29   (a) "Place of public accommodation" means a business, or an

1  educational, refreshment, entertainment, recreation, health, or
2  transportation facility, or institution of any kind, whether
3  licensed or not, whose goods, services, facilities, privileges,
4  advantages, or accommodations are extended, offered, sold, or
5  otherwise made available to the public. Place of public
6  accommodation also includes the facilities of the following private
7  clubs:

8      (*i*) A country club or golf club.

9      (*ii*) A boating or yachting club.

10     (*iii*) A sports or athletic club.

11     (*iv*) A dining club, except a dining club that in good faith
12  limits its membership to the members of a particular religion for
13  the purpose of furthering the teachings or principles of that
14  religion and not for the purpose of excluding individuals of a
15  particular ~~gender,~~ **sex**, race, or color.

16     (b) "Public service" means a public facility, department,
17  agency, board, or commission, owned, operated, or managed by or on
18  behalf of ~~the~~ **this** state, a political subdivision, or an agency
19  ~~thereof~~ **of this state or of a political subdivision** or a tax exempt
20  private agency established to provide service to the public, except
21  that public service does not include a state or county correctional
22  facility with respect to actions and decisions regarding an
23  individual serving a sentence of imprisonment.

24     Sec. 302. Except where permitted by law, a person shall not **do**
25  **any of the following:**

26     (a) Deny an individual the full and equal enjoyment of the
27  goods, services, facilities, privileges, advantages, or
28  accommodations of a place of public accommodation or public service
29  because of religion, race, color, national origin, age, sex, **sexual**

1   **orientation**, **gender identity or expression**, or marital status.

2       (b) Print, circulate, post, mail, or otherwise cause to be

3   published a statement, advertisement, notice, or sign ~~which~~ **that**

4   indicates that the full and equal enjoyment of the goods, services,

5   facilities, privileges, advantages, or accommodations of a place of

6   public accommodation or public service will be refused, withheld

7   from, or denied an individual because of religion, race, color,

8   national origin, age, sex, **sexual orientation**, **gender identity or**

9   **expression**, or marital status, or that an individual's patronage of

10  or presence at a place of public accommodation is objectionable,

11  unwelcome, unacceptable, or undesirable because of religion, race,

12  color, national origin, age, sex, **sexual orientation**, **gender**

13  **identity or expression**, or marital status.

14      Sec. 302a. (1) This section applies to a private club that is

15  defined as a place of public accommodation ~~pursuant to~~ **under**

16  section 301(a).

17      (2) If a private club allows use of its facilities by 1 or

18  more adults per membership, the use must be equally available to

19  all adults entitled to use the facilities under the membership. All

20  classes of membership ~~shall~~ **must** be available without regard to

21  race, color, ~~gender,~~ **sex**, **sexual orientation**, **gender identity or**

22  **expression**, religion, marital status, or national origin.

23  Memberships that permit use during restricted times may be allowed

24  only if the restricted times apply to all adults using that

25  membership.

26      (3) A private club that has food or beverage facilities or

27  services shall allow equal access to those facilities and services

28  for all adults in all membership categories at all times. This

29  subsection ~~shall~~ **does** not require service or access to facilities

1  to persons that would violate any law or ordinance regarding sale,

2  consumption, or regulation of alcoholic beverages.

3     (4) This section does not prohibit a private club from

4  sponsoring or permitting sports schools or leagues for children

5  less than 18 years of age that are limited by age or to members of

6  1 sex, if comparable and equally convenient access to the club's

7  facilities is made available to both sexes and if these activities

8  are not used as a subterfuge to evade the purposes of this article.

9     Sec. 402. An educational institution shall not do any of the

10  following:

11     (a) Discriminate against an individual in the full utilization

12  of or benefit from the institution, or the services, activities, or

13  programs provided by the institution because of religion, race,

14  color, national origin, ~~or~~ sex, **sexual orientation, or gender**

15  **identity or expression**.

16     (b) Exclude, expel, limit, or otherwise discriminate against

17  an individual seeking admission as a student or an individual

18  enrolled as a student in the terms, conditions, or privileges of

19  the institution, because of religion, race, color, national origin,

20  ~~or~~ sex, **sexual orientation, or gender identity or expression**.

21     (c) For purposes of admission only, make or use a written or

22  oral inquiry or form of application that elicits or attempts to

23  elicit information concerning the religion, race, color, national

24  origin, age, sex, **sexual orientation, gender identity or**

25  **expression**, or marital status of ~~a person,~~ **an individual**, except as

26  permitted by rule of the commission or as required by federal law,

27  rule, or regulation, or pursuant to an affirmative action program.

28     (d) Print or publish or cause to be printed or published a

29  catalog, notice, or advertisement indicating a preference,

1 limitation, specification, or discrimination based on the religion,
2 race, color, national origin, ~~or~~ sex, **sexual orientation, or gender**
3 **identity or expression**, of an applicant for admission to the
4 educational institution.

5 (e) Announce or follow a policy of denial or limitation
6 through a quota or otherwise of educational opportunities of a
7 group or its members because of religion, race, color, national
8 origin, ~~or~~ sex, **sexual orientation, or gender identity or**
9 **expression**.

10 Sec. 501. As used in this article:

11 (a) "Real property" includes a building, structure, mobile
12 home, real estate, land, mobile home park, trailer park, tenement,
13 leasehold, or an interest in a real estate cooperative or
14 condominium.

15 (b) "Real estate transaction" means the sale, exchange,
16 rental, or lease of real property, or an interest ~~therein.~~**in real**
17 **property.**

18 (c) "Housing accommodation" includes improved or unimproved
19 real property, or a part ~~thereof, which~~ **of improved or unimproved**
20 **real property, that** is used or occupied, or is intended, arranged,
21 or designed to be used or occupied, as the home or residence of 1
22 or more ~~persons.~~**individuals.**

23 (d) "Real estate broker or ~~salesman"~~ **salesperson**" means a
24 person, whether licensed or not, who, for or with the expectation
25 of receiving a consideration, lists, sells, purchases, exchanges,
26 rents, or leases real property; who negotiates or attempts to
27 negotiate any of those activities; who holds ~~himself~~ **oneself** out as
28 engaged in those activities; who negotiates or attempts to
29 negotiate a loan secured or to be secured by a mortgage or other

1   encumbrance upon real property; who is engaged in the business of

2   listing real property in a publication; or a person employed by or

3   acting on behalf of a real estate broker or ~~salesman.~~**salesperson.**

4        Sec. 502. (1) A person engaging in a real estate transaction,

5   or a real estate broker or ~~salesman,~~ **salesperson,** shall not on the

6   basis of religion, race, color, national origin, age, sex, **sexual**

7   **orientation, gender identity or expression,** familial status, or

8   marital status of ~~a person~~ **an individual** or ~~a person~~ **anyone**

9   residing with that ~~person:~~**individual do any of the following:**

10        (a) Refuse to engage in a real estate transaction with a

11   person.

12        (b) Discriminate against a person in the terms, conditions, or

13   privileges of a real estate transaction or in the furnishing of

14   facilities or services in connection with a real estate

15   transaction.

16        (c) Refuse to receive from a person or transmit to a person a

17   bona fide offer to engage in a real estate transaction.

18        (d) Refuse to negotiate for a real estate transaction with a

19   person.

20        (e) Represent to a person that real property is not available

21   for inspection, sale, rental, or lease when in fact it is so

22   available, or knowingly fail to bring a property listing to a

23   person's attention, or refuse to permit a person to inspect real

24   property, or otherwise make unavailable or deny real property to a

25   person.

26        (f) Make, print, circulate, post, mail, or otherwise cause to

27   be made or published a statement, advertisement, notice, or sign,

28   or use a form of application for a real estate transaction, or make

29   a record of inquiry in connection with a prospective real estate

14

1 transaction, ~~which~~ **that** indicates, directly or indirectly, an
2 intent to make a preference, limitation, specification, or
3 discrimination with respect to the real estate transaction.
4     (g) Offer, solicit, accept, use, or retain a listing of real
5 property with the understanding that a person may be discriminated
6 against in a real estate transaction or in the furnishing of
7 facilities or services in connection ~~therewith.~~**with that**
8 **transaction.**
9     (h) Discriminate against a person in the brokering or
10 appraising of real property.
11     (2) A person shall not deny a person access to, or membership
12 or participation in, a multiple listing service, real estate
13 brokers' organization or other service, organization, or facility
14 relating to the business of selling or renting real property or ~~to~~
15 discriminate against ~~him or her~~ **the person** in the terms or
16 conditions of that access, membership, or participation because of
17 religion, race, color, national origin, age, sex, **sexual**
18 **orientation, gender identity or expression**, familial status, or
19 marital status.
20     (3) This section is subject to section 503.
21     Sec. 504. (1) A person to whom application is made for
22 financial assistance or financing in connection with a real estate
23 transaction or in connection with the construction, rehabilitation,
24 repair, maintenance, or improvement of real property, or a
25 representative of that person, shall not **do any of the following:**
26     (a) Discriminate against the applicant because of the
27 religion, race, color, national origin, age, sex, **sexual**
28 **orientation, gender identity or expression**, familial status, or
29 marital status of the applicant or ~~a person~~ **an individual** residing

1  with the applicant.

2  (b) Use a form of application for financial assistance or

3  financing or make or keep a record or inquiry in connection with an

4  application for financial assistance or financing ~~which~~ **that**

5  indicates, directly or indirectly, a preference, limitation,

6  specification, or discrimination as to the religion, race, color,

7  national origin, age, sex, **sexual orientation, gender identity or**

8  **expression**, familial status, or marital status of the applicant or

9  ~~a person~~ **an individual** residing with the applicant.

10  (2) A person whose business includes engaging in real estate

11  transactions shall not discriminate against a person because of

12  religion, race, color, national origin, age, sex, **sexual**

13  **orientation**, **gender identity or expression**, familial status, or

14  marital status, in ~~the~~ purchasing ~~of~~ loans for acquiring,

15  constructing, improving, repairing, or maintaining a dwelling or

16  ~~the in~~ making or purchasing ~~of~~ loans or ~~the provision of~~ **providing**

17  other financial assistance secured by residential real estate.

18  (3) Subsection (1)(b) does not apply to a form of application

19  for financial assistance prescribed for the use of a lender

20  regulated as a mortgagee under the national housing act, ~~chapter~~

21  ~~847, 48 Stat. 1246~~ **12 USC 1701 to 1750g**, or by a regulatory board

22  or officer acting under the statutory authority of this state or

23  the United States.

24  Sec. 505. (1) A condition, restriction, or prohibition,

25  including a right of entry or possibility of reverter, that

26  directly or indirectly limits the use or occupancy of real property

27  on the basis of religion, race, color, national origin, age, sex,

28  **sexual orientation**, **gender identity or expression**, familial status,

29  or marital status is void, except a limitation of use as provided

1   in section 503(1)(c) or on the basis of religion relating to real

2   property held by a religious institution or organization, or by a

3   religious or charitable organization operated, supervised, or

4   controlled by a religious institution or organization, and used for

5   religious or charitable purposes.

6      (2) A person shall not insert in a written instrument relating

7   to real property a provision that is void under this section or

8   honor such a provision in the chain of title.

9      Sec. 506. A person shall not represent, for the purpose of

10   inducing a real estate transaction from which the person may

11   benefit financially, that a change has occurred or will or may

12   occur in the composition with respect to religion, race, color,

13   national origin, age, sex, **sexual orientation**, **gender identity or**

14   **expression**, familial status, or marital status of the owners or

15   occupants in the block, neighborhood, or area in which the real

16   property is located, or represent that this change will or may

17   result in the lowering of property values, an increase in criminal

18   or antisocial behavior, or a decline in the quality of schools in

19   the block, neighborhood, or area in which the real property is

20   located.

21      Enacting section 1. This amendatory act takes effect 90 days

22   after the date it is enacted into law.



**MDCR**

# Chair of the Michigan Civil Rights Commission Issues Statement on Vote to Expand Elliott-Larsen Civil Rights Act

March 08, 2023

## Vicki Levengood

Communications Director

levengoodv@michigan.gov

**Lansing, MI –** Portia Roberson, Chair of the Michigan Civil Rights Commission, has issued the following statement in response to the Michigan Legislature voting to expand the Elliott-Larsen Civil Rights Act and provide protection against discrimination for the LGBTQ+ community in Michigan.

"This day was long in coming, but today's vote is still gratifying. For more than 40 years, the Michigan Civil Rights Commission has publicly called for the expansion of the state's signature civil rights law, the Elliott-Larsen Civil Rights Act.  For more than 40 years, nothing changed. Then in 2018, the Commission took bold and decisive action, issuing an interpretive statement that the word 'sex' in ELCRA includes sexual orientation and gender identity. Commissioners knew legal challenges would follow and they did, further cementing the concept that the LGBTQ+ community should be able to live their lives free from discrimination. Now, these long- sought and hard-fought rights are enshrined in ELCRA, and all Michiganders will reap the benefits of our state becoming a more welcoming place for everyone to live, work and play."

The Michigan Civil Rights Commission was created by the Michigan Constitution to safeguard constitutional and legal guarantees against discrimination. The Commission is charged with investigating alleged discrimination against any person because of religion, race, color or national origin, genetic information, sex, age, marital status, height, weight, arrest record, and physical and mental disability. The Michigan Department of Civil Rights serves as the operational arm of the Commission.

# # #

Department of Civil Rights      MI Newswire      Department of Civil Rights

Press Release

# Related News

App. 320



**MDCR**

# Michigan Department of Civil Rights Issues Statement on the Expanded LGBTQ+ Protections Under the Elliott-Larsen Civil Rights Act

March 16, 2023

### Vicki Levengood

Communications Director

levengoodv@michigan.gov

**LANSING, MI—**John E. Johnson, Jr., Executive Director of the Michigan Department of Civil Rights, has issued the following statement after Governor Whitmer's official signing of the updated Elliott-Larsen Civil Rights Act.

"Today is a reminder that freedom and equality are both working promises. In 1963 Michigan became the first state in the nation to enshrine civil rights protections, and their enforcement, into its Constitution. In the almost 60 years since, Michigan has constructed one of the most comprehensive civil rights sanctuaries in the US. It cannot be overstated that we are expanding the Elliott-Larsen Civil Rights Act (ELCRA) to include sexual orientation, gender identity, and gender expression at a time when other states are banning books and redacting history. I am proud to say that the Michigan Civil Rights Commission led this effort with a 2018 interpretive statement that the word 'sex' in ELCRA includes sexual orientation and gender identity. Our commission, judges, legislators, and now Governor have all spoken: We believe in equality for ALL people and we will defend our freedom."

The Michigan Department of Civil Rights is charged with investigating and resolving discrimination complaints and works to prevent discrimination through educational programs that promote voluntary compliance with civil rights laws. The Department also provides information and services to businesses on diversity initiatives and equal employment law. For more information on the Michigan Department of Civil Rights, go to www.michigan.gov/mdcr.

# # #

Department of Civil Rights        MI Newswire        Department of Civil Rights

Press Release

**App. 321**



**AG**

# AG Nessel Celebrates the Expansion of Michigan's Elliott Larsen Civil Rights Act to Protect LGBTQ+ Residents Against Discrimination

March 08, 2023

**AG Press**

agpress@michigan.gov

**LANSING** – Michigan Attorney General Dana Nessel joined Michigan legislators on the state House floor to celebrate the expansion of Michigan's Elliott Larsen Civil Rights Act (ELCRA) to encompass protections against discrimination on the basis of sexual orientation and gender identity having been passed through both chambers of the state legislature. The bill now awaits the Governor's signature to officially enshrine such protections in Michigan law.

ELCRA safeguards the civil rights of Michigan residents to be free from discrimination in employment, public accommodations, public services, housing and educational facilities.

Last July, the Michigan Supreme Court ruled in favor of the Department of Attorney General in *Rouch World LLC et al v. Michigan Department of Civil Rights et al*, issuing an interpretation of ELCRA which extended its protection to LGBTQ+ individuals. The court ruled that ELCRA's prohibition against discrimination "because of... sex" also encompassed considerations of sexual orientation and gender identity.

AG Nessel personally argued the *Rouch World* case to ensure that the discrimination of Michigan residents based on how they identified and who they loved would not be permissible under state law. Today's legislative expansion of ELCRA codifies the Michigan Supreme Court's 2022 interpretation in *Rouch World*, solidifying the protections so that they cannot be easily overturned by a future court.

"This expansion of the Elliott Larsen Civil Rights Act will provide immediate enhanced dignity for thousands of Michiganders and further codify what was intended with its passage nearly 50 years ago: civil rights for all Michiganders to be free from discrimination in employment, public accommodations, public services, housing and educational facilities," Nessel said. "As we've seen over the past year, it is imperative that in addition to securing these rights through court interpretation as my department was able to do with *Rouch World*, these rights must also be enshrined in Michigan law to help them withstand future legal attacks. I am proud that Michigan legislators are committed to making this a state that recognizes LGBTQ+ residents' value, protects their dignity, and welcomes all."

###

**App. 322**

**Tweet**



**Jason Morgan (he|him)** ✔
@JasonMorganMI

···

"To those making the argument for religious liberty: Bigotry under a
veneer of religion is still bigotry.
Discrimination masked by concern for children is still discrimination. And
hate born out of religion is still hate...And hate has no place in our state."



▶  13.6K views                                        0:01 / 0:30  🔊  ⤢

6:11 AM · Mar 10, 2023 from Ann Arbor, MI · **37.1K** Views

**136** Retweets   **19** Quotes   **674** Likes



# MEMORANDUM

---

**DATE:**     August 10, 2006

**TO:**        Michigan Civil Rights Commission

**FROM:**     George Wirth, Commission Case Counsel

**SUBJECT:**   BFOQ Request for Southridge Reformed Church

Please find an application and brief in support of application for a Bona Fide Occupational Qualification. Rule 37.25 of the Michigan Civil Rights Commission Rules allow a person to apply to the commission for exemption from the Elliott-Larsen Civil Rights Act on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification. Upon sufficient showing the commission may grant an exemption.

The application of Southridge Reformed Church is narrowly tailored to cover eight specific positions within the church that appear to deal directly with religious education. The granting of a BFOQ in this matter would be consistent with the Commission's past BFOQ decisions in the BFOQ requests of Huda School and Spring Arbor College.

Please feel free to contact me at (313) 456-3792 if you have any questions or would like a copy of the past Commission decisions. Representatives of the church will be available at the commission meeting for questioning.

App. 324

**State of Michigan**
**Civil Rights Commission**

In the Matter of
Southridge reformed Church,
            BFOQ Applicant.
_____/

### Opinion

Mark J. Bernstein, Commission Chair

Southridge Reformed Church has applied to this Commission for a bona fide occupational qualification (BFOQ) exemption pursuant to Section 208 of the Elliott-Larsen Civil Rights Act. The applicant is a Christian church, using the Bible as God's word to help others come to know the love of Jesus Christ as their savior. The church provides regular religious educational classes for children at the preschool through fifth grade levels.

The church has requested a BFOQ exemption for eight positions with direct job responsibilities that involve intertwining religion and teaching. The positions are Director of Children's Ministry, Administrative Assistant for Children's Ministry, Special Events Director for Children's Ministry, Senior Pastor, Adult Spiritual Growth Pastor, Senior High School Youth Pastor, Middle School Youth Pastor Assistant and Arts in Worship Director. The exemption would also apply to future religious teaching positions in the church as they are created.

Michigan Courts have maintained that in circumstances where religious authority is intertwined in religious educational institutions, the government cannot demand that the church-operated educational programs or schools employ persons of other faiths or denominations. Application of religious discrimination law to the faculty employment decisions of church-operated or faith-based educational programs and/or schools necessitates a judicial body determining the degree to which a particular course is secular or religious. This type of inquiry is prohibited because the judicial body must determine the religious nature of a particular course; and would thus qualify as an intimate and sensitive issue regarding the religious mission of the church or school.

The Michigan Court of Appeals decision in *Porth v. Roman Catholic Diocese of Kalamazoo*, 209 *Mich App 630, 532 NW2d 195 (1995)*, held that because religious liberty is a fundamental freedom, courts have a firmly rooted tradition of applying the compelling interest test to its regulation. The *Porth* court further stated that the State has no interest in requiring church operated schools to employ teachers of other faiths or of no faith; such state regulation would substantially burden the mission and function of religious schools.

Although the Religious Freedom Restoration Act , upon which the court relied, was subsequently found to be unconstitutional, the following reasoning of the *Porth* court is still applicable:

> "Imposition of religious discrimination laws to teaching positions in religious schools
> would detrimentally affect the operation of such schools. The state simply has no
> interest, and certainly no compelling interest, in requiring church-operated schools to
> employ teachers of other faiths or of no faith. Such state regulation would
> substantially burden the mission and function of religious schools." Id. at 640.

This burden was recognized and exempted by the United States Congress in Title VII of the U. S. Civil Rights Act of 1964[1], but not by the Michigan Legislature. The religious beliefs of the respondent's faculty members are of fundamental importance to the mission and function of its' religious objectives. The State's interest in equal employment for all although arguably compelling, in this day and age, does not trump the respondent's fundamental religious freedoms.

---

[1] TITLE VII  EXEMPTION SEC. 2000e-1. *[Section 702]* **(a)** This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

The Michigan Supreme Court held that state-mandated teacher certification requirements violate the Free Exercise Clause when applied to families who practice home schooling for religious reasons. *People* v. *DeJonge, 442 Mich 266 (1993)*. The *Porth* court found the reasoning in *DeJonge* persuasive and noted that Michigan courts have always applied a strict scrutiny test to state regulation of religious freedom.  The court also emphasized that the educational value of religion is expressly recognized in Article 8, § 1 of Michigan's Constitution, which states, "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."  The concurring opinion in *Porth* reached the same conclusion as the majority (the failure to renew the teacher's contract on the basis of religion was lawful) without reliance on the Religious Freedom Restoration Act.

In addition, the Michigan Attorney General's Office, Division of Civil Rights and Civil Liberties, dismissed a case of similar circumstances, that was pending hearing before the Michigan Civil Rights Commission.  That case was *Buels* v. *Wee Care Day Care, MDCR No.: 124562-EM06*.  The case involved a teacher's aide who was discharged by a church affiliated day care facility because she did not adhere to the religious tenets of the church. The Attorney General's Office dismissed the *Buels* case on the basis that the principles of the Establishment Clause bar the intervention of Courts where the job requires decision making on doctrine, religious discretion or teaching.

The request for a BFOQ exemption for eight positions directly related to the teaching of religion and the religious beliefs of the church is narrowly focused to include only those persons who have direct job responsibilities that involve the teaching of religion. These positions are already exempt from claims of religious discrimination under Title VII of the U.S. Civil Rights Act. Therefore the granting of a BFOQ exemption for these positions for Southridge Reformed Church is appropriate under the Elliott-Larsen Civil Rights Act.

Mark J. Bernstein

4  G3   4

App. 328

## State of Michigan
## Civil Rights Commission

In the Matter of
Spring Arbor University,
      BFOQ Applicant.
_____/

### RULING

At a meeting of the Michigan Civil Rights Commission
held in Lansing, Michigan on the 29th day of March, 2004

The applicant has submitted a request for a bona fide occupational qualification under the Elliott-Larsen Civil Rights Act. Based on the reasons set forth in the accompanying opinion the commission by unanimous vote hereby grants the request as follows. Applicant shall be allowed an exemption on the basis of religion for teachers and administrators.

MICHIGAN CIVIL RIGHTS COMMISSION

Dated: __4/1/04__

Linda V. Parker, Director

**State of Michigan
Civil Rights Commission**

In the Matter of
Spring Arbor University,
      BFOQ Applicant.
_____/

**Opinion**

Valerie Simmons, Commissioner

Spring Arbor University has applied to this Commission for a bona fide occupational qualification (BFOQ) exemption, on the basis of religion,  pursuant to Section 208 of the Elliott-Larsen Civil Rights Act.

The applicant's mission statement is as follows:

> Spring Arbor, an evangelical Christian university affiliated with the Free Methodist Church, is committed to excel in liberal arts, professional, and graduate studies. Through the influence of an affirming academic community where a faculty of Christian scholars  integrates faith with experiential learning, students develop intellectually, grow as persons, and are challenged by the call to vibrant Christian service.

The applicant states that its mission is rooted in the following core values:

- Spring Arbor University is committed to Jesus Christ as savior and Lord, and affirms the importance of learning grounded in God's Creation and in His uniquely authoritative revelation through Scripture.

- Spring Arbor University is committed to a liberal arts education involving the pursuit of all truth as God's truth, the development of Christian character, and the living integration of faith and learning.

- Spring Arbor University is committed to the value and potential of every human being as created in God's image and thus accountable to Him and responsible for effective, redemptive participation in society and culture.

App. 330

Because of the intertwining of religion into the classroom curriculum and the requirement that each student be educated in Christian ideals the applicant has requested a BFOQ designating that classroom teachers and school administrators be Christians.

Michigan Courts have maintained that in circumstances where religious authority is intertwined in religious educational institutions, the government cannot demand that the church-operated schools employ persons of other faiths or denominations.  Application of religious discrimination law to the faculty employment decisions of church-operated or faith-based schools necessitates a judicial body determining the degree to which a particular course is secular or religious.  This type of inquiry is prohibited because the judicial body must determine the religious nature of a particular course; and would thus qualify as an intimate and sensitive issue regarding the religious mission of the school.

The Michigan Court of Appeals decision in *Porth* v. *Roman Catholic Diocese of Kalamazoo*, 209 *Mich App 630, 532 NW2d 195 (1995)*, held that because religious liberty is a fundamental freedom, courts have a firmly rooted tradition of applying the compelling interest test to its regulation.  The *Porth* court further stated that the State has no interest in requiring church operated schools to employ teachers of other faiths or of no faith;  such state regulation would substantially burden the mission and function of religious schools.

Although the Religious Freedom Restoration Act , upon which the court relied, was subsequently found to be unconstitutional, the following reasoning of the *Porth* court is still applicable:

> "Imposition of religious discrimination laws to teaching positions in religious schools would detrimentally affect the operation of such schools. The state simply has no interest, and certainly no compelling interest, in requiring church-operated schools to employ teachers of other faiths or of no faith. Such state regulation would substantially burden the mission and function of religious schools." Id. at 640.

This burden was recognized and exempted by the United States Congress in Title VII of the U. S.

App. 331

Civil Rights Act of 1964,[1] but not by the Michigan Legislature in the drafting of the Elliott-Larsen Civil Rights Act.  The religious beliefs of the respondent's faculty members are of fundamental importance to the mission and function of its religious objectives.  The State's interest in equal employment for all, although arguably compelling, does not trump the respondent's fundamental religious freedoms under federal law.

The Michigan Supreme Court held that state-mandated teacher certification requirements violate the Free Exercise Clause when applied to families who practice home schooling for religious reasons. *People* v. *DeJonge*, *442 Mich 266 (1993).* The *Porth* court found the reasoning in *DeJonge* persuasive and noted that Michigan courts have always applied a strict scrutiny test to state regulation of religious freedom.  The court also emphasized that the educational value of religion is expressly recognized in Article 8, § 1 of Michigan's Constitution, which states, "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."  The concurring opinion in *Porth* reached the same conclusion as the majority (the failure to renew the teacher's contract on the basis of religion was lawful) without reliance on the Religious Freedom Restoration Act.

In addition, the Michigan Attorney General's Office, Division of Civil Rights and Civil Liberties, dismissed a case of similar circumstances, that was pending hearing before the Michigan Civil Rights Commission.  That case was *Buels* v. *Wee Care Day Care, MDCR No.: 124562-EM06.*  The case involved a teacher's aide who was discharged by a church affiliated day care facility because she did not adhere to the religious tenets of the church. The Attorney General's Office dismissed the *Buels* case on the basis that the principles of the Establishment Clause bar the intervention of Courts where the job requires decision making on doctrine, religious discretion or teaching.

---

[1] TITLE VII  EXEMPTION SEC. 2000e-1. *[Section 702]* **(a)** This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

App. 332

The request for a BFOQ exemption for  teachers and administrators shall include only those employees who have direct job responsibilities that involve the teaching of Christian ideals within the classroom or the implementation of the teaching of Christian ideals to the students. Spring Arbor University defines administrators as staff members who have administrative responsibilities and who are invited to attend faculty meetings.  For purposes of granting the applicant's request for a BFOQ exemption administrators shall include the President's Council, regional directors, coordinators of academic services, chairs of advisory committees and other high ranking similarly situated positions. The granting of this BFOQ exemption is not meant to include support staff, clerical or maintenance personnel who are not directly involved in academic teaching positions or policy decision making within the university.  The positions requested for exemption are already exempt from claims of religious discrimination under Title VII of the U.S. Civil Rights Act.  They also qualify for a BFOQ under the Elliott-Larsen Civil Rights Act.

Subject  to the above limitations the request of Spring Arbor University for a BFOQ exemption on the basis of religion for teachers and administrators is granted.

Dated: 3-29-04

Valerie P. Simmons

Page 4 of  4

App. 333



# MEMORANDUM

**DATE:**     October 20, 2003

**TO:**     Francisco J. Villarruel, Commissioner
          Michigan Civil Rights Commission

**FROM:**     George Wirth, Director of Hearings and Mediations
          Michigan Department of Civil Rights

**SUBJECT:**     Lead Commissioner Assignment

You have been assigned as lead commissioner for a BFOQ request that is scheduled to be heard at the November 16, 2003 Michigan Civil Rights Commission Meeting. The request is from Huda School and Montessori. The mission of the school is in conjunction with fulfilling the requirements of the state curriculum to also provide an Islamic educational environment to develop a mature Islamic personality by studying the basic principles and teachings of Islam as laid down in the Qur'an and Sunnah.

In order to fulfill its mission the school is requesting a BFOQ exemption on the basis of religion for the teachers and administrators of the school. Other employees such as the janitorial staff, physical education teacher and office personnel would not be subject to the BFOQ exemption. The attorney for the respondent, Shereef H. Akeel, has indicated that he will be at the November commission meeting to present his request and answer any questions that the commission may have.

I have enclosed a copy of the school's application for BFOQ along with supporting documents. I have also prepared a short summary in support of the request. Please call me at (313) 456-3792 if you have any questions or require additional information.

cc: Nanette Reynolds
    Vyann Grant

2r: CV
bfoq/ commission assignment letter/ huda

App. 334

## State of Michigan
## Civil Rights Commission

In the Matter of
Huda School and Montessori,
BFOQ Applicant.

_____ /

### RULING

At a meeting of the Michigan Civil Rights Commission
held in Lansing, Michigan on the 17th day of November, 2003

The applicant has submitted a request for a bona fide occupational qualification under the Elliott-Larsen Civil Rights Act. Based on the reasons set forth in the accompanying opinion the commission by unanimous vote hereby grants the request as follows. Applicant shall be allowed an exemption on the basis of religion for classroom teachers and the current school principal.

MICHIGAN CIVIL RIGHTS COMMISSION

Linda V. Parker, Director

Dated: 12/8/03

**State of Michigan**
**Civil Rights Commission**

In the Matter of
Huda School and Montessori,
    BFOQ Applicant.
_____/

**Opinion**

Francisco J. Villarruel, Commissioner

Huda School has applied to this Commission for a bona fide occupational qualification (BFOQ) exemption pursuant to Section 208 of the Elliott-Larsen Civil Rights Act. The applicant is a private elementary school dedicated to the education of children in an environment where they can maintain their Islamic dignity and character and to help them grow in Islamic traditions and values. The school provides an Islamic educational environment to develop a mature Islamic personality by studying the basic principals and teachings of Islam as laid down in the Qur'an and Sunnah. A special focus is given to the Arabic language since it is the language of the Holy Qur'an and Hadith as well as the language of early Islamic Civilization.[1]

Because of the intertwining of religion into the classroom curriculum and the requirement that each student receives an Islamic education in conjunction with an academic education, the applicant has requested that classroom teachers and the school principal be of the Islamic faith. There are currently 34 classroom teachers and the principal of the school who would be covered under this exemption. The exemption would also apply to future classroom teaching positions in the school as they are created.

Michigan Courts have maintained that in circumstances where religious authority is intertwined in religious educational institutions, the government cannot demand that the church-operated schools employ persons of other faiths or denominations. Application of religious discrimination law to the

_____
[1] Huda School & Montessori, Parent - Student Handbook; Page 3

<span style="color:red">**App. 336**</span>

faculty employment decisions of church-operated or faith-based schools necessitates a judicial body determining the degree to which a particular course is secular or religious. This type of inquiry is prohibited because the judicial body must determine the religious nature of a particular course; and would thus qualify as an intimate and sensitive issue regarding the religious mission of the school.

The Michigan Court of Appeals decision in *Porth v. Roman Catholic Diocese of Kalamazoo*, 209 *Mich App 630, 532 NW2d 195 (1995)*, held that because religious liberty is a fundamental freedom, courts have a firmly rooted tradition of applying the compelling interest test to its regulation. The *Porth* court further stated that the State has no interest in requiring church operated schools to employ teachers of other faiths or of no faith; such state regulation would substantially burden the mission and function of religious schools.

Although the Religious Freedom Restoration Act , upon which the court relied, was subsequently found to be unconstitutional, the following reasoning of the *Porth* court is still applicable:

> "Imposition of religious discrimination laws to teaching positions in religious schools would detrimentally affect the operation of such schools. The state simply has no interest, and certainly no compelling interest, in requiring church-operated schools to employ teachers of other faiths or of no faith. Such state regulation would substantially burden the mission and function of religious schools." Id. at 640.

This burden was recognized and exempted by the United States Congress in Title VII of the U. S. Civil Rights Act of 1964[2], but not by the Michigan Legislature. The religious beliefs of the respondent's faculty members are of fundamental importance to the mission and function of its' religious objectives. The State's interest in equal employment for all although arguably compelling, in this day and age, does not trump the respondent's fundamental religious freedoms.

---

[2] TITLE VII EXEMPTION SEC. 2000e-1. *[Section 702]* (a) This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

App. 337

The Michigan Supreme Court held that state-mandated teacher certification requirements violate the Free Exercise Clause when applied to families who practice home schooling for religious reasons *People* v. *DeJonge, 442 Mich 266 (1993)*. The *Porth* court found the reasoning in *DeJonge* persuasive and noted that Michigan courts have always applied a strict scrutiny test to state regulation of religious freedom. The court also emphasized that the educational value of religion is expressly recognized in Article 8, § 1 of Michigan's Constitution, which states, "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." The concurring opinion in *Porth* reached the same conclusion as the majority (the failure to renew the teacher's contract on the basis of religion was lawful) without reliance on the Religious Freedom Restoration Act

In addition, the Michigan Attorney General's Office, Division of Civil Rights and Civil Liberties, dismissed a case of similar circumstances, that was pending hearing before the Michigan Civil Rights Commission. That case was *Buels* v. *Wee Care Day Care, MDCR No.: 124562-EM06*. The case involved a teacher's aide who was discharged by a church affiliated day care facility because she did not adhere to the religious tenets of the church. The Attorney General's Office dismissed the *Buels* case on the basis that the principles of the Establishment Clause bar the intervention of Courts where the job requires decision making on doctrine, religious discretion or teaching.

The request for a BFOQ exemption for classroom teachers and the current school principal is narrowly focused to include only those faculty members who have direct job responsibilities that involve the teaching of Islam or the implementation of the teaching of Islam to the students These positions are already exempt from claims of religious discrimination under Title VII of the U.S. Civil Rights Act. Therefore the granting of a BFOQ exemption for these positions for Huda School and Montessori is appropriate under the Elliott-Larsen Civil Rights Act.

Francisco J. Villarruel

RECEIVED

DEC 0 4 2003

App. 338

MICHIGAN CIVIL RIGHTS
COMMISSION MEETING MINUTES
Detroit, Michigan
September 23, 1980

The public meeting of the Commission was convened at 10:55 a.m., on Tuesday, September 23, 1980, in the Conference Room on the 7th Floor of the Michigan Plaza Building, 1200 Sixth Avenue, Detroit, Michigan, by Chairperson Paul P. Harbrecht.

Present: Commissioners Paul P. Harbrecht, Catherine C. Blackwell, Beatrice Banks, Carole L. Chiamp, Berry C. Goodlett, Gilberto G. Ibarra, and Father Theodore E. LaMarre; and Director Ruth Rasmussen

Absent: Commissioner Dr. Frederick G. Sampson

Guests: Some 40-50 individuals

I.      MINUTES -- The minutes of the September 9, 1980 public meeting of the Commission were approved as submitted.

V.      BFOQ APPLICATIONS (continued)

3.  Kalamazoo Youth Ministry -- Following discussion, motion was made and duly supported to adopt the recommendation made by staff to grant the BFOQ requested by the Kalamazoo Youth Ministry based on sex and religic Motion carried by a vote of 5 to 2 with Commissioners Chiamp and Banks voting no.

App. 339

Michigan Civil Rights Commission

Proposed Ruling

Request for Bona Fide Occupational Qualification Exemption

Filed by:  KALAMAZOO YOUTH MINISTRY

For position of:  Resident Counselor

Exemption basis:  Religion & Sex

The Kalamazoo Youth Ministry (hereafter KYM) has submitted a request for
exemption in accordance with the provisions of Section 208, P.A. 453, 1976.
The application approved by the Michigan Civil Rights Commission has been
submitted and is attached.

Facts:

KYM, a non-denominational Christian organization, operates 2 houses for
young men and women in need of counseling and a temporary place to live.
One of the houses is for men and the other for women.  Each house has
Resident Counselors who live in the building and are responsible for house
management and client relations during the hours of 5:00 p.m. to 8:30 a.m.
It is the avowed purpose of KYM not only to provide shelter, but also to
proselytize the Christian faith.  The Resident Counselor is, therefore,
expected to share his/her faith with clients and to encourage the latter's
belief in Christianity.

The physical structure of the women's house is different from that for the
men.  The former is a duplex with 2 separate, self-contained apartments.  The
Resident Counselors live in one apartment while clients live in the other.
The men's house, however, is an ordinary home without structural separation
of Resident Counselors and the clients.  Kitchen and toilet facilities are
shared between them.  Clients reside and sleep in the living room which
accomodates as many as 10 persons at a time.  The living room is not closed
off from view, and Counselors must pass through to get to the kitchen or to
the stairway which leads to their own bedroom upstairs.  The Resident Counselors
share a single bedroom on the 2nd floor, but also have exclusive use of an
additional bedroom there which has been converted to a living room.  Because
of the living arrangement in the men's house, it is common for the Resident
Counselors to view clients in various stages of undress.

For the women's house, KYM employ's a family (husband, wife and children) as
Resident Counselors.  For the men's house, however, 2 males are so employed.
KYM seeks an exemption for the latter position which would allow it to
continue to hire only Christian males as Resident Counselors in the men's house.

App. 340

Analysis:

### Religion

Proselytizing is of the essence of KYM's business.  Further, KYM contends that only an active, believing Christian could effectively proselytize and propagate the faith.  The position is not unreasonable.  If a Resident Counselor himself did not believe, the effect would be to raise doubts in the minds of the clients.

The Elliott-Larsen Civil Rights Act provides that an employer may be granted an exemption on the basis that religion is a bona fide occupational qualification reasonably necessary to the normal operation of the enterprise. Although the act makes no specific reference to the kind of situation involved herein, the Federal Civil Rights Act, to which we may look for guidance, clearly does.

Section 302 of Title VII provides:

> "This title shall not apply to *** a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

Based on the above, we conclude that the hiring of a Christian for the position of Resident Counselor is reasonably necessary to the operation of KYM's business and thereby qualifies for an exemption.

### Sex

The Commission has previously granted exemptions in situations wherein privacy rights, pertaining to a person's body, are involved.  If a job requires the viewing of persons who are undressed, an employer may exclusively hire people for that job who are the same sex as those being viewed.  Wayne County Civil Service, Clerks I & III, July 30, 1979.  The general rule applies, however, only if the work cannot be re-arranged in such a manner as to avoid collision with the privacy rights involved.

In the present case, as previously stated, Resident Counselors and clients reside in the same house.  The routine activities of the Counselors require frequent passage through areas where clients dress and undress.  There appears to be no reasonable way to either re-assign work or re-arrange the living and working environment in such a way as to avoid the privacy problem.

Decision:

On the basis of the analysis made, the Commission grants the exemption requested on the basis of religion and sex.

App. 341

LOG

## BFOQ APPLICATIONS

Page 1

| EMPLOYER | POSITION | BFOQ BASIS | DATE RECEIVED | DATE ACTED UPON | RESULT | (WRITTEN OPINION?) |
|---|---|---|---|---|---|---|
| St. Clair County Probate Ct. | Child Care Worker, Shift Supervisor, Child Care & Transp. Worker | Age, Sex, Height & Weight | 7/20/77 | 2/14/78 | Granted, BFOQ - Sex, Child Care Worker Denied, BFOQ - Shift Superv. Sex Denied, BFOQ - Age, Height, Weight | Yes |
| Battle Creek Police Dept. | Police Officer | Age, Height, & Weight | 7/26/77 | 2/14/78 | Denied | Yes |
| Bureau of State Lottery, State of Michigan | District Manager | Sex | 12/28/77 | Withdrawn 8/24/78 | | |
| Detroit Metro Masonry Bricklayers Apprenticeship Committee | Bricklayer Apprentice | Age | 8/30/77 | 10/10/78 | Denied | Yes |
| Rowen & Blair Electric Co. | Journeyman Electrician | Age | 10/5/77 | 10/10/78 | Denied | Yes |
| Spa Health Club | Technician Floor Supervisor, Mgmt. Trainee, Asst. Mgr., Manager | Height, Weight | 4/20/78 | 3/27/79 | Granted | Yes |
| Macomb County Sheriff's Dept. | Deputy Sheriff, Correctional Officer, Matron | Age, Height, & Weight | 5/16/78 | 4/16/79 | Denied | Yes |
| Whitehall Convalescent Homes, Inc. | Nurse Aide | Sex | 1/4/78 | 6/19/79 | Denied | Yes |
| Wayne County Civil Service | Airport Fire Fighter | Age | 5/17/78 | 6/19/79 | Denied | Yes |

App. 342

BFOQ APPLICATIONS

| EMPLOYER | POSITION | BFOQ BASIS | DATE RECEIVED | DATE ACTED UPON | RESULT | (WRITTEN OPINION?) |
|---|---|---|---|---|---|---|
| Wayne County Civil Service Commission | Clerk I, III (Jail) | Sex | 5/19/78 | 7/24/79 | Granted | Yes |
| Burns International Security Services, Inc. | Guard | Sex | 7/9/79 | Not acted on--4 filed cases open re: same issues. | | |
| City of Livonia, Police Dept. | Police Officer | Sex | 1/26/78 | 6/17/80 | Denied | Yes |
| Kalamazoo Youth Ministry | Resident Counselor | Religion, Sex | 2/20/80 | 9/23/80 | Granted | Yes |
| Three Rivers Board of Educa. | Physical Ed. Teacher | Sex | 8/2/79 | 9/23/80 | Denied | No |
| Wayne County Civil Service | Deputy Sheriff | Age, Height, Sex | 5/18/79 | 12/16/80 (Age & Height) 2/23/81 (Sex) | Denied Denied | No No |
| Wayne County Civil Service | Juvenile Groupleader | Sex | 5/9/77 | 9/23/80 | Denied | No |
| County of Muskegon | Youth Home Attendant | Sex | 8/1/79 | 2/23/81 | Granted, limited to one employee per shift | No |
| Mich. Dept. of Soc. Services, Office of Children & Youth Services | Youth Specialist, Youth Aide | Sex | 8/29/80 | 2/23/81 | Denied | No |
| Warren Police Department | Communication Aide II | Sex | 8/21/80 | 2/23/81 | Denied | No |
| Memorial Hospital | Nurse Technician | Sex | 5/19/80 | 2/23/81 | Denied | No |
| Battle Creek Police Dept. | Female Youth Specialist | Sex | 5/05/79 | 2/23/81 | Denied | No |
| Canton Twp. Police Dept. | Patrolman | Age | 12/07/79 | 2/23/81 | Denied | No |

App. 343

BFOQ APPLICATIONS

| EMPLOYER | POSITION | BFOQ BASIS | DATE RECEIVED | DATE ACTED UPON | RESULT | (WRITTEN OPINION?) |
|---|---|---|---|---|---|---|
| Pontiac General Hospital | R.N. and L.P.N. | Sex | 3/18/80 | 2/23/81 | Denied | No |
| Western Michigan University | Athletic Equipment Handler | Sex | 11/03/80 | 2/23/81 | Denied | No |
| Wayne County Civil Service Commission | Child Care Worker I (D.J. Healy Home) | Sex | 6/10/81 | 12/14/81 | Granted in part Denied in part | No |
| Western Michigan University | Custodian (Locker Rm) | Sex | 3/29/82 | 4/27/82 | Denied | No |
| Dr. Allan Nelson | Office Nurse | Sex | 10/08/82 | 10/26/82 | Denied | No |
| Ingham County Probate Court | Juvenile Home Attendant | Sex | 1/12/83 | Not acted on — Open complaint pending | | |
| Comp-U-Lab d/b/a Nutritional Health Clinic | Doctors, Medical Assistants, Counselors Technicians | Weight | 10/03/83 | 11/14/83 | Denied | No |
| Tri-Med, Inc. d/b/a Doctors Weight Loss Clinic | Doctors, Medical Assistants, Counselors | Weight | 10/03/83 | 11/14/83 | Denied | No |
| Dr. Atkins Nutrition Break-through Center | Doctors, Registered Nurses, L.P.N., Dieticians, Counselors Medical Assistants | Weight | 10/03/83 | 11/14/83 | Denied | No |
| Bridgewood Non-Profit Housing Corp. and Bridgewood Non-Profit Corporation | Resident-Care/Night-Care Staff | Sex | 11/18/83 | 1/31/84 | Denied | No |

App. 344

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT / RETURNED | | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Bodman & Longley Law Office, Karen Piper | 09/20/84 | 09/26/84 & 01/07/85 | | | | | | | |
| Clinton-Eaton-Ingham Community Mental Health Board | | | 10/26/84 | Business Aide, Sleeper, Resident Aide | Sex | 4/1986 5/1986 | 5/20/86 | Denied | Yes |
| Mr. Robert Dahm | 10/30/84 | 10/30/84 | | | | | | | |
| Mr. Don Bonato Thrun, Maatsch & Nordberg on behalf of the Pinconning Area Schools | 08/28/85 | 08/30/85 | 09/18/85 | Hall and Bathroom Monitor | Sex | 2/1986 4/1986 5/1986 | 5/20/86 | Denied | Yes |
| Ms. Rhoda Neitzel Michigan Capital Girl Scout Council | 04/01/86 | 04/10/86 | | | | | | | |
| Mr. Jack Marks Pontiac Osteopathic Hospital | 4/30/86 | 4/30/86 | | | | | | | |
| Mr. Daniel Nickerson Lansing Ass't City Atty. Lansing Fire Department | 05/06/86 | 05/06/86 | | | | | | | |
| Ms. Bea Goree Office of State Employer | 05/14/86 | 05/14/86 | | | | | | | |

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT / | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Ralph Riddle Office of Aff. Action Department of Social Services (Institutinal Services) | 06/25/86 | 06/26/86 | | | | | | | |
| Mr. Terry Kleinart Director-Kent Cty Child care Haven | 07/21/86 | 07/21/86 | | | | | | | |
| Mr. Ken Empey 1 Woodward Ave. 10th Floor Detroit, MI   48226 | 08/14/86 | 08/14/86 | | | | | | | |
| Taylor School Dist. Gloria A. Hage, Atty for School District (Butzel, Long et al) | | | 01/07/87 | Guidance Counselor for Secondary Schl. (Jr. High & High School | Sex | 5/1987 | 5/26/87 | Denied | No |
| Michael Jozwik City of Detroit Personnel Department | 04/01/87 | 04/02/87 | | | | | | | |
| Mr. Steve Camron Lenawee Intermediate School District | 05/11/87 | 05/13/87 | 05/20/87 | Teacher Aide (3 Positions) | Sex | | | | |

(NOTE: Addition information requested by the Department, before being submitted to the Commission, was never provided nor did school district respond in any other way. Therefore, BFOQ application was terminated on December 14, 1990.) on November 24, 1987

App. 346

<u>BFOQ APPLICATIONS</u>                                                                          <u>Page 6</u>

| EMPLOYER | INQUIRY DATE | FORM SENT / RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|
| Schlussel, Lifton, Simon, Rands, Galvin, Jackier (Attys) on behalf of **The Orchards** | 08/03/87 | 08/03/87 | | | | | | |
| Durant & Durant, P. C. Attorneys and Conselors (on behalf on) | 11-02-87 | 11-16-87 | | | | | | |
| Nora, Hemming, Essad & Polaczyk, P. C. Conselors at Law (on behalf of) **Charter Township of Plymouth** | 10-22-87 | 11-16-87 | | | | | | |
| Angela Watts 3222 South Logan Lansing, MI  48913 **Department of Correction EEO/ Recrutiment Office** | 12-04-87 | 12-07-87 | | | | | | |
| Mr. Gareth R. Volz **Plymouth Christian Nursery** | 12-14-87 | 12-15-87 | | | | | | |
| Residential Uni-Care Inc. Bay City, Michigan | 01/22/88 | 01/22/88  02/09/88 | Direct Care Worker | Sex | 5/5/88 | 5/24/88 | Denied | No |

<span style="color:red">App. 347</span>

BFOQ APPLICATIONS

page 7

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Ms. Judy Levine<br>9035 Coleman Rd<br>Haslett, MI 48840<br>(Day Care Center) | 01/26/88 | 01/26/88 | | | | | | | |
| Department of Social Services<br>Residential Care Div.<br>Office of Children & Youth Services | | | 03/03/88 | Youth Specialist | Sex | 10/17/90 | 10/29/90 | Denied | No |
| Riverview Residential Treatment Facility<br>c/o Atty. John Johnson<br>1055 Bridge St., NW<br>Grand Rapids, MI 49504<br>(Per Tom Carnegie) | 3/22/88 | 3/22/88 | | | | | | | |
| Baraga County Shelter Home<br>Pat Baribeau, President<br>Baraga Co. Shelter Home Board<br>P.O. Box 284<br>L'Anse, MI 49946 | 3/3/88 | 3/22/88 | | | | | | | |
| Mr. Bob Wiersma<br>Cybenet<br>950 Taylor<br>Grand Haven, MI 49517<br>(Per Tom Apple) | 3/22/88 | 3/23/88 | | | | | | | |

App. 348

BFOQ APPLICATIONS

PAGE 8

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Hathorne Children's Center Dept. of Mental Health Lansing, MI (Ms. Mary Pollock) | 5/06/88 | 5/09/88 | | | | | | | |
| Mr. James Hogan 1 South Gratiot Mt. Clemens, MI  48043 | 7/11/88 | 7/11/88 | | | | | | | |
| Wyandotte Hospital & Medical Center 2333 Biddle Wyandotte, MI 48192 (c/o Cynthia Bala | 9/23/88 | 9/27/88 | | | | | | | |
| Mr. Carl Burdick P.O. Box 378 St. Joseph, MI 49085 | 10/19/88 | 10/19/88 | | | | | | | |
| Mr. John Siler 412 S. Saginaw St. Suite 300 Flint, MI 48502 | 10/13/88 | 10/19/88 | | | | | | | |
| Ms. Jewell Street Western Mich. Univ. | 11/28/88 | 11/28/88 | | | | | | | |

App. 349

BFOQ APPLICATIONS

Page 9

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Ms. Bobbie S. Butler Dept. of Corrections Marquette Branch Prison | 12/08/88 | 12/08/88 | 01/11/89 | Corrections Officer VII (Front Door Officer) | Sex | | | | |
| Mr. Raymond Wolf Ferndale Public Schools | 01/04/89 | 01/05/89 | | | | | | | |
| Ms. Ruth Cady Granny's Sitting Service, Inc. | 04/12/89 | 04/14/89 | 04/26/89 | Granny's or Grandpa | Age and Sex | | | | BFOQ request withdrawn by Ruth Cady--Lack of Grannies. Per letter/10/5/89 |
| Mr. James Fehrman 515 Bay Street Traverse city, MI 49684 | 06-28-89 | 06-29-89 | | | | | | | |
| Ms. Maureen McBride St. Joseph Academy Montessori Children House 1700 N. Woodward, Suite A Bloomfield Hills, MI 48013 | 07-28-89 | 07-31-89 | | | | | | | |
| Ms. Lisa Swem Thrun, Maatsch & Nordberg P.O. Box 40699 Lansing, MI 48901 | 08/17/89 | 08/18/89 | | | | | | | |

App. 350

BFOQ APPLICATIONS                                                    Page 10

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Van Buren County Mental Health Svcs. Paw Paw, MI | 9/11/89 | 9/12/89 | | | | | | | |
| Mr. Don Mead Berrien County Juvenile Center 6414 Deans Hill Rd. Berrien Center, MI 49102 Berrien County Probate Court | 10/16/89 | 10/18/89 | 11/15/89 | Youth Specialist & Group Leader | Sex | | | | |
| Ms. Morene Huggett Van Buren County Mental Health Svcs. P.O. Box 249 209 W. Michigan Ave. Paw Paw, MI 49079 | 2/12/90 | 2/20/90 | | | | | | | |
| Mr. Kevin Foley, Atty 11368 Allen Rd Taylor, MI 48180 Melvindale-Northern Allen Park Public Schools | 4/3/90 | 4/6/90 | 7/16/90 | High School Counselor | Sex | | | | |

**App. 351**

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT / RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|
| Mr. Kerry Morgan<br>14412 Lake Winds Way<br>Gaithersburg, MD 20878 | 01/28/91 | 01/30/91 | | | | | | |
| Detroit Rescue Mission Ministries | | 3/31/91<br>11/27/95<br>(Letter Sent) | Members, Directors, & Officers of Corp. as well as employees | Religion | | | | |
| Bill Blaha<br>Collins, Blaha & Slatkin<br>Southfield, MI | 05/29/91 | 05/29/91<br>(Sent via Fax) | | | | | | |
| Rochester School Dist.<br>(Ms. Deborah Humig) | 06/27/91 | 06/28/91 | | | | | | |
| Mark Fosdick<br>19500 Middlebelt<br>Livonia, MI 48152<br>Adult Foster Care | 06/07/91 | 06/07/91 | | | | | | |
| | | | | | | | | |

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT / RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|
| Wesley School 915 East Wesley Muskegon, MI 49442 (Mr. Norm Rosema) | 10/3/91 | 10/14/91 | | | | | | |
| Lenawee Intermediate School District Steve Camron 4107 North Adrian Hwy Adrian, MI 49221 (517) 265-1682 | 02/14/92 | 02/18/92 _terminated 1990 per E.C. Miller_ | | | | | | |
| Christian Homes, Inc. Grand Rapids, MI Scott J. Steiner, Atty 161 Ottawa Ave, N.W. Suite 600 Grand Rapids, MI 49503-2793 | | 03/23/92 03/10/92 11/27/95-Ltr 01-22-96 04/18/96-Ltr Re: Brief | | | | | | |
| Grand Rapids Pub. Schls Fredericka Williams Equal Oppor. Dept. 143 Bostwick, N.E. Grand Rapids, MI 49503 | 08/24/92 | 08/28/92 | | | | | | |
| Jawa Associates, Inc. Wendy Wadsworth Jawa Assoc., Inc. 1575 E. Lafayette, Ste. 200; Det, MI 48207 | | 11/27/95 09/18/92 (Letter Sent) | | | | | | |

App. 353

BFOQ APPLICATIONS

Page 13

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Tim Allen<br>145 South Jackson<br>Jackson, MI 49201 | 10/08/92 | 10/09/92 | | | | | | | |
| Mr. Blaine Coleman<br>Eaglin & Drukis<br>900 Victors Way, Ste 300<br>Ann Arbor, MI 48108<br>**Huron Services for Youth, Incorporated** | 10/12/92 | 10/14/92<br>11/27/95-Ltr | **12/18/92** | All Staff and Supervisors | Marriage or dating relation-ships between or among supervisors, staff and clientele | | | | |
| **Spring Arbor College**<br>Spring Arbor, MI | | 11/27/95-Ltr<br>04/09/96-Form | 3/23/93<br>12/06/95 | All Employees | Religion | | | | |
| **WW Group, Inc.**<br>Sheri Mark, Atty<br>380 N. Woodward, Ste 314<br>Birmingham, 48009 | 03/31/93 | 04/01/93 | | | | | | | |
| Mr. Robert Halle<br>4000 Van Horn Rd.<br>Jackson, MI 49201 | 11/12/92 | 11/13/92 | | | | | | | |
| Mr. Norman Dickson<br>Assistant Principal<br>Harrison High School | 11/19/92 | 11/19/92 | | | | | | | |

App. 354

BFOQ APPLICATIONS

Page 14

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| **Whaley Children's Ctr.** Flint, MI | 06/17/93 | 06/18/93 11/27/95-Ltr 04/18/96-Form | 10/13/93 12/22/95 | Child Care Worker | Sex | | | | |
| Murchie, Calcutt & Boynton 109 E. Front, Ste. 300 Traverse City, MI 49684 | 07/22/93 | 07/22/93 | | | | | | | |
| St. Joseph Mercy Hospt. | 12/20/93 | 12/20/93 01/07/94 | | | | | | | |
| Spectrum Human Scvs. 34000 Plymouth Livonia, MI 48150 | 02/14/94 | 02/14/94 | | | | | | | |
| Saginaw Co. Probate Court Saginaw County <u>Juvenile Facility</u> | 02/15/94 | 02/22/94 11/27/95-Ltr 04/17/96-Form | 02/09/94 (letter 12/18/95 | *no response with to 4-96 Wirth letter.* | | | | | |
| Copper County Mental Health Services Assertive Community Treatment (ACT) Team | 02/09/94 | 11/27/95-Ltr 03/07/94 | | | Sex | | | | |

**App. 355**

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT / RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|
| Dickinson, Wright, Moon, Van Dusen & Freeman | 04/08/94 | 04/08/94 & 04/26/94 | | | | | | |
| Shelby Twp. Fire Department | 06/08/94 | 06/09/94 | | | | | | |
| Michigan Corrections Organization | 12/20/94 | 12/20/94 | | | | | | |
| Western Upper Peninsula District Health Department | 9/12/95 | 10/2/95 | | | | | | |
| Bay County Juvenile Home | | 10/30/95 / 7/18/96 | Youth Development Worker | Sex | | | | |
| Brian J. Kelley Thompson, Hine & Flory Cleveland, Ohio | 6/17/96 | 7/2/96 | | | | | | |
| Amy Thelen Cohl, Stocker, Taskey Lansing, MI | | 7/3/96 | | | | | | |

App. 356

BFOQ APPLICATIONS

| EMPLOYER | INQUIRY DATE | FORM SENT | RETURNED | POSITION | BFOQ BASIS | TRANSMIT TO COMMISSION | DATE ACTED UPON | DECISION | WRITTEN OPINION |
|---|---|---|---|---|---|---|---|---|---|
| Thomas D. Abbey<br>Abbey & Abbey<br>Caro, MI | | 4/9/96 | | | | | | | |
| TUSCOLA MEDICAL CARE FACILITY | | 5-17-96 | 7-3-96 | | | | | | |
| CONTINENTAL CABLEVISION, INC. | | | 11-19-96 | | | | | | |

App. 357

## BFOQ APPLICATIONS

| EMPLOYER | POSITION | BFOQ BASIS | DATE RECEIVED | ADDITIONAL INFO. REQ. (DATE) | SUPPLMENTL MATL. REC. (DATE) | MCRC DISPOSITION (DATE) |
|---|---|---|---|---|---|---|
| Pascola County Medical Care Facility | Competency Evaluated Nurse Aides (CENAS) | Sex | 7/8/96 | 10/1/96 | 10/25/96 | |
| Bay County Juvenile Home | Youth Development Workers | Sex | 7/18/96 | | | |
| Mission Health & Joseph Mercy Hospital | Program Director, Medical Director, Flight Nurse II, Flight Physician, EMS Pilot | Weight | 9/19/96 | 9/27/96 | 11/27/96 | |
| Spring Arbor College | All employees; all locations | Religion | 10/2/96 | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

C:\WP51\DAT\BFOQUE

*Revised February 11, 1998*

## BFOQ Log
### (June 1, 1997 to Date)

| Applicant | Inquiry Date | Appl. Sent | Appl. Ref'd | Case No. | Job Title | Basis | Commissioner Assigned | Action |
|---|---|---|---|---|---|---|---|---|
| Spring Arbor College | | | 3/23/93 | | | Religion | Reassignment Pending *(previously assigned to Comm. Letts)* | 4/23/97  Open complaint pending - request held in abeyance. 5/24/97  Dept. Complaint dismissed (RFRA). 6/4/97  Request for reactivation. 6/5/97  Request reactivated. 2/9/98  Awaiting response from claimant by 3/12/98 re: reopening complaint. (BFOQ in abeyance pending response from Claimant.) |
| Bay County Juvenile Home | | | 8/28/96 | | | Sex | Evelyn Crane | 2/24/97  Granted in part; 1 male, 1 female per shift. |
| Tuscola County Medical Care Facility | | | 9/9/96 | | | Sex | Rev. Edgar L. Vann, Jr. | 2/24/97  Comm. declined to rule – open complaint pending – request dismissed. 2/27/97  Reconsideration request. 7/28/97  Oral argument scheduled. |
| Continental Cablevision, Inc. | | | 12/6/96 | | | Weight | Rev. Edgar L. Vann, Jr. | 5/21/97  Vann memo requesting MDCR & AGO legal opinion, due 7/21/97. |
| Washtenaw County | | 6/4/97 | | | | | | |
| Ingham County Health Dept. | | 6/4/97 | | | | | | |
| DA Residential | 5/22/97 | 6/4/97 | | | | | | |
| MI Dept. of Corrections | | 6/16/97 | | | | | | |

C:\OFFICE\WPWIN\WPDOCS\BFOQ\BFOQ.LOG

App. 359

# BFOQ Log
## Beginning June 1, 1997

| Applicant | Inquiry Date | Appl. Sent | Appl ret'd | Case No. | Job Title | Basis | Assgnd to Commsnr | Action | Date |
|---|---|---|---|---|---|---|---|---|---|
| Spring Arbor College | | | 3-23-93 | | | Religion | Richard Letts | Open complaint pending - request held in abeyance. Dept complnt dismissed. Request for reactivation. Request reactivated. | 4-23-97 6-4-97 5-24-97 6-5-97 |
| Bay County Juvenile Home | | | 8-28-96 | | | Sex | Evelyn Crane | Granted in part. 1 male, 1 female per shift. | 2-24-97 |
| Tuscola County Medical Care Facility | | | 9-9-96 | | | Sex | Rev. Edgar L. Vann, Jr. | Comm. declined to rule - open complaint pending - request dismissed. Reconsideration request. Oral argument scheduled. | 2-27-97 7-28-97 |
| Continental Cablevision, Inc. | | | 12-6-96 | | | Weight | Rev. Edgar L. Vann, Jr. | Vann memo requesting MDCR & AGO legal opinion, due 7-21-97. | 5-21-97 |
| Washtenaw County | | 6-4-97 | | | | | | | |
| Ingham County Health Dept. | | 6-4-97 | | | | | | | |
| DA Residential | 5-22-97 | 6-4-97 | | | | | | | |
| Mich. Dept. of Corrections | | 6-16-97 | | | | | | | |

c:\WP51\DATA\BFOQ\LOG

July 11, 1997

App. 360

*Michigan Department of Civil Rights - Office of Legal Affairs*

## Bona Fide Occupational Qualification Requests
### January 1994 to July 1997

| Applicant | Basis | Commisioner Assigned Name | Date | Action | Date |
|---|---|---|---|---|---|
| Spring Arbor College | Religion | Richard Letts | 3-23-93 | Open complaint pending - request held in abeyance. Complaint dismissed. Request for reactivation. Request reactivated. | 4-23-97 5-24-97 6-4-97 6-5-97 |
| Bay County Juvenile Home | Sex | Evelyn Crane | 8-28-96 | Granted in part. 1 male, 1 female per shift. | 2-24-97 |
| Tuscola County Medical Care Facility | Sex | Rev. Edgar L. Vann, Jr. | 9-9-96 | Comm. declined to rule - open complaint pending - request dismissed. Reconsideration request received. Oral argument scheduled. | 2-24-97 2-27-97 7-28-97 |
| Continental Cablevision, Inc. | Weight | Rev. Edgar L. Vann, Jr. | 12-6-96 | Vann memo requesting MDCR & AGO legal opinion, due 7-21-97. | 5-21-97 |

C:\WP51\DATA\BFOQ\CHART.CM

July 11, 1997

App. 361