UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIAN HEALTHCARE CENTERS,
INC.,

     Plaintiff,

v.

DANA NESSEL, et al.,

     Defendants.

_____/

Case No. 1:22-cv-787

HON. JANE M. BECKERING

**OPINION AND ORDER**

Since its enactment in 1976, Michigan's Elliott-Larsen Civil Rights Act (ELCRA) has "protected Michiganders from discrimination."  Plaintiff Christian Healthcare Centers, Inc. (CHC), a faith-based healthcare organization, filed this pre-enforcement civil rights action for declaratory and injunctive relief, alleging that enforcement of certain ELCRA provisions will infringe on its religious mission and thereby violate the First and Fourteenth Amendments to the United States Constitution.  Pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 145 & 160).  For the following reasons, the Court denies CHC's motion, grants Defendants' motion, and closes this case.

## I. BACKGROUND

### A. Factual Background & Statutory Context

**1.  The ELCRA**

The ELCRA contains several prohibitions to "protect[] Michiganders from discrimination," as recognized and forth by the Sixth Circuit in *Christian Healthcare Centers, Inc.*

*v. Nessel*, 117 F.4th 826, 837–38 (6th Cir. 2024) ("*CHC*").  First, the ELCRA prohibits an employer from failing to "hire or recruit, discharge, or otherwise discriminate" against an individual because of the following enumerated protected characteristics:  "religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, or marital status."  MICH. COMP. LAWS § 37.2202(1)(a).  Employers also may not use hiring applications that elicit information about, or express a preference based on, any protected characteristic.  *Id.* § 37.2206(2)(a), (c).  Consistent with the nomenclature in CHC's Complaint and the parties' briefing,[1] the Court collectively refers to these prohibitions as the "Employment Clause."  The ELCRA defines "employer" as "a person that has 1 or more employees."  *Id.* § 37.2201(a).

Second, the ELCRA prohibits any person from denying an individual the "full and equal enjoyment" of any goods, services, or facilities "of a place of public accommodation or public service" based on the same characteristics.  *Id.* § 37.2302(a) (the "Public Accommodation Clause").  In pertinent part, the ELCRA defines a place of public accommodation as a "health ... facility, or institution of any kind ... whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public."  *Id.* § 37.2301(a).

Third, the ELCRA regulates publication of statements concerning its substantive provisions:  employers and places of public accommodation may not publish statements indicating

---

[1] In briefing, the parties also reference "Article 2" of the ELCRA, which prohibits employment discrimination, and "Article 3" of the ELCRA, which prohibits discrimination by places of public accommodation.  *See generally Rymal v. Baergen*, 686 N.W.2d 241, 271 (Mich. Ct. App. 2004) (K. F. Kelly, J., concurring in part and dissenting in part) (explaining that the ELCRA is composed of eight articles that serve distinct purposes).  For ease of reference, the Court employs only the phrases "Employment Clause," "Employment Publication Clause," "Public Accommodation Clause," and "Public Accommodation Publication Clause" in its analysis.

preferences based on protected characteristics.  *See id.* § 37.2206(1) (employers); *id.* § 37.2302(b) (public accommodations) (the "Employment Publication Clause" and "Public Accommodation Publication Clause," respectively).

Last, the ELCRA contains language "qualifying its application."  *CHC*, 117 F.4th at 837. Most broadly, it is not to "be construed as preventing the [Michigan Civil Rights] [C]ommission from securing civil rights guaranteed by law."  MICH. COMP. LAWS § 37.2705(1).  Additionally, employers may inquire about protected characteristics or express a preference based on those characteristics where "permitted" to do so "by applicable federal law," *id.* § 37.2206(2); and places of public accommodation may be exempted from the ELCRA's regulations "where permitted by law," *id.* § 37.2302.  Employers may also apply for an exemption from the ELCRA's employment provisions if a certain protected characteristic "is a bona fide occupational qualification," or "BFOQ," "reasonably necessary to the normal operation of the business."  *Id.* § 37.2208.  This BFOQ exemption can be either (1) obtained by application to Michigan's Civil Rights Commission (the Commission), which is empowered to investigate the application and approve exemptions for up to five years; or (2) asserted as an affirmative defense in later proceedings.  *Id.*; *see* MICH. ADMIN. CODE R. 37.25; BFOQ App., Ex. A to Jt. Stips., ECF No. 109-1.

The ELCRA and Michigan's administrative code set out the Act's enforcement procedures. *CHC*, 117 F.4th at 838.  Any "person"—a statutorily defined term including Michigan and its subagencies, *see* MICH. ADMIN. CODE R. 37.2(p)—who is "aggrieved by unlawful discrimination" may submit an ELCRA complaint to Michigan's Department of Civil Rights (the Department). *Id.* R. 37.4(1). Certain commissioners, directors, and agents authorized by the Commission may also file complaints on the public's behalf.  *Id.* R. 37.4(2). The Department is empowered to investigate filed complaints, including by collecting evidence and requiring witness testimony that

is "pertinent to a complaint." MICH. COMP. LAWS § 37.2602(c)–(d); *see also* MICH. ADMIN. CODE R. 37.4(10), 37.14(1). The Department will issue a charge if, "after investigation," it "determines that there are sufficient grounds" to do so. *Id.* R. 37.6(1). A person or entity charged with discrimination must "file a written verified answer"; if they do not, the charge's allegations are considered admitted. *Id.* R. 37.11(1), (6). If, after a hearing, the Commission determines that the ELCRA was violated, then it may order monetary and equitable remedies. *See* MICH. COMP. LAWS § 37.2605. Parties may appeal a final order of the Commission to the circuit court of the state of Michigan having jurisdiction over the proceeding. *See id.* § 37.2606.

**2.      Christian Healthcare Center**

CHC's stated purpose is to be a "Christian medical-service ministry that serves the community by providing direct medical services to its patients consistent with the tenets of its faith and to communicate those beliefs to its patients and the public" (Verified Compl. [ECF No. 1] ¶ 17). CHC, which has clinics in Plainfield Charter Township and Newaygo, Michigan, provides medical care to its selected membership and employs individuals at its clinics in different medical and non-medical positions (*id.* ¶¶ 5, 34, 43, 114, 127, 135, 147, 155, 160, 165). Staff begin each workday with corporate prayer and hold monthly and quarterly meetings where staff "engage in corporate worship, Bible study, and an extended period of corporate prayer" (*id.* ¶¶ 64, 67–68). Indeed, CHC requires all Board members, administrators, support staff, and medical personnel to annually sign and abide by a Statement of Faith, Statement of Values, Affirmation on Marriage and Human Sexuality, and Code of Conduct reflecting its religious beliefs (*id.* ¶¶ 94, 96–97).

Additionally, CHC maintains a policy precluding the "use [of] pronouns or other forms of reference inconsistent with a person's biological sex," based on its belief "that the use of a pronoun

4

or form of reference conveys a message about the referenced person's sex" (*id.* ¶ 101).  CHC will refer to patients using their first or last names, instead of their preferred pronouns (*id.* ¶ 334).

CHC also maintains a policy that it will not "prescribe cross-sex hormones to facilitate gender transition" or provide "treatment designed to transition a person to the opposite biological sex" (*id.* ¶¶ 60, 101).  CHC maintains written policies regarding both its refusal to use preferred pronouns and its refusal to provide gender-affirming services (*id.* ¶¶ 240–41, 350–53).  The ministry wants to publish its Membership Agreement online, which explains these policies and how the ministry integrates faith and medicine (Blocher Prelim. Inj. Decl. [ECF No. 5-2] ¶¶ 20–27).

CHC's physicians provide "medical services to the Body of Christ and community, guided by Biblical values" and "are expected to be prepared to address with members the spiritual dimensions of wellness and illness, to pray with members who desire prayer, and to provide both medical and spiritual guidance" (Physician Position Descr., Ex. 8 to Verified Compl., ECF No. 1-10).  CHC has a Biblical Counselor position that provides "Biblical counseling services to members" from "a distinctly Christian perspective," "delivered in a manner consistent with CHC's Christian doctrine, mission, and values" and "based on Biblical principles and not based on any clinical counseling principles, methodologies, or procedures" (Biblical Counselor Position Descr., Ex. 12 to Verified Compl., ECF No. 1-14).

CHC currently has openings for a Member Services Receptionist and a Medical Assistant (Blocher Summ. J. Decl. [ECF No. 145-4] ¶ 12).  These positions regularly interact with other employees and members (*id.* ¶¶ 13–14).  CHC requires applicants for these positions to agree with its religious beliefs, including its positions on sexual orientation and gender identity (*id.*).  CHC would also like to explain these beliefs in job postings (*id.* ¶¶ 11, 18).

CHC claims that it is "critical" that it "hire employees who agree with, personally adhere to, agree to abide by, and can effectively communicate its religious beliefs" (*id.* ¶ 93).  The parties agree, however, that CHC is generally subject to the Employment Clause, the Employment Publication Clause, the Public Accommodation Clause, and the Public Accommodation Publication Clause of the ELCRA (Jt. Stips. [ECF No. 109] ¶¶ 5–6, 13–14, 20, 50; *see also CHC*, 117 F.4th at 843–45 (concluding that CHC is arguably covered by the ELCRA's employer and public-accommodation laws)).  CHC has not sought any BFOQ exemption for any of its staff positions (*id.* ¶ 292).

## B.  Procedural Posture

On August 29, 2022, CHC initiated this action with the filing of a Verified Complaint against Defendants Dana Nessel, Michigan's Attorney General; John E. Johnson, the Department's Executive Director; and individual members of the Commission[2] (collectively, "Defendants").  Pursuant to 42 U.S.C. § 1983, CHC alleges the following four claims:

I.  Violation of the First Amendment's Free Exercise and Establishment Clauses: Religious Autonomy, Ministerial Exception, Co-Religionists, and Compelled Participation

II.  Violation of the First Amendment's Free Exercise Clause: Lack of General Applicability, Individualized Exemptions, and Compelled Participation

III.  Violation of the First Amendment's Free Speech and Assembly Clauses: Freedom of Speech, Expressive Association, Press, and Assembly

IV.  Violation of the Fourteenth Amendment's Due Process Clause: Vagueness

(ECF No. 1).[3]  For each count, CHC seeks injunctive and declaratory relief as to the disputed ELCRA and Equal Accommodations Act provisions, in addition to costs and fees (*id.* at

---

[2] Portia L. Roberson, Zenna Faraj Elhasan, Gloria E. Lara, Regina Gasco-Bentley, Anupama Kosaraju, Richard Corriveau, and David Worthams

[3] Plaintiff's counsel also filed another pre-enforcement civil rights lawsuit in December 2022 against these same Defendants, alleging similar claims. *See Sacred Heart of Jesus Parish, Grand*

PageID.70–71).  CHC did not identify any pending complaint, investigation, or prosecution against it; rather, CHC alleged that it faced "a credible threat and substantial risk that it will be investigated and prosecuted under these laws for engaging in activities and speaking in accordance with its religious beliefs" (*id.* ¶ 196).

In lieu of answering the Verified Complaint, Defendants filed a Motion to Dismiss, arguing, in pertinent part, that no case or controversy existed for federal jurisdiction.  On March 29, 2023, this Court issued an Opinion and Order, granting the motion and issuing a corresponding Judgment to close this case (ECF Nos. 28–29).  This Court also dismissed as moot CHC's motion for a preliminary injunction (*id.*).  CHC appealed to the Court of Appeals for the Sixth Circuit, which issued its decision on September 20, 2024, holding, in pertinent part, "only that (a) no Plaintiff has established standing to challenge the EAA, [and] (b) Christian Healthcare has plausibly established standing to challenge the ELCRA's public-accommodation provision, employment provision, and the publication clauses of each provision."  *CHC*, 117 F.4th at 857.[4]  The Mandate issued on October 15, 2024 (ECF No. 50).

On remand, in November 2024, this Court issued a Case Management Order, setting forth deadlines for discovery and dispositive motions (11/19/2024 CMO, ECF No. 61), which the Court extended in February 2025 (Order, ECF No. 82) and May 2025 (Order, ECF No. 97).  This Court also extended the dispositive motion deadline in October 2025 (Memo. Op. & Order, ECF No.

---

*Rapids et al. v. Nessel, et al.*, 1:22-cv-1214. *Sacred Heart* was deemed related to a third pre-enforcement civil rights lawsuit also filed in December 2022: *St. Joseph Parish St. Johns v. Nessel, et al.*, 1:22-cv-1154. *See* Administrative Order 23-CA-008 (ECF No. 9).

[4] The Sixth Circuit, which consolidated the appeal in this case with the appeals in *Sacred Heart* and *St. Joseph Parish*, affirmed this Court's decision to dismiss the complaint in *St. Joseph Parish* and affirmed in part and reversed in part this Court's decision on the motion to dismiss the complaint in *Sacred Heart*.

129) and December 2025 (Order, ECF No. 156).  The parties stipulated to a Preliminary Injunction (ECF No. 65) and engaged in discovery.

On September 8, 2025, the parties agreed on a plethora of applications of the ELCRA to certain facts in this case, as follows:

51.  It would violate the Employment Clause for Christian Healthcare to fail or refuse to hire, refuse to recruit, limit, segregate, classify, or otherwise discriminate against an otherwise qualified person for any open non-ministerial position because the applicant refused to comply with Christian Healthcare's requirement to abstain from same-sex sexual activity.

52.  It would violate the Employment Clause for Christian Healthcare to fail or refuse to hire, refuse to recruit, limit, segregate, classify, or otherwise discriminate against an otherwise qualified person for any open non-ministerial position because the applicant refused to comply with Christian Healthcare's requirement to identify consistent with the individual's sex.

53.  It would violate the Employment Publication Clause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B—including on its website or other job-search websites—for any open non-ministerial position because Exhibit B indicates a preference, limitation, specification, or discrimination based on sexual orientation and gender identity.

54.  It would violate the Employment Publication [C]lause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B—including on its website or other job-search websites—for any open non-ministerial position because Exhibit B is a written inquiry or form of application that elicits or attempts to elicit information concerning a prospective employee's sexual orientation and gender identity.

55.  Based upon the information contained in the Complaint and the job description, it would violate the Employment Clause for Christian Healthcare to fail or refuse to hire, refuse to recruit, limit, segregate, classify, or otherwise discriminate against an otherwise qualified person for the Medical Assistant position because the applicant refused to comply with Christian Healthcare's requirement to identify consistent with the individual's sex as indicated in Exhibit B and Exhibit C.

56.  Based upon the information contained in the Complaint and the job description, it would violate the Employment Publication Clause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B and Exhibit C—including on its website or other job-search websites—for the Medical Assistant position because Exhibit B and Exhibit C indicate a preference, limitation, specification, or discrimination based on sexual orientation and gender identity.

8

57. Based upon the information contained in the Complaint and the job description, it would violate the Employment Publication [C]lause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B and Exhibit C—including on its website or other job-search websites—for the Medical Assistant position because Exhibit B and Exhibit Care written inquiries or forms of application that elicit or attempt to elicit information concerning a prospective employee's sexual orientation and gender identity.

58. Based upon the information contained in the Complaint and the job description, it would violate the Employment Clause for Christian Healthcare to fail or refuse to hire, refuse to recruit, limit, segregate, classify, or otherwise discriminate against an otherwise qualified person for the Member Services Receptionist position because the applicant refused to comply with Christian Healthcare's requirement to identify consistent with the individual's sex as indicated in Exhibit B and Exhibit D.

59. Based upon the information contained in the Complaint and the job description, it would violate the Employment Publication Clause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B and Exhibit D—including on its website or other job-search websites—for the Member Services Receptionist position because Exhibit B and Exhibit D indicate a preference, limitation, specification, or discrimination based on sexual orientation and gender identity.

60. Based upon the information contained in the Complaint and the job description, it would violate the Employment Publication clause for Christian Healthcare to print, circulate, post, mail or otherwise publish Exhibit B and Exhibit F—including on its website or other job-search websites—for the Member Services Receptionist position because Exhibit B and Exhibit D are written inquiries or forms of application that elicit or attempt to elicit information concerning a prospective employee's sexual orientation and gender identity.

61. Based upon the information contained in the Complaint and the job descriptions, Defendants consider the Medical Assistant and the Member Services Receptionist positions to be non-ministerial positions.

62. Based upon the information contained in the Complaint and the job description, Christian Healthcare's policy of requiring prospective employees for the Medical Assistant and the Member Services Receptionist positions to sign and abide by Christian Healthcare's Statement of Faith contained in Exhibit B violates the Employment Clause.

(*id.* ¶¶ 51–62, referencing Exs. B, C, D, & F to Jt. Stips., ECF Nos. 109-2, 109-3, 109-4, & 109-6).

On November 21, 2025, CHC filed its Motion for Summary Judgment (ECF No. 145).  On January 13, 2026, Defendants[5] filed a Cross-motion for Summary Judgment (ECF No. 160).  This Court permitted the parties' submissions to exceed the page/word count limits set forth in this District's Local Rules (Orders, ECF Nos. 148 & 167).  On February 10, 2026, CHC filed a combined reply in support of its motion and response to Defendants' cross-motion (ECF No. 171).  On February 24, 2026, Defendants filed a reply in support of their cross-motion (ECF No. 172).  The parties have also since filed several supplemental authorities (ECF Nos. 175, 178, 185–87) and responses (ECF Nos. 182–184) for the Court's review.  Having considered the parties' substantial submissions, the Court concludes that oral argument is not necessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standard

The parties' motions are filed pursuant to Federal Rule of Civil Procedure 56.  A party may move for summary judgment, identifying each claim on which summary judgment is sought.  FED. R. CIV. P. 56(a).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

---

[5] Defendants indicate that the Attorney General "does not join the merits arguments advanced by the Commission and Department" because, according to Defendants, CHC "lacks standing" to sue the Attorney General "simply for representing the Commission and Department" (ECF No. 161 at PageID.3341, 3347–3352).  According to Defendants, the only appropriate disposition as to the Attorney General is dismissal (*id.* at PageID.3341, 3352).  The Court disagrees.  As CHC more fully sets forth, the Attorney General is a proper defendant in this case, a proposition that does not rest on the office's general enforcement authority or "representation alone" but on her specific authority to enforce the ELCRA (ECF No. 171 at PageID.3502–3503).  *See also* Jt. Stips. ¶ 49 ("The office of the Attorney General has authority to enforce compliance with orders issued by the Department and the Commission by filing enforcement motions with any state court with jurisdiction over the matter.") (citing MICH. COMP. LAWS § 37.2602(b), (d)).

In resolving a motion for summary judgment, a court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted). The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In responding to a summary judgment motion, the plaintiff can no longer rest on "mere allegations" but must "set forth" by affidavit or other evidence "specific facts" necessary to support the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). *See also Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) ("A party opposing a properly supported summary-judgment motion... 'may not rest upon the mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'") (citation omitted). However, a court may, as the Court does here, consider facts alleged in a verified complaint and about which the plaintiff has personal knowledge. *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (a verified complaint "carries the same weight as would an affidavit for the purposes of summary judgment") (citations omitted).

The function of the court is not "'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (quoting *Anderson*, 477 U.S. at 249). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251–52).

When evaluating cross-motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506–07 (6th Cir. 2003); *see also Harris v. City of Saginaw, Mich.*, 62 F.4th 1028, 1032–33 (6th Cir. 2023) (describing the "hat switch courts perform when evaluating cross-motions for summary judgment"); *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir. 2003) ("[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate").

### B.  Discussion

CHC's claims are brought pursuant to 42 U.S.C. § 1983.  Section 1983 does not confer substantive rights but merely provides a statutory vehicle for vindicating rights found in the United States Constitution.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1160 (6th Cir. 2021).  A court's threshold inquiry under § 1983 is always to identify the specific constitutional right at issue.  *Dibrell*, *supra.*  Once the right is identified, the court must then consider the statutory "elements of, and rules associated with, an action seeking damages for its violation" under § 1983.  *Id.*

Here, CHC argues that enforcement of the ELCRA's provisions relating to employment, public accommodations, and publications will violate its religious and expressive freedoms under the First and Fourteenth Amendments to the United States Constitution.  A plaintiff can challenge the constitutionality of a statute in two ways.  An "as-applied" challenge "argues that a law is

12

unconstitutional as enforced against the plaintiffs before the court." *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015) (citation omitted).  In contrast, a "facial" challenge to a law's constitutionality is "an effort to invalidate the law in each of its applications, to take the law off the books completely." *Id.* (citation omitted).  The plaintiff must establish "'that no set of circumstances exist under which [the statute] would be valid.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

CHC seeks as-applied relief against the Employment, Employment Publication, Public Accommodation, and Public Accommodation Publication Clauses; and facial relief, only, against the Public Accommodation Publication's "Unwelcome Clause" (ECF No. 145 at PageID.3154).  CHC argues that as applied, the Employment, Employment Publication, Public Accommodation, and Public Accommodation Publication Clauses of the ELCRA are per se unconstitutional because they (1) violate religious autonomy, (2) interfere with expressive association and assembly, (3) lack general applicability, and (4) compel and restrict speech based on content and viewpoint (ECF No. 146 at PageID.3217).  And CHC argues that the Public Accommodation Publication's Unwelcome Clause, on its face, is vague and overbroad (*id.*).  Specifically, CHC seeks a declaration and permanent injunction that prevents Defendants from enforcing the ELCRA against its (i) employment policies, including as applied to the Biblical Counselor, Physician, Member Services Receptionist, and Medical Assistant positions; (ii) pronoun policy; (iii) medical care policy; and (iv) publications about those policies (ECF No. 145 at PageID.3152).  Defendants argue that the ELCRA already accommodates CHC's constitutional rights and that CHC "simply wants more protection than the First Amendment provides" (ECF No. 161 at PageID.3341).  Defendants ask this Court to deny CHC's motion and instead grant summary judgment in their

13

favor.  Consistent with the Sixth Circuit's directions on remand, *CHC*, 117 F.4th at 857, the Court

analyzes each of CHC's claims in turn.

**1.      CHC's As-Applied Challenge to the ELCRA's Employment Clause as Burdening Its Religious Autonomy and Free Exercise**

CHC first argues that the ELCRA's Employment Clause interferes with its faith-based

employment policies and decisions by restricting its ability to hire employees who share its

religious beliefs in violation of the "co-religionist doctrine" (ECF No. 146 at PageID.3217–3221).

Emphasizing that all CHC staff must share the organization's faith, CHC contends that "[t]he

religious autonomy doctrine protects Christian Healthcare's employment decisions over

ministerial *and* non-ministerial roles" (ECF No. 171 at PageID.3514–3519) (emphasis in briefing).

In support of summary judgment in their favor, Defendants argue that CHC's position

would create a blanket "co-religionist exception" that would permit discrimination in hiring for

every position regardless of function, a position that runs contrary to case law about the ministerial

exception (ECF No. 161 at PageID.3364–3368; ECF No. 172 at PageID.3557–3558).

Additionally, Defendants point out that the ELCRA incorporates the First Amendment's

ministerial exception through its BFOQ provision, which permits religious employers to make

religion-based hiring decisions for employees who perform religious functions (ECF No. 161 at

PageID.3358).  Delineating the BFOQs that have been granted or denied consistent with judicial

precedent interpreting the ministerial exception, Defendants indicate that based on the facts of this

case, CHC could properly invoke the exception for positions like its Biblical Counselor and

physicians,[6] although not for a medical assistant who takes vital signs and updates charts or a

---

[6] Defendants admitted as much during discovery:
> **Request for Admission No. 21**
> Admit that it would violate the Employment Clause for CHC to decline to hire an
> otherwise qualified person for the open Biblical Counselor position because the

receptionist who explains membership terms to new patients (*id.* at PageID.3359–3363; *see also* ECF No. 172 at PageID.3552–3553 ("[T]he ELCRA, via the First Amendment, provides that CHC can hire whomever it chooses for its Biblical Counsel and Physician positions[.]").

CHC's argument lacks merit.

The First Amendment states, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend I. The United States Supreme Court has held that the First Amendment protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952). *Cf. Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (determining that the First Amendment's Free Exercise Clause applies to States through the Fourteenth Amendment).

In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), the Supreme Court held that the First Amendment barred a court from entertaining an employment discrimination claim brought by an elementary school teacher against the religious

---

applicant refused to comply with CHC's Code of Conduct requirement to abstain from same-sex sexual activity.
**Response**: Based upon the information contained in the Complaint and the Biblical Counselor job description (Exhibit 12 to the Complaint) deny.

**Request for Admission No. 22**
Admit that it would violate the Employment Clause for CHC to decline to hire an otherwise qualified person for the open Physician position because the applicant refused to comply with CHC's Code of Conduct requirement to abstain from same-sex sexual activity.
**Response**: Based upon the information contained in the Complaint and the Physician job description (Exhibit 8 to the Complaint) deny.

(Resps. to RFAs, ECF No. 139-3 at PageID.2861).

15

school where she taught.  The Supreme Court's decision in *Hosanna-Tabor* built on a line of lower court cases adopting what was dubbed the "ministerial exception" to laws governing the employment relationship between a religious institution and certain key employees.  *Id.* at 188–89; *see also id.* at 181 (explaining that the religion protections in the First Amendment "bar the government from interfering with the decision of a religious group to [select] its ministers").  The Supreme Court expressly declined to announce "a rigid formula" for determining whether an employee falls within this exception, but the Court identified circumstances that it found relevant to the determination on the specific facts before it, including the teacher's title as a "Minister of Religion, Commissioned," her educational training, and her responsibility to teach religion and participate with students in religious activities.  *Id.* at 190–91.  The Court reasoned that although society's interests "in the enforcement of employment discrimination statutes [are] undoubtedly important," the First Amendment elevates above those interests the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission."  *Id.* at 196.

In *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020), also an employment discrimination case, the Supreme Court explained that "[t]he independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in what we have termed 'matters of church government.'"  *Id.* at 746 (citation omitted).  The Supreme Court cautioned that "[t]his does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission.  And a component of this autonomy is the selection of the individuals who play certain key roles."  *Id.*  The Court reiterated that under the so-called "ministerial exception," "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions."

16

*Id.* Examining the specific facts before it, the Supreme Court ultimately held that although the plaintiffs-teachers were not given the title of "minister" and had less religious training than the teacher in *Hosanna-Tabor*, their cases fell within the same rule that dictated the decision in *Hosanna-Tabor*. *Id.* at 738.

The Sixth Circuit has identified four factors to assist courts in assessing whether an employee is a minister covered by the exception: (1) whether the employee's title "conveys a religious—as opposed to secular—meaning"; (2) whether the title reflects "a significant degree of religious training" that sets the employee "apart from laypersons"; (3) whether the employee serves "as an ambassador of the faith" and serves a "leadership role within [the] church, school, and community"; and (4) whether the employee performs "important religious functions ... for the religious organization." *EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 582–83 (6th Cir. 2018) (citation omitted), aff'd sub nom. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020).

Last year, in *Pulsifer v. Westshore Christian Academy*, 142 F.4th 859 (6th Cir. 2025), also a discrimination case, the Sixth Circuit observed that the "key question under modern doctrine, then, is how far that autonomy goes: which employees are so key to the institution's religious function so as to place the employee within the ministerial exception?" *Id.* at 864. The Sixth Circuit agreed with this Court that the Constitution precluded review of the Academy's employment actions vis-à-vis the plaintiff, who was the Dean of Students and Assistant Principal at the academy, where abundant record evidence demonstrated that he performed vital religious duties. *Id.* at 865. Even though the plaintiff performed other administrative tasks typical of secular administrators, his religious duties "place[d] his position within the ministerial exception." *Id.* at 866.

This case is procedurally distinct from the above employment discrimination cases.  In this pre-enforcement civil rights action, CHC is not seeking to shield—or "except"—itself from liability in a discrimination suit by an employee.  Rather, CHC seeks to use the church autonomy doctrine in general, and the ministerial exception in particular, to support an affirmative right to hire only adherents to its Statement of Faith, i.e., "co-religionists."  But the ELCRA's Employment Clause is not unconstitutional merely because CHC falls within its reach.  The First Amendment does not provide religious entities "general immunity from secular laws." *Our Lady of Guadalupe*, 591 U.S. at 746.  And there is no dispute that CHC falls within the definitions of an "employer" such that the ELCRA's nondiscrimination requirements apply to CHC.[7]

CHC has not provided any binding authority to support its proposed application of a broader "co-religionist exception" or "co-religionist doctrine."  *See* ECF No. 146 at PageID.3219–3220.  As Defendants emphasize (ECF No. 161 at PageID.3365), the Supreme Court and Sixth

---

[7] CHC contends in its reply brief that Defendants' statement that CHC could properly invoke the exception for positions like its Biblical Counselor and physician is "really a disguised mootness argument" (ECF No. 171 at PageID.3503), and CHC then devotes much attention to why the disputes about its Biblical Counselor and Physician positions (and pronoun and medical care policies) are "not moot" (*id.* at PageID.3503–3513) and returns to its contention several more times in briefing (*see* Pl. Reply, ECF No. 171 at PageID.3528– 3529) ("Michigan has not met its heavy burden to show mootness."); Notice of Supp. Auth., ECF No. 178 at PageID.3616 ("*Chiles* shows that no aspect of this case is moot."); Notice of Supp. Auth., ECF No. 185 at PageID.3638 ("[*Fischer*] supports the ministry's summary-judgment motion by bolstering its standing and showing no aspect of this case is moot."); Notice of Supp. Auth., ECF No. 187 at PageID.3647 ("[T]wo recent decisions from the Supreme Court of the United States … support the ministry's summary-judgment motion because they confirm this case presents a live controversy and is not moot.").  The Court has not engaged in the proffered mootness analysis.  As Defendants point out in their own reply brief, they are not *changing* or voluntarily ceasing their conduct to moot this litigation; rather, following discovery, they articulated their legal analysis of what the First Amendment requires as applied to specific CHC positions and policies (ECF No. 172 at PageID.3551).

Circuit decisions from which CHC gleans favorable language do not address the scope of religious autonomy protections.[8]

CHC references the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), where the Supreme Court addressed whether the NLRB had jurisdiction to bring an unfair labor practice charge against a religious school regarding negotiations related to its teaching staff. The Supreme Court did not address therein whether any particular employment position was exempt from anti-discrimination laws.

CHC references *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987), where the Supreme Court upheld Title VII's express statutory exemption for religious organizations who discriminate based on religion, 42 U.S.C. § 2000e-1, as "rationally related to a legitimate purpose," *id.* at 329–30, 339. The Supreme Court did not suggest therein that a state could not draw a narrower exemption to its own discrimination statute without running afoul of the First Amendment.

CHC also invokes Justice Alito's concurrence in the denial of certiorari in *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022), but that concurrence did not decide anything concerning the ability to hire co-religionists. Indeed, Justice Alito merely observed that the "day may soon come" when the Supreme Court must decide whether the First Amendment protects religious organizations' freedom to hire co-religionists. *Id.* at 1094.

Last, CHC references the Sixth Circuit's decision in *Hall v. Baptist Memorial Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000), which addressed only whether a terminated employee stated

---

[8] In its reply brief, CHC also references a Ninth Circuit decision in support of a "co-religionist exception" (ECF No. 171 at PageID.3516–3519, citing *Union Gospel Mission of Yakima v. Brown*, 162 F.4th 1190 (9th Cir. 2026)). However, as CHC acknowledged (ECF No. 186), the Ninth Circuit has since vacated that opinion pending en banc review.

a prima facie case of religious discrimination under Title VII, not the scope of religious autonomy protections.

In sum, CHC's first as-applied challenge to the ELCRA's Employment Clause—that the Clause interferes with its faith-based employment policies and decisions by restricting its ability to hire employees who share its religious beliefs in violation of the "co-religionist doctrine"—expands the underlying religious autonomy doctrine and ministerial exception more broadly than the Supreme Court's body of caselaw currently permits.  The challenge therefore lacks merit.

**2.    CHC's As-Applied Challenge to the ELCRA's Employment and Employment Publication Clauses as "Co-opting" Its Expressive Association and "Undermining" Its Freedom of Assembly**

Next, relying on *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000), CHC argues that the ELCRA's Employment and Employment Publication Clauses "co-opt" its purported right to expressive association by forcing it to associate with employees who "undermine" its religious messages (ECF No. 146 at PageID.3227–3228).  CHC briefly argues that these clauses likewise "undermine" CHC's purported freedom of assembly because its employees gather corporately to express a particular message (*id.* at PageID.3228–3229).

In support of summary judgment in their favor, Defendants argue that CHC's argument fails for the simple reason that the expressive association doctrine applies to membership, not employment (ECF No. 161 at PageID.3368–3370).  Alternatively, Defendants argue that even if the expressive association doctrine applies in the employment context, CHC's claim would fail where CHC cannot demonstrate that hiring a non-Christian medical assistant or receptionist would burden its ability to provide healthcare services consistent with its religious mission (*id.* at PageID.3370–3371).

CHC's argument lacks merit.

20

In addition to the religious protections discussed above, the First Amendment also prohibits government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST. amend I.  In *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984), the Supreme Court indicated that "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Id.* at 622.  The Court held that by requiring the Jaycees to admit women as full voting members, the Minnesota statute under review, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire."  *Id.* at 623.  The Court indicated that "[f]reedom of association … plainly presupposes a freedom not to associate."  *Id.* (ultimately concluding, however, that Minnesota's compelling interest in eradicating discrimination against its female citizens justified the impact that application of the statute to the Jaycees may have on the male members' associational freedoms).

The Supreme Court's decision in *Boy Scouts of America v. Dale*, the case upon which CHC relies, likewise concerned a private organization's membership decision, to wit:  the Boy Scouts' revocation of an adult's membership and his volunteer assistant scoutmaster position after learning that he was gay.  530 U.S. at 651.  The question was whether applying New Jersey's antidiscrimination law to the Boy Scouts' decision violated the private organization's "freedom not to associate."  *Id.* at 644.  A majority of the Supreme Court held that it did.  *See id.* at 656.

Protected association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends" and "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority."  *Americans for*

21

*Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021).  Hence, the Supreme Court has found government infringement of the freedom of association may be violated not only where groups like the Jaycees and Boy Scouts are required to take in members they do not want, but also where a group is compelled to disclose its list of members to a hostile audience, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); where a group is prohibited from soliciting individuals (prospective clients) to associate with the group's lawyers for litigation purposes, *see NAACP v. Button*, 371 U.S. 415 (1963); where members of a group are denied benefits based on the organization's message, *see Healy v. James*, 408 U.S. 169 (1972); and where individuals are punished for their political affiliation, *see Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion).

The right to assemble has been similarly used to protect the ability of citizens to gather together to protest or picket, *see Thornhill v. Alabama*, 310 U.S. 88 (1940); to parade, *see Cox v. New Hampshire*, 312 U.S. 569 (1941); to march, *see Gregory v. City of Chicago*, 394 U.S. 111 (1969); and to unionize, *see Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 96 (1989) (Stevens, J., concurring).

CHC asserts that based on the "thrust" of the opinion in *Boy Scouts of America v. Dale*, the right of expressive association likewise protects its employment decisions because "hiring employees who disagree with its beliefs would significantly burden its expression" (ECF No. 171 at PageID.3524–3526).  CHC argues that the right to assemble likewise covers its freedom to "gather with like-minded employees" and "protects all the ministry's hiring decisions" inasmuch as CHC's "conduct aligns with th[e] history" of this right (ECF No. 171 at PageID.3527–3528).  However, CHC has not supplied any authority applying the freedom to associate or freedom of assembly within the context of an employment relationship.  Indeed, the Boy Scouts acknowledged that "'it would be necessary for the Boy Scouts of America to obey'" any law "'prohibit[ing]

22

discrimination against individual's employment upon the basis of homosexuality.'"  530 U.S. at 672 (Stevens, J., dissenting) (quoting Boy Scouts' position statement in the record appendix). *Cf. Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."). Thus, this challenge to the ELCRA's Employment and Employment Publication Clauses suffers from the same deficit as CHC's first challenge, to wit:  CHC interprets the rights more broadly than the Supreme Court's body of caselaw currently permits.  This second as-applied challenge also lacks merit.

**3.    CHC's As-Applied Challenge to the ELCRA's Employment and Public Accommodation Clauses as Lacking General Applicability**

Third, CHC argues that the ELCRA's Employment and Public Accommodation Clauses lack general applicability as evidenced by the ELCRA's discretionary case-by-case authorization of individual exemptions in its BFOQ process (ECF No. 146 at PageID.3229–3232; ECF No. 171 at PageID.3520–3522).    CHC also argues that the ELCRA's Employment and Public Accommodation Clauses treat religious exercise worse than comparable conduct and that "Michigan allows sports leagues, schools, landlords, and private clubs to discriminate" (ECF No. 171 at PageID.3522–3523; ECF No. 146 at PageID.3232–3233, pointing to Michigan laws allowing schools to serve members of only one sex, MICH. COMP. LAWS § 37.2404; a housing accommodation exception, MICH. COMP. LAWS § 37.2503; and an exception for medical providers who refuse to participate in abortions, MICH. COMP. LAWS § 333.20182).

In support of summary judgment in their favor, Defendants argue that the ELCRA applies uniformly to all employers and public accommodations regardless of whether their reasons for adverse actions are religious or secular (ECF No. 161 at PageID.3354–3357; ECF No. 172 at PageID.3556–3557).  Defendants reject CHC's characterization of the BFOQ process, pointing

23

out that the BFOQ inquiry is controlled by law and the mere fact that the Commission must engage in fact-specific inquiries to apply the legal standard does not render the law "discretionary" (ECF No. 161 at PageID.3356).  According to Defendants, Plaintiffs' broad interpretation of what it means to exercise discretion would mean that any time a state agency makes decisions in the application of a statute, the agency is exercising discretion, which would render the statute "not generally applicable," a result that is not tenable (ECF No. 172 at PageID.3556).

CHC's argument lacks merit.

Again, as first discussed, the First Amendment protects an individual's "right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't. of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990) ("*Smith*"), superseded by statute on other grounds, Religious Freedom Restoration Act of 1993, Pub. L. No. 103–141, 107 Stat. 1488, as recognized in *Tanzin v. Tanvir*, 592 U.S. 43, 45 (2020).  However, the Supreme Court has held that the right to free exercise does "not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 878–79, 882.  The Supreme Court observed that "[o]ur cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government."  *Id.* at 882 (citation omitted).  *See also Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (reiterating the *Smith* proposition that laws that burden religious exercise are presumptively unconstitutional unless they are both neutral and generally applicable).

The respondents in *Smith* were two members of a Native American tribe found guilty of using a proscribed drug (peyote) for sacramental purposes.  The Supreme Court rejected their attempt to "carry the meaning of 'prohibiting the free exercise [of religion]' one large step further"

24

and held that their religious motivation for using peyote did not place them "beyond the reach of a criminal law that is not specifically directed at their religious practice, and that is concededly constitutional as applied to those who use the drug for other reasons."  494 U.S. at 878; *see id.* at 890 (ultimately concluding that Oregon could therefore deny the respondents unemployment benefits).  *See also Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (similarly holding that "public authorities may enforce neutral and generally applicable rules and may do so even if they burden faith-based conduct in the process").

The Supreme Court has instructed that a law lacks "facial neutrality" if it "refers to a religious practice without a secular meaning discernable from the language or context."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) ("*Lukumi*").  And a law is "not generally applicable" if the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) (citations omitted).  Hence, in *Lukumi*, Florida could not enforce ordinances that purported to be neutral and generally applicable on their face— regulating the keeping and killing of animals—but in practice targeted the adherents of one faith (the Santeria religion) and the actions of one faith (animal sacrifices).  *Ward*, 667 F.3d at 738.  *See also Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020) (holding that a government order that simultaneously subjected religious schools to closure requirements while exempting gyms, tanning salons, casinos, and office buildings "impose[d] greater burdens on the plaintiffs' conduct than on secular conduct").

Additionally, a law is "not generally applicable" if the law includes "a formal mechanism for granting exceptions" that "'invites' the government to decide which reasons for not complying with the [law] are worthy of solicitude."  *Fulton*, 593 U.S. at 537 (citing *Smith*, 494 U.S. at 884)

(referencing *Sherbert v. Verner*, 374 U.S. 398 (1963)).  In *Fulton*, the Supreme Court considered a free exercise challenge to the City of Philadelphia's refusal to continue a foster care placement contract with a Catholic foster care agency, after the agency would not certify same-sex couples to be foster parents.  593 U.S. at 527.  Philadelphia's contracts with foster care agencies prohibited the agencies from rejecting a child or family based on sexual orientation "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion."  *Id.* at 534–35 (citation omitted).  The *Fulton* Court held that the policy was not generally applicable because the contract provision "incorporate[d] a system of individual exemptions, made available ... at the 'sole discretion' of the Commissioner."  *Id.* at 535–38.

In reaching its holding, the *Fulton* Court cited its 1963 decision in *Sherbert*, 374 U.S. 398, which concerned a work requirement for public benefits that was only implicated if a citizen failed to accept work without "good cause."  *Fulton*, 593 U.S. at 534.  The "good cause" exemption in *Sherbert* required—"invited"—an official to examine each applicant's "particular circumstances," *Smith*, 494 U.S. at 884, i.e., *every* unemployment compensation decision was made on a case-by-case basis.  *See also Dahl v. Bd. of Trs. of W. Michigan Univ.*, 15 F.4th 728, 733–34 (6th Cir. 2021) (determining that where "[m]edical or religious exemptions and accommodations will be considered on an individual basis," the university's vaccine mandate, like the policy in *Fulton* and the unemployment compensation law in *Sherbert*, was not generally applicable and impermissibly left for the university to decide "which reasons for not complying with the policy are worthy of solicitude").

The import of the neutrality or applicability of a law is that a law that is not facially neutral or not generally applicable must be justified by a compelling government interest and be narrowly tailored to advance that interest.  *Fulton*, 593 U.S. at 541.  In contrast, "a law that is neutral and of

general applicability need not be justified by a compelling state interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531.[9]

Turning then to the ELCRA provisions at hand, the Employment Clause prohibits an employer from failing to "hire or recruit, discharge, or otherwise discriminate" against an individual because of enumerated protected characteristics ("religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, or marital status"), MICH. COMP. LAWS § 37.2202(1)(a); and from using hiring applications that elicit information about, or express a preference based on, any protected characteristic, *id.* § 37.2206(2)(a), (c).  And the ELCRA's Public Accommodation Clause prohibits any person from denying an individual the "full and equal enjoyment" of any goods, services, or facilities "of a place of public accommodation or public service" based on the same characteristics.  *Id.* § 37.2302(a).

The clauses are neutral because they do not reference any religious practices or target religious conduct.  Unlike the ordinances examined in *Lukumi*, which allowed animal killing for a number of secular reasons but not as part of a religious ritual, the clauses do not reveal a value judgment that religious reasons for certain activities related to employment or public accommodation are less important than secular reasons for the same activities.  The clauses are also generally applicable to the extent that they do not differentiate between religious and secular conduct and do not prohibit religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way.  CHC does not seriously dispute these propositions.  Rather, CHC focuses on the statutory exemptions to the ELCRA and the ELCRA's

---

[9] The Court notes that CHC does not argue that the ELCRA would not pass a lower level of scrutiny, only that it would not pass strict scrutiny.  *See* ECF No. 146 at PageID.3239–3242.

BFOQ process, arguing that they create "individualized exemptions" that render the ELCRA not generally applicable.

The statutory exemptions that CHC identifies—for private clubs, single-sex schools, senior-citizen housing, and abortion objectors—apply equally to religious and secular actors. *See* MICH. COMP. LAWS § 37.2302a(2) ("All classes of membership must be available without regard to … religion[.]"); *id.* § 37.2404 ("The provisions of section 402 relating to sex shall not apply to a private educational institution not exempt under section 403, which now or hereafter provides an education to persons of 1 sex."); *id.* § 37.2503(c) (indicating that § 502 does not apply, "[w]ith respect to the age provision and the familial status provision only, the sale, rental, or lease of housing accommodations meeting the requirements of federal, state, or local housing programs for senior citizens, or accommodations otherwise intended, advertised, designed or operated, bona fide, for the purpose of providing housing accommodations for persons 50 years of age or older."); MICH. COMP. LAWS § 333.20182 ("A physician … who states an objection to abortion on professional, ethical, moral, or religious grounds, is not required to participate in the medical procedures which will result in abortion[, and] [t]he refusal … does not create a liability for damages … or for any disciplinary or discriminatory action."). Therefore, the exemptions that CHC stitches together do not, either individually or cumulatively, demonstrate that religious healthcare providers are treated worse than secular providers. Moreover, the statutory exemptions do not "invite[] the government to consider the particular reasons for a person's conduct," *Fulton*, 593 U.S. at 523, but apply to broad categories. In other words, the statutory exceptions are "mandatory, not discretionary." *Olympus Spa v. Armstrong*, 169 F.4th 817, 833 (9th Cir. 2026) (drawing a distinction between the mandatory exceptions in a Washington law and *Fulton*, "where

28

the challenged foster care contract provision included 'a formal system of entirely discretionary exceptions'").

Turning then to the ELCRA's BFOQ process, CHC attempts to analogize to *Fulton*, 593 U.S. at 533, 537, asserting that the ELCRA's BFOQ process likewise impermissibly gives the Commission "sole discretion" to authorize "individualized exemptions" for some employment activities. However, the BFOQ inquiry is not based on an ad hoc assessment of "which reasons for not complying" with the law "are worthy of solicitude." *Fulton*, 593 U.S. at 537. Rather, the BFOQ inquiry is controlled by law. Employers like CHC may apply for an exemption from the ELCRA's regulations if a certain protected characteristic "is a bona fide occupational qualification" that is "reasonably necessary to the normal operation of the business." MICH. COMP. LAWS § 37.2208. The BFOQ exemption can be either (1) obtained by application to the Commission or (2) asserted as an affirmative defense in later proceedings. *Id.*; *see* MICH. ADMIN. CODE R. 37.25. Applicants must submit proposed findings of fact, "in-depth analysis of case law," and responses to the following thirteen specific criteria:

1.      Name of employer or entity seeking a bona fide occupation exemption.

2.      Address and telephone number of principal location or place of business.

3.      Addresses of all other locations within the State of Michigan.

4.      Location, or locations, for which an exemption is sought.

5.      Describe in detail the entity's functions, operations and purposes.

6.      Check basis for the BFOQ exemption:

☐Religion                    ☐Age                    ☐Weight

☐National                    ☐Height                 ☐Sex
Origin

7.  Title and description of position(s) for which exemption is sought.

8.  Total number of positions in the classification(s) for which the exemption is being requested.

9.  How long has this classification been used?

10. How many current employees, if any, would be affected by this exemption?

11. Describe in detail why a bona fide occupational qualification is necessary to the normal operation of the business or enterprise. Also discuss any compelling reason(s) why persons in the group for which exemption is being sought should be exempted or could not reasonably perform the duties of the position.

12. If the request for exemption is denied, please explain any possible alternatives which may be used and any others which the entity may have explored.

13. Have any civil rights complaints been filed against the entity on the basis for which a BFOQ is requested, i.e., sex, age, etc? If yes, list each and give the present status and the name of the local, state or federal civil rights agency involved.

BFOQ App., Ex. A to Jt. Stips., ECF No. 109-1 at PageID.2102–2103. Unlike the contract provision in *Fulton* and the unemployment compensation law in *Sherbert*, the BFOQ process does not afford the Commission discretion to reject an application for any reason. Rather, the Commission appropriately retains discretion to decide whether an application submitted in support of a BFOQ contains sufficient (or insufficient) information to support the exemption under the statute. The Court concludes that this structured process ensures that outcomes are dictated by the evidence and the First Amendment, rather than the discretion of individual commissioners.

In support of a contrary conclusion, CHC assigns much import to the fact that Defendants' witnesses used the phrase "case by case" in their depositions (ECF No. 146 at PageID.3229–3230). The Court observes that the word choice was often prompted by CHC's counsel, as follows:

Q.  And is whether something counts as a legitimate nondiscriminatory reason something that the department decides on a case by case basis?

A.  That's correct.

30

* * *

Q. Okay. The first bullet: Reasonably necessary qualification to perform the normal operations of respondent's business.   Fair to say, that's a case by case determination?

A.  Absolutely.

Q. And that the department has discretion to determine whether it regards the religious elements of the job as reasonably necessary?

A. Yes.

(Trevino Dep., ECF No. 139-2 at PageID.2581, 2598).

Q.  And again, that [exemption determination] would be on a case by case basis?

A.  That's correct.

* * *

Q. And, in fact, the BFOQ system is designed to be decided on a case by case basis; is that right?

[Defense counsel]: Objection to form.

THE WITNESS:  Yes.

(Londo Dep., ECF No. 139-2 at PageID.2696, 2699).

Whatever its origin in this litigation, the phrase "case by case" excerpted from the depositions does not reveal a systemic problem in Michigan's civil rights law.   That Commissioners must weigh facts and apply their collective judgment on individual BFOQ applications does not transform the legal standard into the kind of open-ended exemption authority that runs afoul of *Fulton* but is instead consistent with the Supreme Court's own approach in *Hosanna-Tabor* and the Supreme Court's instructions in *Our Lady of Guadalupe*.  In *Our Lady of Guadalupe*, 591 U.S. at 757, the Supreme Court rejected a "rigid formula" approach and instructed "courts to take all relevant circumstances into account and to determine whether each particular

31

position implicated the fundamental purpose of the exception" (citation omitted). *See also Hosanna-Tabor*, 565 U.S. at 191–92 (considering the teacher's title, duties, religious training, appointment process, and how she held herself out to the public). The ELCRA entrusts a collective decision to the Commission under a specific statutory legal standard interpreted consistent with Supreme Court precedent. Application of the BFOQ exemption is appropriately context-specific and evidence-bound.

Indeed, such assessment by a state civil rights commission is not unusual. In *Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619 (1986), the Supreme Court held that a state civil rights commission "violates no constitutional rights by merely investigating" a religious school's employment decision "if only to ascertain whether the ascribed religious-based reason was in fact the reason for the discharge." *Id.* at 628. The Court observed that it would instead "seem an unusual doctrine … to say that the Commission could *not* construe its own statutory mandate in the light of federal constitutional principles." *Id.* at 628 (emphasis added).

The Court notes that while CHC does not identify any decision by the Sixth Circuit considering a comparable statutory exemption process, other circuits have approved similar exemption processes under *Fulton*. *See, e.g., Miller v. McDonald*, No. 24-681, 2026 WL 1871521, at *7–8 (2d Cir. June 30, 2026) (rejecting the plaintiffs' argument that school officials have "the power to press the red or green light on each medical exemption request" and holding that New York's medical exemption instead "fits neatly within the contours of other exemptions to immunization that we have held to be constitutionally permissible" where "a physician's use of her professional medical judgment is limited by the statute and regulations"); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007) (holding that the city's zoning plan is "generally applicable," despite certain allowances, and expressly "declin[ing] to

32

hold that every zoning ordinance that includes a waiver or amendment provision is, solely by virtue of that fact, unconstitutional unless it can survive strict scrutiny, as this does not reflect existing precedent of the Supreme Court or of this Circuit and would be untenable as a practical matter"); *Perry v. Marteney*, 172 F.4th 315, 324 (4th Cir. 2026) (acknowledging that "[d]etermining whether an individual qualifies for an exemption will often require some individualized assessment" but holding that unlike the "sole discretion" standard in *Fulton*, West Virginia's compulsory vaccination law does not provide an impermissible mechanism for granting individualized exemptions where the law "clearly articulates the circumstances in which state officials can grant them"); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) (considering a Mormon's challenges to certain curricular requirements and opining that "[w]hile of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court in its discussion of *Sherbert* and related cases"); *Thai Meditation Ass'n of Alabama, Inc. v. City of Mobile, Alabama*, 83 F.4th 922, 929 (11th Cir. 2023) (considering a church's challenge to a city's zoning approval process and holding that the process satisfies *Smith's* general-applicability requirements and the fact that the process "necessarily requires individual assessment" is not sufficient to establish an individualized exemption contrary to *Fulton* where "the criteria apply to all property uses eligible for approval, religious or secular").

Last, to the extent state officials must exercise discretion when deciding whether sufficient evidence exists in a particular application for a bona fide occupational qualification that is "reasonably necessary to the normal operation of the business," MICH. COMP. LAWS § 37.2208, the ELCRA cabins such discretion by judicial review. *See* MICH. COMP. LAWS § 37.2606. *See*

33

*also Perry v. Marteney*, 172 F.4th 315, 324 (4th Cir. 2026) (finding similar import in the fact that

the West Virginia exception process is subject to appeal).

In sum, neither the ELCRA's exemptions nor its embedded ministerial exception

demonstrate that the ELCRA lacks general applicability, and, under *Smith*, 494 U.S. at 878–79,

religious beliefs do not excuse compliance with an otherwise valid law.  Therefore, CHC's third

challenge lacks merit.

**4.      CHC's As-Applied Challenge to the ELCRA's Public Accommodation Clause as Compelling CHC to Speak a Viewpoint About Gender Identity to Which It Objects and to Provide Services that Contradict Its Beliefs; CHC's As-Applied Challenge to the ELCRA's Employment and Public Accommodation Publication Clauses as Restricting Its Speech Based on Content and Viewpoint**

Next, CHC argues that by requiring it to provide "equal enjoyment" of its privileges,

advantages, and accommodations, the ELCRA's Public Accommodation Clause requires CHC to

contradict its religious beliefs by using pronouns and similar language based on gender identity,

not sex (ECF No. 146 at PageID.3234–3235).  CHC argues that the Public Accommodation Clause

also violates its religious autonomy by forcing CHC to provide medical services for gender-

transition interventions that contradict its religious beliefs about the immutability of sex (ECF No.

146 at PageID.3221–3226).  Accordingly, CHC also argues that the ELCRA's Employment and

Public Accommodation Publication Clauses restrict its constitutionally-protected speech about its

pronoun and medical-care policies (ECF No. 146 at PageID.3235–3237).

In support of summary judgment in their favor, Defendants posit that the ELCRA *permits*

CHC to exercise its identified First Amendment religious freedoms consistent with existing

precedent (ECF No. 161 at PageID.3371–3383; ECF No. 172 at PageID.3552–3553).  Specifically,

Defendants indicate that under the facts of this case, "CHC's religiously motivated refusal to use

pronouns inconsistent with biological sex is likely protected speech" and CHC's gender-affirming

care policy is permissible "because the government likely cannot compel CHC to provide medical

34

services that conflict with its sincerely held religious beliefs under the First Amendment" (ECF No. 161 at PageID.3380–3383). Defendants conclude that under the "permitted-by-law" framework of the ELCRA, Michigan's interest in eradicating discrimination must yield when the First Amendment protects the challenged conduct (*id.* at PageID.3383).

CHC's argument lacks merit.

As a healthcare provider open to the public, CHC is subject to the ELCRA's prohibition against discrimination in public accommodations. The relevant prohibition in the ELCRA provides that, "except where permitted by law," a public accommodation may not "deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations . . . because of religion . . . sex, sexual orientation, gender identity or expression." MICH. COMP. LAWS § 37.2302(a).

Application of the ELCRA is expressly cabined by the phrase "except where permitted by law." Quoting the Sixth Circuit's earlier opinion, CHC argues that the Sixth Circuit already determined that the phrase "except where permitted by law" is "not so clear" that it renders the law obviously inapplicable to CHC's activities (ECF No. 171 at PageID.3498, referencing *CHC*, 117 F.4th at 847). But the Sixth Circuit's statement was made within the context of its decision on standing and the threat of enforcement against CHC, which is an inquiry different from whether CHC should succeed on the merits of its constitutional claims. *See CHC*, 117 F.4th at 847 ("[T]he language of exemptions within the ELCRA and the EAA is not so clear that it renders the laws obviously inapplicable to Plaintiffs' conduct—*as is necessary to defeat standing*.") (emphasis added); *see generally Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) ("The standing inquiry is not a merits inquiry."). The Sixth Circuit did not otherwise elaborate on the "permitted by law" phrase in the ELCRA.

In *Cheeseman v. American Multi-Cinema*, the Michigan Court of Appeals interpreted the "except where permitted by law" language in the context of an age discrimination claim—a movie theater had denied minor children entrance to an R-rated movie. 310 N.W.2d 408 (Mich. Ct. App. 1981). The *Cheeseman* court found the language to be a "clear indication of the intent of the Legislature to retain and apply a practical rule of reason to the prohibition against discrimination on the basis of age." *Id.* at 411. *See also Dep't of Civil Rights v. Beznos*, 365 N.W.2d 82 (Mich. 1984) (similarly determining that what might otherwise be unlawful age discrimination for purposes of a claim under Article 5 of the ELCRA relating to real estate transactions is "permitted by law"). With respect to the word "law," the *Cheeseman* court determined the term included common law, statutes, and the constitution. 310 N.W.2d at 411. The *Cheeseman* court concluded that the common law and state statutes permitted the theater to discriminate: "[U]nder Michigan law, theatres have a right to treat children differently than adults. Under the Michigan Civil Rights Act, what might otherwise be unlawful age discrimination is permitted by law where, as here, it is designed for the protection of children." *Id.* at 413.

Applying *Cheeseman's* counsel here, the phrase "except where permitted by law" is a key qualifier, carving out space for CHC's conduct that may otherwise constitute prohibited discrimination when separately authorized by the First Amendment. *See In re Certified Questions from United States Dist. Ct., W. Dist. of Michigan, S. Div.*, 958 N.W.2d 1, 7, 51 (Mich. 2020) ("'[S]tatutes are presumed to be constitutional, and [courts] have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.'") (citation omitted). *See also* MICH. COMP. LAWS § 37.2705 (providing that the ELCRA "shall not be construed as preventing the commission from securing civil rights guaranteed by law other than the civil rights set forth" in the Act).

Defendants do not dispute that CHC's religiously motivated policies are permitted by the First Amendment. Defendants have confirmed through written discovery, deposition testimony, and now in briefing that "the ELCRA, via the First Amendment, provides that CHC … can maintain its pronoun policies and gender-affirming care policies that are grounded in sincere religious beliefs" (ECF No. 172 at PageID.3552–3553). For example:

**Request for Admission No. 55**

Admit that CHC maintaining a policy of conducting patient care in accordance with Exhibit 6 of the Verified Complaint violates the Accommodation Clause.

**Response**: Denied.

(ECF No. 139-2 at PageID.2882). *See also* Resps. to Interrogs., ECF No. 139-3 at PageID.2878 [pronoun policy], PageID.2879 [gender-affirming care policy]; Trevino Dep., ECF No. 139-2 at PageID.2610 [pronoun policy]; Londo Dep., ECF No. 139-2 at PageID.2692 [pronoun policy] and PageID.2710 [gender-affirming care policy].

Defendants' position that CHC's pronoun policy falls within the protection of the First Amendment has a sound basis. The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). In November 2025, the Sixth Circuit specifically held that the First Amendment protects the right to express one's views on sex through the use of gender-specific pronouns. *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 753–57 (6th Cir. 2025) (en banc); *see also Meriwether*, 992 F.3d at 508 (holding that gender-specific pronouns "convey a powerful message implicating a sensitive topic of public concern"—gender identity).

37

There is also sound reason for Defendants to conclude that CHC's policy to refuse to provide gender-affirming services is a matter of faith and doctrine over which CHC has autonomy. The exercise of religious rights includes not only "belief and profession" but also the "performance of (or abstention from) physical acts[.]" *Smith*, 494 U.S. at 877. *See also Fulton*, 593 U.S. at 530 (determining that the Catholic foster care provider's "religious views" regarding marriage "inform[ed] its work," precluding it from certifying unmarried couples and same-sex couples). Acknowledging that the caselaw is not settled, Defendants nonetheless agree that "compelling religious healthcare providers to perform services that violate their sincerely held religious beliefs imposes a significant burden on religious exercise—a burden that may also implicate the First Amendment directly" (ECF No. 161 at PageID.3382, citing *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113 (D. N.D. 2021) (permanently enjoining enforcement of the Affordable Care Act (ACA) provisions that would have required Catholic healthcare organizations to perform gender-transition procedures, finding that the mandate substantially burdened religious exercise), aff'd in part, rev'd in part 55 F.4th 583 (8th Cir. 2022); *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361 (N.D. Tex. 2021) (permanently enjoining enforcement of the ACA provisions that would have required religious healthcare providers to perform abortions and gender-transition procedures, finding that the mandate substantially burdened religious exercise), aff'd in part, rev'd in part, 47 F.4th 368 (5th Cir. 2022)).

CHC argues that Defendants' reliance on the "permitted by law" phrase included in the ELCRA is merely a "dodge" from the merits of CHC's constitutional claims (ECF No. 171 at PageID.3498). The Court disagrees. Every word in a statute is presumed to have meaning. Courts must give effect to "every word, phrase, and clause" in a statute, avoiding a construction that would render any part of a statute surplusage or nugatory. *Sinicropi v. Mazurek*, 729 N.W.2d 256, 261

(Mich. Ct. App. 2006) (citing, in part, *Shinholster v. Annapolis Hosp.*, 685 N.W.2d 275 (Mich. 2004)).

CHC also complains that it took Defendants too long to reach their position in this case and that their position will not bind future enforcement officials in future administrations or future cases (ECF No. 171 at PageID.3505–3513).  While the path of litigation in this 2022 case has been long and the discovery was complicated, the Court submits that the investment of time was commensurate with the importance of the constitutional issues at stake.  And Defendants have been fully transparent that their agreement that certain CHC policies fall within First Amendment protection (and that certain positions qualify for the ministerial exception) reflects the specific facts of this case and should, in fact, *not* be read as a template for future disputes.

Last, CHC, with some fervor, contends that Defendants also sometimes "ignore" the permitted-by-law phrase altogether in other discrimination cases (ECF No. 171 at PageID.3505–3507).  But the examples that CHC stitches together do not necessarily support its contention and do not, in any event, compel a different conclusion on the issues in the case at bar.  For instance, CHC repeatedly points to MDCR complaints made against beauty salons (Studio 8 and Uprooted Electrolysis) for refusing to provide services to transgender customers, but, unlike the policies of a religious healthcare provider, the policies of a beauty salon do not implicate the First Amendment or the "permitted by law" phrase included in the ELCRA.  Similarly, CHC references a letter from the Attorney General about refusing to provide gender-affirming medical care that was issued to healthcare providers in general, i.e., not a letter that purported to address any First Amendment exceptions for a subset of religious healthcare providers or the ELCRA's "permitted by law" phrase.  CHC also references an MDCR complaint that was filed against a religious healthcare entity (Emmaus Healthcare Partners), which did not address any First Amendment exceptions or

39

the ELCRA's "permitted by law" phrase inasmuch as the complaint was dismissed without any investigation or action because the claimant did not submit a signed and properly notarized certified complaint.  *See* 8/10/2023 Letter, ECF No. 172-2.

In sum, Defendants agree that the ELCRA's prohibition against discrimination by public accommodation on the basis of gender identity or expression with respect to the use of pronouns and the provision of gender-affirming care yields to CHC's rights under the First Amendment, which is a "law" for purposes of § 302(a)'s exception.  *Cheeseman*, 310 N.W.2d at 411.  Because CHC's pronoun and gender-affirming care policies are "permitted by law" under the ELCRA, via the First Amendment, the publication of these policies does not violate the corresponding Publication Clauses of the ELCRA.  In sum, CHC's constitutional challenge fails.

**5.     CHC's Challenge to the ELCRA's "Unwelcome Clause" as Facially Violating the First and Fourteenth Amendment as Vague and Overbroad**

Last, CHC argues that the words "objectionable, unwelcome, unacceptable, or undesirable" in the "Unwelcome Clause" of the ELCRA's Public Accommodation Publication Clause renders the clause facially vague and overbroad and grants Michigan officials "unbridled enforcement discretion" (ECF No. 146 at PageID.3242–3244; ECF No. 171 at PageID.3532).

In support of summary judgment in their favor, Defendants argue that CHC's facial challenge fails for three independent reasons:  (1) CHC lacks standing where Defendants have since determined that the Public Accommodation Clause does not apply to CHC's pronoun or gender-affirming care policies, (2) the provision is not vague, and (3) CHC has not demonstrated substantial overbreadth where the ELCRA's permitted-by-law phrase eliminates any realistic danger of substantial overbreadth (ECF No. 161 at PageID.3383–3388).

CHC's argument lacks merit.

The ELCRA's Public Accommodation Publication Clause has two parts—a Denial Clause and an Unwelcome Clause (Jt. Stips. ¶ 16).  The Denial Clause prohibits public accommodations from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" will be "refused, withheld from, or denied an individual because of" sexual orientation, gender identity, and other protected classes (*id.* ¶ 17, quoting MICH. COMP. LAWS § 37.2302(b)).  The Unwelcome Clause prohibits public accommodations from "[p]rint[ing] … or otherwise caus[ing] to be published a statement, advertisement, notice, or sign which indicates … that an individual's patronage of or presence at a place of public accommodation is objectionable, unwelcome, unacceptable, or undesirable because of" sexual orientation, gender identity, and other protected classes (*id.* ¶ 18, quoting MICH. COMP. LAWS § 37.2302(b)).

As a threshold matter, Defendants' standing argument is misplaced.  As CHC aptly points out in reply, Defendants' stated positions on CHC's pronoun or gender-affirming care policies do not undermine standing, which is measured at the time CHC filed this suit (ECF No. 171 at PageID.3501, citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at the time the action commences," it is not entitled "to a federal judicial forum.")).  *See also Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524–26 (6th Cir. 2001) ("Our review of Supreme Court and Sixth Circuit case law informs us that … standing does not have to be maintained throughout all stages of litigation. Instead, it is to be determined as of the time the complaint is filed.").

Turning then to the merits of CHC's argument, in constitutional challenges reaching beyond the plaintiff's circumstances, the plaintiff must satisfy the "standards for a facial challenge to the extent of that reach."  *Green Party*, 791 F.3d at 692 (quoting *John Doe No. 1 v. Reed*, 561

U.S. 186, 194 (2010)).  "Due process requires a court to hold an ordinance or statute 'void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.'"  *Brown v. City of Albion*, 136 F.4th 331, 344 (6th Cir. 2025) (citation omitted).  "When determining whether a law provides a reasonable opportunity to understand its prohibitions, courts begin with the plain text of the statute."  *Id.* at 345.  "Courts should not require 'mathematical certainty' regarding the precise extent of the statute."  *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).  Rather, "when the common meaning of a term makes clear what conduct is prohibited, failure to further define the term will not render the statute void for vagueness."  *Id.*  For example, in *Grayned*, the Supreme Court found that the City of Rockford's anti-noise ordinance, prohibiting a person while on grounds "adjacent to any building in which a school or any class thereof is in session" from "willfully" making "any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class," was not unconstitutionally vague but was instead marked by "flexibility and reasonable breadth, rather than meticulous specificity[.]"  408 U.S. at 110–11 (citation omitted).

According to CHC, the words "objectionable, unwelcome, unacceptable, or undesirable" in the Unwelcome Clause render the provision unconstitutionally vague.  However, these words have "ordinary meanings."  *Brown*, 136 F.4th at 345.  Given the "particular context" within which the words fall, the Unwelcome Clause gives "fair notice to those to whom (it) is directed."  *Grayned*, 408 U.S. at 112.  The words "objectionable," "unwelcome," "unacceptable," and "undesirable" are near-synonyms that convey a single, understandable meaning: a place of public accommodation may not publish statements indicating that patrons will be denied service or treated unequally because of a protected characteristic.  In support of a contrary conclusion, CHC

42

emphasizes that the Commission's witness could not, "off the top of [his] head," define the words during his deposition (ECF No. 146 at PageID.3242, citing Londo Dep., ECF No. 139-2 at PageID.2704), but Defendants aptly point out that one commissioner's uncertainty about how to answer a question during a deposition does not render a statute unconstitutionally vague (ECF No. 161 at PageID.3386).

CHC argues that the Unwelcome Clause is also overbroad because the words "objectionable, unwelcome, unacceptable, or undesirable" ban too much speech. To succeed on a facial overbreadth claim, a plaintiff must show "that a substantial number of instances exist in which the law cannot be applied constitutionally." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013). CHC contends, for example, that these terms could prevent a Muslim shop owner from hanging a "There is no God but Allah" sign if it made a Christian customer feel "unwelcome" (ECF No. 146 at PageID.3243–3244). However, as Defendants point out, a sign expressing the owner's religious beliefs is categorically different from a sign indicating that Christians will be denied service (ECF No. 161 at PageID.3387). The former, which reflects the owner's faith, is not the target of the Unwelcome Clause. The latter, which communicates discriminatory intent, is the Unwelcome Clause's target. In short, CHC's hypothetical does not establish overbreadth. And "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 801 (citations omitted).

Moreover, "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  "[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."  *Id.* at 615–16.  For the reasons previously stated, because the ELCRA is "readily susceptible" to a narrowing construction that renders it constitutional, it must be upheld.  *See Virginia v Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (indicating that "[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld.").

### III.    CONCLUSION

In summary, the ELCRA survives CHC's challenges.  CHC has not demonstrated that the "co-religionist doctrine," the right to expressive association, or the right to assembly protect its employment choices.  Conversely, the ELCRA, via the First Amendment, provides that CHC can hire whomever it chooses for its Biblical Counsel and Physician positions and can maintain its pronoun policies and gender-affirming care policies that are grounded in sincere religious beliefs.  Consequently, the declaratory and injunctive relief CHC seeks is not warranted.  Defendants, in contrast, are entitled to judgment as a matter of law on these issues.  Accordingly:

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 145) is DENIED.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 160) is GRANTED.

Because this Opinion and Order resolves all pending claims, the Court will also issue a corresponding Judgment.  *See* FED. R. CIV. P. 58.


Dated:  August 5, 2026                                          /s/ Jane M. Beckering
                                                              JANE M. BECKERING
                                                              United States District Judge